# Exhibit A



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 ·534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### IC POWER LTD AND KENON HOLDINGS LTD

**V.**

### REPUBLIC OF PERU

### (ICSID CASE NO. ARB/19/19)

    I hereby certify that the attached documents are true copies of the English and Spanish versions of the Tribunal's Award dated October 3, 2023.

Meg Kinnear
Secretary-General

Washington, D.C., October 3, 2023

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

in the arbitration

**IC Power Ltd and Kenon Holdings Ltd**

– Claimants –

v.

**Republic of Peru**

– Respondent –

**ICSID Case No. ARB/19/19**

---

**AWARD**

---

*Members of the Tribunal*

Professor Luca G. Radicati di Brozolo, President

Mr. David R. Haigh KC, Arbitrator

Mr. Eduardo Siqueiros T., Arbitrator

*Assistant to the Tribunal*

Mr. Fabio Giuseppe Santacroce

*Secretary of the Tribunal*

Mr. Marco Tulio Montañés-Rumayor

October 3, 2023

ICSID Case No. ARB/19/19
Award

PARTIES' REPRESENTATIVES

| *Representing IC Power Ltd and Kenon Holdings Ltd:* | *Representing The Republic of Peru:* |
|---|---|
| Mr. Nigel Blackaby KC<br>Ms. Caroline Richard<br>Mr. Lee Rovinescu<br>Ms. María Julia Milesi<br>Mr. Alexandre Alonso<br>Ms. Karen Wiswall<br>Ms. María Paz Lestido<br>Ms. Paula Daniela Cala Pérez<br>Freshfields Bruckhaus Deringer US LLP<br>700 13th Street, N.W. 10th Floor<br>Washington, D.C. 20005-3960<br>United States of America<br><br>Ms. Carolina de Trazegnies<br>De Trazegnies Thorne Abogados S.A.C.<br>Malecon Paul Harris 308-202<br>Barranco 15063<br>Peru | Ms. Vanessa Rivas Plata Saldarriaga<br>Comisión Especial que Representa al Estado en<br>Controversias Internacionales de Inversión<br>Ministerio de Economía y Finanzas<br>Jr. Junín 319<br>Cercado de Lima<br>Lima, Peru<br><br>Ms. Marinn Carlson<br>(until July 31, 2023)<br>Ms. Jennifer Haworth McCandless*<br>(until July 31, 2023)<br>Ms. María Carolina Durán**<br>(until August 2, 2023)<br>Ms. Courtney Hikawa<br>Sidley Austin LLP<br>1501 K Street, NW<br>Washington, DC 20005<br>United States of America<br><br>Mr. Stanimir A. Alexandrov<br>Stanimir A. Alexandrov, PLLC<br>1501 K Street NW<br>Washington, D.C. 20005<br>United States of America<br><br>Mr. Ricardo Puccio<br>Mr. Aresio Viveros<br>Estudio Navarro & Pazos Abogados<br>Av. Del Parque 195 – San Isidro<br>Lima, Peru<br><br>* With Baker Botts LLP as of August 1, 2023<br>** With Baker Botts LLP as of August 3, 2023 |

ICSID Case No. ARB/19/19
Award

**ABBREVIATIONS AND DEFINITIONS**

| | |
|---|---|
| AGC | Automatic generation control system |
| Balancing Market | Market on which generators submit short-term offers to provide the SFR service |
| Base Provision | Provision of the SFR service through long-term contracts to be awarded by a tender process conducted by COES, whereby generators commit to hold a certain capacity in reserve to provide the SFR service at the price proposed in their offers |
| Benefit Criterion | Criterion for the apportionment of transmission costs pursuant to which all generators pay for all lines regardless of their actual use and in proportion to the benefit that they derive from the line, measured based on the amount of electricity each generator injects into the system or on its installed capacity |
| Bid | Bid submitted by Kallpa GSA in the Tender |
| BRG | Berkeley Research Group LLC |
| C-[#] | Claimants' Exhibit |
| CDA | Cerro del Águila SA |
| CER-BRG I | Expert report of Berkeley Research Group LLC dated June 5, 2020 |
| CER-BRG II | Expert report of Berkeley Research Group LLC dated May 24, 2021 |
| CER-Espinoza | Expert report of Luis Alberto Espinoza Quiñones dated May 24, 2021 |
| Cerro del Águila | Hydroelectric plant on the Mantaro River, in the Department of Huancavelica, for the construction of which, in October 2010, Kallpa GSA entered into a concession agreement with the Ministry of Energy and Mining, and in June 2011 transferred it to CDA |
| CL-[#] | Claimants' Legal Authority |
| Claims | The SFR Service Claim and the New Methodology Claim |
| Claimants | IC Power Ltd. and Kenon Holdings Ltd. |
| Claimants' Rejoinder | Claimants' Rejoinder on the objections to jurisdiction dated November 1, 2021 |
| COES | *Comité de Operación Económica del Sistema* |
| COES Draft | COES's proposal for a technical procedure for assigning SFR, issued through Letter No. COES/D-644-2012 of December 19, 2012 |
| Commitment Act | Commitment act concluded by COES and generators including Kallpa GSA on April 15, |

| | |
|---|---|
| | 2016, awarding Kallpa and Las Flores plants the Firm Base Provision of SFR for the period between August 2016 and July 2019. |
| Counter-Memorial | Respondent's Counter-Memorial on the merits dated February 12, 2021 |
| CWS-Frisancho I | Witness statement of Irwin Frisancho dated June 5, 2020 |
| CWS-Frisancho II | Witness statement of Irwin Frisancho dated May 24, 2021 |
| CWS-Guerra | Witness statement of Jaime Guerra dated May 24, 2021 |
| CWS-García Burgos | Witness statement of Javier García Burgos dated June 5, 2020 |
| Daily Program | Program set out by COES to establish for each day which power generation units will be called upon to dispatch the electricity required to meet the projected demand at each point in time during the following day |
| Declared Costs | Variable costs declared by natural gas-fueled plants once a year |
| Demand Users | Distributors and large consumers of electricity |
| ECL Regulation | Supreme Decree No. 9 of February 25, 1993 |
| Economic Benefit Criterion | Criterion for the apportionment of transmission costs pursuant to which generators that benefit economically from the existence of a Line pay for the costs of that Line |
| Economic Dispatch Principle | Principle established by Article 12.1 of Law 28832 pursuant to which COES shall operate the Peruvian electricity system at the minimum cost |
| EE Study | Report from the consulting firm Estudios Eléctricos S.A. attached to OSINERGMIN's letter to COES on December 15, 2015 |
| Electricity Concessions Law | Decree Law No. 25884 of November 19, 1992 |
| Energy/Distance Method | Methodology for the apportionment of costs of the Use Criterion Lines based on (*i*) the electric distance between the generator and the line and (*ii*) the amount of energy generated by the generator |
| FET | Fair and equitable treatment |
| Firm Base Provider(s) | Provider(s) of the Base Provision with priority over other generators |
| First Draft PR-22 | Draft of PR-22 issued by OSINERGMIN on November 28, 2013 |

| First Methodology | Methodology used for the apportionment of the costs of the Use Criterion Lines from 2001 to 2008 |
| --- | --- |
| Globeleq | Globeleq Americas Limited |
| GTS | Guaranteed transmission system |
| Guidelines | Guidelines for the award of the Base Provision for Secondary Frequency approved by OSINERGMIN on February 11, 2016 |
| ICPL | IC Power Asia Development Ltd |
| IC Power | IC Power Ltd |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated March 18, 1965 |
| ICSID | International Centre for Settlement of Investment Disputes |
| Impedance Filter | Filter based on impedance changes introduced under the New Methodology |
| Indra Report | Report on the assessment of the possible implementation of an automated voluntary system for SFR published on February 24, 2014 |
| Inkia | Inkia Energy Ltd |
| Inkia Americas | Inkia Americas Limited |
| Israel Corporation | Israel Corporation Ltd |
| Joint Optimization | Procedure for assigning the SFR reserve which occurs jointly with the determination of the Daily Program based on the Merit Order |
| Kallpa | Thermal power plant in Chilca, Department of Lima, developed between 2007 and 2012 |
| Kallpa GSA | Kallpa Generación SA |
| Kenon | Kenon Holdings Ltd |
| Las Flores | Thermal power plant located in Chilca, in the Department of Lima, which was acquired by Kallpa GSA in February 2014 |
| Law 28832 | Law No. 28832 of July 23, 2006 |
| Merit Order | List of the generation units to be dispatched at any given time in order of ascending cost |
| MST | Minimum Standard of Treatment |
| National Grid | Peruvian interconnected electricity grid |
| Nautilus Inkia | Nautilus Inkia Holdings LLC |
| New Methodology Claim | Claim related to the adoption of Resolution No. 164 |
| OSINERGMIN | *Organismo Supervisor de la Inversión en Energía y Minería* |
| Parties | Claimants and Respondent |
| PFR | Primary frequency regulation |

| Plants | Electric powers plants owned and operated by the Subsidiaries: Kallpa, Cerro del Águila, Puerto Bravo, Las Flores. |
|---|---|
| PR-01 | Technical Procedure No. 01 of November 26, 2014 |
| PR-22 | Technical Procedure No. 22 of March 29, 2014 |
| PR-33 | Technical Procedure No. 33 of November 26, 2014 |
| Pre-publication Report | Report clarifying the contents of the Second Draft PR-22 issued by OSINERGMIN in January 2014 |
| PTS | Primary transmission system |
| Puerto Bravo | Two open cycle dual-fueled thermoelectric plants in Mollendo, in the Department of Arequipa, developed by Samay |
| R-[#] | Respondent's Exhibit |
| Rejoinder | Respondent's Rejoinder on the merits and reply on jurisdiction dated September 2, 2021 |
| Relevant Generators | Generators of which at least one electrical pathway to any demand busbar passes through a Transmission Line |
| RL-[#] | Respondent's Legal Authority |
| Reply | Claimants' reply on the merits and counter-memorial on jurisdiction dated May 24, 2021 |
| Report 410 | OSINERGMIN's Report No. 410-2016-GRT, of June 2016 |
| Report 411 | OSINERGMIN's Report No. 411-2016-GRT, of June 10, 2016 |
| Report No. 111 | OSINERGMIN's Report No. 111-2016-GRT, of February 2016 |
| Report No. 455 | OSINERGMIN's Report No. 455-2016-GRT, of June 2016 |
| Report No. 457 | OSINERGMIN's Legal Report No. 457-2016-GRT, of June 27, 2016 |
| RER-CLEX I | Expert report of Compass Lexecon dated February 12, 2021 |
| RER-CLEX II | Expert report of Compass Lexecon dated September 2, 2021 |
| RER-Gutiérrez I | Expert report of César Gutiérrez dated February 12, 2021 |
| RER-Gutiérrez II | Expert report of César Gutiérrez dated September 2, 2021 |
| RER-Leyva I | Expert report of Ricardo Leyva dated February 12, 2021 |
| RER-Leyva II | Expert report of Ricardo Leyva dated September 2, 2021 |

| | |
|---|---|
| RER-Tabors | Expert report of Richard Tabors dated September 2, 2021 |
| Resolution No. 24 | Draft of Resolution No. 164 issued by OSINERGMIN on February 11, 2016 |
| Resolution No. 69 | General Directorate of Electricity's 2011 Resolution of August 18, 2011 |
| Resolution No. 141 | OSINERGMIN's Resolution No. 141-2016-OS/CD of June 13, 2016 |
| Resolution No. 164 | OSINERGMIN's Resolution No. 164-2016-OS/CD of June 30, 2016 |
| Resolution No. 383 | OSINERGMIN's Resolution No. 383-2008-OS/CD of May 30, 2008 |
| Response Report | Report issued by OSINERGMIN in March 2014 |
| Request | Claimants' Request for arbitration dated June 12, 2019 |
| Respondent or Peru | The Republic of Peru |
| Rules | ICSID Arbitration Rules in force as of April 10, 2006 |
| RWS-Mendoza | Witness statement of Jaime Mendoza dated February 12, 2021 |
| RWS-Buenalaya I | Witness statement of Severo Buenalaya dated February 12, 2021 |
| RWS-Buenalaya II | Witness statement of Severo Buenalaya dated September 2, 2021 |
| Samay | Samay I S.A. |
| Secondary Lines | Lines comprising the secondary and complementary transmission system |
| Second Draft PR-22 | Second draft of PR-22 issued by OSINERGMIN on January 16, 2014 |
| Second Methodology | Methodology used for the apportionment of the costs of the Use Criterion Lines from 2009 to 2017 |
| SFR | Secondary frequency regulation service |
| SFR Service Claim | Claim related to the adoption of Resolution No. 141 |
| Share Purchase Agreement | Share purchase agreement executed by Inkia and others on November 24, 2017 |
| Spot Price | The price at which generators sell and buy electricity on the short-term market |
| Subsidiaries | Kallpa GSA, CDA and Samay |
| Tariff Period | Period of four years during which methodologies for the apportionment of costs for the Use Criterion Lines are applied |
| TDF Method | "Topological distribution factors" method |
| Technical Minimum | The minimum amount of energy that any given generation unit must produce when it |

|  |  |
|---|---|
|  | is turned on, below which it cannot operate or shuts off |
| Technical Note 1 | Technical Note for the Implementation of the Secondary Frequency Regulation Service through the Automatic Generation Control – AGC, issued by COES on October 1, 2015 |
| Technical Note 2 | Technical Note for the Methodology to carry out the Assignment of the Economic Dispatch and the Reserve for Secondary Frequency Regulation, issued by COES on July 8, 2016 |
| Technical Note 3 | Technical note: methodology to be used for assignment of economic dispatch and secondary frequency regulation reserve, issued by COES on July 27, 2016 |
| Tender | Tender awarding the Base Provision for the period between August 2016 and July 2019 |
| Use Criterion Lines | Secondary and complementary transmission systems |
| Tr. Day [#] [page:line] | Transcript of the Hearing |
| Treaty or FTA | Free Trade Agreement between Singapore and Peru, signed on May 29, 2008 and entered into force on  August 1, 2009. |
| Tribunal | Arbitral tribunal composed of Professor Luca G. Radicati di Brozolo (President of the Tribunal), Mr. David R. Haigh KC (Arbitrator), Mr. Eduardo Siqueiros T. (Arbitrator) |
| Uribe & Leyva Transmission Report | Study conducted by the consulting firm Uribe & Leyva hired by Peru in 2015 on the Second Methodology |
| Use Criterion | Criterion for the apportionment of transmission costs pursuant to which generators pay for the lines they use based on an analysis of electricity flows |
| Use Criterion Lines | Lines comprising the secondary and complementary transmission system to which the Use Criterion applies and which are subject to the New Methodology Claim |
| Variable Base Provider(s) | Provider(s) of the Base Provision called upon to provide the SFR service, if needed, on a daily basis, and provided their offers are more competitive than those submitted by generators in the Balancing Market |
| XM Report | Technical report provided by the Colombian dispatch operator and consulting firm XM in 2007 |

**SELECT CASES**

| |
|---|
| *9REN Holding S.a.r.l v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, May 31, 2019 |
| *Adel A Hamadi Al Tamimi v. Sultanate of Oman*, ICSID Case No. ARB/11/33, Award, November 3, 2015 |
| *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Hungary*, ICSID Case No ARB/07/22, Award, September 23, 2010 |
| *Anglo American PLC v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/14/1, Award, January 18, 2019 |
| *Aris Mining Corporation (formerly known as GCM Mining Corp. and Gran Colombia Gold Corp.) v. Republic of Colombia*, ICSID Case No. ARB/18/23, Decision on the Bifurcated Jurisdictional Issue, November 23, 2020 |
| *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, July 14, 2006 |
| *Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, July 24, 2008 |
| *Cargill, Incorporated v. United Mexican States*, ICSID Case No. ARB(AF)/05/2, Award, September 18, 2009 |
| *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, August 20, 2007 |
| *Daimler Financial Services AG v. Argentine Republic*, ICSID Case No. ARB/05/1, Award, August 22, 2012 |
| *EDF (Services) Limited v. Romania,* ICSID Case No. ARB/05/13, Award, October 8, 2009 |
| *El Paso Energy International Company v. Argentine Republic,* ICSID Case No. ARB/03/15, Decision on Jurisdiction, April 27, 2006 |
| *Glamis Gold, Ltd. v. United States of America*, UNCITRAL, Award, June 8, 2009 |
| *Global Telecom Holding S.A.E. v. Canada*, ICSID Case No. ARB/16/16, Award, March 27, 2020 |
| *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, September 22, 2014 |
| *International Thunderbird Gaming Corporation v. United Mexican States*, UNCITRAL, Award, January 26, 2006 |
| *Joseph C. Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, January 14, 2010 |
| *Joseph Houben v. Republic of Burundi*, ICSID Case No. ARB/13/7, Award, January 12, 2016 |
| *LG&E Energy Corp., LG&E Capital Corp. and LG&E International, Inc v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, October 3, 2006 |
| *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, May 16, 2018 |
| *Merrill & Ring Forestry L.P. v. Canada*, ICSID Case No. UNCT/07/1, Award, March 31, 2010 |
| *Mobil Investments Canada Inc. and Murphy Oil Corporation v. Canada*, ICSID Case No. ARB(AF)/07/4, Decision on Liability and Principles of Quantum, May 22, 2012 |
| *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, October 11, 2002 |
| *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Award, March 10, 2015 |
| *Pac Rim Cayman LLC v. Republic of El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections, June 1, 2012 |

| |
|---|
| *PSEG Global Inc and others v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, January 19, 2007 |
| *Rumeli Telekom A.S. and Telsim Mobil Telekomikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, July 29, 2008 |
| *Siemens A.G. v. Argentine Republic,* ICSID Case No. ARB/02/8, Award, February 6, 2007 |
| *Spyridon Roussalis v. Romania*, ICSID Case No. ARB/06/1, Award, December 7, 2011 |
| *Técnicas Medioambientales Tecmed, S.A. v. United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award, May 29, 2003 |
| *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. Argentine Republic*, ICSID Case No. ARB/09/1, Award, July 21, 2017 |
| *The Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3, Award, June 26, 2003 |
| *Total SA v. Argentine Republic,* ICSID Case No. ARB/04/01, Decision on Liability, December 27, 2010 |
| *Ulysseas, Inc. v. Republic of Ecuador*, Interim Award, September 28, 2010 |
| *Waste Management, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award, April 30, 2004 |

ICSID Case No. ARB/19/19
Award

**TABLE OF CONTENTS**

I.   Introduction.................................................................................................1

II.   Procedural history.........................................................................................2

III.  The factual background ..............................................................................11

     A.  *The Parties* .........................................................................................11

     B.  *Claimants' investments in Peru* .........................................................12

     C.  *The Peruvian electricity system* .........................................................13

     D.  *The facts relevant to the SFR Service Claim* ......................................17

         1.  Introduction........................................................................17

         2.  The enactment of PR-22 .....................................................18

         3.  Technical Note 1 and the Guidelines ...................................21

         4.  Kallpa GSA's participation in the tender for the Base Provision............24

         5.  The enactment of Resolution No. 141 .................................26

     E.  *The facts relevant for the New Methodology Claim* ...........................31

IV.  The Subject Matter of the Dispute and the Parties' Requests for Relief.........................34

     A.  *The subject matter of the dispute* .....................................................34

         1.  Claimants' position ...........................................................35

         2.  Respondent's position .......................................................36

     B.  *The Parties' Requests for Relief* .........................................................36

V.  Jurisdiction ...............................................................................................37

     A.  *Introduction* .....................................................................................37

     B.  *Respondent's position*........................................................................39

         1.  The Denial of Benefits Objection ........................................39

         2.  The Kenon Objection .........................................................42

     C.  *Claimants' position* ...........................................................................44

         1.  The Denial of Benefits Objection ........................................44

         2.  The Kenon Objection .........................................................45

     D.  *The Tribunal's decision* ......................................................................48

         1.  The Denial of Benefits Objection ........................................48

ICSID Case No. ARB/19/19
Award

2. The Kenon Objection ....................................................................................... 57

**VI. Liability** ................................................................................................................. **61**

   *A. The applicable standard of treatment of foreign investors under Article 10.5 of the Treaty* .... *62*

     1. The Parties' positions on the obligation to afford FET in accordance with the MST ........... 62

       *i. Claimants' position* ....................................................................................... *62*

       *ii. Respondent's position* .................................................................................. *64*

     2. The Parties' positions on the obligation to accord FPS ..................................................... 68

       *i. Claimants' position* ....................................................................................... *68*

       *ii. Respondent's position* .................................................................................. *70*

     3. The Tribunal's decision .................................................................................................. 71

       *i. The MST/FET standard* ................................................................................. *73*

          a. The level of protection of the investor required by the MST/FET standard .......... 73

          b. The content of the MST/FET standard ................................................................ 77

             1) Arbitrary and discriminatory conducts .................................................... 77

             2) Legitimate expectations ........................................................................ 79

             3) The guarantee of a stable and predictable legal and regulatory environment ............................................................................................ 82

       *ii. The FPS standard* ......................................................................................... *84*

   *B. The SFR Service Claim* ............................................................................................... *86*

     1. Claimants' position ........................................................................................................ 87

       *i. The Bid Terms' guarantee of continuous dispatch* ........................................ *87*

       *ii. The arbitrariness of Resolution No. 141* ..................................................... *94*

     2. Respondent's position ................................................................................................... 96

       *i. The Bid Terms' guarantee of continuous dispatch* ........................................ *96*

       *ii. The arbitrariness of Resolution No. 141* ..................................................... *100*

     3. The Tribunal's decision .................................................................................................. 101

       *i. Whether the Bid Terms guaranteed continuous dispatch of the Firm Base Provider* *101*

          a. The drafting history of PR-22 ............................................................................ 102

          b. PR-22     108

          c. Technical Note 1 ............................................................................................... 115

          d. The Guidelines ................................................................................................. 117

          e. Whether the guarantee of a permanent dispatch of the Firm Base Provider is compatible with the Economic Dispatch Principle .......................................... 119

       *ii. Whether Resolution No. 141 was seriously arbitrary* ........................................... *123*

C.  The New Methodology Claim ...................................................................................130

    1. Claimants' position .............................................................................................130

        i.     The arbitrariness of Resolution No. 164 ................................................. 130

        ii.    The discriminatory nature of Resolution No. 164 ................................... 134

    2. Respondent's position .........................................................................................136

        i.     The arbitrariness of Resolution No. 164 ................................................. 136

        ii.    The discriminatory nature of Resolution No. 164 ................................... 138

    3. The Tribunal's decision .......................................................................................140

        i.     Whether Resolution No. 164 was seriously arbitrary ............................. 141

            a.   Resolution No. 164's alleged inconsistency with the Use Criterion ................... 141

            b.   The allegedly defective procedure for the adoption of Resolution No. 164 ....... 143

            c.   Resolution No. 164's allegedly illegitimate purpose .............................................145

        ii.    Whether Resolution No. 164 was seriously discriminatory ................................. 147

**VII. Quantum .................................................................................................................149**

    A.  Claimants' position .....................................................................................................149

        1. The irrelevance to Claimants' damages of the sales price of the Subsidiaries and of Nautilus Inkia's actions ....................................................................................................150

        2. The accuracy of BRG's damages calculations .................................................151

        3. The applicable interest and discount rates .......................................................157

    B.  Respondent's position .................................................................................................159

        1. The relevance to Claimants' damages of the sales price of the Subsidiaries and of Nautilus Inkia's actions ....................................................................................................160

        2. The accuracy of BRG's damages calculations .................................................161

        3. The applicable interest and discount rates .......................................................164

    C.  The Tribunal's decision ...............................................................................................166

        1. The relevance for the assessment of Claimants' damages of the sales price of the Subsidiaries and of Nautilus Inkia's actions ....................................................167

        2. The accuracy of BRG's damages calculations .................................................169

            i.     The applicability of the Operating Costs Compensation .......................... 170

            ii.    Kallpa's alleged ability to operate with two gas turbines ..................... 174

            iii.   The causal link between Respondent's breach and Claimants' indirect damages. 176

            iv.    The applicable interest and discount rates for the calculation of Historic Losses and Loss in Value ........................................................................................... 176

        3. The applicable pre- and post-award interest rate ............................................179

**VIII. Costs .................................................................................................................180**

A. Claimants' cost submission .................................................................................. 180

B. Respondent's cost submission ............................................................................. 182

C. The Tribunal's decision ....................................................................................... 182

IX. Decisions ........................................................................................................... 186

ICSID Case No. ARB/19/19
Award

## I.   INTRODUCTION

1.   This Award resolves a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**") pursuant to Article 36 of the Convention on the Settlement of Investment Disputes between States and Nationals of other States (the "**ICSID Convention**") and Article 10.17 of the Free Trade Agreement between Singapore and Peru ("**Treaty**" or "**FTA**") entered into force on August 1, 2009.

2.   These proceedings are conducted in accordance with the ICSID Arbitration Rules in force as of April 10, 2006 ("**Rules**").

3.   The Claimants are two companies incorporated in Singapore, IC Power Ltd ("**IC Power**") and Kenon Holdings Ltd ("**Kenon**") (together, "**Claimants**"), which, at the time of the facts relevant for the present dispute, indirectly controlled three Peruvian companies that owned and operated four power plants in Peru.

4.   The Respondent is the Republic of Peru ("**Peru**" or "**Respondent**").

5.   The Parties' representatives and counsel are listed on page *ii* of this Award.

6.   Each of Claimants and Respondent are hereinafter referred to as a "**Party**" and jointly as the "**Parties**".

7.   Claimants allege that they suffered damage as a consequence of two measures adopted by the Peruvian regulator of the energy sector, *Organismo Supervisor de la Inversión en Energía y Minería* ("**OSINERGMIN**"), which they claim constituted breaches of Peru's fair and equitable treatment ("**FET**") and full protection and security ("**FPS**") obligations under Article 10.5 of the Treaty.

8.   Claimants bring the following two distinct claims ("**Claims**"), seeking recovery for damages for a total amount of US$ 195.3 million:

- The first relates to the adoption of OSINERGMIN's Resolution No. 141-2016-OS/CD of June 13, 2016 ("**Resolution No. 141**"), regulating the provision of the secondary frequency regulation service ("**SFR**") for the Peruvian electricity grid ("**SFR Service Claim**").

- The second relates to OSINERGMIN's Resolution No. 164-2016-OS/CD of June 30, 2016 ("**Resolution No. 164**"), modifying the costs apportioning methodology for the use of the electricity system transmission lines by generators ("**New Methodology Claim**").

9. Respondent objects to the Tribunal's jurisdiction invoking the Denial of Benefits Clause of the Treaty (Article 10.15) and Kenon's lack of standing and contests the merits of both of Claimants' claims.

## II. PROCEDURAL HISTORY

10. On June 12, 2019, ICSID received a request for arbitration dated June 12, 2019, from Claimants against Peru ("**Request**").

11. On June 27, 2019, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and invited the Parties to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d).

12. On July 17, 2019, Respondent requested that Claimants disclose information concerning their (*i*) third-party funding arrangements for this arbitration and (*ii*) corporate structure and business operations.

13. On August 7, 2019, Claimants replied to Respondent's request by noting that (*i*) the funding was provided by Lomo Investments, an entity ultimately controlled by Tenor Capital Management Company and (*ii*) Kenon is a publicly listed company on the New York Stock Exchange and as such all information regarding its business activities was publicly available.

14. On August 28, 2019, Claimants requested that the tribunal be constituted pursuant to Article 37(2)(b) of the ICSID Convention.

15. On August 29, 2019, ICSID confirmed that the tribunal would be constituted in accordance with Article 37(2)(b) of the ICSID Convention. Accordingly, the tribunal would consist of three arbitrators, one arbitrator appointed by each Party and the third, presiding arbitrator to be appointed by agreement of the Parties.

16. On September 6, 2019, following appointment by Claimants, Mr. David R. Haigh KC accepted his appointment as an arbitrator.

17. On September 22, 2019, Respondent wrote to ICSID regarding its request of July 17, 2019. It noted that while Claimants had identified the identity of the third-party funder, they had not disclosed the terms agreed with, nor the identity of the investors in Claimants' funder. Respondent further stated that it expected to raise its request with the tribunal upon constitution.

ICSID Case No. ARB/19/19
Award

18.    On October 3, 2019, following appointment by Respondent, Mr. Eduardo Siqueiros T. accepted his appointment as an arbitrator.

19.    On October 28, 2019, the Parties informed ICSID that they had agreed to appoint Professor Luca G. Radicati di Brozolo as the president of the tribunal pursuant to Article 37(2)(b) of the ICSID Convention and Rule 5.

20.    On October 30, 2019, in accordance with Rule 6(1), the Secretary-General notified the Parties that all three arbitrators had accepted their appointments and that the tribunal was therefore deemed to have been constituted on that date.

21.    The tribunal is composed of Prof. Luca G. Radicati di Brozolo, a national of Italy and the UK, President, appointed by agreement of the Parties; Mr. David R. Haigh KC, a national of Canada, appointed by Claimants; and Mr. Eduardo Siqueiros T., a national of Mexico, appointed by Respondent ("**Tribunal**"). Mr. Marco Tulio Montañés-Rumayor, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

22.    On November 20, 2019, the Tribunal proposed to hold the first session on December 18, 2019, pursuant to Rule 13(1).

23.    On December 10, 2019, the Parties agreed to extend the 60-day period set in Rule 13(1) and proposed alternative dates for the first session.

24.    On December 19, 2019, the Tribunal fixed January 31, 2020 as the date for the first session.

25.    On December 24, 2019, the Tribunal circulated a draft agenda and a draft Procedural Order No. 1, inviting the Parties to confer and to submit a joint proposal with any agreements reached and/or of their respective positions where they were unable to reach agreement. The President of the Tribunal also proposed that Mr. Fabio Giuseppe Santacroce, an associate with his firm, be appointed as the assistant to the President of the Tribunal.

26.    On January 20, 2020, the Parties submitted their proposed revisions to the draft Procedural Order No. 1, reflecting their agreements and disagreements.

27.    On January 29, 2020, the Parties filed their proposed calendars for the proceeding.

28.    On January 29, 2020, ICSID transmitted Mr. Santacroce's signed declaration of independence and confidentiality to the Parties.

29.    On January 31, 2020, the Tribunal held a first session with the Parties by teleconference in accordance with Rule 13(1). Respondent requested a clarification to Mr. Santacroce's declaration of independence.

30.    On February 12, 2020, the Parties reverted on the pending items in draft Procedural Order No. 1 that the Tribunal had requested they give further consideration.

31.    On February 13, 2020, the Parties submitted further comments on the procedural calendar.

32.     On February 20, 2020, Mr. Santacroce submitted a clarification to his declaration. On February 25, 2020, Respondent advised it had no objection to Mr. Santacroce's appointment as the assistant to the President of the Tribunal.

33.     On February 27, 2020, the Tribunal issued Procedural Order No. 1 ("**PO1**") recording the agreement of the Parties on the procedural matters and the decision of the Tribunal on the disputed issues. PO1 provides, *inter alia*, that (*i*) the applicable Arbitration Rules would be those in effect from April 10, 2006, (*ii*) the procedural languages would be English and Spanish, and (*iii*) the place of proceeding would be Washington, D.C.  Finally, the Tribunal fixed the hearing dates and invited the Parties to confer and to agree on the dates for their written submissions.

34.     On February 28, 2020, Respondent requested the Tribunal to order Claimants to provide further information about their third-party funding, as well as on their ownership, control, and activities in Singapore ("**Request for Disclosure**").

35.     On March 5, 2020, the Tribunal invited Claimants to reply to Respondent's Request for Disclosure.

36.     On March 9 and 10, 2020, the Parties informed the Tribunal that they could not agree on a timetable for their written submissions and provided further observations on this matter.

37.     On March 18, 2020, Claimants provided their comments on Respondent's Request for Disclosure.

38.     On March 23, 2020, the Tribunal adopted the procedural calendar after considering the Parties' correspondence of March 9 and 10, 2020.

39.     On March 25, 2020, the Tribunal invited Respondent to submit a short reply to Claimants' letter of March 18, 2020, and Claimants to then submit a rejoinder to Respondent's reply.

40.     On April 4, 2020, Respondent submitted its reply to Claimants' letter of March 18, 2020.

41.     On April 13, 2020, Claimants submitted their rejoinder to Respondent's reply of April 4, 2020.

42.     On May 6, 2020, the Tribunal issued Procedural Order No. 2 ("**PO2**"), rejecting Respondent's Request for Disclosure.

43.     On June 6, 2020, Claimants filed their Memorial on the Merits ("**Memorial**"), together with the Witness Statements of Mr. Javier García Burgos ("**CWS-García Burgos**") and Mr. Irwin Frisancho ("**CWS-Frisancho I**"); the Expert Report of Berkeley Research Group ("**CER-BRG I**") and its respective exhibits; Exhibits C-74 to C-121; and Legal Authorities CL-1 to CL-102.

44.     On January 22, 2021, the Parties agreed to revise the procedural calendar.

45.     On January 23, 2021, the Tribunal approved the revised calendar.

46.     On February 13, 2021, Respondent filed its Counter-Memorial on the Merits and Memorial on Jurisdiction ("**Counter-Memorial**"), together with the Witness Statements of Mr. Jaime Mendoza ("**RWS-Mendoza**") and Mr. Severo Buenalaya ("**RWS-Buenalaya I**"); the Legal Opinion of Mr. Ricardo Leyva ("**RER-Leyva I**"); the Expert Report of Mr. César Gutiérrez ("**RER- Gutiérrez I**") together with its respective Annex A; the Expert Report of Compass Lexecon ("**RER-CLEX I**") together with Appendices A to L and its respective Exhibits; Exhibits R-008 to R-108; and Legal Authorities RL-001 to RL-027.

47.     On March 22, 2021, Claimants requested the Tribunal to order Respondent and Compass Lexecon to provide certain representations in relation to Peru's engagement of Compass Lexecon as its experts.

48.     On March 23, 2021, the Tribunal invited Respondent to comment on Claimants' request of March 22, 2021.

49.     On March 30, 2021, Respondent submitted a letter with the requested representations from Peru and Compass Lexecon.

50.     On April 13, 2021, the Tribunal invited Claimants to confirm whether they considered the representations of March 30, 2021 to be responsive to their request of March 22, 2021.

51.     On April 20, 2021, Claimants confirmed that the representations and undertakings of March 30, 2021 were responsive to Claimants' request.

52.     On April 21, 2021, the Tribunal noted Claimants' confirmation of April 20, 2021 and thanked the Parties for their constructive approach to resolving this matter.

53.     On May 25, 2021, Claimants submitted their Reply on the Merits and Counter-Memorial on Jurisdiction ("**Reply**"), together with the Witness Statement of Mr. Jaime Guerra ("**CWS-Guerra**"), the Second Witness Statement of Mr. Irwin Frisancho ("**CWS-Frisancho II**"); the Expert Reports of Luis Espinoza ("**CER-Espinoza**") and its respective exhibits; the Second Expert Report of Berkeley Research Group ("**CER-BRG II**") and its respective exhibits; Exhibits C-122 to C-199; and Legal Authorities CL-103 to CL-156.

54.     On September 3, 2021, Respondent filed its Rejoinder on the Merits and Reply on Jurisdiction ("**Rejoinder**") together with the Second Witness Statement of Mr. Severo Buenalaya ("**RWS-Buenalaya II**"); the Second Legal Opinion of Mr. Ricardo Leyva ("**RER-Leyva II**"); the Expert Report of Mr. Richard Tabors ("**RER-Tabors**"); the Second Expert Report of Mr. César Gutiérrez ("**RER-Gutiérrez II**"); the Second Expert Report of Compass Lexecon ("**RER-CLEX II**") and its respective Exhibits; Exhibits R-060bis, R-109 to R-216; and Legal Authorities RL-23bis, RL-028 to RL-059.

55.     On September 24, 2021, Claimants requested that the Tribunal strike from the record the PSR Report, RER-Tabors, and all passages of Peru's Rejoinder submission (and accompanying documents) in which either of the two reports were cited.

56.    On September 28, 2021, the Tribunal invited Respondent to comment on Claimants' request of September 24, 2021.

57.    On September 30, 2021, Claimants submitted a letter with two annexes, concerning Claimants' request of 24 September 2021.

58.    On October 5, 2021, Respondent replied to Claimants' request of September 24, 2021, as supplemented on September 30, 2021.

59.    On October 6, 2021, the Tribunal invited Claimants to respond to Peru's letter of October 5, 2021 and Respondent to then file a short reply to Claimants' response.

60.    On October 7, 2021, Claimants filed their comments on Respondent's letter of October 5, 2021.

61.    On October 13, 2021, Respondent replied to Claimants' letter of October 7, 2021.

62.    On October 25, 2021, the Tribunal issued Procedural Order No. 3 ("**PO3**") on Claimants' request of September 24, 2021. The Tribunal decided to strike from the record (*i*) the PSR Report, and all passages of the Rejoinder and of RER-CLEX II referring to it and (ii) certain sections of RER-Tabors and all passages of the Rejoinder and of RER-CLEX II referring to them. The Tribunal also ordered Respondent to submit an amended version of the Rejoinder and of RER-CLEX II by November 1, 2021.

63.    On November 1, 2021, Respondent informed the Tribunal that it intended to file a request for reconsideration of the Tribunal's PO3, to which Claimants objected on November 2, 2021.

64.    On November 2, 2021, Respondent filed further comments regarding its intended request for reconsideration and the Tribunal granted the Respondent's request to file a motion for reconsideration of PO3.

65.    On November 2, 2021, Claimants filed their Rejoinder on Jurisdiction ("**Claimants' Rejoinder**"), together with Exhibits C-200 to C-217 and Legal Authorities CL-157 to CL-181.

66.    On November 4, 2021, Respondent filed a Motion for Reconsideration of the Tribunal's Procedural Order No.3 ("**Request for Reconsideration**").

67.    On November 4, 2021, the Tribunal invited Claimants to submit their comments on the Request for Reconsideration.

68.    On November 5 and 6, 2011, the Parties identified the witnesses and experts that they intended to cross-examine at the hearing pursuant to Section 19.1 of PO1.

69.    On November 7, 2021, Claimants filed their response on the Request for Reconsideration.

70.    On November 8, 2021, the Tribunal transmitted a draft Procedural Order No. 4 on hearing logistics and invited the Parties to submit jointly any comments on the draft and to agree on a hearing schedule.

71.     On November 9, 2021, Claimants wrote to the Tribunal concerning Respondent's inclusion of *Sociedad Integrada de Consultoría* ("**SIDEC**") in its witness/expert list. Claimants argued that SIDEC was *"neither a witness nor an expert in these proceedings, and cannot therefore validly be called for cross-examination."*

72.     On November 10, 2021, the Tribunal invited Respondent to comment on Claimants' letter of November 9, 2021, which Respondent did on November 11, 2021.

73.     On November 11, 2021, the Parties jointly filed their comments on draft Procedural Order No. 4, with their proposals on the items on which they disagreed.

74.     On November 12, 2021, the Tribunal held a pre-hearing conference with the Parties by videoconference.

75.     On November 15, 2021, the Tribunal issued Procedural Order No. 4 ("**PO4**"), deciding on (*i*) the Request for Reconsideration and (*ii*) the application on SIDEC's cross-examination.

76.     On November 19, 2021, Respondent submitted updated versions of its Rejoinder, RER-CLEX II, and RER-Tabors.

77.     On November 19, 2021, the Parties indicated the order in which they would present their witnesses and experts at the hearing.

78.     On November 28, 2021, the Tribunal issued Procedural Order No. 5 ("**PO5**") concerning the organization of the hearing.

79.     On December 3, 2021, Claimants requested leave to introduce five new factual exhibits into the record.

80.     On December 6, 2021, the Tribunal invited Respondent to comment on Claimants' request of December 3, 2021.

81.     On December 9, 2021, the Respondent filed observations on Claimants' request of December 3, 2021.

82.     On December 10, 2021, the Tribunal denied Claimants' request of December 3, 2021 in accordance with Section 17.3 of PO1.

83.     A hearing was held by videoconference from December 13-20, 2021 ("**Hearing**"). The following persons were present at the Hearing:

**Tribunal**:

| Name | Affiliation to Case |
|---|---|
| Prof. Luca G. Radicati di Brozolo | President |
| Mr. David R. Haigh KC | Co-arbitrator |
| Mr. Eduardo Siqueiros T | Co-arbitrator |

**Secretary of the Tribunal**:

| Name | Affiliation to Case |
|------|---------------------|
| Marco Tulio Montañés-Rumayor | Secretary of the Tribunal |

**Assistant to the Tribunal**:

| Name | Affiliation to Case |
|------|---------------------|
| Fabio Giuseppe Santacroce | Assistant to the President |
| Lucia Pontremoli | Assistant to the President |

**Claimants**:

| Counsel: | Affiliation to Case |
|----------|---------------------|
| Caroline Richard | Freshfields BruckhausDeringer US LLP |
| Lee Rovinescu | Freshfields BruckhausDeringer US LLP |
| María Julia Milesi | Freshfields BruckhausDeringer US LLP |
| Karen Wiswall | Freshfields BruckhausDeringer US LLP |
| Juan Pomes | Freshfields BruckhausDeringer US LLP |
| María Paz Lestido | Freshfields BruckhausDeringer US LLP |
| Alexandre Alonso | Freshfields BruckhausDeringer LLP |
| Daniela Cala | Freshfields BruckhausDeringer US LLP |
| Carolina de Trazegnies | De TrazegniesAbogados |
| Ruben Castro | Freshfields BruckhausDeringer US LLP |
| Yesica Crespo | Freshfields BruckhausDeringer US LLP |
| Sandra Díaz | Freshfields BruckhausDeringer US LLP |
| Marco Castañeda | De TrazegniesAbogados |
| T-Zady Guzman | FTI Consulting |
| *Party Representatives:* | |
| Robert Rosen | Kenon Holdings Ltd /IC Power Ltd |
| Zeena Tan | Kenon Holdings Ltd /IC Power Ltd |
| Mark Hasson | Kenon Holdings Ltd |
| Desmond Loh | Kenon Holdings Ltd |
| Jeslene Chia | Kenon Holdings Ltd |
| Pierre Amariglio | Tenor Capital |
| *Witnesses:* | |
| Irwin Frisancho | Kallpa GSA |
| Javier García Burgos | Inkia NautilusHoldings |
| Jaime Guerra | Independent consultant |
| *Experts and SIDEC:* | |
| Luis Espinoza | Independent consultant |

| Daniela M Bambaci | Berkeley ResearchGroup |
| Santiago Dellepiane A. | Berkeley ResearchGroup |
| Julian Horowitz | Berkeley ResearchGroup |
| Agustin Shehadi | Berkeley ResearchGroup |
| Luis Torres | Sociedad Integrada deConsultoría - SIDEC |

**Respondent**:

| Name | Affiliation to Case |
|---|---|
| *Counsel:* | |
| Stanimir A.Alexandrov | Stanimir A.AlexandrovPLLC |
| Jennifer Haworth McCandless | Sidley AustinLLP |
| Marinn Carlson | Sidley AustinLLP |
| Courtney Hikawa | Sidley AustinLLP |
| María Carolina Durán | Sidley AustinLLP |
| Alex Young | Sidley AustinLLP |
| Angela Ting | Sidley AustinLLP |
| Natalia Zuleta | Sidley AustinLLP |
| Gavin Cunningham | Sidley AustinLLP |
| Ally Reilly | Sidley AustinLLP |
| Bellami Radosti | Sidley AustinLLP |
| Ricardo Puccio Sala | Estudio Navarro &Pazos Abogados |
| Aresio AntonioViveros Zuazo | Estudio Navarro &Pazos Abogados |
| Andrea Navea Sánchez Cerro | Estudio Navarro &Pazos Abogados |
| Sandra Sánchez-Cerro Medina | Estudio Navarro &Pazos Abogados |
| *Party Representatives:* | |
| Vanessa del Carmen Rivas Plata Saldarriaga | Ministry of Economy and Finance |
| Mónica del Pilar Guerrero Acevedo | Ministry of Economy and Finance |
| Giancarlo Peralta Miranda | Ministry of Economy and Finance |
| *Witnesses:* | |
| Jaime Mendoza | OSINERGMIN |
| Severo Buenalaya | OSINERGMIN |
| *Experts:* | |
| Dr. Richard Tabors | Tabors Caramanis Rudkevich (TCR) |
| César Gutiérrez | Peruvian Engineers Association |
| Ricardo Leyva | Uribe & Leyva |
| Ruxandra Ciupagea | Compass Lexecon |
| Dr. Boaz Moselle | Compass Lexecon |
| Juan Carlos Bisso | Compass Lexecon |
| Despina Doneva | Compass Lexecon |
| Iria Camba Flórez de Losada | Compass Lexecon |

ICSID Case No. ARB/19/19
Award

**Court Reporters**:

| David Kasdan | English Court Reporter – Worldwide Court Reporting |
|---|---|
| Elizabeth Cicoria | Spanish Court Reporter – DR Esteno |
| Marta Rinaldi | Spanish Court Reporter – DR Esteno |

**Interpreters**:

| Charles Roberts | English- Spanish Interpreter |
|---|---|
| Anna Sophia Chapman | English- Spanish Interpreter |
| Andrew Roth | English- Spanish Interpreter |

**Technical Support Staff**:

| Joe Heaven-Terry | Sparq |
|---|---|
| Ivania Fernandez | Paralegal, ICSID |
| Iain McGrath | Freshfields Bruckhaus Deringer US LLP |
| Earle Anderson | Sidley Austin LLP |

84. On December 18, 2021, Claimants entered Exhibit C-218 into the record pursuant to the Tribunal's directions of Day 5 of the Hearing.

85. On February 11, 2022, the Tribunal provided guidance to the Parties on the content, length, and format of the post-hearing briefs to be filed simultaneously.

86. On February 25, 2022, the Parties jointly submitted the revised English and Spanish transcripts of the Hearing.

87. On March 1, 2022, the Parties informed the Tribunal that they had reached agreement on parameters for the post-hearing submissions and costs statements.

88. On March 21, 2022, the Parties filed their post-hearing briefs ("**Claimants' Post-Hearing Brief**" and "**Respondent's Post-Hearing Brief**").

89. On May 19, 2023, the Parties filed their submissions on costs ("**Claimants' Statement of Costs**" and "**Respondent's Statement of Costs**").

90. On June 8, 2023, the Tribunal declared the proceeding closed.

III. THE FACTUAL BACKGROUND

A. The Parties

91.    The Claimants, IC Power and Kenon, are holding companies incorporated in Singapore, from where they oversee and manage their interests in various companies outside Singapore. Kenon controls IC Power, which in turn controls IC Power Asia Development Ltd ("**ICPL**"), a company incorporated in Israel.

92.    Until 2017, IC Power and Kenon controlled – through Inkia Energy Ltd, a company incorporated in Bermuda ("**Inkia**") – three Peruvian companies ("**Subsidiaries**" or "**Peruvian Subsidiaries**"), i.e. Kallpa Generación SA ("**Kallpa GSA**"),[1] Cerro del Águila SA ("**CDA**") and Samay I S.A. ("**Samay**").[2] The Subsidiaries owned and operated the following five electric power plants in Peru (the "**Plants**"):

- a thermal power plant in Chilca, Department of Lima, developed between 2007 and 2012 ("**Kallpa**");[3]

- a hydroelectric plant on the Mantaro River, in the Department of Huancavelica, for the construction of which, in October 2010, Kallpa GSA entered into a concession agreement with the Ministry of Energy and Mining, transferred in June 2011 to CDA, which started developing the plant[4] ("**Cerro del Águila**");

- two open cycle dual-fueled thermoelectric plants in Mollendo, in the Department of Arequipa, developed by Samay, which won a public bid in November 2013 ("**Puerto Bravo**");[5] and

---

[1] Inkia acquired interests in Kallpa GSA in June 2007 through the purchase of Globeleq Americas Limited ("**Globeleq**") (see Register of Members of Inkia Americas, June 9, 2017 (C-19)), later renamed Inkia Americas Limited ("**Inkia Americas**") (see Certificate of Incorporation on Change of Name of Inkia Americas Holdings Ltd., November 7, 2007 (C-18)). While at that date Inkia indirectly held 99.9% of the shares in Kallpa GSA, it reduced its stake to 74.9% in November 2009 (Share register of Kallpa GSA, various dates (C-23)).

[2] Certificate of Incorporation of Samay II SA, July 14, 2010 (C-26); Amendment of the by-laws of CDA, February 7, 2011 (C-27); Certificate of Incorporation of Samay, July 14, 2010 (C-29).

[3] Memorial, ¶ 23; CWS-García Burgos, ¶ 15.

[4] See Ministry of Energy Resolution No 64, October 23, 2010, Articles 1-2 (C-46); Ministry of Energy Resolution No 59, June 23, 2011, Articles 1-3 (C-47).

[5] IC Power SEC Form F-1, January 23, 2017, p. 3 (C-13).

> • a thermal power plant located in Chilca, in the Department of Lima, acquired by Kallpa GSA in February 2014 ("**Las Flores**").[6]

93. Through the Plants, the Subsidiaries operated in the Peruvian electricity system, transmitting power through the network and providing certain ancillary services such as the SFR service, as described below,[7] which is the subject of the SFR Service Claim.

94. The Respondent is the Republic of Peru.

**B. Claimants' investments in Peru**

95. Claimants acquired their respective indirect interests in Inkia as follows. Until January 7, 2015, Inkia was wholly owned by ICPL,[8] which, in turn, was entirely owned by Israel Corporation Ltd ("**Israel Corporation**"). Kenon, which was incorporated by Israel Corporation,[9] acquired its indirect interest in Inkia on January 7, 2015, when it purchased Israel Corporation's shares in ICPL.[10] IC Power, which was incorporated by Kenon on May 4, 2015 as its wholly owned subsidiary,[11] acquired its indirect interest in Inkia, when it purchased Kenon's interest in ICPL, which had been renamed IC Power Asia Development Ltd.[12]

96. Kenon and IC Power retained their indirect interests in the Subsidiaries until November 24, 2017, when they sold those interests to a third party, Nautilus Inkia Holdings LLC ("**Nautilus Inkia**"),  by way of a share and purchase agreement ("**SPA**")[13]

---

[6] Memorial, ¶ 30.

[7] Section III.D.

[8] ICPL was renamed IC Power Asia Development Ltd (Israel) on March 28, 2016 (see Registration Certificate of ICPL (English translation), November 10, 2016 (C-12), p. 1).

[9] Counter-Memorial, ¶ 204; Kenon Holdings Ltd., U.S. Securities & Exchange Commission Form 20-F Annual Report for the Fiscal Year Ended Dec. 31, 2014 (excerpts) (R-61).

[10] See Israel Corporation Ltd. 2015 Annual Report for the Board of Directors, p. 3 (C-102); IC Power SEC Form F-1, January 23, 2017 (C-13), p. 2; Register of Members of Inkia, February 6, 2018 (C-16); Kenon SEC Form 20-F, January 1, 2017 (C-14).

[11] Certificate of Good Standing of IC Power, March 1, 2019 (C-9); Business Profile of IC Power issued by the Singaporean Accounting and Corporate Regulatory Authority, February 19, 2019 (C-8), p. 3; Register of Members of IC Power, April 3, 2019 (C-10).

[12] Registration Certificate of ICPL (English translation), November 10, 2016 (C-12), p. 2; Register of Members of Inkia, February 6, 2018 (C-16).

[13] Share Purchase Agreement executed by Inkia and others, November 24, 2017 (C-15).

ICSID Case No. ARB/19/19
Award

providing at Article 2.6 that IC Power retained its rights to bring claims in relation to the investment under the Treaty in the following terms:

> The Parties agree that IC Power Ltd retains all rights it currently has in relation to the Investment Treaty Claims and there shall be no effect on such rights by virtue of this Agreement. For the avoidance of doubt, the Parties expressly acknowledge that this Agreement is being made without prejudice to IC Power Ltd. receiving whatever redress is possible from an arbitration tribunal for its Investment Treaty Claims. [14]

97. The evolution of Claimants' corporate structure is illustrated by the following chart: [15]



### C.   The Peruvian electricity system

98. At the time relevant for the present dispute, the Subsidiaries operated as generators of power for the transmission of which they used the Peruvian interconnected electricity grid ("**National Grid**").

---

[14] Share Purchase Agreement executed by Inkia and others, November 24, 2017, Article 2.6 (C-15).

[15] C-31.

99.     The latter is composed of two types of transmission systems:

- the primary transmission system ("**PTS**") and the guaranteed transmission system ("**GTS**"), consisting of very high and high-voltage transmission lines running North-South across Peru transporting electricity in both directions; and

- the secondary and complementary transmission system (the "**Secondary Lines**"), consisting of peripheral high and medium-voltage transmission lines, which transmit electricity from generators to the PTS or the GTS or, alternatively, from the PTS or GTS to distributors or large consumers ("**Demand Users**").

100.    As the PTS and the GTS benefit all users, their costs are borne by end consumers through regulated tariffs. Conversely, the Secondary Lines can be used by both generators and Demand Users. Accordingly, to allocate the costs of the Secondary Lines it is necessary to determine which groups of users (generators, Demand Users, or both) use those Lines and must pay for them, and to apportion the costs amongst them.[16]

101.    The generation, transmission, distribution, and commercialization of electricity through the National Grid is governed by Decree Law No. 25884 of November 19, 1992 ("**Electricity Concessions Law**"),[17] as supplemented by Supreme Decree No. 9 of February 25, 1993 ("**ECL Regulation**")[18] and by Law No. 28832 of July 23, 2006 ("**Law 28832**"),[19] which aimed to "*perfect the rules established in the Electricity Concessions Law*".[20]

102.    The power to regulate the sector rests with OSINERGMIN, a public decentralized agency attached to the Presidency of the Council of Ministers, whose mission is to regulate, supervise and monitor the functioning of Peru's electricity system.[21]

---

[16] Memorial, ¶ 140; Reply, ¶ 209; Counter-Memorial, ¶ 48.

[17] Electricity Concessions Law, November 19, 1992 (C-33).

[18] ECL Regulation, February 25, 1993 (C-34).

[19] Law 28832, July 23, 2006 (C-42).

[20] Law 28832 (C-42), Article 2. The original Spanish reads as follow: "*La presente Ley tiene por objeto perfeccionar las reglas establecidas en la Ley de Concesiones Eléctricas*".

[21] Law 27332, July 29, 2000, Art. 2, (C-76); Law 28964, January 24, 2007 (C-78), Article 1; Memorial, ¶ 41.

103.    OSINERGMIN's powers include regulating the methodology for the apportionment of costs for the Secondary Lines.[22] Methodologies are applied for at least four years ("**Tariff Period**").

104.    Pursuant to Law 28832, the coordination of the National Grid is entrusted to the *Comité de Operación Económica del Sistema* ("**COES**"), a committee established in October 2000 in accordance with the Electricity Concessions Law, composed of electricity generators, transmitters, distributors, and certain categories of end users.[23] Article 12.1 sets out certain principles which COES must follow in operating the National Grid, and in particular the minimization of cost, the preservation of safety and the best use of energy resources. Article 12.1 of Law 28832 reads as follows:

> The purpose of COES is to coordinate the short, medium and long-term operation of the [National Grid] at the lowest cost, preserving the safety of the system, the best use of energy resources, as well as planning the development of the SEIN's transmission and administering the Short Term Market.[24]

105.    COES acts as dispatch administrator of the National Grid. As such it decides each day which power generation units will be called upon to dispatch the electricity required to meet the projected demand at each point in time during the following day ("**Daily Program**").

106.    COES determines the Daily Program on an operating cost basis, thus listing the generation units to be dispatched at any given time in order of ascending cost ("**Merit Order**"): the least expensive units are dispatched first and, as demand increases, more expensive units are dispatched. The cost of the most expensive unit called upon to dispatch electricity (i.e. the one dispatched last) determines the price at which

---

[22] Electricity Concessions Law, November 19, 1992 (C-33), Article 62; ECL Regulation, February 25, 1993 (C-34), Article 139. See also Law 28832 (C-42), Article 27.2(b)-(c).

[23] Law 28832, (C-42), Article 12.1, which defines COES as "*una entidad privada, sin fines de lucro y con personería de Derecho Público [...] conformado por todos los Agentes del SEIN y sus decisiones son de cumplimiento obligatorio por los Agentes*".

[24] The original Spanish version reads as follows: "*El COES tiene por finalidad coordinar la operación de corto, mediano y largo plazo del SEIN al mínimo costo, preservando la seguridad del sistema, el mejor aprovechamiento de los recursos energéticos, así como planificar el desarrollo de la transmisión del SEIN y administrar el Mercado de Corto Plazo*".

generators sell and buy electricity on the short-term market ("**Spot Price**"), which is assessed every 15 minutes.[25]

107.    Not all power generation units are called upon to dispatch at all times. As demand for electricity increases, the number of units called upon to dispatch increases as does the Spot Price.[26]

108.    To prepare the Merit Order and the Daily Program, COES considers the variable costs of each power plant,[27] which are determined through audits on the variable costs structure of all power plants, with the exception of natural gas-fueled power plants (like Kallpa and Las Flores), whose costs cannot be audited *ex ante* given the complexity of determining the variable component of natural gas costs.

109.    Natural gas-fueled plants are thus permitted to self-declare their variable costs to be taken into account by COES. The costs are declared once a year and remain in force for one year ("**Declared Costs**"). Until 2017, natural gas-fueled plants had discretion as to the fuel costs they declared and were thus permitted to declare costs below their actual ones.[28] Accordingly, to compete for inclusion in the Daily Program and depending on their business strategy, natural gas generators often declared fuel costs close or equal to zero.[29] In December 2017, Peru established a minimum threshold for Declared Costs, calculated according to a specific formula.[30]

110.    In certain cases, as to which the Parties are not in agreement, COES may decide to dispatch units irrespective of the Merit Order.[31] The variable costs of such units are not taken into account in the determination of the Spot Price, which continues to be based upon the variable costs of the last unit in the Merit Order. The Parties agree

---

[25] Memorial, ¶¶ 45 ff.; Counter-Memorial, ¶¶ 57-60; Reply, ¶¶ 23-24; Rejoinder, ¶ 56.

[26] Memorial, ¶¶ 5, 46; Counter-Memorial, ¶¶ 57, 61; Reply, ¶ 23; Rejoinder, ¶ 56.

[27] Natural gas-fueled plants' variable costs usually include (*i*) the supply cost paid to the natural gas producer; (*ii*) the transportation cost paid to the pipeline operator; and (*iii*) the natural gas distribution cost (see Memorial, ¶ 48).

[28] Declared Costs could not exceed the sum of total cost of supply, transportation and distribution of natural gas.

[29] Memorial, ¶ 50; Reply, ¶ 172; Counter-Memorial, ¶¶ 59 ff; Rejoinder, ¶ 56.

[30] Supreme Decree No. 43, December 27, 2017 (C-156). See Memorial, fn. 40; Reply, fn. 255.

[31] Memorial, ¶¶ 53-54; Counter-Memorial, ¶¶ 7, 62; Reply, ¶ 24; Rejoinder, ¶¶ 80 ff.; Law 28832 (C-42), Article 12.1.

that the dispatch of units outside the Merit Order generates additional costs for the system.[32]

111. In addition to the production of electricity, generators may also be tasked with ancillary services, one of which is the SFR service, that is the object of the SFR Service Claim.

### D.   The facts relevant to the SFR Service Claim

#### 1.   Introduction

112. The projected demand for electricity, based on which the Daily Program is determined, may differ from actual demand, giving rise to an excess of demand over supply (an under-frequency event) or to an excess of supply over demand (an over-frequency event).[33] The equilibrium between projected and actual supply and demand of electricity in the system is achieved by the "frequency regulation service", which is an ancillary service to power generation, that increases output in case of under-frequency events, or decreases it in case of over-frequency events.[34]

113. There are two types of frequency regulation services in Peru: the primary frequency regulation ("**PFR**") and SFR. PFR is the first and most immediate level of the service, which is activated within 5 seconds of an event of disequilibrium and must be available for 10 minutes.[35] Through PFR, all generation units with an installed capacity greater than 10 MW automatically reduce or increase the frequency so as to guarantee equilibrium. When PFR is exhausted, SFR comes online, restoring the flexibility of the plants that provided the PFR for 10 minutes for the event that they are again needed for PFR.

114. Contrary to PFR, SFR service is not provided by all plants operating in the system. It can only be provided by plants having the technical capability to generate or decrease the required amount of energy within 20 seconds of a disequilibrium and sustain that level for at least 30 minutes. This means that the SFR service can only be provided by plants that are already operating or dispatching electricity, since turning on

---

[32] Memorial, ¶ 53; Counter-Memorial, ¶ 63.

[33] Memorial, ¶ 56; Counter-Memorial, ¶ 65.

[34] PR-22, March 26, 2014, (C-56), Section 5.1.

[35] Memorial, ¶¶ 7, 57; Counter-Memorial, ¶¶ 9, 67.

additional units that were not operating or dispatching is a much slower process.[36] Moreover, in order to be able to adjust generation upwards (i.e. to increase the power output), eligible generators are not permitted to generate at their full capacity, but must hold back some reserved capacity. Conversely, to be able to adjust generation downward (i.e. to decrease their output), those generators must be dispatching electricity above the minimum amount of energy that they must produce when they are operating, below which they cannot operate or shut off ("**Technical Minimum**").[37]

115. Pursuant to Law 28832, the planning and administration of the provision of the ancillary services needed to guarantee the safe and "*economical*" operation of the National Grid, including SFR, is entrusted to COES.[38] In particular, COES is responsible for drafting the procedures for the operation of the National Grid, which must then be approved by OSINERGMIN.[39]

### 2. The enactment of PR-22

116. Until 2011, PFR and SFR services were provided by two hydroelectric plants, located in the North and in the South of the country, which were the only plants with the technical flexibility required to adjust their power output. Those plants were obliged to provide the service without compensation, but were compensated for holding back the energy needed for upward adjustments of electricity output.[40]

117. At that time, the frequency regulation systems were operated "manually", which meant that in case of an imbalance in the system, COES needed to physically call the operator of the power plant providing the frequency regulation service and request that it reduce or increase its output.[41] Consequently, response times were long and entailed high risks of partial blackouts.

118. To correct this, in August 2011, Peru undertook the reform of the SFR system. On August 18, 2011, the General Directorate of Electricity (i.e. the entity in charge of

---

[36] Memorial, ¶¶ 56 ff.; Counter-Memorial, ¶¶ 9, 66; Rejoinder, ¶¶ 7, 71.

[37] Memorial, ¶ 61; Reply, ¶ 56; Counter-Memorial, ¶ 66; Rejoinder, ¶ 71.

[38] Law 28832 (C-42), Article 14(j).

[39] Law 28832 (C-42), Article 13(b).

[40] Memorial, ¶ 66, Reply, ¶ 53; Counter-Memorial, ¶ 69; Rejoinder, ¶ 73.

[41] Memorial, ¶ 67; Reply, ¶ 54(c); Counter-Memorial, ¶ 69; Rejoinder, ¶ 73.

proposing policies to regulate the power sector) issued a resolution establishing that the SFR service would henceforth be voluntary and remunerated and tasked OSINERGMIN with approving the technical procedure setting out the methodology, criteria and conditions for the provision of the SFR ("**Resolution No. 69**").[42]

119.    The aim of the reform was to reduce the response times, by introducing an automatic generation control ("**AGC**") system, which would automatically send generators signals to adjust or regulate the frequency level within the National Grid to preserve its stability.[43] The introduction of the AGC system was also critical to integrating renewable energy power generation units, which are more difficult to manage because their ability to generate power depends on the availability of the renewable resource.[44]

120.    Pursuant to Resolution No. 69, on December 2012, COES submitted a proposal of technical procedure aimed *inter alia* at establishing the procedure for assigning SFR ("**COES Draft**").[45] The COES Draft was based on a technical report provided by the Colombian dispatch operator and consulting firm XM in 2007 (the "**XM Report**")[46] and adopted the report's recommendation that the SFR reserve be assigned first to generators qualified in the Merit Order ("**Joint Optimization**"), and then, if additional generators were needed, to the lowest cost unit capable of providing SFR.[47]

121.    OSINERGMIN rejected the COES Draft, noting that:

> Certain gaps have been identified in the published proposal that relate to the reserve provision model, a lack of definition as to how the Secondary Frequency Reserve (SFR) service will be provided in real time and how it will be distributed by areas of regulation, among other things in such a manner that following the process which is underway in accordance with the rules established in the Guide would mean that the approval of the new incomplete COES PR-22 Procedure, instead of improving the development of the electricity market, would be the source of deficiencies due to the gaps that

---

[42] Memorial, ¶ 71; Reply, ¶ 55; Counter-Memorial, ¶ 70; Rejoinder, ¶ 73. See also Ministry of Energy Resolution No. 14 of March 3, 2005, as amended by General Directorate of Electricity's 2011 Resolution of August 18, 2011 (C-48).

[43] Memorial, ¶ 68; Reply, ¶ 54(c); Counter-Memorial, ¶ 70; Rejoinder, ¶ 73. CWS-Frisancho I, ¶ 38.

[44] Memorial, ¶¶ 69-70, Reply, ¶ 54(b).

[45] COES Letter No. COES/D-644-2012, December 19, 2012 (C-90). Memorial, ¶ 72; Counter-Memorial, ¶ 76.

[46] XM Report, November 1, 2007 (C-81).

[47] XM Report, November 1, 2007 (C-81), Section 9.3.2, p 67.

> have been identified and that need to be improved, thereby failing to achieve
> the purpose of the process of approval of the aforementioned procedure and
> of the normative mandate established in the Board of Directors Resolution
> No. 069-2011-EM/DGE.[48]

122.  In September 2013, the Ministry of Economy of Peru instructed the consulting firm
      Indra to assess the possible implementation of an automated voluntary system for
      SFR. Indra's assessment was published on February 24, 2014 ("**Indra Report**").[49]

123.  On the basis of Indra's recommendations, in November 2013, OSINERGMIN sent
      COES its first draft of Technical Procedure No. 22 ("**First Draft PR-22**").[50] A revised
      draft of PR-22 ("**Second Draft PR-22**")[51] was circulated in January 2014, together with
      a report clarifying and detailing its contents ("**Pre-publication Report**").[52]

124.  On January 23, 2014, OSINERGMIN presented the proposed text of PR-22 to
      interested parties at a public hearing,[53] and subsequently, in a Report issued in
      March 2014 ("**Response Report**"),[54] it addressed questions and observations
      received from generators, including Kallpa GSA.

125.  On March 29, 2014, OSINERGMIN published Technical Procedure No. 22 ("**PR-22**").[55]

126.  The Parties agree that PR-22 establishes that:

      (i)  The SFR service would be provided automatically using the AGC system;[56]

---

[48] OSINERGMIN Resolution No. 195, October 4, 2013 (C-50), p. 2. The original Spanish version reads as follows: "*se han advertido algunos vacíos en la propuesta publicada, relacionados con el modelo de provisión de reservas, falta de definición en cuanto a cómo se prestará el servicio de Reserva Secundaria de Frecuencia (RSF) en tiempo real y la distribución de la misma por áreas de regulación, entre otros, de tal manera que de seguirse el proceso en curso de acuerdo con las pautas establecidas en la Guía, correspondería la aprobación del nuevo Procedimiento COES PR-22 incompleto, el cual en lugar de mejorar el desarrollo del mercado eléctrico, originaría deficiencias por los vacíos que se han identificado y que precisan ser mejorados; contraviniéndose, de dicho modo, la finalidad del proceso de aprobación del mencionado procedimiento y del mandato normativo establecido en la Resolución Directoral 069-2011-EM/DGE*".

[49] Indra Report (C-94), p. 10.

[50] First Draft PR-22, November 28, 2013 (C-51).

[51] Second Draft PR-22, January 16, 2014 (C-53).

[52] Pre-Publication Report, January 2014 (C-52); Second Draft PR-22 (C-53).

[53] See OSINERGMIN Minutes of the public hearing on the presentation, January 23, 2014 (C-92).

[54] Response Report, March 2014 (C-54).

[55] PR-22 (C-56), Section 5.1.

[56] Reply, ¶ 145; Counter-Memorial, ¶ 97; Rejoinder, ¶ 73. PR-22 (C-56), Section 5.7.

(ii) SFR service providers would be selected according to a combined methodology: (*a*) through long-term contracts to be awarded by a tender process conducted by COES, whereby generators would commit to hold a certain capacity in reserve to provide the SFR service at the price proposed in their offers ("**Base Provision**"); and (*b*) through a balancing market, on which generators qualified in the Merit Order would submit short-term offers to provide the service ("**Balancing Market**");[57] and

(iii) Base Provision would be divided amongst firm base providers, which would be called upon to provide the SFR service with priority over other generators[58] ("**Firm Base Providers**"), and variable base providers, which would be called upon to provide such service, if the Firm Base Provider's SFR reserve was insufficient to cover the entire amount of necessary reserve, and on condition that their offers were more competitive than those submitted by generators in the Balancing Market ("**Variable Base Providers**").[59]

127.    On the other hand, the Parties disagree – and this is the crux of the SFR Service Claim – on whether, under PR-22, Firm Base Providers were guaranteed dispatch for the provision of electricity without having to compete with other generators for inclusion in the Daily Program or whether they would be called to provide the SFR service with priority over other generators only insofar as they were included in the Merit Order.[60]

### 3.    Technical Note 1 and the Guidelines

128.    In order to implement PR-22, Section 6.1.17 of PR-22 tasked <u>**COES**</u> with publishing "a Technical Note for Secondary Regulation establishing the necessary technical specifications for the operation of the Secondary Regulation"[61] and Section 6.1.11

---

[57] Memorial, ¶ 89; Reply, ¶ 91; Counter-Memorial, ¶ 97; Rejoinder, ¶ 42. PR-22 (C-56), Section 9.2.

[58] Memorial, ¶¶ 10, 78, 81-83; Reply, ¶¶ 29(a)-(b), 51, 71(d), 77(c), 107; Counter-Memorial, ¶¶ 92, 97(v); Rejoinder, ¶ 144.

[59] Memorial, ¶¶ 77, 89-91; Reply, ¶ 95; Counter-Memorial, ¶¶ 11, 97; Rejoinder, ¶ 42. PR-22 (C-56), Sections 9.5.3(a) and 9.3.

[60] Memorial, ¶¶ 83-90; Reply, ¶ 30; Counter-Memorial, ¶¶ 72 ff., 92, 97(v); Rejoinder, ¶¶ 76 ff., 144, 496.

[61] PR-22 (C-56), Section 6.1.17 ("*una Nota Técnica para Regulación Secundaria donde se establezcan las especificaciones técnicas necesarias para el funcionamiento de la Regulación Secundaria*").

tasked COES with establishing "the guidelines of the Base Provision, which will be presented to OSINERGMIN for its approval".[62]

129.  Accordingly, on October 1, 2015 COES published a "Technical Note for the Implementation of the Secondary Frequency Regulation Service through the Automatic Generation Control – AGC" ("**Technical Note 1**").[63] Technical Note 1 "define[d] the technical specifications necessary for the operation of the Secondary Frequency Regulation", namely: (i) the technical requirements to implement the AGC System; (ii) the technical requirements for generators to qualify as potential SFR service providers; and (iii) the procedure to assign the SFR service provision.[64]

130.  Technical Note 1 was reviewed by OSINERGMIN, which, on December 16, 2015, sent its comments and recommendations to COES "*with the goal of arriving at a suitable process for implementing the* [SFR service]*, complying with the minimum technical specifications referred to in subparagraph 6.1.17 of PR-22*",[65] together with a report by the consulting firm Estudios Eléctricos S.A. (the "**EE Study**"). The EE Study recommended that Section 5.7.2 of Technical Note 1 be amended to include "[a] *term that considers the reserve allotted by the base provision should be included in the restrictions of the optimization model*".[66] According to Respondent, COES did not consider OSINERGMIN's suggestions and "*did nothing at the time to clarify* [the] *Technical Note*".[67]

131.  The Parties disagree on the relevance of Technical Note 1 for the interpretation of Resolution No. 141.

132.  Pursuant to Section 6.1.11 of PR-22, COES then submitted to OSINERGMIN a draft of the "*Guidelines for the award of the Base Provision for Secondary Frequency*" (the

---

[62] PR-22 (C-56), Section 6.1.11 ("*los lineamientos de la Provisión Base, el cual será presentado a OSINERGMIN para su aprobación previa*").

[63] Technical Note 1, October 1, 2015 (C-59).

[64] *Id*., Section 2.

[65] Letter from OSINERGIMIN to COES, Observations to the Technical Note for the Implementation of the GC Control System for the Secondary Frequency Regulation Service of December 15, 2015 (R-43), p. 1.

[66] *Id*., p. 15.

[67] Counter-Memorial, ¶ 109.

"**Guidelines**"). The draft was published on December 30, 2015 and was subject to comments and questions of generators, which OSINERGMIN answered.[68]

133.    Of particular relevance for the discussions between the Parties is OSINERGMIN's response to the following observation of the thermal power generator Enersur (now "**Engie**"):

> Subsection 6.5 of the proposal [i.e. the Guidelines] establishes the methodology for the award of the Base Provision within the scope of the auction, which indicates that it will be awarded, starting from the lowest to highest rate offered, until the required reserve margin has been covered. However, this fails to take into account the operational costs of each generation technology offering the Secondary Frequency Regulation service. This would create an unnecessary excess cost for the system.
>
> As a matter of fact, if SFR is awarded to only one or two URS [SFR units], based on their bid prices, these generation units will operate in a firm manner during the tendered periods, that is, for three years. The operation of these units is going to be forced in the daily economic dispatch, thus possibly generating cost overruns.
>
> For example, if a diesel generation unit offered all the required SFR reserve at a low bid price becoming the only winner of the tender. This unit would provide the SFR in a firm manner for the 3 years and would operate in a forced way in the dispatch, even during periods when the marginal cost of the system is much lower than its variable fuel costs. Currently, when said cost difference occurs, it is compensated by COES arbitrarily through a new rate that has been created and called 'SFR operation', which is imposed on the agents, generating higher costs.
>
> Therefore, in addition to the bid prices, the technologies of the units providing SFR should also be considered so that the provision of such service is optimized, minimizing the operating cost of the SEIN.[69]

---

[68] Rejoinder, ¶ 192.

[69] OSINERGMIN Report No. 110, February 2016 (C-103), Comment 2.1.3. The original Spanish version reads as follows: "*El numeral 6.5 de la propuesta establece la metodología de asignación de la provisión Base en la subasta, el cual indica que será asignado de menor a mayor precio ofertado hasta cubrir el margen de reserva requerido. Sin embargo, no toma en cuenta los costos operativos de cada tecnología de generación que oferte el servicio de RSF. Esto generaría un sobrecosto innecesario al sistema. En efecto, al adjudicar la RSF solo a una o dos URS, sobre la base de sus precios ofertados, estas unidades de generación operarán de manera firme durante los periodos que han ofertado, es decir, podrían operar durante los tres años. La operación de estas unidades va a ser forzada en el despacho económico diario, pudiendo generar sobrecostos. Como ejemplo podemos citar una unidad de generación a diésel que oferte toda la reserva requerida de la RSF a un precio bajo, siendo solo ésta la adjudicada en la subasta. Esta unidad va a proveer de manera firme la RSF durante los 3 años y va a operar de manera forzada en el despacho, incluso en periodos en que el costo marginal del sistema sea mucho menor a su costo variable de combustible. Actualmente, cuando se produce dicha diferencia de costos, es compensada por el COES de manera*

23

134. In its response OSINERGMIN noted that PR-22 and the Guidelines did not make a distinction between bids depending on the technology of generation units offering to provide the SFR.[70] As discussed below, the Parties disagree on the meaning and implication of that answer.

135. The Guidelines were adopted by OSINERGMIN on February 11, 2016.[71] They mention PR-22 in the recitals and incorporate by reference Technical Note 1 in Annex 3 (the Guidelines, together with PR-22 and Technical Note 1, are also referred as the "**Bid Terms**").

136. The Guidelines (*i*) entrust COES with the task of conducting and supervising the tender process to award the Base Provision;[72] (*ii*) in compliance with Section 9.5.5 of PR-22, confirm that the tender process would end in the signing of a commitment act between the winning bidder and COES;[73] (*iii*) establish that the cost of providing the SFR service offered by each bidder (i.e. the bid price) would be the objective factor for determining the winner of the tender;[74] and (*iv*) provide that the winner of the tender would have the exclusive right to provide the Base Provision for a period of three years.[75]

### 4.    *Kallpa GSA's participation in the tender for the Base Provision*

137. In accordance with the legal framework described above, in February 2016, COES called generators to participate in the tender for the award of the Base Provision from August 2016 to July 2019 ("**Tender**").[76]

---

arbitraria a través de una nueva calificación que ha creado y denomina "operación RSF", la cual es impuesta a los agentes, generándole mayores costos. Por lo tanto, adicionalmente a los precios ofertas, se deben considerar también las tecnologías que proveen la RSF a fin de que la provisión de dicho servicio sea de manera óptima, minimizando el costo de operación del SEIN".

[70] *Ibid*.

[71] OSINERGMIN Resolution No. 26 approving the Guidelines for the Award of the Base Provision for Secondary Frequency (Guidelines), issued on February 11, 2016, published on February 16, 2016 (C-60).

[72] Guidelines (C-60bis), Section 3.1.1.

[73] *Id*., Section 6.6.4.

[74] *Id*., Section 6.5.2.

[75] *Id*., Sections 4.2.1, 6.5.2.3, 6.53(iii).

[76] COES Letter No. COES/D-132-2016, February 29, 2016 (C-62).

138.    After receiving the approval of its management and shareholders,[77] Kallpa GSA decided to take part in the Tender offering to provide the Firm Base Provision through both its power plants, Kallpa and Las Flores, for a price of zero Soles/kW-month and to declare the entirety of its variable costs for both plants in the upcoming gas price declaration on June 15, 2016.[78] According to Claimants' witness, Mr. Frisancho, Kallpa GSA's then commercial manager, those decisions were taken on the premise that "*we were prepared not to receive any remuneration for maintaining the reserve, since the greater benefit would be to be able to recover all of our gas costs by dispatching energy*".[79] On that basis, Kallpa GSA submitted its bid ("**Bid**").[80]

139.    As discussed below,[81] Kallpa GSA's understanding of the conditions of the Tender and of the assurances it allegedly received from COES – based on which it contends that it submitted the Bid – is at the core of the dispute on the SFR Service Claim. Claimants allege that Kallpa GSA's participation in the Tender was premised exclusively on the understanding that the Firm Base Provider would be mandatorily dispatched, irrespective of the Merit Order. Claimants maintain that such understanding was confirmed by COES at a meeting on March 30, 2016 between Mr. Frisancho, Mr. Aguilar, Kallpa GSA's assistant studies manager, and COES's representatives.[82] This version of the events is disputed by Respondent.

140.    Kallpa GSA won the Tender and, on April 15, 2016, concluded with COES the commitment act awarding to the Kallpa and Las Flores plants the Firm Base Provision of SFR for the period between August 2016 and July 2019 (the "**Commitment Act**").[83]

---

[77] PowerPoint Presentation entitled "Secondary Frequency Regulation through AGC", April 3, 2016 (C-104); CWS-Frisancho I, ¶ 70; CWS- García Burgos, ¶¶ 34-35.

[78] Memorial, ¶ 110; Reply, ¶ 175. According to Claimants' witness, such intention was ratified on June 8, 2015, at a meeting of Kallpa GSA's Executive Committee (see Memorial, ¶ 113; CWS-Frisancho, I, ¶¶ 73-78).

[79] CWS-Frisancho I, ¶ 78, as quoted in Memorial, ¶ 113.

[80] Memorial, ¶¶ 106-107; Reply, ¶ 153.

[81] See Section VI.B.1i below.

[82] Memorial, ¶¶ 105-107.

[83] Commitment Act, April 15, 2016 (C-63). As noted by Respondent, "*that same Commitment Act was signed by the other two generation companies that were selected as SFR Variable Base Providers, Statkraft (with four generation units) and Duke Energy (with two generation units)*" (Rejoinder, ¶ 212).

The Commitment Act incorporated by reference the commitments and obligations established by – *inter alia* – PR-22, Technical Note 1, and the Guidelines.[84]

### 5. The enactment of Resolution No. 141

141.    Between June 8 and June 13, 2016 (after the award of the Tender and before the deadline for the filing by generators of their Declared Costs) several generators wrote to OSINERGMIN expressing concerns regarding the award of the Firm Base Provision to Kallpa GSA and the interpretation of PR-22.

142.    The core of their concerns was that the provision of the SFR service by Kallpa GSA in accordance with PR-22 and the Commitment Act might generate additional costs, in contravention of the principle established by Article 12.1 of Law 28832 pursuant to which COES must operate the Peruvian electricity system at the minimum cost (the "**Economic Dispatch Principle**").[85] The generators also expressed concern about Kallpa GSA's upcoming annual Declared Costs[86] and requested that OSINERGMIN provide clarifications on the correct interpretation of PR-22 by June 15, 2016, which was the deadline for the filing by generators of their Declared Costs.[87]

143.    The Parties disagree on the content, significance, and consequences of these communications of the generators. According to Claimants, those communications pressured Respondent to reverse the terms of PR-22.[88] Respondent disputes this, arguing that OSINERGMIN realized that Kallpa GSA had misunderstood how PR-22

---

[84] Memorial, ¶ 111; Reply, ¶ 327; Commitment Act (C-63), ¶ 4.1.

[85] Letter from Engie Energía Perú S.A. to OSINERGMIN and COES, Letter No, ENG/535-2016, June 8, 2016 (C-64); Letter from Termochilca to OSINERGMIN, Letter N° GG-MISC-348-2016, June 10, 2016 (C-65); Letter from Empresa de Generación Eléctrica San Gabán S.A. to COES, Letter EGESG N° 307-2016-GC, June 9, 2016 (R-45); Letter from Statkraft Perú S.A. to OSINERGMIN, Letter N° SKP/GC-837-2016, June 10, 2016 (R-46); Letter from Termoselva S.R.L. to OSINERGMIN, Letter N° C-TMS-065-2016, June 10, 2016 (R-49); Letter from Electroperú S.A. to OSINERGMIN, Letter N° G-579-2016, June 13, 2016 (R-51).

[86] Letter from Engie Energía Perú S.A. to OSINERGIMN and COES, Letter No. ENG/535-2016, June 8, 2016 (C-64); Letter from Empresa de Generación Eléctrica San Gabán S.A. to COES, Letter EGESG N° 307-2016-GC, June 9, 2016 (R-45); Letter from Electroperú S.A. to OSINERGMIN, Letter N° G-579-2016, June 13, 2016 (R-51).

[87] Letter from Engie Energía Perú S.A. to OSINERGIMN and COES, Letter No. ENG/535-2016, June 8, 2016 (C-64); Letter from Termochilca to OSINERGMIN, Letter N° GG-MISC-348-2016, June 10, 2016 (C-65); Letter N° SKP/GC-837-2016, June 10, 2016 (R-47); Letter from Termoselva S.R.L. to OSINERGMIN, Letter N° C-TMS-065-2016, June 10, 2016 (R-49); Letter from Empresa de Generación Huallaga S.A. al OSINERGMIN, Letter N° EGH-080-2016, June 13, 2016 (R-50).

[88] Memorial, ¶ 114.

was to be interpreted and implemented and that it was therefore necessary to clarify it.[89]

144. On June 13, 2016, two days before Declared Costs were due, OSINERGMIN issued Resolution No. 141, together with Technical Report No. 410 ("**Report 410**")[90] and Legal Report No. 411 ("**Report 411**").[91]

145. Resolution No. 141 in essence did the following:

   (i) it referred to two of the communications from generators mentioned above (one from Engie[92] dated June 8, 2015, and one from Termochilca S.A. dated June 10, 2016[93]) concerning the interpretation of PR-22 and the latter's compatibility with Law 28832;[94]

   (ii) indicated that the object of Resolution No. 141 was to establish the correct interpretation of Articles 9.3 and 9.5 of PR-22 and, specifically, whether the latter provided that the Firm Base Provider would necessarily be included in the Daily Program and thus always dispatched;[95]

   (iii) referred to COES's Technical Procedure concerning the "*Programing of Short Term Operations*", which had been approved by OSINERGMIN's Resolution No. 244 ("**PR-01**") of November 26, 2014, providing that the Daily Program must "*ensure that the program in question considers efficient management for the best use of energy resources, as well as to guarantee the economic operation of*

---

[89] Counter-Memorial, ¶ 123; Rejoinder, ¶ 226.

[90] OSINERGMIN, Report No. 410-2016-GRT, June 2016 (R-26).

[91] OSINERGMIN, Report No. 411-2016-GRT, June 10, 2016 (C-107).

[92] Letter from Engie Energía Perú S.A. to OSINERGIMN and COES, Letter No. ENG/535-2016, June 8, 2016 (C-64).

[93] Letter from Termochilca to OSINERGMIN, Letter N° GG-MISC-348-2016, June 10, 2016 (C-65).

[94] Resolution No. 141 (C-66), p. 1.

[95] Resolution No. 141 (C-66), p. 3: "*Que para el caso concreto, estaría en debate, en particular lo previsto en los numerales 9.3 y 9.5 del PR-22, en cuanto dispondría que, i) la reserva rotante para la regulación secundaria de frecuencia se cubra primero con el compromiso firme en la Provisión Base, y lo faltante con el Mercado de Ajuste, y ii) el bloque de la reserva rotante para la regulación secundaria de frecuencia se asignará y liquidará económicamente en cualquier caso. El sentido en cuestión, que se estaría otorgando se refiere a que forzosamente la reserva será programada al despacho y de ese modo será pagada*".

*the SEIN, preserving the criteria of quality, safety and reliability, established by applicable regulations*";[96]

(iv) clarified that, "if there are discrepancies between the meaning" of PR-22 and PR-01, "subjecting the procedures to the principle of legality and complying with COES's legal purpose clears up any uncertainty regarding the correct interpretation, since Article 12.1 of Law No. 28832 provides that: 'The purpose of COES is to coordinate the short, medium and long term operation of the SEIN at minimum cost, preserving the security of the system, better use of energy resources [...]'";[97]

(v) indicated that "[t]he need to clarify is based on the possible different meanings that have been reported to Osinergmin" and that OSINERGMIN had the power to clarify the correct interpretation of PR-22;[98] and

(vi) concluded that, considering Reports 410 and 411,

the provisions of subsections 9.3 and 9.5.3 of COES Technical Procedure PR-22 "Rotating Reserve for Secondary Frequency Regulation" are not incompatible with the minimum operating cost requirements described in Law No. 28832, and therefore:

a. In the case of units that provide the Secondary Frequency Regulation reserve, as long as they are programmed in the dispatch according to the economic dispatch, the reserve will first be covered with the firmly committed amounts through Firm Base Provision, while the Balancing Market and the amounts not firmly committed as part of the Base Provision, will cover the rest, and;

b. The Reserve block firmly committed through the Base Provision will be assigned in the calculation of the payment of the Secondary

---

[96] Resolution No. 141 (C-66), p. 3. The original Spanish version reads as follows: "*considere la gestión eficiente para el mejor aprovechamiento de los recursos energéticos, así como garantizar la operación económica del* [National Grid] *preservando los criterios de calidad, seguridad y confiabilidad establecidos por la normativa vigente*".

[97] *Ibid*. The original Spanish version reads as follows: "*si acaso hubiera discrepancias entre los sentidos de dos procedimientos técnicos, la sujeción al principio de legalidad y el cumplimiento de la finalidad legal del COES, despeja cualquier incertidumbre respecto de la opción correcta a elegir, ya que el artículo 12.1 de la Ley N° 28832, establece que: 'El COES tiene por finalidad coordinar la operación de corto, mediano y largo plazo del SEIN al mínimo costo, preservando la seguridad del sistema, el mejor aprovechamiento de los recursos energéticos,…'*".

[98] Resolution No. 141 (C-66), p. 4. The original Spanish version reads as follows: "*la necesidad de precisar surg*[ió] *a partir de posibles sentidos distintos que se han puesto en conocimiento de* [OSINERGMIN]*".

Regulation service and will be economically compensated in any case, even if not programed to operate.[99]

146.    Following the adoption of Resolution No. 141, Kallpa GSA decided not to declare full costs for the Kallpa and Las Flores plants, as it initially intended to do, and instead opted to "*strategically declare only its gas supply price (not including transport and distribution costs)*".[100]

147.    On July 8, 2016, COES published "Technical Note for the Methodology to carry out the Assignment of the Economic Dispatch and the Reserve for Secondary Frequency Regulation" ("**Technical Note 2**"),[101] which aimed to define "the methodology that should be used by COES to determine the economic dispatch of generation and the reserve required for Secondary Frequency Regulation, taking into account the provisions of [Resolution No. 141] and [Report 410]". [102]

148.    On July 27, 2016, COES partially amended Technical Note No. 2 by the "*Technical note: methodology to be used for assignment of economic dispatch and secondary frequency regulation reserve*" ("**Technical Note 3**"), which provided further clarifications on Firm Base Providers, Variable Base Providers and on the Balancing Market generators.[103]

---

[99] *Id.*, p. 5, Article 1. The original Spanish version reads as follows: "[…] *lo previsto en los numerales 9.3 y 9.5.3.a del Procedimiento Técnico COES PR-22 "Reserva Rotante para Regulación Secundaria de Frecuencia, no es incompatible con el esquema de mínimo costo de la operación previsto en la Ley N° 28832, y por tanto: a. En el caso de las unidades que proveen la Reserva para la Regulación Secundaria de Frecuencia, siempre que se encuentren programadas en la operación por despacho económico, dicha Reserva será cubierta primero con las URS que tengan cantidades comprometidas en firme en la Provisión Base, mientras que, con el Mercado de Ajuste y las cantidades no comprometidas en firme de la Provisión Base, se cubre lo faltante, y; b. El bloque de la Reserva comprometida en firme en la Provisión Base se asignará en el cálculo del pago del servicio de Regulación Secundaria y se liquidará económicamente en cualquier caso, así no se encuentre programada en la operación*".

[100] Memorial, ¶ 126; Gas Price Declaration Envelope Opening Act, June 15, 2016 (C-110), Section 10.

[101] Technical Note 2, July 8, 2016 (C-112).

[102] *Ibid*. The original Spanish version reads as follows: "[…] *es necesario definir de una manera clara la metodología que debe utilizar el COES para determinar el despacho económico de generación y la reserva requerida para Regulación Secundaria de frecuencia, tomando en cuenta lo establecido en la Resolución Osinergmin N° 141-2016-OS/CD aprobada el 13.06.2016 y el Informe Técnico N° 410-2016-GRT que sustenta*".

[103] Technical Note 3, July 27, 2016 (C-113).

149.    In particular, Technical Note 3 clarified that:

(i) there was no order of priority for the assignment of the SFR service between Firm Base Providers, Variable Base Providers, and Balancing Market generators;[104]

(ii) the economic dispatch of the National Grid as well as the assignment of the SFR service provision would be carried out through Joint Optimization, taking into consideration the entire available generator park and any generation unit qualified to operate under AGC control;[105] and

(iii) Variable Base Providers would be allowed to participate in the Balancing Market and offer prices and quantities other than those agreed in their respective commitment acts, while the Firm Base Providers would not be allowed to participate in the Balancing Market.[106]

150.    On December 6, 2016, Kallpa GSA challenged both Technical Note 2 and Technical Note 3 before COES.[107]

151.    The challenge was partially upheld[108] and, as a result, on December 16, 2016, COES issued Technical Note 4,[109] which eliminated the provision according to which there

---

[104] *Id*., p. 3.

[105] *Ibid*.

[106] *Ibid*.

[107] COES Letter No. 225, December 6, 2016 (C-115), Section 3(a). The original Spanish version reads as follows: "[Technical Note 1 and Technical Note 3] *le causan agravio al dejar sin efecto su derecho a ser considerado preferentemente en el programa de despacho para brindar la Regulación Secundaria de Frecuencia (RSF). Así mismo, que dichas decisiones recortan su legítimo derecho de brindar el servicio de Provisión Base a Firme en los términos en los que le fue adjudicado, mediante un cambio de reglas que modifican los presupuestos del análisis costo/beneficio bajo el cual se comprometió a brindar el servicio, colocándolo en una situación desfavorable frente a sus competidores*".

[108] At Sections 15 and 16, COES observed that: "*KALLPA también cuestiona el contenido de la Nota Técnica 2, específicamente en el extremo del numeral 2 que señala lo siguiente: '2. No existe un orden de prioridad para la asignación de la Reserva para RSF a ser suministrada por la Provisión Base Firme, la Base Variable y la del Mercado de ajuste.' KALLPA señala que dicho contenido excede lo dispuesto por la Resolución. Al respecto, es correcto señalar que la Resolución 141 no eliminó el orden de prioridad para la asignación de la reserva para RSF sino que simplemente precisó que para el ejercicio de tal prioridad, en el marco del respeto al mandato de la ley sobre la operación del sistema al mínimo costo, se requería que las URS se encontraran programadas para operar en el despacho económico*".

[109] COES Letter No. 225, December 6, 2016 (C-115), Resolution 1. Technical Note 4, December 16, 2016 (C-116).

would be no priority order between Firm Base Providers, Variable Base Providers and the providers of the Balancing Market.[110]

### E.   The facts relevant for the New Methodology Claim

152.   The methodology for apportioning the costs of Secondary Lines among generators is determined by OSINERGMIN in accordance with the criteria established by law.[111]

153.   Under Peruvian law, there are two criteria that OSINERGMIN must follow in devising the methodology for apportioning such costs. For the Secondary Lines at the heart of the New Methodology Claim (the "**Use Criterion Lines**"), Law 28832 requires OSINERGMIN to follow a criterion, under which generators only pay for the Lines they effectively use ("**Use Criterion**").[112]

154.   Over the course of the period from 2001 until Claimants divested their interest in the Subsidiaries, Respondent adopted three methodologies for the apportionment of costs of the Use Criterion Lines.

155.   According to the first methodology ("**First Methodology**"), which was adopted for two successive tariff periods from 2001 to 2008, OSINERGMIN allocated costs among generators in accordance with the "*topological distribution factors*" method ("**TDF Method**") on the electricity flows injected into the system by each generator. Pursuant to that methodology, generators only paid for the Use Criterion Lines through which their electricity flowed, in proportion to the energy they injected.[113]

156.   The second methodology ("**Second Methodology**"), adopted on May 30, 2008, by OSINERGMIN with Resolution No. 383-2008-OS/CD ("**Resolution No. 383**"),[114] was a

---

[110] Memorial, ¶ 132.

[111] ECL Regulation, as amended (C-34), Article 139(e)(III). The original Spanish version reads as follows: *"OSINERGMIN definirá la asignación de responsabilidad de pago a la generación o a la demanda, o en forma compartida entre ambas. Para ello, deberá tener en cuenta el uso y/o el beneficio económico que cada instalación proporcione a los generadores y/o demanda, así como lo dispuesto por el cuarto párrafo de la Sexta Disposición Complementaria Final de la Ley Nº 28832".*

[112] Law 28832 (C-42), Sixth Transitory Final Provision. In particular, Law 28832 stabilized the criterion to apportion the Secondary Lines' costs in effect at the time it was issued by providing that it would have to remain the same going forward (Rejoinder, ¶ 285). Reply, ¶ 214; Rejoinder, ¶ 282. See also Uribe & Leyva Transmission Report, (R-52), pp. 10, 12-14.

[113] Memorial, ¶ 139; Reply, ¶ 220; Counter-Memorial, ¶ 165; Rejoinder, ¶¶ 290-298.

[114] Resolution No. 383, May 30, 2008 (C-44), Article 1.

two-step methodology, which applied for the two following tariff periods, i.e. from 2009 until 2017.[115]

157. Under the Second Methodology, OSINERGMIN first identified the "*relevant generators*" using a given Use Criterion Line by applying the TDF Method. A generator was "*relevant*" if at least one of its electrical pathways to any demand "*busbar*" passed through the Line ("**Relevant Generators**").[116] Then, OSINERGMIN apportioned the costs between Relevant Generators based on (*i*) the electric distance between the generator and the Line;[117] and (*ii*) the amount of energy produced by the generator (the "**Energy/Distance Method**").[118] Thus, the closer a generator was to the Use Criterion Line and the more electricity it generated, the higher the costs it was required to bear for that line.[119] Notably, however, Article 11.5 of Resolution No. 383 dispensed Relevant Generators from paying the costs of a Line if they were liable for less than 1% of such costs under the Energy/Distance Method.[120]

158. It is undisputed that both the First and the Second Methodology were in line with the Use Criterion.[121]

159. On May 1, 2017, OSINERGMIN enacted Resolution No. 164 which introduced yet another methodology (the "**New Methodology**").[122] The New Methodology apportioned the Use Criterion Lines costs only based on the Energy/Distance

---

[115] The Second Methodology was implemented first by Resolution No. 184 of October 14, 2009 (C-45), which approved the compensation payable for the use of the Use Criterion Lines from November 2009 to April 2013, and then confirmed for the subsequent four-year period by Resolution No. 54 of April 15, 2013 (C-49).

[116] Resolution No. 183 (C-44), Article 4.20. The original Spanish version reads as follows: "*Si por lo menos un camino eléctrico de un generador particular hasta cualquier barra de demanda pasa por un Elemento, el generador es relevante para el Elemento*".

[117] Electric distance is measured using electrical impedance, which is the opposition that a part of a circuit presents to electric current and it is directly proportional to the length of the line. See Reply, ¶ 221; Counter-Memorial, ¶ 169; Rejoinder, ¶ 309.

[118] Memorial, ¶ 139; Counter-Memorial, ¶ 169; Reply, ¶ 221; Rejoinder, ¶ 309.

[119] Memorial, ¶ 146; Counter-Memorial, ¶ 169.

[120] Resolution No. 383 (C-44), Article 11.5.

[121] Memorial, ¶¶ 139, 144; Reply, ¶¶ 220-222; Counter-Memorial, ¶ 165; Rejoinder, ¶ 289.

[122] Resolution No. 164 (C-67), Article 1. Resolution No. 164 provided that the New Methodology would take effect gradually from 2017 to 2021, at which date it would be fully implemented (*id.*, Second Complementary Transitory Disposition).

Method, no longer referring to the concept of Relevant Generators.[123] However, it maintained the 1% filter of Article 11.5 of Resolution No. 383[124] and introduced another filter based on impedance changes which, according to Respondent, identified the generators that used a given line,[125] but, according to Claimants, "*merely serves to eliminate exclusive use elements*" ("**Impedance Filter**").[126]

160.   The Parties disagree on the criterion underlying the New Methodology. Respondent alleges that Resolution No. 164 is consistent with the Use Criterion. Claimants argue that Peru adopted a benefit criterion, pursuant to which all generators were to pay for all lines, regardless of whether they actually used them, in proportion to the benefit derived therefrom, measured on the basis of the amount of electricity injected into the system by each generator or on its installed capacity ("**Benefit Criterion**"). Respondent disputes that the Benefit Criterion exists under Peruvian law or in practice.

161.   The Parties also disagree on the reasons that led to the adoption of the New Methodology. Respondent alleges that the New Methodology was based on a study by the consulting firm Uribe & Leyva hired by OSINERGMIN in 2015, which concluded that the Second Methodology caused uncertainty and led to inconsistent results, due to its two-fold structure ("**Uribe & Leyva Transmission Report**").[127] Claimants contend that this is unproven and actually inconsistent with the fact that OSINERGMIN received the Uribe & Leyva Transmission Report after issuing the draft of Resolution No. 164 ("**Resolution No. 24**"),[128] and only two months prior to the publication of Resolution No. 164 itself.[129]

162.   OSINERGMIN issued Resolution No. 24 in February 2016, after having solicited comments and observations from generators and stakeholders.[130] Concurrently, it

---

[123] Memorial, ¶ 151; Reply, ¶ 231; Counter-Memorial, ¶ 177; Rejoinder, ¶ 316.

[124] See ¶¶ 156-157 *supra*. Resolution No. 164 (C-67), Article 11.4.

[125] Rejoinder, ¶ 316.

[126] Claimants' Post-Hearing Brief, ¶ 214. See also Reply, ¶ 243. Resolution No. 164 (C-67), Article 11.1.

[127] Counter-Memorial, ¶ 177; Rejoinder, ¶¶ 313-315; Uribe & Leyva Transmission Report, Section 6.5.2 (R-52-ENG).

[128] Resolution No. 24, February 11, 2016 (C-61).

[129] Reply, ¶¶ 252-255.

[130] Report No. 455, June 2016 (R-40), ii: "*Resolution No. 024-2016-OS/CD granted a term of fifteen (15)*

published a "*Report to Support the Proposal to Amend the Rule on the '*Procedure to Assign Payment Responsibility for the Secondary Transmission Systems and Complementary Transmission Systems'" ("**Report No. 111**") explaining the reasons for the change of methodology.[131]

163.   In June 2016, OSINERGMIN issued the "*New Rule* 'Procedure for the Apportionment of Responsibility for the Payment of STS and CTS'*: Analysis of Opinions and Suggestions on the Proposed Rule*" ("**Report No. 455**"), replying to the generators' technical comments on Resolution No. 24.[132]

164.   On June 27, 2016, OSINERGMIN issued its "*Legal Report No. 457-2016-GRT: Legal opinion on the merits of publishing the resolution approving the Rule on the '*Procedure to Apportion Payment Responsibility of the Secondary Transmission Systems and Complementary Transmission Systems*' and legal analysis of the comments presented on the draft legislation*" ("**Report No. 457**"), setting out the legal basis for the methodology change and answering the generators' comments on legal aspects of Resolution No. 164.[133]

## IV.  THE SUBJECT MATTER OF THE DISPUTE AND THE PARTIES' REQUESTS FOR RELIEF

### A.   The subject matter of the dispute

165.   The dispute submitted to the Tribunal relates to two measures that – according to Claimants – Peru adopted in breach of its FET and FPS obligations under Article 10.5 of the Treaty and affected their investments in the power generation sector, causing damages in the total amount of US$ 195.3 million. The measures are:

   •   Resolution No. 141, regulating the provision of the SFR service, which is the subject of the SFR Service Claim; and

---

*calendar days in which to submit opinions and suggestions from interested parties. Subsequently, Resolution No. 038-2016-OS/CD modified the term for submission of opinions and suggestions from interested parties, extending it from fifteen (15) to thirty (30) calendar days*".

[131] Report No. 111, February 2016 (R-29).

[132] Report No. 455, June 2016 (R-40).

[133] Report No. 457, June 27, 2016 (R-30).

- Resolution No. 164, which modified the methodology for apportioning the Use Criterion Lines costs among generators and which is the subject of the New Methodology Claim.

### 1. *Claimants' position*

166. By the SFR Service Claim, Claimants seek recovery for the damages they allegedly suffered as a consequence of OSINERGMIN's adoption of Resolution No. 141. According to Claimants, Resolution No. 141 violated Respondent's MST/FET and FPS obligations under the Treaty, because it "eviscerated" the bidding terms it had established for the tender of SFR services by retroactively amending the Bid Terms,[134] upon which Kallpa GSA relied when it submitted its Bid for the provision of the SFR service. Peru thereby breached Claimants' legitimate expectations, in an arbitrary fashion and contrary to Peru's obligation to maintain a stable and predictable legal and business environment.

167. In particular, Claimants contend that by Resolution No. 141 Respondent reversed the commitments previously made to Kallpa GSA that the winner of the Tender would be called upon to dispatch energy on a continuous basis, irrespective of its position in the Merit Order and thus with priority over other generators, recovering the costs of providing the SFR service through the compensation it would receive for the energy it supplied to the grid.[135]

168. According to Claimants, the adoption of Resolution No. 141 caused them damages in the amount of US$ 110.7 million.[136]

169. By the New Methodology Claim, Claimants seek compensation for the losses allegedly incurred by their investments in Peru as a consequence of the adoption by OSINERGMIN of Resolution No. 164, which modified the costs apportioning methodology for the use by generators of the Use Criterion Lines. According to Claimants, Peru breached Article 10.5 of the Treaty, because Resolution No. 164 was impermissibly arbitrary, discriminatory and in breach of Peru's obligation to maintain

---

[134] See PR-22 (C-56).

[135] Memorial, ¶¶ 12, 117; Reply, ¶¶ 4-6.

[136] Reply, ¶ 482.

a stable and predictable legal and business environment, causing damages to Claimants' investments for US$ 84.6 million.[137]

170.    Claimants oppose both of Respondent's objections to jurisdiction.

### 2.    Respondent's position

171.    Respondent objects to the Tribunal's jurisdiction over both Claimants based on the denial of benefits provision of Article 10.15 of the Treaty.[138] Additionally it contends that Kenon, contrary to IC Power, did not retain the right to arbitrate the present dispute when it sold its investments in Peru in 2017 and therefore it cannot be a claimant.[139]

172.    As to the merits, Respondent maintains that both the SFR Service Claim and the New Methodology Claim must be rejected, since, by adopting the Resolutions, it acted reasonably and in accordance with its regulatory powers, to ensure the proper operation of the electricity system and thus did not breach its obligations under Article 10.5 of the Treaty.

### B.   The Parties' Requests for Relief

173.    Claimants request from the Tribunal the following relief:[140]

(a) REJECT Peru's objections to the jurisdiction of the Tribunal;

(b) DECLARE that Peru has breached Article 10.5 of the Treaty;

(c) ORDER Peru to pay Claimants US$ 195.3 million for its breaches of the Treaty or such other sum as the Tribunal sees fit;

(d) ORDER Peru to pay pre-award interest on the damages awarded in respect of (c) as set out in Section V.C [of the Reply], or at such rate as the Tribunal determines to be appropriate and calculated from 30 November 2017 until the date of Award;

(e) ORDER Peru to pay post-award interest on all damages awarded as set out in Section V.C [of the Reply], or at such rate as the Tribunal determines to be appropriate;

(f) AWARD such other relief as the Tribunal considers appropriate; and

---

[137] Reply, ¶ 506.

[138] Counter-Memorial, ¶¶ 190 ff.; Rejoinder, ¶¶ 351 ff.

[139] Rejoinder, ¶¶ 350, 436-442.

[140] Reply, ¶ 584.

(g) ORDER Peru to pay all of the costs and expenses of this arbitration, including Claimants' legal and expert fees, the fees and expenses of the Tribunal and ICSID's other costs.

174. Respondent requests from the Tribunal the following relief:[141]

> For the foregoing reasons (and those provided in Respondent's prior written and oral submissions), Respondent respectfully requests that the Tribunal dismiss all of Claimants' claims for want of jurisdiction or, in the alternative, on the merits, and award Respondent the costs and fees, including attorneys' fees, it has incurred in this arbitration, which, given the complexity of the issues under dispute, have been significant.

175. On the basis of the Parties written and oral submissions and of their prayers for relief, the Tribunal will first deal with Respondent's objections to jurisdiction. Next it will address the merits of Claimants' claims that Peru breached its fair and equitable treatment and full protection and security obligations under Article 10.5 of the Treaty by enacting Resolution No. 141 and Resolution No. 164. Finally it will decide whether Claimants are entitled to the damages they claim.

\*\*\*

176. Considering the above prayers for relief, the Tribunal will analyze in succession Respondent's objections to jurisdiction over the Claims (**Section V**), Respondent's alleged liability for the breach of Article 10.5 of the Treaty for the SFR Service Claim and the New Methodology Claim (**Section VI**) and quantum (**Section VII**).

## V. JURISDICTION

### A. Introduction

177. Respondent raises two objections to the Tribunal's jurisdiction.

- First, it maintains that the Tribunal lacks jurisdiction *ratione voluntatis* over both Claimants ("**Denial of Benefits Objection**"), since, in its view, Respondent denied its consent to arbitration by invoking Article 10.15 of the Treaty ("**Denial of Benefits Clause**) in the Counter-Memorial.[142]

- Second, Respondent alleges that the Tribunal lacks jurisdiction over the second Claimant, Kenon, since the latter – contrary to IC Power – allegedly did not retain the right to bring claims under the Treaty in relation to its

---

[141] Respondent's Post-Hearing Brief, ¶ 213.

[142] Counter-Memorial, ¶ 195.

investments, when it sold them in 2017 ("**Kenon Objection**" and together with the Denial of Benefits Objection, the "**Jurisdictional Objections**").

178.   Before analyzing the Jurisdictional Objections, the Tribunal considers it necessary to identify Claimants' investments protected under the Treaty.

179.   Article 10.1.6 of the Treaty, defines an "investment" as follows:

> […] every kind of asset, owned or controlled, directly or indirectly, by an investor, that includes characteristics such as the commitment of capital of other resources, the expectations of gain or profit, or the assumption of risk, including but not limited to the following:
>
> (a) an enterprise;
>
> (b) shares, stock, and other forms of equity participation in an enterprise, including rights derived therefrom;
>
> (c) bonds, debentures, and loans and other instruments including rights derived therefrom;
>
> (d) futures, options, and other derivatives;
>
> (e) turnkey, construction, management, production, concession, revenue-sharing, and other similar contracts;
>
> (f) claims to money or to any contractual performance related to a business and having an economic value;
>
> (g) intellectual property rights;
>
> (h) licenses, authorizations, permits, and similar rights conferred pursuant to applicable domestic law, including any concession to search for, cultivate, extract or exploit natural resources;
>
> (i) other tangible or intangible, movable or immovable property, and related property rights, such as leases, mortgages, liens, and pledges.

180.   According to Claimants, their protected investments are: (*i*) their indirect shareholdings in Kallpa GSA and Samay; (*ii*) the Kallpa, Las Flores, Cerro del Águila and Puerto Bravo power plants; (*iii*) the rights and administrative authorizations granted to Kallpa GSA and Samay in relation to the operation and electricity generation of those plants; (*iv*) the right to provide the SFR service on a firm basis in accordance with the Commitment Act;[143] and (*v*) the Commitment Act.[144]

---

[143] Memorial, ¶ 178.

[144] Reply, ¶ 333(a).

181.    Respondent does not contest that the investments listed in (*i*) to (*iv*) above are protected investments under the Treaty. However, it maintains that the Commitment Act (point (*v*) above) is not a protected investment.[145]

182.    The Tribunal is of the view that the argument that the Commitment Act is not an investment is not raised strictly as a jurisdictional objection, but as a defense to Claimants' claim that Resolution No. 141 frustrated their legitimate expectations of continuous dispatch for Kallpa GSA as the winner of the Tender.[146] Indeed, that argument is raised to rebut Claimants' position – advanced for the first time in the Reply – that their expectations were legitimate and protected by the Treaty because they arose when Claimants made their investment in Peru, and therefore when they acquired equity interests in Kallpa GSA, but also when Kallpa GSA entered into the Commitment Act.[147]

183.    Given the Tribunal's decision (Section VI.B.3 below), that the SFR Claim is to be granted on the ground that Resolution No. 141 was arbitrary, the Tribunal has not found it necessary to address whether that Resolution also frustrated Claimants' legitimate expectations. Consequently, there is no need for the Tribunal to address Respondent's argument on the nature of the Commitment Act, which was raised to rebut Claimants' argument on legitimate expectations. However, for the sake of completeness, the Tribunal finds that the Commitment Act is a protected investment under Article 10.1.6 of the Treaty, on the grounds that it is *an "asset, owned or controlled, directly or indirectly, by an investor"*.[148]

B.   **Respondent's position**

1.    ***The Denial of Benefits Objection***

184.    Respondent maintains that the Tribunal lacks jurisdiction *ratione voluntatis* over the present dispute, since Peru allegedly denied its consent to arbitration by invoking the Denial of Benefits Clause in the Counter-Memorial.

---

[145] Respondent's Post-Hearing Brief, ¶¶ 135, 141.

[146] Respondent's Post-Hearing Brief, ¶¶ 135, 141; Rejoinder, ¶ 486.

[147] Reply, ¶¶ 338, 349.

[148] Article 10.1.6 of the Treaty (C-1).

185.    The Denial of Benefits Clause reads as follow:

> Subject to prior notification and consultation according to the procedures set out in Article 17.4 (Consultations), a Party may deny the benefits of this Chapter to an investor of the other Party that is an enterprise of such Party and to investments of such an investor where the Party establishes that the enterprise is owned or controlled by persons of a non-Party, or of the denying Party, and has no substantive business operations in the territory of the other Party.[149]

186.    Pursuant to that Clause, Peru may deny the benefits of the investment chapter of the Treaty – including its offer to arbitrate – to Singaporean investors that Peru demonstrates (*i*) are owned or controlled by non-Singaporean persons or entities and (*ii*) have no substantive business operations in Singapore.

187.    In Respondent's view, both those requirements were satisfied at the time of the Request for Arbitration (i.e. June 19, 2019) – which, according to Respondent, is the relevant moment to assess whether Claimants satisfy the requirements of the Denial of Benefits Clause –[150] (and continue to be satisfied today),[151] because Claimants are "*precisely the kind of investors that Article 10.15 is intended to reach and carve out from the* [Treaty's] *investment chapter protections*".[152]

188.    Based on Claimants' filings with the US Securities & Exchange Commission ("**SEC**"),[153] Respondent submits that, in 2019, Claimants were (and remain today) ultimately owned and controlled by an Israeli national, Mr. Idan Ofer.[154]

189.    Respondent further maintains that Claimants have not proven their ownership of "*substantive business operations*" in Singapore, either at the time of the Request for

---

[149] Article 10.15 of the Treaty reads as follows: "*Subject to prior notification and consultation according to the procedures set out in Article 17.4 (Consultations), a Party may deny the benefits of this Chapter to an investor of the other Party that is an enterprise of such Party and to investments of such an investor where the Party establishes that the enterprise is owned or controlled by persons of a non Party, or of the denying Party, and has no substantive business operations in the territory of the other Party*".

[150] Counter-Memorial, ¶ 200; Rejoinder, ¶ 406.

[151] Counter-Memorial, ¶ 194.

[152] Counter-Memorial, ¶¶ 194-226; Rejoinder, ¶¶ 398-435.

[153] See R-4, R-56, R-57, R-58, R-59, R-60, R-63.

[154] Counter-Memorial, ¶¶ 198-210; Rejoinder, ¶¶ 400-402.

Arbitration, or currently, since, in its view, they failed to demonstrate that they hold an interest in a business conducting real operations in Singapore.[155]

190. Respondent contests that its invocation of the Denial of Benefits Clause is belated and ineffective. In Respondent's view, its denial of benefits is timely under the Treaty and the ICSID Rules, since, according to the relevant case law, the invocation of a denial of benefits clause gives rise to a jurisdictional objection, with the consequence that the clause may properly be invoked in the counter-memorial pursuant to Rule 41(1).[156] Respondent further argues that many tribunals considered that a denial of benefits clause can only be invoked after a dispute arises.[157] It also emphasizes that, as a practical matter, before a dispute arises a State is not in a position to notify its intention to invoke a denial of benefits clause and subsequent consultations cannot take place, because "*no State, Peru included, has the capacity to review and investigate every investor at the time an investment is made, and at every point in time thereafter that the investor's ownership structure or home State business operations might change, to determine whether invocation of a denial of benefits clause is appropriate*".[158] According to Respondent, "*states usually become aware of the circumstances justifying the denial of benefits only when faced with a claim from a presumptive investor*".[159]

---

[155] Counter-Memorial, ¶¶ 211-226; Rejoinder, ¶¶ 403-434.

[156] Counter-Memorial, ¶ 195; Rejoinder, ¶¶ 375-385. In support of its position, Respondent relies upon the following decisions: *Aris Mining Corporation (formerly known as GCM Mining Corp. and Gran Colombia Gold Corp.) v. Republic of Colombia*, ICSID Case No. ARB/18/23, Decision on the Bifurcated Jurisdictional Issue, November 23, 2020 (RL-2), ¶ 131 [hereinafter: "*Gran Colombia v. Colombia*"]; *Pac Rim Cayman LLC v. Republic of El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections, June 1, 2012 (RL-1), ¶ 4.85 [hereinafter: "*Pac Rim v. El Salvador*"]; *Guaracachi America, Inc. and Rurelec PLC v. Plurinational State of Bolivia*, PCA Case No. 2011-17, Award, January 31, 2014 (RL-3), ¶ 381; *Ulysseas, Inc. v. Republic of Ecuador*, Interim Award, September 28, 2010 (RL-4), ¶ 172 [hereinafter: "*Ulysseas v. Ecuador*"].

[157] Counter-Memorial, ¶ 196; Rejoinder, ¶ 365. In support of its position, Respondent relies upon the following decisions and authorities: *Guaracachi America, Inc. and Rurelec PLC v. Plurinational State of Bolivia*, PCA Case No. 2011-17, Award, January 31, 2014 (RL-3), ¶¶ 376-377, 379; *Ulysseas v. Ecuador*, ¶ 173; *Littop Enterprises Limited, Bridgemont Ventures Limited, Bordo Management Limited v. Ukraine*, SCC Arbitration V 2015/092, Final Award, February 4, 2021 (RL-30), ¶¶ 598, 600, 603; Loukas A. Mistelis and Crina M. Baltag, *Denial of Benefits and Article 17 of the Energy Charter Treaty*, 113 *Penn State Law Review,* 1301, 2009 (RL-29), p. 1315.

[158] Rejoinder, ¶ 361.

[159] Rejoinder, ¶ 361, where Respondent quotes Loukas A. Mistelis and Crina M. Baltag, *Denial of Benefits and Article 17 of the Energy Charter Treaty*, 113 *Penn State Law Review*, 1301, 2009 (RL-29), p. 1315.

191.    In Respondent's view, the case-law relied upon by Claimants to support their position that denial of benefits clauses must be invoked before a dispute arises and have only prospective effects is irrelevant for, and not applicable to, the present dispute, since that case-law concerns the denial of benefits clause of the Energy Charter Treaty, the wording of which is different from that of the Denial of Benefits Clause.[160]

192.    Respondent also contests Claimants' allegation that it did not validly invoke the Denial of Benefits Clause since it did so without respecting the prior-notification-and-consultation-requirement of Article 10.15 of the Treaty. Peru claims that, already in June 2019, it alerted Claimants that it might invoke that provision and then properly notified them of its intention to invoke the Denial of Benefits Clause prior to the Counter-Memorial. It further maintains that Article 10.15 of the Treaty does not require that a decision to deny benefits can only be adopted after completion of consultations and that consequently the prior-consultation requirement is met in the present case. That is because, it submits, Peru and Singapore effectively engaged in consultations and reached a "mutually satisfactory resolution" in compliance with Article 17.4 of the Treaty, following Peru's notification of its intention to invoke the Denial of Benefits Clause on June 22, 2021.[161]

### 2.    The Kenon Objection

193.    As mentioned, in addition to the Denial of Benefits Objection, Respondent advances a further jurisdictional objection (the Kenon Objection) whereby it contests the Tribunal's jurisdiction *ratione personae* over Kenon.

194.    Respondent submits that Kenon is not a proper claimant in the present arbitration since, when Kenon and IC Power sold their investments in Peru in 2017, only IC Power retained the right to arbitrate the claims relating to those investments, while Kenon transferred it together with the underlying investments.

195.    Respondent bases the Kenon Objection on the SPA whereby in 2017, through their wholly owned subsidiary, Inkia, Claimants sold their assets in Latin America, including

---

[160] Rejoinder, ¶¶ 366-376.

[161] Counter-Memorial, ¶ 193; Rejoinder, ¶¶ 386-397.

their Peruvian subsidiaries, to third parties not involved in this arbitration.[162] Specifically, it relies on Article 2.6 of the SPA, which reads as follow:

> [t]he Parties agree that IC Power Ltd. retains all rights it currently has in relation to the Investment Treaty Claims and there shall be no effect on such rights by virtue of this Agreement. For the avoidance of doubt, the Parties expressly acknowledge that this Agreement is being made without prejudice to IC Power Ltd. receiving whatever redress is possible from an arbitration tribunal for its Investment Treaty Claims.[163]

196.     According to Respondent, the full, unredacted, version of the SPA – that it was able to locate on the SEC's website after Claimants filed the Reply –[164] revealed that "*there are no other provisions in the SPA that provide a similar right to Kenon*".[165]

197.     On that basis, Respondent argues that "*Claimants are not equally entitled to bring a claim before this Tribunal*" and that, by selling its rights to its Peruvian investments in 2017 without expressly retaining its rights to arbitrate the claims relating to those investments, Kenon "*sold its rights to any such claims as well*".[166]

198.     As to the timing of the Kenon Objection, Respondent claims that Kenon's lack of standing only became apparent when Peru was able to locate the unredacted version of the SPA on the SEC's website after the filing of the Reply, which revealed that detailed information about the 2017 transaction was available on that website. In Respondent's view, the versions of the SPA produced by Claimants with the Memorial[167] and the Reply,[168] which were "*heavily redacted and incomplete*", did not allow Respondent to know the full content of the SPA.[169] Therefore, because it did not have access to the unredacted version of the SPA it was impossible for Respondent to raise the Kenon Objection earlier.[170]

---

[162] Share Purchase Agreement by and among Inkia Energy Ltd., IC Power Distribution Holdings, PTE. Ltd., Nautilus Inkia Holdings LLC, Nautilus Distribution Holdings LLC, and Nautilus Ishmus Holdings LLC of November 24, 2017 (C-15, C-15*bis*, and R-135-ENG).

[163] (C-15), (C-15*bis*), (R-135), Article 2.6.

[164] Rejoinder, ¶ 438.

[165] Rejoinder, ¶ 439, emphasis in the original.

[166] Rejoinder, ¶ 441.

[167] C-15.

[168] C-15*bis*.

[169] Rejoinder, ¶¶ 437-438.

[170] Rejoinder, ¶ 437.

### C. Claimants' position

#### 1. The Denial of Benefits Objection

199. Claimants oppose the Denial of Benefits Objection on three grounds.

200. _First_, they argue that Peru's invocation of the Denial of Benefits Clause in the Counter-Memorial (i.e. more than four years after Respondent was first notified of the existence of a dispute with IC Power and more than two years after it was first notified of the existence of a dispute with Kenon) is untimely and abusive. They aver that, according to prevailing case-law, denial of benefits clauses cannot be invoked after a dispute has arisen and with retroactive effect and that thus, as of October 4, 2016, when Peru was notified of the existence of a dispute with IC Power,[171] Respondent was precluded from retroactively invoking the Denial of Benefits Clause.

201. Claimants put forward two further alternative arguments as to the time limit within which Respondent should have exercised its right to deny Claimants' benefits under the Treaty. The first argument, which is based on Article 10.17 of the Treaty and Article 25(1) of the ICSID Convention, is that Peru was not permitted to invoke the Denial of Benefits Clause after April 12, 2019, which is the moment when the Parties' consent to arbitration "_crystallized_" as a consequence of Peru's receipt of Claimants' Notice of Intent.[172] In the alternative, based on the principle that jurisdiction must

---

[171] Reply, ¶¶ 529-543; Claimants' Rejoinder, ¶ 39. Claimants refer to IC Power's letters to the Peruvian Ministry of Economy and Finance of October 3, 2016, C-68 and June 21, 2017, C-69 and to Kenon's letter to the Peruvian Ministry of Economy and Finance of November 12, 2018, C-72. In support of their position, Claimants rely upon the following decisions: _Plama Consortium Limited v. Republic of Bulgaria,_ ICSID Case No. ARB/03/24, Decision on Jurisdiction, February 8, 2005 (CL-114), ¶ 144; _Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan,_ ICSID Case No. ARB/07/14, Excerpts of Award, June 22, 2010 (CL-125), ¶ 225; _Yukos Universal Limited (Isle of Man) v. The Russian Federation_, PCA Case No. AA 227, UNCITRAL, Interim Award on Jurisdiction and Admissibility, November 30, 2009 (CL-124), ¶ 458; _Hulley Enterprises Limited (Cyprus) v. Russian Federation_, PCA Case No. 2005-04/AA227, UNCITRAL, Interim Award on Jurisdiction and Admissibility, November 30, 2009 (CL-167); _Veteran Petroleum Limited (Cyprus) v. Russian Federation_, PCA Case No. 2005-05/AA228, Interim Award on Jurisdiction and Admissibility, November 30, 2009 (CL-168); _Khan Resources Inc. v. Mongolia_, UNCITRAL, Decision on Jurisdiction, July 25, 2012 (CL-130), ¶¶ 425-431; _Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Trading Ltd v. Kazakhstan_, SCC Case No. V 116/2010, Award, December 19, 2013 (CL-134), ¶ 745; _Isolux Infrastructure Netherlands, BV v. Reino de España_, SCC Case No. SCC V2013/153, Award, July 12, 2016 (CL-141), ¶ 715; _Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain_, ICSID Case No. ARB/14/1, Award, May 16, 2018 (CL-148), ¶ 239 [hereinafter: "_Masdar v. Spain_"]; _NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain_, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles, March 12, 2019 (RL-5), ¶¶ 267-271.

[172] Reply, ¶¶ 544-549; Claimants' Rejoinder, ¶ 39.

be assessed at the commencement of the arbitration, Claimants submit that Peru lost its right to invoke the Denial of Benefits Clause once Claimants filed the Request for Arbitration on June 12, 2019,[173] since events subsequent to the commencement of the arbitration, like Peru's denial of benefits in the Counter-Memorial, "*cannot affect the Tribunal's evaluation of its jurisdiction*".[174]

202. _Second_, Claimants contend that Peru's denial of benefits is invalid and exercised in bad faith, since Respondent failed to fulfill the preconditions of Article 10.15 of the Treaty, pursuant to which the Denial of Benefits Clause can be invoked only "*subject to prior notification and consultation*".[175]

203. _Third_, Claimants maintain that, in any case, the Denial of Benefits Objection must be dismissed, because Respondent failed to establish that Claimants have "*no substantive business operations*" in Singapore, as required by Article 10.15 of the Treaty.[176]

204. Claimants do not contest that they are owned and controlled by a non-Singaporean entity.

### 2. The Kenon Objection

205. Claimants oppose the Kenon Objection on two grounds.

206. <u>First</u>, they contend that that Objection is belated, since it was unjustifiably raised after the time limit of ICSID Rule 41(1).[177] In Claimants' view, "*Peru has no valid excuse for having waited until its* […] *Reply on Jurisdiction to lodge* [the Kenon

---

[173] Reply, ¶¶ 550-552. In support of this position, Claimants rely on *Ampal-American Israel Corporation and others v. Arab Republic of Egypt,* ICSID Case No. ARB/12/11, Decision on Jurisdiction, February 1, 2016 (CL-139).

[174] Reply, ¶ 550.

[175] Reply, ¶¶ 527, 554-559; Claimants' Rejoinder, ¶¶ 9(a), 11-23.

[176] Reply, ¶¶ 560-583; Claimants' Rejoinder, ¶¶ 9(c), 67-111.

[177] To support their position, Claimants rely on the tribunal's decision in *Pac Rim Cayman LLC v. Republic of El Salvador,* ICSID Case No. ARB/09/12, October 14, 2016 (CL-173), ¶¶ 5.34, 5.45-5.49, by which the tribunal dismissed a jurisdictional objection raised by the respondent in its counter-memorial, "*following multiple submissions from the parties in relation to jurisdiction and two related decisions from the tribunal*" (Claimants' Rejoinder, ¶ 119).

Objection], *because it is not based on any new facts not available to* [Respondent] *previously*".[178]

207.     Claimants maintain that the Kenon Objection is based on (*i*) Article 2.6 of the SPA, which was available to Peru as of 2019, because that provision was not redacted in the version of the SPA submitted with the Request for Arbitration; and (*ii*) the absence of other provisions in the SPA granting Kenon rights similar to those granted to IC Power's by Article 2.6.[179]

208.     Claimants draw two consequences from this. First, that the Kenon Objection is "based on a provision of the SPA to which [Respondent] had access 21 months prior to the submission of its Memorial on Jurisdiction […] – i.e., the presumptive deadline, under Rule 41(1), for the making of jurisdictional objections"[180] and second, that Respondent bases the Kenon Objection not on a new fact, but rather on the absence of a new fact and therefore "could have asserted the same objection on the exact same basis in its [Counter-Memorial]".[181]

209.     In addition, Claimants aver that, even admitting that the unredacted copy of the SPA on which Respondent relies revealed a new fact unknown to Respondent at the time of the Counter-Memorial, "*Peru's failure to timely locate a publicly available document (the SPA) in advance of the date set for its* [Counter-Memorial] *is a problem of its own making and therefore cannot justify a late jurisdictional objection*".[182] According to Claimants, "*even where there is an arguably 'new' fact* […], *an objection is nonetheless untimely if the party objecting should have discovered the fact sooner*".[183]

---

[178] Claimants' Rejoinder, ¶ 114. See also ¶¶ 117-133.

[179] Claimants' Rejoinder, ¶ 124.

[180] Claimants' Rejoinder, ¶ 125.

[181] Claimants' Rejoinder, ¶ 126.

[182] Claimants' Rejoinder, ¶ 127.

[183] Claimants' Rejoinder, ¶ 130. In support of this argument, Claimants rely upon the tribunal's decision in the case *Waguih Elie George Siag and Clorinda Vecchi v Arab Republic of Egypt,* ICSID Case No. ARB/05/15, June 1, 2009 (CL-54).

210.   Second, Claimants allege that the Kenon Objection is "*demonstrably without merit*",[184] since Respondent "*mischaracterizes*" the effect of Article 2.6 of the SPA.[185]

211.   Claimants highlight that in the present arbitration Kenon and IC Power are pursuing identical claims in relation to the damages allegedly suffered by their Peruvian subsidiaries Kallpa GSA, Cerro del Águila S.A. and Samay as a consequence of the regulatory measures introduced by Peru. The basis of Kenon's right to bring claims is its indirect ownership of those subsidiaries at the time of the challenged measures, since until 2017 Kenon held those investments through its 100% subsidiaries, IC Power and Inkia.[186]

212.   Article 2.6 of the SPA records the intention of the parties that the sale have no effect on IC Power's rights in relation to the claims concerning the Peruvian subsidiaries, and carved those claims out of the sale. According to Claimants, it follows that those claims remained among IC Power's assets and, consequently, among Kenon's assets, since Kenon was (and continues to be) IC Power's sole shareholder.[187]

213.   Claimants maintain that if IC Power has the right to pursue the claims because they were not transferred by the SPA, "*then so does Kenon*", since "[t]*he claims could not have transferred to the buyers in respect of Kenon, but not IC Power*".[188]

214.   Claimants further argue that, even in the absence of Article 2.6 of the SPA, the claims would not have been transferred simply by virtue of the sale of the Peruvian subsidiaries under the SPA, since "*treaty claims belong to qualifying investors, and are not attached to qualifying investments, such that the default assumption under international law (absent something express to the contrary) is that the claims stay with the investors even when the underlying investments are sold*".[189] In support of

---

[184] Claimants' Rejoinder, ¶ 115.

[185] Claimants' Rejoinder, ¶ 135.

[186] Claimants' Rejoinder, ¶ 137.

[187] Claimants' Rejoinder, ¶¶ 138-139, 142.

[188] Claimants' Rejoinder, ¶ 144.

[189] Claimants' Rejoinder, ¶ 143.

that assertion, Claimants rely on the *Daimler v. Argentina* award[190] and on the decision on jurisdiction in *El Paso v. Argentina*.[191]

## D. The Tribunal's decision

### 1. The Denial of Benefits Objection

215. Claimants contest the Denial of Benefits Objection on multiple grounds. They raise a number of procedural defenses arguing that Peru's denial of benefits is belated, ineffective, and exercised in bad faith. They also submit that Respondent failed to establish that Claimants do not have "*substantive business operations*" in Singapore.

216. The Tribunal will begin by addressing the merits of the Denial of Benefits Objection, because if Respondent is unable to prove that Claimants lack "substantive business operations" in Singapore, this would be sufficient to dismiss the Objection, without addressing Claimants' procedural defenses to it.

217. It is common ground between the Parties[192] that, in order to be "substantive" for the purposes of Article 10.15 of the Treaty, the business operations of a company in its State of incorporation cannot be merely "*cursory, fleeting[,] or incidental, but must be of sufficient extent and meaning as to constitute a genuine connection by the company to its home State*".[193] The Parties also agree that, consequently, in order to be "substantive" the activities must be more significant than those required to maintain the company's registration or corporate existence.[194]

218. According to Respondent, however, "*for holding companies there is a higher bar*".[195] Respondent argues that in order to be considered to have substantive business operations in its State of incorporation, a holding company must hold among its assets an interest in a business that itself has real operations in the State of registration (Singapore in this case) and that, conversely, interests in a business

---

[190] *Daimler Financial Services AG v. Argentine Republic*, ICSID Case No. ARB/05/1, Award, August 22, 2012 (CL-79), ¶ 145 [hereinafter: "*Daimler v. Argentina*"].

[191] *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Decision on Jurisdiction, April 27, 2006 (CL-161), ¶ 135 [hereinafter: "*El Paso v. Argentina*"].

[192] Counter-Memorial, ¶ 212; Rejoinder, ¶ 405; Reply, ¶ 566; Claimants' Rejoinder, ¶ 93.

[193] *Gran Colombia v. Colombia*, ¶ 137.

[194] Counter-Memorial, ¶ 213; Rejoinder, ¶ 405; Reply, ¶ 566; Claimants' Rejoinder, ¶ 77.

[195] Counter-Memorial, ¶ 216.

whose real operations are outside of the State of registration are not sufficient. In support of that position, Respondent relies on the *Pac Rim v. El Salvador* decision.[196]

219. Claimants contest that position, and maintain that, according to the prevailing case law,[197] a holding company is deemed to have "*substantive business operations*" in its State of incorporation if it has office spaces, employees, and bank accounts in that State and conducts core corporate functions there (e.g., it holds board of directors' and shareholders' meetings there).[198]

220. Claimants also allege that Respondent misinterprets the tribunal's decision in *Pac Rim v. El Salvador* which, according to them, supports their position.[199]

221. Claimants further emphasize that to determine whether business operations are "substantive" one must assess the nature of the company's business activities by reference to the company's business purpose. With specific reference to holding companies, Claimants argue that a holding company's business operations must be assessed by reference to the types of activities that a holding company typically conducts in the ordinary course.[200]

222. As to the application of the "substantive business operations" test in the present case, the Parties disagree on the moment with respect to which that test must be satisfied.

223. Respondent contends that the only relevant moment in which Claimants' activities are to be assessed under Article 10.15 of the Treaty is June 2019, when Claimants submitted the Request for Arbitration, since it is a generally accepted that jurisdiction is to be determined at the time of the commencement of the arbitration.[201]

224. In Claimants' view, Respondent's position is irreconcilable with the text of the Denial of Benefits Clause, which uses the present tense, thus unequivocally indicating that

---

[196] Counter-Memorial, ¶ 216; Rejoinder, ¶ 405.

[197] Claimants rely upon the following decisions: *Gran Colombia v. Colombia*, ¶ 139; *Limited Liability Company Amto v. Ukraine*, SCC Arbitration No. 080/2005, Final Award, March 26, 2008 (CL-120), ¶¶ 68-69; *Masdar v. Spain*, ¶¶ 224 and ff., 253-254; *9REN Holding S.a.r.l v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, May 31, 2019 (CL-152), ¶ 182 [hereinafter: "*9REN v. Spain*"].

[198] Reply, ¶¶ 567, 570, 571; Claimants' Rejoinder, ¶¶ 79-81, 89-92.

[199] Reply, ¶¶ 569-570; Claimants' Rejoinder, ¶¶ 81-88.

[200] Claimants' Rejoinder, ¶¶ 91, 93.

[201] Rejoinder, ¶ 406.

the conditions required to deny an investor the benefits of the Treaty must be assessed "*contemporaneously to the State's invocation of the provision*".[202]

225.    As to the nature of the entity's operations that are relevant for the purposes of Article 10.15 of the Treaty, the Tribunal finds Claimants' arguments more persuasive. The case-law they refer to (which Respondent fails to rebut) confirms that (*i*) the inquiry into which operations are relevant must be based on the nature of that entity's business;[203] and (*ii*) consequently, a holding company has substantive business operations in its State of incorporation as long as it conducts core corporate functions, rents office spaces, has full-time locally-based employees and bank accounts there.[204]

226.    Respondent's reading of *Pac Rim v. El Salvador* is unconvincing. That decision does not hold that, in order to have substantive business operations in its State of registration, a holding company's assets must include an interest in a business that itself has real operations in the State of registration.[205] As pointed out by Claimants, in that case the tribunal clearly stated that it was not deciding, in general terms, that a "*traditional holding company*" can never meet the "substantive business operations*"* requirement, but merely that, in the specific case before it, the claimant had failed to meet that standard, as the company did not have "*a board of directors, board minutes, a continuous physical presence and a bank account*" in its State of incorporation.[206]

227.    Thus, in accordance with the principle applied in *Pac Rim v. El Salvador*, which is aligned with the remaining case law relied on by Claimants,[207] for the purpose of establishing whether Claimants have substantive business operations in Singapore, the Tribunal must determine whether Claimants, as holding companies, carried out significant activities in Singapore.

_____

[202] Claimants' Rejoinder, ¶ 94.

[203] *Pac Rim v. El Salvador*, ¶ 4.72; *9REN v. Spain*, ¶ 182.

[204] *Gran Colombia v. Colombia*, ¶ 139; *Limited Liability Company Amto v. Ukraine*, SCC Arbitration No. 080/2005, Final Award, March 26, 2008 (CL-120), ¶¶ 68-69; *Masdar v. Spain*, ¶¶ 224 and ff., 253-254.

[205] Counter-Memorial, ¶ 216 and fn. 383.

[206] Reply, ¶ 569(b), quoting paragraphs 4.72 and 4.73 of the *Pac Rim* v. *El Salvador* Decision.

[207] See fn. 203 and 204 above.

228. As to the moment for assessing whether Claimants have substantive business operations in Singapore, the issue is moot since, as noted below, Claimants submitted compelling evidence that both in June 2019 (when they filed the Request for Arbitration) and in February 2021 (when Peru invoked the Denial of Benefits Clause) Claimants had a continuous physical presence in Singapore, from where they managed and organized their international business affairs, and therefore conducted substantive business operations there.

229. The chart below lists the evidence that confirms Claimants' position on this point:

| Evidence of Kenon's continuous physical presence in Singapore | | | |
|---|---|---|---|
| | Type of document | Exhibit No. and references | Date | Relevance |
| **Before February 2021** | Minutes of board of directors' meetings | C-197bis, p. 1-7 | November 17, 2016 | Proof that Kenon held board of directors' meetings in Singapore |
| | | C-197bis, p. 9-11 | May 23-25, 2016 | |
| | | C-197bis, p. 13-18 | March 27, 2018 | |
| | | C-197bis p. 20-26 | May 30, 2018 | |
| | | C-197bis, p. 26-35 | August 29, 2018 | |
| | | C-197bis, p. 37-45 | May 29, 2019 | |
| | | C-197bis, p. 47-54 | August 29, 2019 | |
| | | C-197bis, p. 57-65 | November 19, 2019 | |
| | | C-197bis, p. 67-79 | March 31, 2020 | |
| | | C-197bis, p. 81-90 | September 1, 2020 | |
| | | C-197bis, p. 92-101 | November 24, 2020 | |
| | | | | |
| | Proxy statement for the annual general meeting of shareholders to be held on June 30, 2015 | C-129 | June 12, 2015 | Proof that Kenon held its shareholders' annual general meetings in Singapore |
| | Proxy statement for the annual general meeting | C-137 | June 3, 2016 | |

| | | | |
|---|---|---|---|
| of shareholders to be held on June 22, 2016 | | | |
| Proxy statement for the annual general meeting of shareholders to be held on June 22, 2017 | C-150 | June 2, 2017 | |
| Proxy statement for the annual general meeting of shareholders to be held on June 14, 2018 | C-160 | May 16, 2018 | |
| Proxy statement for the annual general meeting of shareholders to be held on June 14, 2019 | C-172 | May 16, 2019 | |
| Proxy statement for the annual general meeting of shareholders to be held on June 11, 2020 | C-177 | June 11, 2020 | |
| | | | |
| Notice of extraordinary general meeting of shareholders to be held on December 19, 2017 | C-153 | November 19, 2017 | Proof that Kenon held (at least) one shareholders' extraordinary general meeting in Singapore |
| | | | |
| Office lease between Millenia Private Limited and Kenon (relevant excerpts) | C-127 | October 16, 2014 | Proof that Kenon rented office spaces in Singapore from November 1, 2014 to October 31, 2017 |
| Office lease between Millenia Private Limited and Kenon (relevant excerpt) | C-149bis | June 1, 2017 | Proof that Kenon rented office spaces in Singapore from June 1, 2017 to December 31, 2020 |
| | | | |

| | | | |
|---|---|---|---|
| Employees' payroll | C-215, p. 1 | From December 1, 2015 to December 31, 2015 | |
| Employees' social security contributions (Central Providence Fund) | C-215, p. 2 | December 2015 | |
| Employees' payroll | C-215, p. 3 | From May 1, 2016 to May 31, 2016 | |
| Employees' social security contributions (Central Providence Fund) | C-215, p. 4 | May 2016 | |
| Employees' payroll | C-215, p. 5 | From February 1, 2017 to February 28, 2017 | |
| Employees' social security contributions (Central Providence Fund) | C-215, p. 6 | February 2017 | |
| Employees' payroll | C-215, p. 7 | From July 1, 2018 to July 31, 2018 | Proof that Kenon had permanent personnel based in Singapore |
| Employees' social security contributions (Central Providence Fund) | C-215, p. 8 | July 2018 | |
| Employees' social security contributions (Central Providence Fund) | C-215, 9 | July 2018 | |
| Employees' social security contributions (Central Providence Fund) | C-215, 23-24 | August 2018 | |
| Employees' social security contributions (Central Providence Fund) | C-215, p. 13-14 | October/November 14, 2019 | |
| Employees' payroll | C-215, p. 10 | November 1, 2019 to November 30, 2019 | |

| | | | |
|---|---|---|---|
| Employees' social security contributions (Central Providence Fund) | C-215, p. 11-12 | November 2019 | |
| Employees' social security contributions (Central Providence Fund) | C-215, p. 15 | April 2020 | |
| Employees' social security contributions (Central Providence Fund) | C-215, p. 18 | October/November 2020 | |
| Press release | C-216, p. 4-23 | From June 2015 to May 2019 | |
| | | | |
| SEC Form 20-F, 2016 | C-134 | April 22, 2016 (account period: January 1, 2015-December 31, 2015) | |
| SEC Form 20-F, 2017 | C-148 | April 19, 2017 (accounting period: January 1, 2016-December 31, 2016) | |
| SEC Form 20-F, 2017 | C-14bis | 2017 (accounting period: January 1, 2017 to December 31, 2017) | Proof that KMPG Singapore audited Kenon's accounts |
| SEC Form 20-F, 2019 | C-171 | April 8, 2019 (accounting period: January 1, 2018 to December 31, 2018) | |
| SEC Form 20-F, 2020 | C-176 | April 30, 2020 (accounting period January 1, 2019-December 31, 2019) | |
| | | | |
| Bank statements | C-193, p. 1-11 | September 30. 2016-November 2018 | Proof that Kenon's held bank accounts in Singapore |
| | | | |

| | Type of document | Exhibit No. and references | Date | Content |
|---|---|---|---|---|
| | IT services contract concluded by Kenon | C-181bis, p. 1-37 | April 2016-April 2019 Duration 12 months | Proof that Kenon engaged with local service providers |
| | Travel insurance policy of Kenon's personnel | C-211, p. 1-8 | April 2017 – April 2018 | |
| | IT services contract concluded by Kenon | C-181bis, p. 1-37 | April 2016-April 2019 (Duration: 12 months) | |
| | Kenon's liability insurance policy | C-204 | November 12, 2019 (Duration: until October 31, 2020) | |
| | Travel insurance policy of Kenon's personnel | C-211, p. 8-16 | April 2019 – April 2020 | |
| | Health insurance policy of Kenon's personnel | C-213, p. 1-16 | March 2019-February 2020 | |

| | Type of document | Exhibit No. and references | Date | Content |
|---|---|---|---|---|
| **In or after February 2021** | Minutes of board of directors' meeting | C-197bis, p. 103-108 | April 13, 2021 | Proof that Kenon held board of directors' meetings in Singapore |
| | Office Lease between Millenia private Limited and Kenon (relevant excerpt) | C-180 | October 12, 2020 | Proof that Kenon rents office spaces in Singapore as of January 1, 2021 to December 31, 2023 |
| | Employees' social security contributions (Central Providence Fund) | C-215, p. 20-21 | April/May 2021 | Proof that Kenon had permanent personnel based in Singapore |
| | Employees' payroll | C-215, p. 22 | August 1, 2021 to August 31, 2021 | |
| | Press releases from Singapore | C-260, p. 24-32 | June 2021 | |
| | SEC Form 20-F, 2021 | C-189 | April 19, 2021 (accounting period January 1, 2020- | Proof that KMPG Singapore audited Kenon's accounts |

| | | | December 31, 2020) | |
|---|---|---|---|---|
| Kenon's bank statements | C-193, p. 12-22 | June 2019-March 2021 | Proof that Kenon's had bank accounts in Singapore |
| Travel insurance policy of Kenon's personnel | C-211, p. 17-24 | April 2021 – April 2022 | Proof that Kenon engaged with local service providers |

| | Evidence of IC Power's continuous physical presence in Singapore | | | |
|---|---|---|---|---|
| | Type of document | Exhibit No. and references | Date | Relevance |
| **Before February 2021** | Minutes of board of directors' meeting | C-197bis, p. 110-113 | November 18, 2015 | Proof that IC Power held board of directors' meetings in Singapore |
| | Minutes of board of directors' meeting | C-197bis, p. 115-117 | February 23, 2016 | |
| | Minutes of board of directors' meeting | C-197bis, p. 119-122 | November 16, 2017 | |
| | Letter from Millenia Private Limited (Kenon's landlord) to Kenon | C-131 | December 24, 2015 | Proof that IC Power used Kenon's office space in Singapore |
| | Lease Agreement between Kenon and Millenia Private Limited | C-149bis | June 1, 2017 | |
| | Bank statements | C-209, p. 1-17 | February28, 2017-March 2019 | Proof that IC Power had bank accounts in Singapore |
| | Minutes of annual shareholders' meeting | C-214 | August 29, 2017 | Proof that IC Power held at least one shareholders' annual meeting in Singapore |
| | Accounting and Corporate Regulatory Authority (ACRA) IC Power's business Profile of IC Power | C-212, p- 1-11 | 2018-2019 | Proof that IC Power had directors and secretaries based in Singapore |

| | Type of document | Exhibit No. and references | Date | Relevance |
|---|---|---|---|---|
| **In of after February** | Minutes of board of directors' meetings | C-197bis, p. 124-125 | February 21, 2020 | |

| | | | |
|---|---|---|---|
| Minutes of board of directors' meetings | C-197bis, p. 127-128 | March 25, 2021 | Proof that IC Power held board of directors' meetings in Singapore |
| Letter from Pontiac to Kenon re lease agreement | C-187 | February 25, 2021 | Proof that IC Power used Kenon's office space in Singapore |
| IC Power's bank statements | C-209, p. 19- | August 2019-April 2021 | Proof that IC Power had bank accounts in Singapore |
| Minutes and agendas of annual shareholders' meetings | C-214 | June 30, 2020 and 2021 | Proof that IC Power held shareholders' annual meetings in Singapore |
| Accounting and Corporate Regulatory Authority (ACRA) IC Powers' business Profile | C-212, p. 12-19 | 2020-2021 | Proof that IC Power had directors and secretaries based in Singapore |

230. Based on this evidence, the Tribunal is satisfied that Claimants have shown that, at the relevant times, they conducted substantive business operations in Singapore in accordance with the criteria set forth by prevailing case law on denial of benefits clauses. Accordingly, the Denial of Benefits Objection is rejected.

### 2.   The Kenon Objection

231. The Tribunal now moves to Respondent's further jurisdictional objection with respect to Kenon, which is based on the latter's alleged lack of standing due to the sale of its investments in 2017. As mentioned, Claimants contest this objection on the grounds that it is both belated and meritless.

232. Respondent characterizes this objection as one going to the Tribunal's jurisdiction. However, Respondent is not claiming that the Tribunal lacks what in the Dissenting Opinion in *Waste Management, Inc. v. United Mexican States* is referred to as "*the power [...] to hear*"[208] and decide Kenon's claims. Rather, it submits that "*Kenon is* [...] *not a proper Claimant in this arbitration, as it has no standing*".[209] That is the

---

[208] *Waste Management, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/98/2, Dissenting Opinion of Keith Highet, June 2, 2000, ¶ 58.

[209] Rejoinder, ¶ 442, emphasis added.

basis for its position that the Tribunal cannot "*exercise its adjudicative power in relation to the specific claims submitted to it*".[210]

233.    The Tribunal is accordingly of the view that the Kenon Objection can also be construed as an objection to the admissibility of Kenon's claims.

234.    Either way, the Tribunal does not consider that characterizing the Kenon Objection in one way or the other impacts the decision on the objection. This is so for two reasons. First, because Rule 41 – which is the basis for Claimants' contention that the Kenon Objection is belated – is usually interpreted as applicable to admissibility objections, in addition to strictly jurisdictional ones.[211] Second, because, as illustrated below, the Kenon Objection is to be dismissed not on the basis of Claimants' belatedness defense but for lack of merit, for which the characterization of the Objection as pertaining to jurisdiction or admissibility is irrelevant.

235.    Starting from the belatedness argument, Rule 41(1) should be read in conjunction with Rule 41(2) and Article 41 of the ICSID Convention, which establish the tribunal's power and duty to consider preliminary objections on its own initiative, at any stage of the proceedings. Accordingly, the Tribunal must consider the Kenon objection, regardless of whether it was belated.[212]

---

[210] Z. Douglas, *International Law of Investment Claims*, Cambridge University Press, 2009, p. 293. On the difference between jurisdiction and admissibility, see also See J. Crawford, *Brownlies' Principles of Public International Law*, Oxford University Press, 2012, p. 693: "*Objections to jurisdiction relate to conditions affecting the parties' consent to have the tribunal decide the case at all.* […] *An objection to the admissibility of a claim invites the tribunal to dismiss* […] *the claim on a ground which, while it does not exclude its authority in principle, affects the possibility or propriety of its deciding the particular case at the particular time*" and B. Sabahi, *The Course of an Investment Arbitration: Overview of the Procedure*, in B. Sabahi et al., *Investor-State Arbitration*, 2019, pp. 172-174.

[211] J. Fouret, R. Gerbay, G. M. Alvarez, *The ICSID Convention, Regulations and Rules – A Practical Commentary*, 2019, ¶ 25.137; *The Rompetrol Group N.V. v. Romania*, ICSID Case No. ARB/06/3, Decision on Respondent's Preliminary Objections on Jurisdiction and Admissibility, April 18, 2008, ¶ 112; *Pan America Energy LLC and BP Argentina Exploration Company v. Argentine Republic*, ICSID Case No. ARB/03/13 and *BP America Production Company and others v. Argentine Republic*, ICSID Case No. ARB/04/08, Decision on Preliminary Objections, July 27, 2006, ¶ 54; *Bureau Veritas, Inspection, Valuation, Assessment and Control, BIVAC B.V. v. Republic of Paraguay*, ICSID Case No. ARB/07/9, Decision on Jurisdiction, May 29, 2009, ¶ 52; *Alpha Projektholding GmbH v. Ukraine*, ICSID Case No. ARB/07/16, Award, November 8, 2010, ¶ 240.

[212] See also the holding in *The Lopez-Goyne Family Trust and others v. Republic of Nicaragua*, ICSID Case No. ARB/17/44, Award, March 1, 2023, ¶ 364 that "*case-law and academic literature largely endorse the view that, save for fringe cases, pursuant to Article 41 of the ICSID Convention, tribunals must address jurisdictional objections irrespective of when they were raised*".

236.    As to the merits, the Kenon Objection is based on the SPA, whereby Claimants, through their wholly owned subsidiary Inkia, sold all their Latin American assets, including the Subsidiaries.[213]

237.    The Parties base their respective positions on Article 2.6 of the SPA, which provides that "*IC Power Ltd. retains all rights it currently has in relation to the Investment Treaty Claims*",[214] without however engaging in the interpretation of that provision in accordance with the law governing the SPA, i.e., the law of the State of New York.[215]

238.    Respondent points to the fact that Kenon is not mentioned in Article 2.6 of the SPA and that no other provision of the SPA grants Kenon rights similar to those granted to IC Power by Article 2.6, from which it concludes that "*Claimants are not equally entitled to bring a claim before this Tribunal*". It maintains that, by selling its rights to its Peruvian investments in 2017 without expressly retaining its rights to arbitrate the claims relating to those investments, Kenon "*sold its rights to any such claims as well*".[216]

239.    For their part, Claimants contend that, regardless of whether Kenon is named in Article 2.6 of the SPA, the effect of the sale governed by the SPA is that the claims pursued in the present arbitration were carved out of the sale and remained among IC Power's assets. In Claimants' view, it follows that Kenon has standing to pursue those claims in its capacity as IC Power's sole shareholder, since the basis of Kenon's right to bring those claims is its indirect ownership of the Peruvian assets, which it held through IC Power when Peru adopted the challenged measures.[217]

240.    Since the Parties have provided no elements for the interpretation of Article 2.6 of the SPA under its governing law, the Tribunal is not in a position to conduct that exercise on its own motion and must therefore base its decision on the Kenon Objection on the arguments put forward by the Parties.

---

[213] See ¶ 195 above.

[214] Article 2.6 of the SPA, C-15, C-15*bis* and R-135-ENG.

[215] See Article 12.8 of the SPA, R-135 ENG, p. 75.

[216] Rejoinder, ¶ 441.

[217] Claimants' Rejoinder, ¶¶ 138-139, 142-144.

241.    The Kenon Objection raises the debated question of the transferability of treaty claims in case of disposal of investments.

242.    This question is not explicitly addressed by Respondent. However, its assertion that Kenon's claims have been transferred as a result of the SPA since the latter does not indicate that they have been retained by Kenon suggests that Respondent considers that treaty claims are automatically transferred together with the investment to which they attach, without need for an express agreement to that effect between the transferor and the transferee.

243.    Claimants, instead, expressly address the issue and, relying on *Daimler v. Argentina* and *El Paso v. Argentina*, submit that "treaty claims belong to qualifying investors, and are not attached to qualifying investments, such that the default assumption under international law (absent something express to the contrary) is that the claims stay with the investors even when the underlying investments are sold".[218]

244.    Although there are different views on the transferability of treaty claims in case of disposal of the investments they relate to, the prevailing view of investor-State tribunals[219] is the one espoused in the Decision on Jurisdiction in *El Paso v. Argentina* on which Claimants rely, i.e. that, in case of transfer of an investment, the treaty claim attached to it *"continues to exist,* ie *the right to demand compensation for the injury suffered at the hands of the State remains - unless, of course, it can be shown that it was sold with the investment"*.[220]

245.    In the present case, the SPA does not indicate that by selling the Peruvian subsidiaries the parties also intended to transfer the related treaty claims that are the subject matter of the present arbitration. Actually, with respect to IC Power, Article 2.6 of the SPA explicitly records the parties' intent to carve out of the sale its claims, which

---

[218] Claimants' Rejoinder, ¶ 143, emphasis in the original.

[219] See H. Wehland, *The Transfer of Investments and Rights of Investors under International Investment Agreements – Some Unresolved Issues*, in *Arbitration International*, 2014, pp. 571-572: "*There is little doubt that the transferor of an investment can have treaty claims for damages arising out of pre-transfer breaches of an IIA even after the transfer has been completed.* […] [T]*ribunals have rightly concluded that, even in case if a sale of the investment, 'the claim continues to exist…unless, of course, it can be shown that it was sold with the investment*". The author refers to *El Paso v. Argentina*, ¶ 135; *EnCana Corporation v. Ecuador,* LCIA Case No. UN3481, Award, February 3, 2006, ¶ 132; *Daimler v. Argentina*, ¶ 145. See also *M. Burgstaller, A. Zarowna, Effects of Disposal of Investments on Claims in Investment Arbitration*, in *Journal of International Arbitration*, 2019, pp. 236-237.

[220] *El Paso v. Argentina*, ¶ 135.

thus were not sold and remained among IC Power's assets. Respondent does not dispute this.

246. Kenon is, and was at the time of the challenged measures, the sole shareholder of IC Power and therefore, as the indirect controller of the Peruvian subsidiaries, it is entitled to bring the same claims as IC Power. And that is indeed what it is doing, since it is claiming the same damages allegedly suffered by the Peruvian subsidiaries as a consequence of Peru's measures that IC Power is claiming in this arbitration. It is therefore irrelevant that Article 2.6 of the SPA does not spell out that Kenon retained its right to pursue its treaty claims.

247. It is noteworthy that the implications of Respondent's argument would be unworkable. On the one hand, the treaty claims could be pursued by IC Power, and decided by this Tribunal, in the present arbitration because they have been retained by IC Power. On the other hand, on the assumption that they were not retained by Kenon and were therefore transferred to the purchasers of the Peruvian subsidiaries, they could also be pursued by the purchasers in a different forum, with the risk of conflicting decisions and double recovery.

248. Conversely, recognizing that Kenon too, alongside IC Power, has standing to bring the claims would have no practical negative effects for Peru, precisely since both Claimants are pursuing the same claims. This means that the scope of the claims, and Peru's potential liability in respect of the treatment of the investments, remains the same in both cases.

249. For the foregoing reasons, the Kenon Objection is rejected as well.

## VI. LIABILITY

250. Having established that it has jurisdiction over the dispute, the Tribunal will now address the merits of the SFR Service Claim and the New Methodology Claim, under both of which Claimants seek compensation from Peru for its alleged failure to afford them protection in respect of their investments in compliance with Article 10.5 of the Treaty. According to this provision, Peru is bound to afford foreign investments Fair and Equitable Treatment (FET) and Full Protection and Security (FPS) "*in accordance with the minimum standard of treatment of aliens*" (MST).

251.    Before analyzing the merits of the two Claims in Sections B and C below, it is necessary to determine the scope of the Treaty standards of treatment that Claimants assert were breached by Peru (Section A).

**A.   The applicable standard of treatment of foreign investors under Article 10.5 of the Treaty**

**1.    The Parties' positions on the obligation to afford FET in accordance with the MST**

**i.    Claimants' position**

252.    In Claimants' view, from the fact that Article 10.5 of the Treaty requires Peru to provide FET "*in accordance with*" the MST ("**MST/FET**") it does not follow that they are entitled to a lower level of protection than the one they would be entitled to if that provision referred to an autonomous FET standard, i.e. one not linked to the MST, because the MST/FET and FET standards have converged.[221]

253.    Claimants' position that those standards have converged rests essentially on three grounds: (*i*) the language of Article 10.5 of the Treaty, that states that the MST encompasses FET, which would indicate that the latter standard has become part of the former;[222] (*ii*) investment treaty practice, which has witnessed the conclusion by more than 130 states of investment treaties linking the two concepts in the same way as Article 10.5 of the Treaty;[223] and (*iii*) the decisions of investment tribunals, a majority of which – according to Claimants – have concluded that the MST/FET and FET standards are now equivalent.[224]

254.    Claimants reject Respondent's argument that those decisions are distinguishable from the present case based on the language of the applicable treaties.[225] According to Claimants, "*minor differences in how the MST / FET provisions appear in the treaties underlying the cases on which the Claimants rely are not particularly relevant to the finding at issue – ie that many investment tribunals have ruled that the MST has evolved and that the standard now requires according to foreign investors*

---

[221] Reply, ¶ 274; Claimants' Post-Hearing Brief, ¶¶ 117-118.

[222] Memorial, ¶ 202; Reply, ¶¶ 281-282; Claimants' Post-Hearing Brief, ¶ 118 (a).

[223] Reply, ¶¶ 287-291; Claimants' Post-Hearing Brief, ¶ 118 (b).

[224] Memorial, ¶ 202; Reply, ¶¶ 292-297; Claimants' Post-Hearing Brief, ¶ 118 (c).

[225] Counter-Memorial, ¶¶ 233-234.

treatment that is fair and equitable".[226] In those cases, the tribunals did not "*purport to limit* [their] *conclusion to the treaty language at issue*".[227]

255. Claimants consider *Neer v. Mexico* irrelevant to determine the level of protection afforded by the MST/FET standard.[228] Emphasizing that *Neer* was rendered nearly a century ago and concerned physical rather than economic protection,[229] Claimants contend that the standard adopted in that case, which prohibited treatment amounting, *inter alia*, to an "*outrage*", "*bad faith*" or "*willful neglect of duty*",[230] "*has quite clearly been overtaken by events*".[231] Moreover, they argue that Respondent would be liable even under that standard, because its arbitrary and discriminatory measures were "*outrageous*".[232]

256. As to the specific obligations comprised in the MST/FET protection of Article 10.5 of the Treaty, Claimants submit that, in order to identify them, one must start from the "*ordinary meaning*" of the words "*fair*" and "*equitable*", "*in light of the Treaty's object and purpose*", as required by the Vienna Convention on the Law of Treaties ("**VCLT**").[233] Moreover, citing the International Law Commission's ("**ILC**") study on sources of customary international law, Claimants assert that one should also look at the decisions of investment tribunals, because they are a "*source*" of customary international law.[234] By contrast, the International Court of Justice's ("**ICJ**") decisions

---

[226] Reply, ¶ 296.

[227] Reply, ¶ 297 and fn. 456. See also Memorial, fn. 268.

[228] Reply, ¶¶ 284-297.

[229] Reply, ¶ 285.

[230] According to the *Neer* tribunal, "*the treatment of an alien, in order to constitute an international delinquency, should amount to an outrage, to bad faith, to wilful neglect of duty, or to an insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency*" (*L. F. H. Neer and Pauline Neer (USA) v. United Mexican States* (1926), 4 RIAA 60 (RL-10), pp. 61-62).

[231] Reply, ¶ 276. This was underlined in the *Mondev v. United States* case, in which the tribunal considered the *Neer* standard inapplicable to modern investment law (see Reply, ¶ 292).

[232] Reply, ¶ 285.

[233] Reply, ¶ 281.

[234] Reply, ¶ 281, making reference to International Law Commission, *International Law Commission Report on the Work of the Seventieth Session*, A/73/10, 2018, (CL-147), p. 149. See also Claimants' Post-Hearing Brief, ¶ 136.

are less relevant, since – unlike those of investment tribunals – they do not directly focus on the treatment to be afforded to foreign investors.[235]

257.    Relying on the language of Article 10.5 of the Treaty and on investor-State case-law applying treaties linking FET to the MST, Claimants posit that the duty to provide MST/FET includes an obligation: (*i*) not to frustrate an investor's legitimate expectations;[236] (*ii*) not to act arbitrarily or discriminatorily;[237] and (*iii*) to provide a stable and transparent legal and regulatory environment.[238]

258.    Claimants maintain that the ICJ's judgment in *Bolivia v. Chile*[239] is irrelevant to determining whether the MST/FET standard includes an obligation to protect legitimate expectations, because that judgment: (*i*) "*reflects findings as to the legal obligations owed between States, not the obligations owed by a State towards aliens in its territory under customary international law*";[240] and (*ii*) deals not with customary international law (of which the MST/FET is part), but rather with general principles of law (which are a different source of international law).[241]

###    ii.    Respondent's position

259.    Respondent agrees that Article 10.5 of the Treaty must be interpreted "*in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context*",[242] but arrives at substantially different conclusions as to its scope.[243]

---

[235] Claimants' Post-Hearing Brief, ¶ 136.

[236] Memorial, ¶¶ 201(i), 204 ff.; Reply, ¶ 305(a) ; Claimants' Post-Hearing Brief, ¶ 118 (d).

[237] Reply, ¶ 305(b). See also Memorial, ¶¶ 201(ii), 212 ff. ; Claimants' Post-Hearing Brief, ¶ 118 (d).

[238] Reply, ¶¶ 274, 299-305; Claimants' Post-Hearing Brief, ¶ 118 (d).

[239] *Bolivia v. Chile (Obligation to Negotiate Access to the Pacific Ocean)*, Judgment, I.C.J. Reports 2018, p. 507: "*The Court notes that references to legitimate expectations may be found in arbitral awards concerning disputes between a foreign investor and the host State that apply treaty clauses providing for fair and equitable treatment. It does not follow from such references that there exists in general international law a principle that would give rise to an obligation on the basis of what could be considered a legitimate expectation. Bolivia's argument based on legitimate expectations thus cannot be sustained*".

[240] Claimants' Post-Hearing Brief, ¶ 132. In this respect, Claimants also add that the ICJ's decision has never been credited as reflecting the law applicable to the treatment of aliens (see Claimants' Post-Hearing Brief, ¶ 135).

[241] Claimants' Post-Hearing Brief, ¶ 134.

[242] Respondent's Post-Hearing Brief, ¶ 110.

[243] Counter-Memorial, ¶¶ 229-247; Rejoinder, ¶ 443, 457. According to Respondent, Claimants' position

260.    For a start, Respondent disagrees with Claimants' suggestion that the level of protection under the MST and FET standards has converged, alleging that the MST/FET standard sets a higher threshold. In particular, Respondent emphasizes that Article 10.5 of the Treaty only guarantees "*FET in accordance with the customary international law minimum standard of treatment, and nothing more*".[244] Thus, Peru's MST/FET obligation "*includes only those rules of treatment that have crystallized into customary international law*",[245] such as "*'the obligation not to deny justice in criminal, civil or administrative adjudicatory proceedings'*" expressly mentioned in the Treaty.[246] These rules of treatment represent "*the lowest standard of treatment*",[247] i.e. the "*floor below which treatment of foreign investors must not fall*", because conduct below that "*absolute bottom*" is "*not accepted by the international community*".[248]

261.    According to Respondent, it is irrelevant that many treaties establish a link between MST and FET, as that "does not mean that the treaties are equating the customary international law minimum standard of treatment and the autonomous FET standard".[249] Respondent considers equally irrelevant the cases relied on by Claimants,[250] because they are either distinguishable from the present case, insofar as they concern treaties that do not explicitly refer to the MST,[251] or indicate that, if there is any commonality between MST/FET and FET, it is the latter that has lowered the former.[252]

---

on the equivalence of the two standards is impossible to square with the language of the Treaty, which expressly provides that Peru's obligation to provide "*fair and equitable treatment*" does not require treatment beyond what is required under the "*customary international law minimum standard of treatment*" (see Respondent's Post-Hearing Brief, ¶¶ 109-112).

[244] Rejoinder, ¶¶ 447, 464. Counter-Memorial, ¶¶ 229-230.

[245] Rejoinder, ¶ 450.

[246] Rejoinder, ¶ 447.

[247] Respondent's Post-Hearing Brief, ¶ 110.

[248] Respondent's Post-Hearing Brief, ¶ 109.

[249] Rejoinder, ¶ 466.

[250] Respondent's Post-Hearing Brief, ¶ 130.

[251] Counter-Memorial, ¶¶ 233-234.

[252] Counter-Memorial, ¶ 237.

262.    Respondent's position is that the *Neer* standard remains the foundation of the modern MST, as it contends has been found by a majority of investment tribunals.[253] Consequently, invoking *Glamis Gold* which elaborated on the *Neer* standard, Respondent contends that, to constitute a breach of the MST/FET standard, an "*act must be sufficiently egregious and shocking – a gross denial of justice, manifest arbitrariness, blatant unfairness, a complete lack of due process, evident discrimination, or manifest lack of reasons*".[254]

263.    Respondent also disagrees with Claimant regarding the specific obligations comprised in the duty to afford MST/FET under Article 10.5 of the Treaty.

264.    To begin with, Respondent posits that it is for the investor to demonstrate the existence of the specific customary international law obligations it invokes as part of the MST/FET standard.[255] In particular, relying on footnote 10-6 to Article 10.5 of the Treaty,[256] Respondent argues that the investor must show that the existence of such obligations is supported by both State practice and *opinio juris*.[257] As noted in the

---

[253] Counter-Memorial, ¶¶ 242, 247; Rejoinder, ¶ 463. See also Counter-Memorial, ¶ 232, citing *L. F. H. Neer and Pauline Neer (USA) v. United Mexican States* (1926), 4 RIAA 60, pp. 61-62 (RL-10), according to which a breach of the minimum standard of treatment requires State's actions that amount to "*an outrage, to bad faith, to willful neglect of duty, or to an insufficiency of governmental actions so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency*".

[254] Rejoinder, ¶ 462 relying on the *Glamis Gold, Ltd. v. United States of America*, UNCITRAL, Award, June 8, 2009 (CL-55), ¶ 616 [hereinafter: "*Glamis v. USA*"]: "[A]*lthough situations may be more varied and complicated today than in the 1920s, the level of scrutiny is the same. The fundamentals of the Neer standard thus still apply today: to violate the customary international law minimum standard of treatment codified in Article 1105 of the NAFTA, an act must be sufficiently egregious and shocking—a gross denial of justice, manifest arbitrariness, blatant unfairness, a complete lack of due process, evident discrimination, or a manifest lack of reasons—so as to fall below accepted international standards and constitute a breach of Article 1105(1) [...]. The standard for finding a breach of the customary international law minimum standard of treatment therefore remains as stringent as it was under Neer; it is entirely possible, however that, as an international community, we may be shocked by State actions now that did not offend us previously*". See also *Mobil Investments Canada Inc. and Murphy Oil Corporation v. Canada*, ICSID Case No. ARB(AF)/07/4, Decision on Liability and Principles of Quantum, May 22, 2012 (CL-129), ¶ 153 [hereinafter: "*Mobil v. Canada*"]; *Adel A Hamadi Al Tamimi v. Sultanate of Oman*, ICSID Case No. ARB/11/33, Award, November 3, 2015 (RLA-38), ¶ 390. See also Counter-Memorial, ¶ 250 [hereinafter: "*Tamimi v. Oman*"].

[255] Respondent's Post-Hearing Brief, ¶¶ 113; Rejoinder, ¶ 454.

[256] "*Customary international law results from a general and consistent practice of States that they follow from a sense of legal obligation. With regards to this Article, customary international law minimum standard of treatment of aliens refers to all customary international law principles that protect the economic rights and interests of aliens*".

[257] Rejoinder, ¶ 451.

ILC's study on sources of customary international law,[258] to meet its burden of proof the investor may rely on the decisions of international courts and arbitral tribunals, insofar as they examine both State practice and *opinio juris*.[259]

265.   Respondent submits that Claimants have failed to prove that there is State practice and *opinio juris* demonstrating the existence in customary international law of the specific obligations they invoke, i.e. the ones to protect an investor's legitimate expectations,[260] not to engage in arbitrary or discriminatory conduct,[261] and to guarantee a stable and predictable legal and regulatory environment.[262] According to it, this would be dispositive of the claims.[263]

266.   As to the obligation to protect an investor's legitimate expectations, Respondent considers the cases cited by Claimants irrelevant, as many of them deal with treaties containing an autonomous FET obligation, and none directly assesses whether, according to *opinio juris*, the MST/FET requires protection of legitimate expectations.[264] Conversely, the ICJ's decision in *Bolivia v. Chile* authoritatively confirms that international law does not impose on States a duty to respect legitimate expectations.[265]

267.   As to the obligation to abstain from arbitrary or discriminatory conduct, Respondent contends that there is no evidence that such conduct is forbidden under the MST/FET standard. Rather, there is evidence that such standard only prohibits "*outrageous*",

---

[258] Michael Wood (Special Rapporteur), *Second Report on Identification of Customary International Law, A/CN.4/672*, International Law Commission, May 22, 2014 (RL-39).

[259] Rejoinder, ¶ 453 and fn. 728, quoting *Glamis v. USA*, ¶ 608; *Cargill, Incorporated v. United Mexican States*, ICSID Case No. ARB(AF)/05/2, Award, September 18, 2009 (RL-8), ¶ 277 [hereinafter: "*Cargill v. Mexico*"]; and Maurice H. Mendelson, *The Formation of Customary International Law*, 272 Recueil Des Cours 155 (1998) (RL-47), p. 202; Respondent's Post-Hearing Brief, ¶¶ 122-130.

[260] Rejoinder, ¶ 452(a); Respondent's Post-Hearing Brief, ¶ 113.

[261] Rejoinder, ¶ 452(b) Respondent's Post-Hearing Brief, ¶ 113.

[262] Rejoinder, ¶ 452(c); Respondent's Post-Hearing Brief, ¶ 113.

[263] Rejoinder, ¶ 448.

[264] Rejoinder, ¶ 452(a). In fact, Respondent alleges that tribunals discussing State practice confirm that an investor's expectations about a legal regime do not preclude a State from taking regulatory action inconsistent with such expectations. See also Respondent's Post-Hearing Brief, ¶¶ 129-130.

[265] Respondent's Post-Hearing Brief, ¶¶ 115-121.

"*grossly unfair*" or "*egregious and shocking*" treatment.[266] The decisions relied upon by Claimants for the proposition that MST/FET forbids arbitrariness and discrimination are in its view inapposite, as they do not analyze *opinio juris* and State practice with respect to the content of that standard.[267]

268.     Finally, as to the obligation to guarantee a stable and predictable legal and regulatory environment, Respondent avers that the cases cited by Claimants do not confirm that it is part of MST/FET. In fact, some of those cases, such as *Mobil v. Canada*,[268] explicitly deny that the standard in question encompasses that obligation.

### 2.   The Parties' positions on the obligation to accord FPS

#### i.   Claimants' position

269.     Claimants submit that Peru's obligation under Article 10.5 of the Treaty to provide FPS to investments in accordance "*with the customary international law minimum standard of treatment of aliens*" extends beyond physical security and encompasses legal security, which in turn requires Peru to maintain a stable and predictable legal environment.[269]

270.     Claimants say that their interpretation of the FPS obligation as requiring the State to ensure legal protection is: (*i*) supported by several tribunals,[270] which have found

---

[266] Rejoinder, ¶ 452(b), relying on *L. F. H. Neer and Pauline Neer (USA) v. United Mexican States* (1926), 4 RIAA 60, at pp. 61-62 (RL-10); *Cargill v. Mexico*, ¶ 296; *Glamis v. USA*, ¶ 616. However, both Glamis and Cargill – as well as other case-law quoted by Respondent – accept that arbitrariness is to an extent relevant under MST. See *Glamis v. USA*, ¶ 616.; *Cargill v. Mexico*, ¶ 293; *International Thunderbird Gaming Corporation v. United Mexican States*, UNCITRAL, Award, January 26, 2006 (RL-7), ¶ 194 [hereinafter: "*Thunderbird v. Mexico*"]; *S.D. Myers, Inc. v. Government of Canada*, UNCITRAL (NAFTA), Partial Award, November 13, 2000 (RL-9), ¶ 263; *The Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3, Award, June 26, 2003 (RL-36), ¶ 131 [hereinafter: "*Loewen v. USA*"].

[267] See Rejoinder, fn. 720.

[268] Rejoinder, ¶ 452(c), quoting *Mobil v. Canada*, ¶ 153: the "*applicable standard does not require a State to maintain a stable legal and business environment for investments, if this is intended to suggest that the rules governing an investment are not permitted to change, whether to a significant or modest extent*".

[269] Memorial, ¶¶ 202, 226; Reply, ¶¶ 113, 311-314. Claimants further maintain that the FPS obligation can be breached not only by the host State's and its instrumentalities' failure to prevent actions of third parties against the investments, but also by the actions of the formers (Memorial, ¶¶ 203, 226).

[270] Memorial, ¶ 203, relying upon *CME Czech Republic B.V. (The Netherlands) v. The Czech Republic*, UNCITRAL, Partial Award, September 13, 2001 (CL-15), ¶ 613; *Československa obchodní banka, a.s. v.*

that where the words "*protection*" and "*security*" are qualified by "*full*", the standard may extend to matters beyond physical security,[271] such as the stability of the legal environment[272]; (*ii*) consistent with the purpose of the Treaty, which is to "*build a legal framework that fosters economic partnership*" and "*open, transparent and competitive markets*", and which would be unachievable if the FPS obligation were interpreted as requiring "*physical protection alone*";[273] and (*iii*) confirmed by the inclusion of intangible assets in the Treaty's definition of protected "*investment*", given that such assets – as noted by some tribunals[274] – can only benefit from legal (as opposed to physical) security.[275]

271. Claimants reject Respondent's contention that their interpretation of the scope of the FPS obligation is inconsistent with the language of Article 10.5.2(b), which provides that FPS "*requires each Party to provide the level of police protection required under customary international law*". To begin, by using the term "*requires*", that provision merely indicates that "*police protection*" is the "*minimum 'floor'*" for Respondent's conduct; had the Contracting Parties intended "*police protection*" as a ceiling, they would have specified that FPS "*does not require treatment in addition to*

---

*Slovak Republic*, ICSID Case No. ARB/97/4, Award, December 29, 2004 (CL-26), ¶ 170. See also Reply ¶ 312.

[271] Reply ¶ 312, quoting *Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, July 24, 2008 (CL-46), ¶ 729 [hereinafter: "*Biwater v. Tanzania*"]; *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, July 14, 2006 (CL-32), ¶ 408 [hereinafter: "*Azurix v. Argentina*"]; *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, August 20, 2007 (CL-40), ¶ 7.4.15 [hereinafter: "*Vivendi v. Argentina*"]; *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Hungary*, ICSID Case No ARB/07/22, Award, September 23, 2010 (CL-64), ¶ 13.3.2 [hereinafter: "*AES v. Hungary*"]; *Spyridon Roussalis v. Romania*, ICSID Case No. ARB/06/1, Award, December 7, 2011 (CL-127), ¶ 321 [hereinafter: "*Roussalis v. Romania*"]; *Anglo American PLC v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/14/1, Award, January 18, 2019 (CL-149), ¶ 482 [hereinafter: "*Anglo American v. Venezuela*"].

[272] Reply ¶ 312; *CME Czech Republic B.V. (The Netherlands) v. The Czech Republic*, UNCITRAL, Partial Award, September 13, 2001 (CL-15), ¶ 613.

[273] Reply, ¶¶ 313-314.

[274] *Global Telecom Holding S.A.E. v. Canada*, ICSID Case No. ARB/16/16, Award, March 27, 2020 (CL-155), ¶ 665 [hereinafter: "*Global Telecom v. Canada*"]; *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. Argentine Republic*, ICSID Case No. ARB/09/1, Award, July 21, 2017 (CL-145), ¶ 905 [hereinafter: "*Teinver v. Argentina*"]; *Joseph Houben v. Republic of Burundi*, ICSID Case No. ARB/13/7, Award, January 12, 2016 (CL-138), ¶ 160 [hereinafter: "*Houben v. Burundi*"]; *National Grid plc v. Argentine Republic*, UNCITRAL, Award, November 3, 2008 (CL-50), ¶ 187.

[275] Reply, ¶¶ 317-318.

*or beyond"* that limit.[276] In any event, "*police protection*" is not limited to "*physical protection*", but rather extends to a State's "*'police' powers*", i.e. "*the state's general right to regulate in the public interest*" including by providing legal protection.[277]

272. Finally, Claimants contest Respondent's allegation that legal security in any event only requires a well-functioning system of courts and legal remedies,[278] and deny that interpreting FPS as also requiring legal security would make such standard a duplicate of the FET standard.[279]

### ii.    Respondent's position

273. Respondent argues that its FPS obligation under the Treaty is limited to the provision of "*physical protection*", as confirmed by the text of Article 10.5.(2)(b) of the Treaty that clarifies that FPS "*requires*" the host State to provide "*police protection*", which means physical (rather than legal) security.[280]

274. Respondent maintains that there is no basis for Claimants' contention that the reference to "*police protection*" in Article 10.5.(2)(b) is non-exhaustive. Had the Contracting Parties so intended, they would have stated that FPS "*includes*", rather than "*requires*", police protection, as they did in Article 10.5(2)(a) with respect to a different obligation.[281]

275. According to Respondent it is likewise untenable that the term "*police protection*" refers to a State's "*police powers*" (i.e. the State's right to regulate in the public interest), as the two concepts are completely different. Had the Contracting Parties wished to refer to the "*police powers*", they would have done so expressly.[282] In fact, interpreting the FPS clause as also requiring legal protection and security would

---

[276] Reply, ¶ 309. When the Treaty parties wished to fix the upper limit of the scope of a given provision, they used a different language (*e.g.* "*do not require treatment in addition or beyond*").

[277] Reply, ¶ 310.

[278] Reply, ¶¶ 320-321, quoting *Siemens A.G. v. Argentine Republic,* ICSID Case No. ARB/02/8, Award, February 6, 2007 (CL-37), ¶ 308 [hereinafter: "*Siemens v. Argentina*"]; *Azurix v. Argentina*, ¶ 408.

[279] Reply, ¶ 322, quoting *Total SA v. Argentine Republic,* ICSID Case No. ARB/04/01, Decision on Liability, December 27, 2010 (CL-67), ¶ 343 [hereinafter: "*Total v. Argentina*"].

[280] Counter-Memorial, ¶ 295; Rejoinder, ¶ 535.

[281] Rejoinder, ¶ 537.

[282] Rejoinder, ¶ 538.

create an overlap with the FET standard, and render the FPS provision superfluous, in contrast with the *effet utile* canon.[283]

276. Respondent suggests that the cases cited by Claimants that interpret FPS as requiring legal protection reflect the "*minority view*".[284] There are many other cases that have found that, absent an express reference to legal protection, the FPS standard only protects against physical harm.[285]

277. Respondent denies that its interpretation of the FPS obligation is inconsistent with the Treaty's purpose of fostering "*open, transparent and competitive markets*". In fact, the provision of "*physical security for a foreign investor's assets certainly furthers this goal*".[286]

278. In response to Claimants' position that the Treaty's definition of "*investment*" includes intangible assets, Respondent avers that the FPS protection need not be exactly coterminous with the range of covered investments.[287]

279. Finally, Respondent says that even if FPS did encompass legal security, that would merely require States to guarantee a functioning judicial system. Claimants cannot complain that Respondent failed to comply with such an obligation, as they did not try to litigate their claims in Peru's courts.[288]

### 3.   The Tribunal's decision

280. According to Claimants, Respondent breached two obligations under the Treaty, having failed to afford Claimants' investments both Fair and Equitable Treatment (FET) and Full Protection and Security (FPS). Both obligations are enshrined in Article 10.5 of the Treaty, which provides that:

---

[283] Counter-Memorial, ¶ 297; Rejoinder, ¶ 540.

[284] Rejoinder, ¶ 541.

[285] Rejoinder, ¶ 542, and case-law mentioned therein.

[286] Rejoinder, ¶ 540.

[287] Rejoinder, ¶ 539, referring to *Rumeli Telekom A.S. and Telsim Mobil Telekomikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, July 29, 2008 (CL-47), ¶ 668 [hereinafter: "*Rumeli v. Kazakhstan*"].

[288] Counter-Memorial, ¶ 300.

1. Each Party shall accord to investments of investors of the other Party treatment in accordance with the customary international law minimum standard of treatment of aliens, including fair and equitable treatment and full protection and security.

2. The concepts of fair and equitable treatment and full protection and security in paragraph 1 do not require treatment in addition to or beyond that which is required by the customary international law minimum standard of treatment of aliens and do not create additional substantive rights.

(a) The obligation to provide fair and equitable treatment includes the obligation not to deny justice in criminal, civil or administrative adjudicatory proceedings.

(b) The obligation to provide full protection and security requires each Party to provide the level of police protection required under customary international law.

3. A determination that there has been a breach of another provision of this Agreement, or of a sperate international agreement, does not establish that there has been a breach of this Article.

281.  The parameters for the interpretation of the concepts of "*customary international law*" and "*minimum standard of treatment of aliens*" referred to in Article 10.5 are elucidated as follows in footnote 10-6 to that provision:

Customary international law results from a general and consistent practice of States that they follow from a sense of legal obligation. With regards to this Article, customary international law minimum standard of treatment of aliens refers to all customary international law principles that protect the economic rights and interests of aliens.

282.  The formulation of the standards in Article 10.5 of the Treaty is similar to that in numerous other investment protection treaties.[289]

283.  In the following **Sections *i*** and ***ii***, the Tribunal sets out its decision on the content respectively of the MST/FET standard and of the FPS standard under customary international law.

---

[289] See, *inter alia*, Article 10.5 and Annex 10-B of the Dominican Republic-Central America Free Trade Agreement (DR-CAFTA); Article 10.5 and Annex 10-A of the Morocco - United States Free Trade Agreement; Article 10.5 and Annex 10-A of the Agreement between the Government of the United States of America and the Government of the Sultanate of Oman on the Establishment of a Free Trade Area. See also Article 1105(1) of NAFTA interpreted in light of the Interpretive Note of the NAFTA Free Trade Commission of July 21, 2001.

### i.   The MST/FET standard

284. As regards the MST/FET standard, the difference between the Parties concerns two issues. The first one is the standard of protection of foreign investments provided for by Article 10.5 of the Treaty and the relation between that standard and the autonomous FET standard. The second one is which specific obligations are comprised in the applicable standard.

### a.   The level of protection of the investor required by the MST/FET standard

285. Article 10.5 of the Treaty requires the host State to accord to foreign investments "*treatment in accordance with customary international law*", and specifically with "*the minimum standard of treatment of aliens*", including "*fair and equitable treatment*".

286. The Parties disagree on the level of protection afforded by "*the customary international law minimum standard of treatment of aliens*". According to Claimants that standard guarantees a level of protection that is essentially the same as that of an autonomous FET provision, whereas according to Respondent it is far lower. In support of their respective positions, both Parties rely heavily on investment tribunal decisions, predominantly in NAFTA cases, none of which specifically apply the Treaty.

287. The Parties' disagreement raises the contentious question of the content of the MST and its relation to the FET. As acknowledged by the Parties, while some tribunals have held that the MST and FET standards have become equivalent,[290] others have found that MST "*is meant to serve as a floor, an absolute bottom, below which conduct is not accepted by the international community*",[291] and that the standard for proving its breach is particularly high.[292]

---

[290] See, *inter alia*, *Ronald S Lauder v. The Czech Republic*, UNCITRAL, Final Award, September 3, 2001 (CL-14), ¶ 292; *Rumeli v. Kazakhstan*, ¶ 611; *Merrill & Ring Forestry L.P. v. Canada*, ICSID Case No. UNCT/07/1, Award, March 31, 2010 (CL-60), ¶¶ 210-213 [hereinafter: "*Merrill & Ring v. Canada*"]; *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/2, Award, October 31, 2012 (CL-132), ¶ 419; *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Award, March 10, 2015 (CL-90), ¶ 489 [hereinafter: "*OI v. Venezuela*"].

[291] *Glamis v. USA*, ¶ 615; *Tamini v. Oman*, ¶ 383 (quoting *Glamis*).

[292] *Cargill v. Mexico*, ¶ 286: "*If the conduct of the government toward the investment amounts to gross misconduct, manifest injustice or, in the classic words of the Neer claim, bad faith or the willful neglect of duty, whatever the particular context the actions take in regard to the investment, then such conduct will*

288.    As noted by scholars, the starting point to determine the content of the host State's obligation to afford MST/FET is the language of the relevant provision, in this case Article 10.5 of the Treaty.[293] In analyzing such language, the Tribunal can be guided by investment tribunals awards that have applied similar provisions, as they constitute "*subsidiary means for the determination of rules of law*" pursuant to Article 38 of the Statute of the ICJ.[294]

289.    Article 10.5 of the Treaty provides that the Contracting Parties must accord "*treatment in accordance with customary law, including fair and equitable treatment*". In the Tribunal's judgment, this provision can only be understood as acknowledging that FET is now part of the MST under customary international law. This in turn confirms that the MST has evolved since *Neer*,[295] when it only prohibited "*outrageous*" behavior, and now forbids a wider range of conducts. Indeed, most investment tribunals have strongly rejected the idea that a breach of the MST can only be found in the presence of the kind of behavior described in *Neer* and its progeny.[296]

---

be a violation of the customary obligation of fair and equitable treatment"; *Thunderbird v. Mexico*, ¶ 194: "*the threshold for finding a violation of the minimum standard of treatment still remains high […] [T]he Tribunal views acts that would give rise to a breach of the minimum standard of treatment prescribed by the NAFTA and customary international law as those that, weighed against the given factual context, amount to a gross denial of justice or manifest arbitrariness falling below acceptable international standards*"; *Tamini v. Oman*, ¶ 390: "*to establish a breach of the minimum standard of treatment under Article 10.5, the Claimant must show that Oman has acted with a gross or flagrant disregard for the basic principles of fairness, consistency, even-handedness, due process, or natural justice expected by and of all States under customary international law. Such a standard requires more than that the Claimant point to some inconsistency or inadequacy in Oman's regulation of its internal affairs: a breach of the minimum standard requires a failure, willful or otherwise egregious, to protect a foreign investor's basic rights and expectations*".

[293] Rudolf Dolzer, Ursula Kriebaum, and Christoph Schreuer, *Principles of International Investment Law*, 2022, p. 200.

[294] On this point, see Michael Wood (Special Rapporteur), *Second Report on Identification of Customary International Law, A/CN.4/672*, International Law Commission, May 22, 2014 (RL-39), ¶ 46.

[295] *L. F. H. Neer and Pauline Neer (USA) v. United Mexican States* (1926), 4 RIAA 60, at pp. 61-62 (RL-10).

[296] See, *inter alia*, *Pope & Talbot v. The Government of Canada*, UNCITRAL, Award on the Merits of Phase 2, April 10, 2001 (CL-111), ¶ 118; *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, October 11, 2002 (CL-112), ¶¶ 115-116 [hereinafter: "*Mondev v. USA*"; *Waste Management, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award, April 30, 2004 (RL-6) ¶ 93 [hereinafter: "*Waste Management v. Mexico*"]; *Merrill & Ring v. Canada*, ¶ 213; *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, September 22, 2014 (CL-85), ¶ 567 [hereinafter: "*Gold Reserve v. Venezuela*"]. See also Rudolf Dolzer, Ursula Kriebaum, and Christoph Schreuer, *Principles of International Investment Law*, 2022, p. 204.

290.    However, Article 10.5 of the Treaty also clarifies that "the concept of FET" does not "require treatment in addition to or beyond that which is required by [the MST] and [does] not create additional substantive rights". According to the Tribunal, the rationale of provisions of this type is to prevent an overbroad interpretation of the MST/FET, setting a higher threshold for a finding of breach than under an autonomous FET clause not tethered to customary international law.[297] As Respondent observes,[298] had the parties to the Treaty intended that Article 10.5 afford the same degree of protection as an autonomous FET standard, they could have included an autonomous FET provision in the Treaty, such as those contained in many Treaties, without referring to customary international law.

291.    That the rationale of Article 10.5 of the Treaty is to preclude overexpansive interpretations of FET is confirmed by a significant body of case-law based on treaties with similar language. For example, in analyzing a treaty provision almost identical to Article 10.5 of the Treaty in the US-Oman FTA, the tribunal in *Adel A Hamadi Al Tamimi v. Oman* concluded that:

> [a] strict "minimum standard of treatment" provision such as Article 10.5 [of the US–Oman FTA], particularly when considered in the light of Annex 10-A in the present case, cannot be interpreted in the expansive fashion in which some autonomous fair and equitable treatment or full protection and security provisions of other treaties have been interpreted. Indeed, the language of Article 10.5.2 makes very clear that Article 10.5 does "not require treatment in addition to or beyond" that required by the minimum standard of the treatment of aliens under customary international law.[299]

292.    Likewise, many tribunals have convincingly explained that provisions like Article 10.5 of the Treaty require a high threshold for a finding of breach. For instance, in *International Thunderbird*, the tribunal held that "[n]*otwithstanding the evolution of customary law since decisions such as Neer Claim in 1926, the threshold for finding a*

---

[297] On this point, see *United Nations Conference On Trade And Development, Fair And Equitable Treatment: a sequel*, UNCTAD Series on Issues in International Investment Agreements II, 2012, pp. 28-29: "*An explicit link between the FET obligation and the minimum standard of treatment is used in these treaties to prevent overexpansive interpretations of the FET standard by arbitral tribunals and to further guide them by referring to an example of gross misconduct that would violate the minimum standard of treatment of aliens – denial of justice. […] from the host country perspective, linking the FET standard to the minimum standard of treatment of aliens may be seen as a progressive step, given that this will likely lead tribunals to apply a higher threshold for finding a breach of the standard, as compared with unqualified FET clauses*".

[298] Rejoinder, ¶ 457.

[299] *Tamini v. Oman*, ¶ 382.

*violation of the minimum standard of treatment still remains high*".[300] Similarly, in the already mentioned *Adel A Hamadi Al Tamimi v. Oman* award, the tribunal concluded that:

> [a]lthough a number of subsequent arbitral decisions have acknowledged that with the passage of time the standard has likely advanced beyond these basic requirements [set out in the Neer decision], tribunals have continued to employ descriptions which emphasise the high threshold for breach.[301]

293.    In particular, several tribunals have required serious misconduct to find a breach of MST/FET. By way of example, *Mobil v. Canada* found that the minimum standard guaranteed by Article 1105 of NAFTA is "*set [...] at a level which protects against egregious behavior*".[302] Similarly, the *S.D. Myers v. Canada* tribunal ruled that "*a breach of Article 1105 [NAFTA] occurs only when it is shown that an investor has been treated in such an unjust or arbitrary manner that the treatment rises to the level that is unacceptable from the international perspective*".[303] Likewise, in *Mondev*, the tribunal noted that in applying the international minimum standard,

> [i]n the end the question is whether, at an international level and having regard to generally accepted standards of the administration of justice, a tribunal can conclude in the light of all the available facts that the impugned decision was clearly improper and discreditable, with the result that the investment has been subjected to unfair and inequitable treatment.[304]

294.    Even *Waste Management II*, on which Claimants rely to define the standard of treatment they are entitled to, accepts that State conduct constitutes a breach of MST only if it is sufficiently serious. Indeed, the tribunal in that case found that a breach of that standard is triggered by conduct that is "*arbitrary, grossly unfair, unjust or idiosyncratic*", or amounts to a "*complete lack of transparency and candour*", or "*a lack of due process leading to an outcome which offends judicial propriety – as might be the case with a manifest failure of natural justice in judicial*

---

[300] *Thunderbird v. Mexico*, ¶ 194.

[301] *Tamini v. Oman*, ¶ 383.

[302] *Mobil v. Canada*, ¶¶ 152-153.

[303] *S.D. Myers, Inc. v. Government of Canada*, UNCITRAL (NAFTA), Partial Award, November 13, 2000 (RL-9), ¶ 263.

[304] *Mondev v. USA*, ¶ 127.

*proceedings"*.[305] The use of modifiers such as "*grossly*" or "*manifest*" confirms the stringency of that standard.

295.     For these reasons, the Tribunal concludes that the MST/FET standard in Article 10.5 of the Treaty imposes a high threshold for a finding of breach, without however requiring that the State's conduct be outrageous as dictated by the *Neer* standard.

### b.   The content of the MST/FET standard

296.     In addition to disagreeing on the level of protection provided by the MST/FET standard under Article 10.5 of the Treaty, the Parties disagree on which specific obligations are comprised in that standard. Claimants' position is that the standard requires the host State (*i*) to abstain from arbitrary and discriminatory conduct, (*ii*) to protect the investor's legitimate expectations, and (*iii*) to guarantee a stable and transparent legal and regulatory environment.[306] On the other hand, Respondent contests that any of these obligations form part of the standard in question.

### 1)   Arbitrary and discriminatory conducts

297.     As to arbitrary and discriminatory conducts, Respondent's position that the MST/FET standard does not prohibit such conducts conflicts with many investor-State awards on which it relies itself, such as *International Thunderbird*,[307] *Glamis Gold*[308] and *Cargill*.[309]

298.     That position is incidentally also irreconcilable with the one Respondent has itself adopted in other recent investment treaty cases, as emerges from Peru's memorials in those cases which are public, but were not referred to by the Parties. For instance, in *Lupaka Gold*, Peru maintained that *Waste Management II*, which proscribes arbitrary and discriminatory conduct, reflects "*contemporary State practice and*

---

[305] *Waste Management v. Mexico*, ¶ 98.

[306] See ¶¶ 265 ff. *supra*.

[307] *Thunderbird v. Mexico*, ¶ 194.

[308] *Glamis v. USA*, ¶ 616.

[309] *Cargill v. Mexico*, ¶ 293.

opinio juris" as to the content of the MST/FET standard.[310] Similarly, in *Gramercy*,[311] *Latam*,[312] *Renco*,[313] and *Kaloti*,[314] Peru agreed that MST/FET forbids arbitrary and discriminatory conducts, provided they are sufficiently serious.

299. In light of the decisions in *International Thunderbird*,[315] *Glamis Gold*,[316] *Cargill*[317] and *Waste Management II*,[318] the Tribunal holds that MST/FET prohibits both arbitrariness and discrimination by the host State.

300. However, since the MST/FET standard sets a higher threshold than an autonomous FET provision, it follows that, in order to constitute a breach, both arbitrariness and discrimination must be sufficiently serious. This too is confirmed by several awards.[319] For instance, in *International Thunderbird*, the tribunal found that:

> [f]or the purposes of the present case, **the Tribunal views acts that would give rise to a breach of the minimum standard of treatment prescribed by the NAFTA and customary international law as those that**, weighed against the given factual context, **amount to** a gross denial of justice or **manifest**

---

[310] *Lupaka Gold Corp. v. Republic of Peru*, ICSID Case No. ARB/20/46, Respondent Memorial on Jurisdiction and Counter-Memorial on the Merits, March 24, 2022, ¶ 561, in https://www.italaw.com/sites/default/files/case-documents/italaw170376.pdf.

[311] *Gramercy Funds Management LLC and Gramercy Peru Holdings LLC v. Republic of Peru*, ICSID Case No. UNCT/18/2, Respondent Post-Hearing Brief on Merits and Remedies, August 31, 2020, ¶ 88 (quoting *Waste Management*) in https://www.italaw.com/sites/default/files/case-documents/italaw16181.pdf.

[312] *Latam Hydro LLC and CH Mamacocha S.R.L. v. Republic of Peru*, ICSID Case No. ARB/19/28, Respondent Rejoinder on the Merits and Reply on Jurisdiction, November 9, 2021, ¶ 605, in https://www.italaw.com/sites/default/files/case-documents/italaw16388.pdf : "*El Perú acepta el contenido del nivel mínimo de trato según el derecho internacional consuetudinario (incluido el trato justo y equitativo) según fue descrito en el fallo en Waste Management II c. México*".

[313] *The Renco Group Inc. v. Republic of Peru II*, PCA Case No. 2019-46, Respondent Counter-Memorial, April 1, 2022, ¶¶ 538 ff., in https://www.italaw.com/sites/default/files/case-documents/italaw170508.pdf, relying on case law which identifies manifest arbitrariness as a breach of MST.

[314] *Kaloti Metals & Logistics, LLC v. Republic of Peru*, ICSID Case No. ARB/21/29, Respondent Memorial on Jurisdiction and Counter-Memorial on Merits, August 5, 2022, ¶ 471, in https://www.italaw.com/sites/default/files/case-documents/italaw170561.pdf, in which Peru relies on the definitions of MST in *Waste Management*, *Gami* and *Cargill*.

[315] *Thunderbird v. Mexico*, ¶ 194.

[316] *Glamis v. USA*, ¶ 616.

[317] *Cargill v. Mexico*, ¶ 293.

[318] *Waste Management v. Mexico*, ¶ 98.

[319] *S.D. Myers, Inc. v. Government of Canada*, UNCITRAL (NAFTA), Partial Award, November 13, 2000 (RL-9), ¶ 263; *Loewen v. USA*, ¶ 131; *Thunderbird v. Mexico*, ¶ 194; *Glamis v. USA*, ¶ 616; *Cargill v. Mexico*, ¶ 293.

**arbitrariness** falling below acceptable international standards (emphasis added). [320]

301.    Likewise, in *Glamis Gold*, the tribunal held that:

> **a violation of the customary international law minimum standard of treatment** […] requires **an act that is sufficiently egregious and shocking**—a gross denial of justice, **manifest arbitrariness**, blatant unfairness, a complete lack of due process, evident discrimination, or a manifest lack of reasons—so as to fall **below accepted international standards** and constitute a breach of Article 1105. Such a breach may be exhibited by a 'gross denial of justice or **manifest arbitrariness falling below acceptable international standards'**; […] (emphasis added). [321]

302.    The choice of words of these tribunals (and particularly the adjectives "*egregious*", "*shocking*", "*manifest*" and "*evident*") underscores that only sufficiently blatant instances of arbitrariness and discrimination may justify a finding of breach.

303.    For these reasons, the Tribunal concludes that serious arbitrary and discriminatory State measures entail a breach of the standard of treatment under Article 10.5 of the Treaty.

### 2)   Legitimate expectations

304.    As to legitimate expectations, Claimants rely on several investment treaty awards to argue that the MST/FET includes an obligation for the State to respect such expectations of the investor. Respondent contests this, arguing that none of the awards cited by Claimants analyzed *opinio juris* in respect of the existence of such an obligation as part of MST, and noting that in *Bolivia v. Chile* the ICJ held that there is no general principle of international law requiring States to respect legitimate expectations.

305.    In the Tribunal's opinion, the ICJ's judgment *Bolivia v. Chile* is not pertinent for the present dispute. [322] That judgment concerns a State-to-State dispute in which the Court had to determine, on the basis of customary international law applicable to relations between States, what types of expectations could acquire relevance with reference to Chile's alleged obligation to negotiate Bolivia's sovereign access to the

---

[320] See *Thunderbird v. Mexico*, ¶ 194.

[321] *Glamis v. USA*, ¶ 627.

[322] *Obligation to Negotiate Access to the Pacific Ocean (Bolivia v. Chile)*, Judgment, 18 September 2018, I.C.J. Reports 2018 (RL-61), ¶ 162.

sea. The Court's holding that there is no principle of international law requiring States to protect legitimate expectations is confined to the realm of relations between States, which were the subject matter of that case. The Tribunal does not consider it possible to extrapolate from that holding any conclusion as to whether such a principle exists in the completely different context of relations between a State and aliens governed by a treaty on the protection of investments.

306.    The Tribunal finds persuasive Claimants' argument that MST/FET protects legitimate expectations. As clarified in footnote 10-6 to Article 10.5 of the Treaty, that standard "*refers to all customary international law principles that protect the economic rights and interests of aliens*". As noted by the case-law and scholars, the obligation to protect an investor's legitimate expectations stems from the principle of good faith,[323] which is certainly one of the "*customary international law principles that protect the economic rights and interests of aliens*".[324] Thus, as part of their broader customary international law obligation to act in good faith, host States must also protect an investor's legitimate expectations.

307.    This is corroborated by many investment awards that have unequivocally acknowledged that the protection of legitimate expectations falls within the purview of the MST.[325] For instance, in *Waste Management II*, the tribunal held that:

> [i]n applying [the minimum standard of treatment of fair and equitable treatment] it is relevant that the treatment is in breach of representations made by the host State which were reasonably relied on by the claimant.[326]

---

[323] *El Paso Energy International Company v. The Argentine Republic*, ICSID Case No. ARB/03/15, Award, October 31, 2011 (CL-74), ¶ 339 finding that *"the basic touchstone of fair and equitable treatment is to be found in the legitimate and reasonable expectations of the parties, which derive from the obligation of good faith"*; *Thunderbird v. Mexico*, ¶ 147. See also J Grierson-Weiler and I-A Laird, "Chapter 8: Standards of Treatment" in P. Mulchinski, F. Ortino and C. Schreuer (eds), *The Oxford Handbook of International Investment Law*, 2008 (CL-43), p. 9.

[324] *Waste Management v. Mexico*, ¶ 138, finding that "[a] *basic obligation of the State under Article 1105(1) is to act in good faith and form*"; *Thunderbird v. Mexico*, ¶ 147. See also *Merrill & Ring v. Canada*, ¶ 187, holding that "[g]*ood faith and the prohibition of arbitrariness are no doubt an expression of such general principles and no tribunal today could be asked to ignore these basic obligations of international law*".

[325] *Waste Management v. Mexico*, ¶ 98; *Thunderbird v. Mexico*, ¶ 147; *Glamis v. USA*, ¶¶ 22, 621, 627; *El Paso Energy International Company v. The Argentine Republic*, ICSID Case No. ARB/03/15, Award, October 31, 2011 (CL-74), ¶¶ 356-359, 375-377.

[326] *Waste Management v. Mexico*, ¶ 98. That reasoning was followed by subsequent case law (see, for instance, *William Ralph Clayton, William Douglas Clayton, Daniel Clayton and Bilcon of Delaware, Inc. v.*

308.    Similarly, in *Glamis Gold*, which adopted the restrictive view of the MST standard endorsed by Respondent, the tribunal noted that said standard may be breached by "*the creation by the State of objective expectations in order to induce investment and the subsequent repudiation of those expectations*".[327]

309.    Since Respondent itself relied on these awards in this and other investment arbitrations,[328] its suggestion that those awards should not be considered because they did not analyze *opinio juris* is unconvincing.

310.    For these reasons, the Tribunal concludes that the standard of treatment under Article 10.5 of the Treaty includes an obligation for the host State not to frustrate the investor's legitimate expectations.

311.    However, since the threshold set by MST/FET is higher than that of an autonomous FET clause, the requirements for a finding of breach of legitimate expectations under MST/FET must be stringent. In particular, according to the case-law, such a finding is subject to an objective analysis of the overall context, disregarding the subjective views of the investor, and taking into account the specific facts of the case to determine whether (*i*) the State made specific assurances or representations addressed to the investor (*ii*) that were reasonably relied upon by the investor in making the investment and (*iii*) that the State then repudiated.[329]

---

*Government of Canada*, PCA Case No. 2009-04, Award on Jurisdiction and Liability, March 17, 2015 (CL-92), ¶¶ 442-445).

[327] *Glamis v. USA*, ¶ 627.

[328] See *Gramercy Funds Management LLC and Gramercy Peru Holdings LLC v. Republic of Peru*, ICSID Case No. UNCT/18/2, Respondent Post-Hearing Brief on Merits and Remedies, August 31, 2020, ¶ 88, quoting *Waste Management*; *Latam Hydro LLC and CH Mamacocha S.R.L. v. Republic of Peru*, ICSID Case No. ARB/19/28, Respondent Rejoinder on the Merits and Reply on Jurisdiction, November 9, 2021, ¶ 605, quoting *Waste Management*; *The Renco Group Inc. v. Republic of Peru II*, PCA Case No. 2019-46, Respondent Counter-Memorial, April 1, 2022, ¶¶ 538 ff., relying *inter alia* on *Waste Management*, *Glamis* and *Gami*; *Kaloti Metals & Logistics, LLC v. Republic of Peru*, ICSID Case No. ARB/21/29, Respondent Memorial on Jurisdiction and Counter-Memorial on Merits, August 5, 2022, ¶ 471, in which Peru relies on the definitions of MST in *Waste Management*, *Gami* and *Cargill*; *Lupaka Gold Corp. v. Republic of Peru*, ICSID Case No. ARB/20/46, Respondent Memorial on Jurisdiction and Counter-Memorial on the Merits, March 24, 2022, ¶ 561.

[329] See *Glamis v. USA*, in which the tribunal stated that a breach of MST may be exhibited by "*the creation by the State of objective expectations* in order to induce *investment and the subsequent repudiation of those expectations*" (¶ 22), provided that "*a State Party's duty under Article 1105 arises only when the State has induced these expectations in a quasi-contractual manner*" (¶ 799). See also *Waste Management v. Mexico*, ¶ 98: "*it is relevant that the treatment is in breach of representations made by the host State which were reasonably relied on by the claimant*"; *Thunderbird v. Mexico*, ¶ 147: "*the concept of*

### 3) The guarantee of a stable and predictable legal and regulatory environment

312. Finally, Claimants contend that the case-law corroborates their position that the obligation to guarantee a stable and predictable legal and regulatory environment is part of the MST/FET standard. Conversely, Respondent submits that none of the awards referred to by Claimants support their position, and that one of them, *Mobil v. Canada*, even specifically contradicts it.

313. The Tribunal agrees with Respondent that there is no support for the position that the MST/FET standard requires the host State to guarantee a stable and predictable legal and regulatory environment. The only cases cited by Claimants apparently supporting their position, *Murphy v. Ecuador*[330] and *CMS v. Argentina*,[331] fail to substantiate the holding that the MST imposes such an obligation.[332] Moreover, the relevant passages of both cases are *obiter*, as the FET provisions applicable in those cases were not anchored to MST.

─────────────────────

'legitimate expectations' *relates, within the context of the NAFTA framework, to a situation where a Contracting Party's conduct creates reasonable and justifiable expectations on the part of an investor (or investment) to act in reliance on said conduct, such that a failure by the NAFTA Party to honor those expectations could cause the investor (or investment) to suffer damages*".

[330] *Murphy Exploration & Production Company - International v. Republic of Ecuador*, UNCITRAL, PCA Case No 2012-16, Partial Final Award, May 6, 2016 (CL-96), ¶ 207: "*Protecting the stability and predictability of the host State's legal and business framework also underpins the modern customary international law standard*". The tribunal relied on *Técnicas Medioambientales Tecmed, S.A. v. United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award, May 29, 2003 (CL-19), ¶ 154 [hereinafter: "*Tecmed v. Mexico*"]; *Duke Energy Electroquil Partners and Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, August 18, 2008 (RL-16), ¶ 339 and *LG&E Energy Corp., LG&E Capital Corp. and LG&E International, Inc v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, October 3, 2006 (CL-34), ¶ 125 [hereinafter: "*LG&E v. Argentina*"].

[331] *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Award, May 12, 2005 (CL-28), ¶ 284: "*the Treaty standard of fair and equitable treatment and its connection with the required stability and predictability of the business environment, founded on solemn legal and contractual commitments, is not different from the international law minimum standard and its evolution under customary law*". Other decisions quoted by Claimants either do not relate to MST/FET provisions (*Occidental Exploration and Production Company v. The Republic of Ecuador*, LCIA Case No. UN3467, Final Award, July 1, 2004 (CL-24); *Joseph C. Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, January 14, 2010 (CL-59) [hereinafter: *Lemire v. Ukraine*]; *AES Corporation and Tau Power B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/10/16, Award, November 1, 2013 (CL-81); *LG&E v. Argentina*; *PSEG Global Inc and others v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, January 19, 2007 (CL-36) [hereinafter: *PSEG v. Turkey*]; *Total v. Argentina*; or do not state that legal stability is a component of MST/FET (*Metalclad Corporation v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, August 30, 2000 (CL-10); *Waste Management v. Mexico*; *Merrill & Ring v. Canada*.

[332] In particular, *CMS v. Argentina* provided no reason at all for its conclusion (see fn. 331 *supra*), while *Murphy v. Ecuador* merely referred to *CMS v. Argentina* and other investment treaty awards applying FET provisions not anchored to MST (see fn. 330 *supra*).

314.    By contrast, another case cited by Claimants, *Mobil v. Canada*, which is more
pertinent because it applied a provision anchoring FET to MST like Article 10.5 of the
Treaty,[333] categorically denied that the host State is bound to guarantee a stable and
predictable environment for investments. In particular, it held the following:

> The fair and equitable treatment standard does not require a State to
> maintain a stable legal and business environment for investments, if this is
> intended to suggest that the rules governing an investment are not permitted
> to change, whether to a significant or modest extent [...]. [T]here is nothing in
> Article 1105 to prevent a public authority from changing the regulatory
> environment to take account of new policies and needs, even if some of those
> changes may have far-reaching consequences and effects, and even if they
> impose significant additional burdens on an investor. Article 1105 is not, and
> was never intended to amount to, a guarantee against regulatory change, or
> to reflect a requirement that an investor is entitled to expect no material
> changes to the regulatory framework within which an investment is made [...].
> What the foreign investor is entitled to under Article 1105 is that any changes
> are consistent with the requirements of customary international law on fair
> and equitable treatment.[334]

315.    Based on the foregoing, the Tribunal does not share Claimants' position that the
MST/FET requires the host State to maintain a stable and predictable legal and
regulatory environment.

* * * *

316.    To conclude, the Tribunal considers that the standard of protection of investments
enshrined in Article 10.5 of the Treaty:

- imposes a high threshold for a finding of breach, without however requiring
  that the State's conduct be outrageous according to the standard set out in
  *Neer* in 1926;

- prohibits, among other things, State conduct that: (*a*) is seriously arbitrary
  and discriminatory; or (*b*) frustrates an investor's legitimate expectations
  that are reasonable and objective in the circumstances;

- does not incorporate a duty to maintain a stable and predictable legal and
  regulatory environment.

---

[333] *Mobil v. Canada*, on Article 1105 NAFTA.

[334] *Id.*, ¶ 153.

*ii.    The FPS standard*

317.   Article 10.5 of the Treaty lays down an obligation for the host State to provide "*full protection and security*" to protected investments in accordance with customary international law. Article 10.5(2)(b) describes the FPS standard under the Treaty as follows:

> The obligation to provide full protection and security requires each Party to provide the level of police protection required under customary international law.

318.   Claimants argue that FPS under Article 10.5 of the Treaty encompasses legal, as well as physical, protection and security, while according to Respondent it only includes police protection, that is physical protection.

319.   As with the MST/FET standard, the starting point of the Tribunal's analysis must be the text of the relevant Treaty provisions. In identifying the scope of the obligation to provide FPS, Article 10.5(2)(b) uses the expression "*police protection*", which – according to its ordinary meaning – indicates the protection against physical harm that can be afforded by the State's police forces.[335] It follows that the FPS obligation only encompasses physical security and protection. The Tribunal is unable to follow Claimants' suggestion[336] that "*police protection*" is a reference to the "*police powers*" doctrine, which concerns the right of States to regulate in the public interest.[337]

320.   The Tribunal also disagrees with Claimants that, by stating that FPS "*requires*" police protection, Article 10.5(2)(b) merely sets a "*minimum floor*", and not a ceiling, for protection.[338] Had that been the intention, the Contacting Parties would have used

---

[335] Campbell McLachlan, Laurence Shore, et al., *International Investment Arbitration: Substantive Principles*, Oxford International Arbitration Series, Oxford University Press, 2017, p. 334, noting that the expression "*police protection*" in a FPS clause is "*a reference to a function of the State that is most naturally limited to protection of physical assets.*"

[336] Reply, ¶ 310.

[337] In support of their interpretation of "*police protection*" as synonymous of "*police powers*", Claimants refer to *Tecmed v. Mexico*, ¶¶ 119-122, referred to in Reply, ¶ 310. But that award does not advance Claimants' case insofar as it does not analyze the meaning of "*police protection*", but only that of the term "*police power.*"

[338] Reply, ¶ 309.

the term "*includes*" or similar ones, rather than "*requires*", to indicate the protection afforded by that standard, as they did in Article 10.5(2)(a) to define MST/FET.[339]

321.    The cases cited by Claimants that interpret FPS as requiring legal protection and security were not concerned with a provision referring only to "*police protection*" like Article 10.5(2)(b).[340] In any event, Respondent seems to be correct that those cases reflect a minority view, since the prevailing position is that, absent an express reference to legal security and protection,[341] FPS clauses must be interpreted as only requiring protection against physical harm (and this even when there is no specific limitation to "*police protection*").[342]

322.    The Tribunal also disagrees with Claimants' submission that FPS must be interpreted broadly because the Treaty's definition of "*investment*" (Article 10.1.6) includes intangible assets, for which physical protection would be impracticable. As Respondent notes, there is no requirement under the Treaty that the scope of FPS be coterminous with that of covered investments. It makes sense that, due to their

---

[339] Another example is Article 10.1(6) of the Treaty, defining "investment" under the Treaty in the following manner: *"investment means every kind of asset, owned or controlled, directly or indirectly, by an investor, that **includes** characteristics **such as** the commitment of capital or other resources, the expectation of gain or profit, or the assumption of risk, **including but not limited to** the following: (a) an enterprise; (b) shares, stock, and other forms of equity participation in an enterprise, including rights derived therefrom* […]" (emphasis added).

[340] See *Global Telecom v. Canada*, ¶ 664 (the FPS clause was not limited to police protection); *Teinver v. Argentina*, ¶ 905 (the FPS clause was not limited to police protection); *Houben v. Burundi*, ¶ 160 (the FPS clause "*indicates that the protection offered by the BIT under the constant security and protection standard is not limited to protection against physical damage to the investment, since it refers to possible damage to 'right[s]' to the enjoyment of the investment*"); *National Grid plc v. The Argentine Republic*, UNCITRAL, Award, November 3, 2008 (CL-50), ¶ 187 (the FPS clause established a guarantee of "*protection and constant security*" linked with FET); *CME Czech Republic B.V. (The Netherlands) v. The Czech Republic*, UNCITRAL, Partial Award, September 13, 2001 (CL-15), ¶ 613 (the FPS clause was not limited to police protection); *Azurix v. Argentina*, ¶ 408 (the FPS clause was not limited to police protection); *Vivendi v. Argentina*, ¶ 7.4.15 (the FPS clause established a guarantee of "*protection and full security*" linked with FET); *Biwater v. Tanzania*, ¶ 729 (the FPS clause was not limited to police protection); *Anglo American v. Venezuela*, ¶ 482 (the FPS clause was not limited to police protection).

[341] *Indian Metals & Ferro Alloys Ltd v. Republic of Indonesia*, PCA Case No. 2015-40, Award, March 29, 2019 (RL-17), ¶ 267.

[342] See *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL, Partial Award, March 17, 2006 (CL-30), ¶ 484; *PSEG v. Turkey*, ¶ 258; *BG Group Plc. v. Republic of Argentina*, UNCITRAL, Award, December 24, 2007 (CL-42), ¶¶ 323-328; *Rumeli v. Kazakhstan*, ¶ 668; *Roussalis v. Romania*, ¶ 320; *Gold Reserve v. Venezuela*, ¶ 622; *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, April 4, 2016 (CL-95), ¶¶ 632-633; *Indian Metals & Ferro Alloys Ltd v. Republic of Indonesia*, PCA Case No. 2015-40, Award, March 29, 2019 (RL-17), ¶ 267; *Infinito Gold Ltd. v. Republic of Costa Rica*, ICSID Case No. ARB/14/5, Award, June 3, 2021 (RL-79), ¶ 623.

different nature, not all investments are entitled to all the protections afforded by the Treaty (and, in particular, that by their nature intangible assets can only benefit from some of the protections afforded by the Treaty, like MST/FET).

323.  The Tribunal is likewise unpersuaded by Claimants' contention that the Treaty's object and purpose would require interpreting the FPS standard broadly to encompass legal protection and security.[343] That contention rests on an implied, but unconvincing, assumption that an interpretation of the FPS standard as requiring only physical protection of investments would not further the Treaty's goal of facilitating an "*open, transparent and competitive markets*." Actually, also the protection of investments limited to physical harm is instrumental to furthering that goal, as absent that protection no market can work properly.

324.  From the above, the Tribunal concludes that the obligation to accord "*full protection and security*" under Article 10.5 of the Treaty is limited to protection from physical harm. This leads to the dismissal of Claimants' claim for breach of FPS, since Claimants do not allege having suffered physical harm.

**B.  The SFR Service Claim**

325.  By the SFR Service Claim, Claimants seek compensation for damages allegedly suffered due to Respondent's adoption of Resolution No. 141. Claimants' position is that Resolution No. 141 retroactively reversed Peru's undertaking that Kallpa GSA – as the winner of the Tender – would be continuously dispatched. That undertaking was in their view enshrined in the Commitment Act concluded between OSINERGMIN and Kallpa GSA, which declared the latter winner of the Tender pursuant to the Bid Terms. These consisted of PR-22[344] (which established the criteria and methodology for the selection of the SFR service provider), Technical Note 1[345] (which defined the technical requirements for the provision of such service) and the Guidelines[346] (which governed the Tender). Claimants submit that, by reversing what they consider the guarantee of continuous dispatch, Respondent acted in an impermissibly arbitrary manner, frustrated Claimants' legitimate expectations and failed to maintain a stable

---

[343] See ¶ 270 *supra*.

[344] See OSINERGMIN Resolution No. 58 approving Technical Procedure No. 22 (PR-22), issued on March 26, 2014, published on March 29, 2014 (C-56).

[345] Technical Note 1, October 1, 2015 (C-59).

[346] Guidelines, February 16, 2016 (C-60).

and predictable business environment in breach of its MST/FET and FPS obligations under Article 10.5 of the Treaty.

326. Respondent contends that the SFR Service Claim is meritless, because Resolution No. 141 merely clarified what was already apparent from the Bid Terms and the Commitment Act: that the winner of the Tender had no guarantee of continuous dispatch but needed to qualify in the Merit Order to be included in the Daily Program.

327. In light of the Tribunal's holding that the MST/FET and FPS standards do not include an obligation to maintain a stable and predictable legal and regulatory environment,[347] Claimants' argument that Peru failed to maintain such an environment cannot be upheld, and will not be discussed further.

328. Given that seriously arbitrary conduct and frustration of legitimate expectations are forbidden by the MST/FET standard under Article 10.5 of the Treaty, the Tribunal must instead address Claimants' claim that, by issuing Resolution No. 141, Peru acted in an impermissibly arbitrary manner and frustrated their legitimate expectations. Since a finding that Peru breached one of the standards would be sufficient to uphold the SFR Service Claim, were the Tribunal to decide that Peru breached one of them, for reasons of procedural economy it would not need to examine whether it also breached the other one.

### 1. Claimants' position

#### i. The Bid Terms' guarantee of continuous dispatch

329. Claimants contend that, by virtue of the Bid Terms and then the Commitment Act (which enshrined those Terms and declared Kallpa GSA winner of the Tender) Peru guaranteed that Kallpa GSA would be dispatched on a continuous basis, regardless of its position in the Merit Order and with priority over other generators.[348] Their position is that such guarantee constituted the main incentive behind Kallpa GSA's decision to bid for the provision of the SFR service.[349] Indeed, the guarantee of continuous dispatch would always have allowed Kallpa GSA to enter the Daily

---

[347] See ¶ 312 *supra*.

[348] Memorial, ¶ 10, Section III.A.5; Reply, ¶¶ 4-6, Sections II.C and II.D. Claimants' Post-Hearing Brief, Section II.B.

[349] Memorial, ¶¶ 107-110; Reply, ¶ 154.

Program, even if its variable costs were higher than the marginal costs of the system (i.e. when it could not qualify in the Merit Order).[350]

330. The starting point of Claimants' argument is PR-22, which provided that Peru would award the Firm Base Provision for a three-year period by way of public tender.

331. According to Claimants, the terms of PR-22, and particularly its Sections 9.3, 9.5.3, 9.5.10 and 11.8, "*on their face, resolve the parties' dispute as to the scope of Peru's commitments under the Bid Terms*", because they confirm that Kallpa GSA was guaranteed a continuous dispatch.[351] Specifically, Claimants argue that:

(i) by providing that "the required [SFR] reserve[352] will be covered first" by the Firm Base Provider, while "the Balancing Market and the amounts not firmly committed as part of the Base Provision will cover the rest", Section 9.3 necessarily implies that the Firm Base Provider would be dispatched continuously. As a matter of fact, due to the very short time (20 seconds) within which an imbalance between supply and demand of electricity within the system must be addressed by SFR, the Firm Base Provider can only "cover" the SFR reserve (or, in other words, increase or decrease power for SFR purposes) if it is already operating.[353] The Firm Base Provider cannot provide the SFR reserve "first", as required by Section 9.3, if it is not being continuously dispatched;

(ii) Section 9.5.3 of PR-22 confirms that the Firm Base Provider would be continuously dispatched inasmuch as it provides that the Provider's committed "*block of Reserve* [...] *will be assigned and economically liquidated in any case.*" This means that, in allocating the SFR reserve for the next day, COES must

---

[350] Claimants also state that Kallpa GSA would have been able to fully recover its variable costs even when they were higher than the marginal costs of the system. For this proposition, they rely on Section 11.8 of PR-22, which provides that units entering the Daily Program "*without establishing the marginal cost*" (i.e. without qualifying in the Merit Order) to provide the SFR reserve shall recover their costs based on PR-33, under which the Firm Base Provider would be entitled to compensation equal to the difference between its variable costs and the Spot Price ("**Operating Costs Compensation**") (See Memorial, ¶ 91(c); Reply, ¶¶ 106-107, 154(c), 327(a)).

[351] Claimants' Post-Hearing Brief, ¶ 22.

[352] At the Hearing, Respondent's witness Mr. Mendoza, OSINERGMIN's Manager of Electricity Generation and Transmission Division when PR-22 was issued, explained that "*reserve*" means the "*quantity of power measured in megawatts that a unit must be capable of increasing or decreasing in response to an imbalance,*" *i.e.* the amount of energy that the Firm Base Provider committed to supply as part of the service to address imbalances (Tr. Day 3, 603:11–14, quoted in Claimants' Post-Hearing Brief, ¶ 24).

[353] Memorial, ¶ 89; Reply, ¶¶ 91-93; Claimants' Post-Hearing Brief, ¶ 27.

mandatorily "*assign*" to the Firm Base Provider a block of such reserve equal to the committed quantity (i.e. that block must be "*assigned* […] *in any case*"). This in turn means that the Firm Base Provider must be mandatorily included in the Daily Program, for otherwise it would be unable to supply the "*assigned*" reserve. The phrase "*economically liquidated in any case*" refers to the fact that the Firm Base Provider is compensated for providing the SFR service on a take-or-pay basis, regardless of the amount of "*assigned*" reserve used on any given day.[354] Respondent's interpretation of Section 9.5.3 – as merely providing that the Firm Base Provider would be compensated on a take-or-pay basis without any guarantee of continuous dispatch – fails to give the term "*assigned*" an autonomous meaning in contrast with the *effet utile* principle.[355] The absence of any reference to the Merit Order in Section 9.5.3 seems to render untenable Respondent's interpretation of the phrase "*assigned* […] *in any case*" as requiring that the Firm Base Provider be assigned its committed quantity of reserve with priority only if it qualifies in the Merit Order;[356]

(iii) Section 9.5.10 makes it clear that the only condition possibly preventing the Firm Base Provider from entering the Daily Program is its "*unavailability*" to provide the SFR Service due to maintenance or other technical reasons.[357] Indeed, consistent with Section 9.5.3, that Section provides that COES must always "*assign*" to the Firm Base Provider a quantity of SFR reserve "*at least equal to the committed* [one]", except in case of an "*unavailability* [of the Firm Base Provider] *that has been communicated and proven.*" Respondent's witness Mr. Mendoza confirmed that the term "*unavailable*" in that provision means "*not available to dispatch because it's in maintenance*";[358]

(iv) Section 11.8 provides that the costs incurred by generation units dispatched "*without establishing the marginal costs*" (i.e. without qualifying in the Merit Order) to provide the SFR reserve must be compensated pursuant to PR-33. This confirms that the PR-22 scheme contemplated a continuous dispatch of the

---

[354] Memorial, ¶ 90; Reply, ¶¶ 95-97; Claimants' Post-Hearing Brief, ¶¶ 31-36.

[355] Claimants' Post-Hearing Brief, ¶ 34.

[356] Claimants' Post-Hearing Brief, ¶¶ 35-36.

[357] Claimants' Post-Hearing Brief, ¶¶ 38-41.

[358] Tr. Day 4, 670:16–17, quoted in Claimants' Post-Hearing Brief, ¶ 39.

Firm Base Provider to provide the SFR service, even if it did not qualify in the Merit Order.[359]

332.   Claimants deny that their interpretation of PR-22 is contradicted by Section 5.6 of PR-22, which provides that the assignment of the SFR reserve must be "*based on a joint PDO* [Daily Program] *assignment procedure with the Reserve for RS*" (i.e. the Joint Optimization). According to Claimants, that provision must be read together with the provisions of Section 9 of PR-22 that set out the "*principal criteria*" for the allocation of the SFR (as recognized in Section 5.6), establishing that the Firm Base Provider must be included in the Daily Program in "*any case*." Accordingly, in Claimants' view, the reference to Joint Optimization in Section 5.6 of PR-22 can only concern the allocation of any residual amount of SFR reserve not already covered by the Firm Base Provider.[360]

333.   Claimants disagree with Respondent[361] that they should have conducted a proper due diligence regarding the meaning of PR-22 and obtained confirmation of their interpretation with OSINERGMIN, saying that the terms of PR-22 were clear and required no confirmation.[362]

334.   To Respondent's submission that dispatch of units outside the Merit Order is only permitted for safety and voltage operations ("**Forced Dispatch**"),[363] Claimants rebut that such dispatch may also occur for other reasons.[364] In any event, according to Claimants, the provision of SFR services is a safety operation under Technical Procedure No. 8 ("**PR-8**"),[365] which covers "*multiple circumstances in which Forced Dispatch may be required for safety reasons, ie to guarantee electricity supply to end*

---

[359] Memorial, ¶ 231(c); Reply, ¶¶ 102, 106, 162, 327(a)(iii).

[360] Reply, ¶ 101.

[361] Counter-Memorial, ¶ 262; Rejoinder, ¶¶ 193-195, 499; Respondent's Post-Hearing Brief, ¶¶ 35, 50, 55, 62, 148, 184-186.

[362] Reply, ¶ 358. Because the terms were clear, Claimants did not request confirmation from OSINERGMIN (nor were they required to do so in order for their expectations to be Treaty-protected).

[363] Counter-Memorial, ¶¶ 7, 8, 62, 101; Rejoinder, ¶¶ 82-84; Respondent's Post-Hearing Brief, ¶ 21.

[364] Reply, ¶ 143.

[365] Security Criteria for SEIN's Short-Term Operation, Technical Procedure of the Committee for the Economic Operation of the SINAC, PR-08, Approved by OSINERGMIN Resolution Nº 247-2014-OS/-CD, November 26, 2014 (Amended by OSINERGMIN Resolution N° 176-2017-OS/CD, of January 1, 2018) (R-17).

*users*".[366] Indeed, SFR is meant to preserve the safety of the system, by avoiding unsafe frequency levels and blackouts.[367] This is confirmed by PR-8 which lists frequency regulation as one of the safety circumstances that COES must consider when preparing the Daily Program.[368]

335. Claimants say that their interpretation of PR-22 is corroborated by its drafting history, Technical Note 1 and the Guidelines, and was shared by other generators and OSINERGMIN.

336. As to PR-22's drafting history, Claimants contend that several preparatory documents[369] published before the enactment of PR-22 confirm that Respondent's "*intention was to have one or more Firm Base Providers that would be continuously dispatched in order to be able to provide SFR before any other units*".[370]

337. With respect to Technical Note 1, Claimants say that its Section 5.7.2 supports their interpretation of PR-22, because it clarifies that: (*i*) Joint Optimization applies only to the portion of SFR reserve allocated through the Balancing Market (i.e. the portion not covered by Base Provision); and (*ii*) the amount of SFR reserve committed by the Firm Base Provider is mandatorily included in the Daily Program, since its dispatch is not "*a decision variable*".[371]

338. Claimants refute Respondent's allegation that, in a letter to COES, OSINERGMIN also recommended that also the Firm Base Provider should be subject to Joint Optimization. For Claimants, OSINERGMIN's letter contained no such recommendations, but merely referred COES to certain remarks on Technical Note 1 contained in a study by the consulting firm Estudios Eléctricos S.A. (the EE Study), none of which however required COES to jointly optimize the Firm Base Provision

---

[366] Reply, ¶ 140.

[367] Reply, ¶ 142. See also Memorial, ¶¶ 6, 56, 64, 84.

[368] Reply, ¶ 140, referring to PR-8, November 26, 2014 (R-17), Section 6.

[369] Claimants' Post-Hearing Brief, ¶¶ 42-56. In particular, Claimants rely on COES Draft (COES Letter No. COES/D-644-2012, December 19, 2012 (C-90)), the Indra Report (Indra Report, February 24, 2014 (C-94)), the First Draft PR-22 based on the Indra Report (First Draft PR-22, November 28, 2013 (C-51)), the Second Draft PR-22 (Second Draft PR-22, January 16, 2014 (C-53)) and the Pre-Publication Report (Pre-Publication Report, January 2014 (C-52)).

[370] Claimants' Post-Hearing Brief, ¶ 57.

[371] Memorial, ¶¶ 93-94, 128; Reply, ¶¶ 109-110, 327(b); Claimants' Post-Hearing Brief, ¶ 60.

and the Daily Program.[372] Furthermore, Claimants note, had OSINERGMIN believed that Technical Note 1 was inconsistent with PR-22 (and, more generally, with Peruvian law), it could have challenged the Note, requested its amendment or sanctioned COES, none of which it never did.[373]

339.     Claimants also reject Respondent's observation that COES is a private entity without regulatory power that could not derogate from PR-22 and from OSINERGMIN's instructions, contending that COES has a public law status and was delegated by OSINERGMIN to exercise public authority to supplement PR-22 and enter into the Commitment Act.[374]

340.     As to the Guidelines, Claimants assert that they incorporated PR-22 and Technical Note 1, and thereby confirmed their content. Moreover, at Section 6.5.2 they provided that the bid price would be the sole criterion for determining the winner of the Tender. In Claimants' view, this means that the technology – and thus the variable costs – of the participants in the Tender were irrelevant.[375]

341.     Regarding the understanding of other generators and OSINERGMIN, Claimants rely heavily on a comment by Engie (at the time Enersur) on the draft Guidelines published by OSINERGMIN after the adoption of PR-22 but before the Tender, as well as on OSINERGMIN's response, both of which Claimants assert support their interpretation of PR-22.[376] In particular, in its comment 2.1.3 on the draft Guidelines, Engie recommended that the "*technologies of the units providing SFR should also be considered*" in determining the winning bid, because PR-22 contemplated a mandatory ("*forced*") dispatch of the Firm Base Provider even when "*the marginal cost of the system is much lower that its variable fuel costs*", which would entail higher costs for the system.[377] OSINERGMIN did not contest Engie's understanding

---

[372] Claimants' Post-Hearing Brief, ¶¶ 66 and 68-69.

[373] Claimants' Post-Hearing Brief, ¶ 67.

[374] Claimants' Post-Hearing Brief, ¶ 64. However, it seems to me that Respondent actually runs a different argument: that, as a private entity, COES could not derogate from the Economic Dispatch Principle as it did through Technical Note 1 (Counter-Memorial, ¶¶ 105-107; Rejoinder, ¶ 186). The implications of that argument are unclear.

[375] Reply, ¶ 328; Claimants' Post-Hearing Brief, ¶¶ 71-72.

[376] Memorial, ¶¶ 97-98; Reply, ¶¶ 126-129; Claimants' Post-Hearing Brief, ¶¶ 145-149.

[377] OSINERGMIN Report No. 110, February 2016 (C-103), comment 2.1.3, p. 9: "*if SFR is awarded to only one or two URS [SFR units], based on their bid prices, these generation units will operate in a firm manner*

of PR-22, but rejected its suggestion that the units' technologies be considered for tender purposes.[378] Claimants submit that this exchange confirms that both Engie and OSINERGMIN interpreted the Bid Terms, and particularly PR-22, as guaranteeing a continued dispatch of the Firm Base Provider regardless of its costs.[379]

342.   Claimants contest Respondent's argument[380] that their interpretation of the Bid Terms is irreconcilable with the Economic Dispatch Principle enshrined in Article 12.1 of Law 28832, that requires COES to operate the National Grid "*at the lowest cost, preserving the safety of the system* [and] *the best use of energy resources*".[381] In their view Respondent is wrong for the following reasons:

(i)   first, Article 12.1 of Law 28832 does not lay down "*a guiding principle that can override unambiguous regulations by OSINERGMIN*", but merely defines COES' operational criteria;[382]

(ii)   Second, Article 12.1 of Law 28832 sets three goals that must be pursued *simultaneously*: operating the National Grid at the lowest cost, preserving the system safety and making the best use of energy resources. Contrary to Respondent's position, cost minimization does not prevail over the other two goals, and the decision as to the goal to be prioritized at any given moment is a matter of policy. It is undisputed that the purpose of SFR is to guarantee the safety and security of the system. As also demonstrated by the drafting history

---

*during the tendered periods, that is, for three years. The operation of these units is going to be forced in the daily economic dispatch, thus possibly generating cost overruns. For example, if a diesel generation unit offered all the required SFR reserve at a low bid price becoming the only winner of the tender. This unit would provide the SFR in a firm manner for the 3 years and would operate in a forced way in the dispatch, even during periods when the marginal cost of the system is much lower than its variable fuel costs*".

[378] Memorial, ¶¶ 97-98; Reply, ¶¶ 126-129; Claimants' Post-Hearing Brief, ¶¶ 77-78.

[379] To Respondent's observation that OSINERGMIN did not expressly take any position on Engie's understanding of PR-22, Claimants reply that OSINERGMIN's silence can only be viewed as acquiescence and agreement with Engie's interpretation (Claimants' Post-Hearing Brief, ¶ 79)

[380] Counter-Memorial, ¶¶ 13, 41, 54-55, 73, 82, 95-96; Rejoinder, ¶ 253; Respondent's Post-Hearing Brief, ¶¶ 17 ff.. Respondent also runs the similar argument that Claimants' interpretation of the Bid Terms would ignore Peru's goal of "*economic efficiency*" (Counter-Memorial, ¶ 265).

[381] To Respondent's contention that their interpretation of the Bid Terms would defy the "*normal practice of cost disclosure for dispatch*" as Kallpa GSA would have been allowed to fully recover its fuel costs, Claimants reply that there would have been nothing improper in that, since Peruvian regulations allow natural-gas fueled plants such as Kallpa GSA to declare up to 100% of their fuel costs (which include supply, distribution and transportation costs) (see Counter-Memorial, ¶ 265 and Reply, ¶ 367).

[382] Claimants' Post-Hearing Brief, ¶ 84. See also Reply, ¶ 133.

of PR-22, by opting to secure SFR through a Firm Base Provider that would be continuously dispatched (instead of relying on Joint Optimization, for which Peru was considered not ready), Peru chose, as a matter of policy, a trade-off between safety and cost minimization;[383]

(iii) Third, Respondent interprets the "*lowest cost*" requirement in Article 12.1 as relating solely to the variable costs of generation units, ignoring other costs (e.g. those for uncorrected frequency imbalances and blackouts) that OSINERGMIN consciously chose to minimize by securing the SFR service through the continuous dispatch of the Firm Base Provider.[384]

343.   In conclusion, for Claimants, there can be no doubt that the Bid Terms, and the Commitment Act in which they were crystallized, guaranteed that the Firm Base Provider would be continuously dispatched regardless of its costs.

### ii.     The arbitrariness of Resolution No. 141

344.   Against the background of their interpretation of the Bid Terms and the Commitment Act, Claimants assert that, by issuing Resolution No. 141, Peru acted in an impermissibly arbitrary manner in breach of the MST/FET standard of Article 10.5 of the Treaty, because that Resolution retroactively reversed the guarantee of continuous dispatch of the winner of the Tender enshrined in those documents. In Claimants' view, the reversal was so "*outrageous*", that it would even have entailed a breach of the *Neer* standard, had it been applicable.[385]

345.   Claimants rely on the definition of arbitrariness accepted by the tribunal in *EDF v. Romania*, according to which a measure is arbitrary when it: (*i*) "*inflicts damage on the investor without serving any apparent legitimate purpose*"; or (*ii*) is not "*based on legal standards but on discretion, prejudice or personal preference*"; or (*iii*) is taken

---

[383] Reply, ¶¶ 135-138; Claimants' Post-Hearing Brief, ¶¶ 84-89 and 94-96. In response to a question from the Arbitral Tribunal about the cost savings allegedly generated by Resolution No. 141, Claimants contend that such savings only amount to around 4 to 8% of the total costs of the National Grid, and concerned costs that in any event would have been borne by other generators rather than consumers (Claimants' Post-Hearing Brief, ¶¶ 91-108).

[384] Claimants' Post-Hearing Brief, ¶ 90. See also Reply, ¶¶ 147-148.

[385] Reply, ¶ 285.

"*for reasons that are different from those put forward by decision maker*"; or (*iv*) is adopted "*in wilful disregard of due process and proper procedure*".[386]

346.   They also point to the definition of *Saluka v. Czech Republic*, where the Tribunal held that arbitrariness arises when the State takes "*varying, sometimes even contradictory positions*" and acts "*inconsistently in in its overall communications*".[387] Moreover, relying on *Owens-Illinois v. Venezuela*, they add that a State's conduct is also arbitrary when it "*does not respond to law, justice or reason*".[388] According to Claimants, other decisions of investment tribunals articulated the standard in a similar manner.[389]

347.   Claimants contend that Resolution No. 141 was impermissibly arbitrary because it: (*i*) reversed the guarantee of continuous dispatch of the winner of the Tender, *after* the award of the Tender; (*ii*) was a material alteration of the Bid Terms disguised as an interpretation; (*iii*) unilaterally revoked the guarantee of continuous dispatch, while holding Kallpa GSA to its commitment to provide the SFR service without compensation (as it had bid zero Soles for the provision of the service); (*iv*) applied retroactively in breach of the principle of Peruvian law of non-retroactivity of laws; (*v*) was issued without regard to the requirements OSINERGMIN (*a*) obtain COES's opinion before approving or modifying a technical procedure, and (*b*) publish a draft text in the Official Gazette in order to receive comments from interested parties, and, if necessary, hold a public hearing; and (*vi*) as revealed in the Uribe & Leyva SFR Report, was issued only because "*it is not convenient for these [Kallpa and Las Flores plants] to provide the SFR*" service.[390]

---

[386] *EDF (Services) Limited v. Romania,* ICSID Case No. ARB/05/13, Award, October 8, 2009 (CL-58), ¶ 303 [hereinafter: "*EDF v. Romania*"]. Claimants emphasize that that definition was endorsed by Peru itself in another case (*Lidercón, S.L. v. Republic of Peru*, ICSID Case No. ARB/17/9, Award, March 6, 2020 (CL-101), ¶ 168).

[387] *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL, Partial Award, March 17, 2006 (CL-30), ¶¶ 417-419, quoted in Memorial, ¶ 218 and Reply, ¶ 376.

[388] Memorial, ¶ 214 referring to *OI v. Venezuela*, ¶ 494 and *Flughafen Zürich A.G. and Gestión e Ingeniería IDC S.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award, November 18, 2014 (CL-88), ¶ 585.

[389] Reply, ¶ 376, making reference to *AES v. Hungary*, ¶ 10.3.9; *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, November 25, 2015 (CL-93), ¶ 179; *Siemens v. Argentina*, ¶¶ 318-319; *Eureko B.V. v. Republic of Poland*, UNCITRAL, Partial Award, August 19, 2005 (CL-29), ¶ 233; *Occidental Exploration and Production Company v. The Republic of Ecuador*, LCIA Case No. UN3467, Final Award, July 1, 2004 (CL-24), ¶ 162.

[390] Memorial, ¶ 244; Reply, ¶¶ 378-381; Claimants' Post-Hearing Brief, ¶ 125.

**2.   Respondent's position**

*i.   The Bid Terms' guarantee of continuous dispatch*

348.    Respondent contests that the Bid Terms guaranteed a continuous dispatch of the Firm Base Provider regardless of its costs, maintaining that they instead subjected the Firm Base Provider to Joint Optimization.

349.    Starting with PR-22, Respondent argues that none of the provisions invoked by Claimants assist their case:

(i)   Sections 5.6 and 6.1.17(e) provided that the Firm Base Provider would furnish the SFR service only insofar as it qualified in the Daily Program, based on the Merit Order. Indeed, Section 5.6 expressly stated that the "*assignment of the necessary Reserve for the RS*" to each unit is based on a Joint Optimization procedure (i.e. it occurs jointly with the determination of the Daily Program based on the Merit Order), which COES is expressly tasked with elaborating pursuant to Section 6.1.17(e);[391]

(ii)   Section 9.3 merely provided that the Firm Base Provider's SFR reserve be used with priority over that offered in the Balancing Market or by a Variable Base Provider. The implication is that, in order to provide its reserve, the Firm Base Provider had to qualify for inclusion in the Daily Program based on the Merit Order;[392]

(iii)   Section 9.5.3, which provided that the Firm Base Provider's reserve "*will be assigned and economically liquidated in any case*", merely meant that the Firm Base Provider was to be compensated on a *take or pay* basis regardless of whether it supplied the SFR service. The term "*assigned*" is not synonymous of dispatched, and only referred to COES' obligation to consider ("*assign*") the Firm Base Provider's reserve in "*the calculation* [...] *for the payment of SFR services.*"[393] This is confirmed by Article 2.2 of Annex IV of PR-22, providing that

---

[391] Counter-Memorial, ¶¶ 130-131; Rejoinder, ¶¶ 164-167.

[392] Rejoinder, ¶¶ 237-239.

[393] Rejoinder, ¶¶ 246-248; Respondent's Post-Hearing Brief, ¶¶ 46-47.

compensation of the Firm Base Provider was based on the "*assigned*" reserve;[394]

(iv) Section 11.8, according to which units entering the Daily Program "*without establishing the marginal cost*" to provide SFR services are entitled to recover their costs pursuant to PR-33, cannot be interpreted as setting out the compensation mechanism for the continuous dispatch of the Firm Base Provider. This is demonstrated by the fact that PR-33 only deals with thermal plants, whereas the Firm Base Provider could have used a different technology to produce energy.[395] In fact, Section 11.8 sets out the compensation mechanism for the "*exceptional circumstance when an SFR service provider is a thermal plant and experiences costs*" for operational inflexibility (whether caused by economic or forced dispatch), which is the subject-matter of PR-33.[396]

350.   Respondent asserts that Claimants' interpretation of PR-22 also ignores that dispatch of units outside the Merit Order is only permitted for safety and voltage operations (so called Forced Dispatch).[397] Contrary to Claimants' submission, the SFR service is not a safety operation since it is not mentioned in PR-8 (which regulates safety operations), and PR-22 (which regulates SFR services) refers neither to safety operations nor to PR-8.[398] Indeed, unlike the SFR service, safety operations are short-lived and unexpected contingencies. Moreover, even if the provision of SFR services were a safety operation, it would still be subject to the Economic Dispatch Principle.[399]

---

[394] Respondent's Post-Hearing Brief, ¶¶ 48-49.

[395] Section 7.1 of PR-33 simply indicates a situation exists where compensation for operational inflexibility is provided outside of the economic dispatch. As voltage operations and safety operations are the only two operations occurring outside the economic dispatch, Section 7.1 is necessarily referring to those two operations. See Rejoinder, ¶¶ 178-179; Respondent's Post-Hearing Brief, ¶¶ 25-31.

[396] See Respondent's Post-Hearing Brief, ¶ 30.

[397] Counter-Memorial, ¶¶ 7, 8, 62, 101; Rejoinder, ¶¶ 82-84; Respondent's Post-Hearing Brief, ¶ 21.

[398] Rejoinder, ¶¶ 85-88; Respondent's Post-Hearing Brief, ¶¶ 20-24, referring to PR-8, November 26, 2014 (R-17). Respondent notes that unlike SFR, safety operations are for unforeseen emergency situations in which the Economic Dispatch Principle may be circumvented.

[399] Indeed, even for safety operations, COES still must apply the Economic Dispatch Principle and choose the generator that can meet the emergency with the lowest possible costs. See Counter-Memorial, ¶¶ 63, 102; Rejoinder, ¶¶ 89-90; Respondent's Post-Hearing Brief, ¶ 24.

351.    Respondent also says that Claimants deserve no protection because their interpretation of PR-22 was not based on a proper due diligence,[400] and because they failed to obtain confirmation of such interpretation from OSINERGMIN. [401]

352.    As to Technical Note 1, Respondent does not seem to contest that it provides for a continuous dispatch of the Firm Base Provider.[402] However, it emphasizes that its author, COES, is a private entity that could not validly derogate from PR-22 and Peruvian law, which required it to allocate the reserve for SFR services based on Joint Optimization.[403] Respondent also maintains that COES ignored OSINERGMIN's letter of December 16, 2015 forwarding to it the EE Study that recommended the inclusion of the reserve for SFR "*in the restrictions of the optimization model*",[404] where the term "*restriction*" meant a "*limitation*" to be considered "*when determining the means to provide the main and ancillary electricity services at the lowest possible cost*".[405]

353.    With respect to the Guidelines, Respondent notes that Claimants rely on them only because they incorporated PR-22 and Technical Note 1, which however – if read as Respondent suggests – do not support the proposition that the Firm Base Provider was guaranteed continuous dispatch.

354.    Respondent denies that the drafting history of PR-22 confirms Claimants' interpretation of the Bid Terms.[406] Moreover, it suggests that no other generator shared that interpretation, as demonstrated by the fact that, unlike Kallpa GSA, none of them bid zero Soles.[407] Respondent downplays the importance of the Engie-OSINERGMIN exchange on the draft Guidelines, saying that OSINERGMIN's silence on Engie's comment that the Firm Base Provider would be continuously dispatched

---

[400] Rejoinder, ¶¶ 193-195, 499; Respondent's Post-Hearing Brief, ¶¶ 35, 50, 55, 62, 148, 184-186.

[401] Rejoinder, ¶¶ 204, 499; Respondent's Post-Hearing Brief, ¶ 184.

[402] Indeed, in its Post-Hearing Brief, Respondent states that by issuing Technical Note 1 COES "*failed to implement the joint assignment procedure from Section 6.1.17 of PR-22 to allocate the reserve for SFR services within the economic dispatch model, as OSINERGMIN had requested*" (Respondent's Post-Hearing Brief, ¶ 51).

[403] Counter-Memorial, ¶¶ 106-108; Rejoinder, ¶¶ 183-186; Respondent's Post-Hearing Brief, ¶ 55.

[404] Counter-Memorial, ¶ 109; Rejoinder, ¶¶ 188-189; Respondent's Post-Hearing Brief, ¶¶ 52-54.

[405] Respondent's Post-Hearing Brief, ¶ 52. See also Rejoinder, ¶ 189.

[406] Counter-Memorial, ¶¶ 75-96; Rejoinder, ¶¶ 106-156.

[407] Counter-Memorial, ¶¶ 270-271; Rejoinder, ¶ 499; Respondent's Post-Hearing Brief, ¶ 41.

cannot be read as acquiescence, because OSINERGMIN only had to focus, as it did, on Engie's question (which was whether the bidders' technology would be a relevant factor for the award of the Tender).[408]

355.   Finally, Respondent argues that Claimants' interpretation of the Bid Terms is irreconcilable with the Economic Dispatch Principle, enshrined in Article 12.1 of Law 28832. In Respondent's submission, that principle "*applies to all aspects of Perú's electricity system*",[409] and requires COES to operate the system at the minimum cost.[410] The continuous dispatch of the Firm Base Provider, instead, would have generated significant useless costs.

356.   Respondent emphasizes that other generators too considered Claimants' interpretation of the Bid Terms contrary to the Economic Dispatch Principle. It notes that in June 2016, slightly before the generators filed their Declared Costs for natural gas-powered plants, no less than 7 companies highlighted to OSINERGMIN that an interpretation of PR-22 guaranteeing continuous dispatch of Kallpa GSA's units regardless of costs would cause "*significant cost overruns*" in breach of that Principle.[411]

357.   In response to Claimants' assertion that, in addition to minimizing costs, Article 12.1 of Law 28832 requires COES to preserve the safety of the National Grid and make best use of energy resources, Respondent argues that the last two prongs of Article 12.1 (preserving the safety of the system and making the best use of energy resources) do not supplant the first prong (minimization of costs), even if "[t]*he two subsidiary clauses modify the main clause*".[412] This was confirmed by Claimants' own witness, Mr. Guerra, and experts, Mr. Torres and Ms. Bambaci, who recognized that the National Grid must be operated at the lowest possible cost.[413]

---

[408] Respondent's Post-Hearing Brief, ¶¶ 167-176.

[409] Respondent's Post-Hearing Brief, ¶ 10. See also Counter-Memorial, ¶¶ 4, 34, 55, 99; Rejoinder, ¶¶ 3, 67, 81, 135, 138.

[410] Counter-Memorial, ¶¶ 13, 41, 54-55, 73, 82, 95-96; Rejoinder, ¶ 253; Respondent's Post-Hearing Brief, ¶¶ 17 ff.

[411] Counter-Memorial, ¶¶ 124-125; Rejoinder, ¶ 231; Respondent's Post-Hearing Brief, ¶ 42.

[412] Respondent's Post-Hearing Brief, ¶ 12. See also Rejoinder, ¶¶ 17, 57-63.

[413] Respondent's Post-Hearing Brief, ¶¶ 10-18, referring to Tr. Day 2, 447:21 – 448:4, 450:10-17 (examination of Mr. Guerra); Tr. Day 6, 1140:18 – 1141:16 (examination of Mr. Torres); Tr. Day 6, 1201:19-20 (examination of Ms. Bambaci).

358.    Respondent's conclusion is that Claimants tried to gamble the system by relying on their interpretation of the Bid Terms: they tried to secure a continuous and automatic inclusion of their units in the Daily Program in order to provide not only the SFR Service, but also electricity to the system, so they could fully declare (and recover) their costs, even if they were substantially higher than the marginal costs of the system.[414]

### ii.    The arbitrariness of Resolution No. 141

359.    Respondent does not appear to contest Claimants' definition of arbitrariness as covering State measures that are not "*based on legal standards but on discretion, prejudice or personal preference*", are taken "*in wilful disregard of proper procedure and due process*" or "*for reasons that are different from those put forward by decision maker*" and are inconsistent or contradictory with previous measures or policy goals. However, it says that none of those articulations of arbitrariness "*applies to Resolution No. 141*".[415]

360.    For a start, Respondent rejects Claimants' submission that Resolution No. 141 was contrary to applicable legal standards because it breached the principle of non-retroactivity of Peruvian law. In its submission, far from retroactively altering the Bid Terms, the Resolution merely clarified what was already apparent from PR-22: that the Firm Base Provider would be subject to Joint Optimization and would accordingly not be continuously dispatched regardless of costs.[416] In any event, Resolution No. 141 did not retroactively change the compensation for services already rendered, but rather applied only prospectively to future services.[417]

361.    Furthermore, Respondent rejects the argument that OSINERGMIN issued Resolution No. 141 in willful disregard of the legal procedures and due process under Peruvian law. It contends that OSINERGMIN was not required to seek COES' opinion prior to issuing Resolution No. 141, as such requirement only applies to amendments (and

---

[414] Counter-Memorial, ¶¶ 3, 116-119, 152, 154; Rejoinder, ¶¶ 13, 211, 216, 223, 272, 274.

[415] Rejoinder, ¶ 505. See also Counter-Memorial, ¶ 273.

[416] According to Respondent, the fact that OSINERGMIN sought to ensure that electricity providers properly understood PR-22 "*shows not that Perú acted arbitrarily, but, rather, that Perú was careful to treat all electricity providers equally and to be fully transparent regarding its energy distribution goals*" (Counter-Memorial, ¶ 275).

[417] Counter-Memorial, ¶ 275; Rejoinder, ¶ 507.

not to clarifications) of existing resolutions. Moreover, according to it, OSINERGMIN was not required to publish a draft of Resolution No. 141 to solicit comments from the public, because that requirement may be dispensed with in case of urgency. That was the case with respect to the issuance of Resolution No. 141: since the deadline for the filing by generators of their Declared Costs was fast approaching, OSINERGMIN needed to clarify the content of PR-22 urgently.[418]

362. Finally, Respondent argues that there is no evidence that Resolution No. 141 was issued because Peru realized after the fact that compensating Claimants' plants would have been too costly. That proposition is not supported by the Uribe & Leyva SFR Report, since that was commissioned after the issuance of Resolution No. 141 and cannot elucidate the reasons behind that Resolution.[419]

### 3. The Tribunal's decision

363. The first issue before the Tribunal is whether Peru breached its obligation under the MST/FET standard of the Treaty not to engage in seriously arbitrary conduct by issuing Resolution No. 141. In this Section, the Tribunal analyzes first the preliminary question that arises in this respect, which is whether Kallpa GSA's units were guaranteed permanent dispatch under the Bid Terms (**Section i**) and then whether, as Claimants submit, Resolution No. 141 reversed that guarantee in a seriously arbitrary fashion (**Section ii**).

### i. Whether the Bid Terms guaranteed continuous dispatch of the Firm Base Provider

364. The Parties offer radically different interpretations of the Bid Terms. Claimants suggest that those Terms – and the Commitment Act in which they were crystallized – guaranteed the winner of the Tender a continuous inclusion in the Daily Schedule irrespective of costs. This is contested by Respondent which maintains that the Bid Terms provided that the winner of the Tender would be dispatched only if it qualified in the Daily Program based on the Merit Order (the so-called Joint Optimization).

365. Before discussing whether the Bid Terms guaranteed continuous dispatch, it is useful to examine the drafting history of PR-22, which provides some background to the meaning of the Bid Terms.

---

[418] Counter-Memorial, ¶¶ 141-150; Rejoinder, ¶¶ 255-260.

[419] Rejoinder, ¶ 509.

#### a. The drafting history of PR-22

366.   PR-22 was the culmination of Peru's reform aimed at improving the SFR system and the safety of the National Grid that began in 2011.

367.   Until 2011, in Peru SFR services were provided without compensation by two hydroelectric plants located in the North and in the South of the country.[420] The SFR system was operated "manually", which means that in case of an imbalance in the system, COES needed to physically call the operator of the power plant providing the SFR service and request that it use its SFR reserve to reduce or increase output.[421] Consequently, response times were high and entailed high risks of partial blackouts.

368.   To correct this, on August 18, 2011, the General Directorate of Electricity, which was in charge of proposing policies to regulate the power sector, issued Resolution No. 69 providing that the SFR service would thenceforth be voluntary and remunerated, and tasked COES with preparing a new Technical Procedure (which would become PR-22), to be approved by OSINERGMIN, that would reform the SFR system.[422] The aim of the reform was to introduce an automated AGC system for the provision of SFR services that would drastically reduce the time for the response to imbalances and thus increase the National Grid's safety and reliability.[423]

369.   In accordance with Resolution No. 69, and based on the XM Report, in December 2012 COES finalized its draft of PR-22 (i.e. the COES Draft) and shared it with OSINERGMIN for its review and approval.[424] The COES Draft contemplated that the SFR reserve would be mainly allocated through Joint Optimization. That draft was rejected by OSINERGMIN on the grounds that it contained certain "*gaps*", including in respect of how the SFR service would be provided.[425] Consequently, OSINERGMIN took it upon itself to prepare a new draft.

---

[420] Memorial, ¶ 66, Reply, ¶ 53; Counter-Memorial, ¶ 69; Rejoinder, ¶ 73.

[421] Memorial, ¶ 67; Reply, ¶ 54(c); Counter-Memorial, ¶ 69; Rejoinder, ¶ 73.

[422] Memorial, ¶ 71; Reply, ¶ 55; Counter-Memorial, ¶ 70; Rejoinder, ¶ 73. See also Ministry of Energy Resolution No. 14 of March 3, 2005, as amended by General Directorate of Electricity's 2011 Resolution of August 18, 2011 (C-48).

[423] Memorial, ¶ 68; Reply, ¶ 54(c); Counter-Memorial, ¶ 70; Rejoinder, ¶ 73. CWS-Frisancho I, ¶ 38.

[424] COES Letter No. COES/D-644-2012, December 19, 2012 (C-90). Memorial, ¶ 72; Counter-Memorial, ¶ 76.

[425] OSINERGMIN Resolution No. 195, October 4, 2013 (C-50), p. 2.

370.    In November 2013, OSINERGMIN published the First Draft PR-22. The Parties agree that this was based on the recommendations of the Indra Report (a study prepared by the Spanish consulting firm Indra at the request of the Ministry of Economy of Peru to assist OSINERGMIN in devising an automated SFR system).[426] However, they diverge as to its interpretation.

371.    Since OSINERGMIN's First Draft PR-22 is essentially identical to the final PR-22, which is discussed below, the Tribunal does not need to dwell on it. The Indra Report, instead, deserves greater attention, because it describes the Peruvian market at that time and the type of SFR system that OSINERGMIN was advised to implement.

372.    The Indra Report observed that the Peruvian market was not sufficiently developed to allow the allocation of SFR services only through the Balancing Market, which was considered the most cost-effective way for awarding SFR services as would be based on Joint Optimization.[427] For that reason, and in order to incentivize operators to make the necessary investments for the upgrade of their plants to provide automated SFR services and present bids to become SFR service providers, Indra recommended that, in the short term, the SFR service be awarded to Base Providers mainly on the basis of multi-year contracts (also called "*bilateral contracting*"),[428] using the Balancing Market if necessary to supplement the required SFR reserve.[429]

373.    More importantly for present purposes, the Indra Report also recommended that:

> The assignment algorithm [which programs units in the Daily Program based on cost] must take into account, as a **boundary condition**, the reserve which has already been committed through commitment agreements (bilateral contracting or Base Provision) so that the units which supply the Base

---

[426] Indra Report, February 24, 2014 (C-94). See Memorial, ¶ 77; Counter-Memorial, ¶¶ 77, 82; Reply, ¶¶ 65, 71.

[427] Memorial, ¶ 76; Reply, ¶ 66; Rejoinder, ¶¶ 120-121; Claimants' Post-Hearing Brief, ¶ 47.

[428] Indra Report, February 24, 2014 (C-94), p. 62.

[429] Memorial, ¶ 76; Counter-Memorial, ¶ 78; Reply, ¶ 67; Rejoinder, ¶ 121; Claimants' Post-Hearing Brief, ¶ 47. This is further confirmed by the text of the First Draft PR-22, which provides that "*given that the market for the secondary regulation service is still developing, we propose to assign the service for temporal periods that are long-term (Base Provision) and short-term (Balance Market), the assignment procedure being different in each case*" and notes that "[t]*he goal of the long-term assignment is to provide an incentive for generation companies to install the equipment needed for the service, with a compensation and minimum band commitment for several years. Whereas the short-term assignment should enable COES to satisfy the required reserve if the reserve secured through a long-term assignment is insufficient*" (First Draft PR-22, November 28, 2013 (C-51), Section 2.2.3). See also Pre-publication Report, January 2014 (C-52), Section 3.2.2

> Provision must be suitably programmed to ensure that the supply and the reserve which they provide is not taken into account at the time of optimization.[430]

374.    In the Tribunal's view, Claimants are correct that the term "*boundary condition*" refers to the fact that the Base Providers' SFR reserve would be considered a limitation in the assignment algorithm, i.e. it would not be subject to that algorithm, and thus would always be included in the Daily Program. By contrast, there is no basis for Respondent's suggestion that the term "*boundary condition*" would instead refer to "*the maximum amount of energy from the Base Provider that can be dispatched in the Daily Dispatch Schedule without impacting the provider's ability to provide the SFR services that it committed to provide*".[431] Indeed, the paragraph goes on to state that the Base Provider's reserve should not be "*taken into account at the time of optimization*", which means that it would not be subject to Joint Optimization, and hence would always be included in the Daily Program.

375.    Respondent emphasizes that "*Indra did not state that Firm Base Providers would be included in the daily dispatch of electricity (the main service), regardless of costs*", but only that the reserve "*committed through a base provision mechanism was outside the optimization*".[432] But this distinction appears immaterial. It is undisputed that, in order to be able to provide the SFR reserve, a generator must be operating (i.e. it must be dispatching energy to the National Grid). Thus, Indra's statement that the Base Provision's SFR reserve is exempt from Joint Optimization (and thus mandatorily included in the Daily Program) necessarily implies that the provider of such reserve, the Base Provider, must also be exempt from Joint Optimization (and thus be mandatorily dispatched), because otherwise it would be unable to provide the SFR reserve when needed.[433]

---

[430] Indra Report, February 24, 2014 (C-94), p. 21 (emphasis added).

[431] Rejoinder, ¶ 125.

[432] Rejoinder, ¶ 126.

[433] The Tribunal also does not accept Respondent's argument that construing this passage of the Indra Report as suggesting that Base Providers would be programmed in the Daily Program regardless of costs would conflict with the Parties' shared understanding that the Variable Base Providers would be dispatched "*according to the Daily Dispatch Schedule*", i.e. only if they qualified in the Merit Order based on their costs (Rejoinder, ¶ 127). Neither the Indra Report nor the drafts of PR-22 state that the dispatch of Variable Base Providers was subject to that condition. Indeed, the notion that Variable Base Providers would be dispatched based on cost (namely, based on a cost competition with the Balancing Market) appeared for the first time only in PR-22 (Section 9.5.3). Hence it is not contradictory to understand the Indra Report as recommending the dispatch of Base Providers irrespective of costs.

376.   Two further passages of the Indra Report confirm that Indra considered Base Provision not subject to Joint Optimization. The first one is Section 4.2.3.1, where, in describing "*bilateral contracting*" (i.e. the Base Provision), Indra explained that:

> In the case of extensive market concentration which makes an economic optimization process very inefficient (which may be the case in the Northern zone of Peru, in case zonal regulation is chosen) or in order to provide transitional implementation while the procedures and processes are being adjusted, **it is recommended to use bilateral contracting**.[434]

377.   By recommending "*bilateral contracting*" (i.e. Base Provision) when "*an economic optimization process*" (i.e. Joint Optimization) is inefficient, Indra seemed to consider Base Provision and Joint Optimization mutually exclusive. This first passage is also relevant because it states that Base Provision is recommended when "*the procedures and processes*" for the provision of SFR services are being "*adjusted*", which was the case in Peru at the time.

378.   The other passage showing that Base Providers would not be subject to Joint Optimization is at pages 36-37, where Indra advised that:

> a "ranking" which exclusively considers daily programming would no longer apply, but rather a ranking based on a "mixed" criterion which starts up other units which are different to those which would not be operating had the secondary service not been included, so as to ensure that they are at an operating point which allows them to provide the Secondary Regulation service. This means that, in addition to minimizing fuel and non-fuel costs, another criterion, the provision of Secondary Reserve to provide stability of the system, also applies and both criteria, applied together or in turn, generate the ranking.[435]

379.   The above is a strong indication that according to Indra the units to be included in the Daily Program would no longer only be the ones with the lowest cost, but would also comprise those committed to the "*provision of SFR services*", which would itself be a qualifying criterion for including a unit in the Daily Program, regardless of its costs.

380.   Respondent suggests that the foregoing paragraph of the Indra Report confirms that Base Providers were subject to Joint Optimization, because, according to it, that passage recommends that the costs of both "*supplying electricity (the main service) and providing ancillary services are taken into account in order to reach the most*

---

[434] Indra Report, February 24, 2014 (C-94bis), Section 4.2.3.1.

[435] Indra Report, February 24, 2014 (C-94bis), pp. 36-37.

*economically efficient solution*".[436] However, that paragraph contains no reference to the "*costs*" of providing the SFR service, nor does it suggest that such costs would have to be considered jointly with those of supplying energy to create the Daily Program, which is how Joint Optimization operates.

381. In January 2014, OSINERGMIN published the Second Draft PR-22 – which, although more detailed, remained substantively similar to the First Draft – as well as a Pre-Publication Report explaining its content. The Pre-Publication Report appears to indicate that OSINERGMIN had embraced Indra's suggestion that the "*Base Provision reserve*" should be a "*boundary condition*", in other words an exception to the operation of the assignment algorithm (which is based on cost), and thus that Base Providers would not be subject to that algorithm. Indeed, in Section 3.2.3 the Pre-Publication Report stated that:

> We propose to uphold COES's proposal regarding a joint optimization program/secondary reserve (Unit Commitment) since it would be difficult for a model of specific allocations of a Unit Commitment based on costs to coexist, such as the current daily programming in Perú, with a separate market model for the secondary band. […]
>
> However, the assignment algorithm should take the Base Provision reserve into account as a boundary condition, in such a way that the units that supply the Base Provision should be adequately programmed to ensure the supply and the minimum reserve they provide must not be taken into account when optimization occurs.

382. Respondent submits that the second paragraph of this passage cannot be interpreted as exempting Base Providers from Joint Optimization, because the first paragraph expressly states that OSINERGMIN upheld COES' proposal to apply Joint Optimization. This ignores that the second paragraph starts with the adverb "*however*", which would indicate a contrast or an exception with respect the previous paragraph (here, that Joint Optimization applies in all cases).

383. The Pre-Publication Report also stated in Section 3.7 that the "*secondary regulation services are costly for the system*" but are necessary to ensure its "*stability and quality*". This indicates that OSINERGMIN understood that there is an inevitable tension between minimizing costs and guaranteeing the safety of the system through SFR services, and that it accepted a trade-off between the two, with a view to improving the SFR system and, thus, the reliability of the National Grid.

---

[436] Rejoinder, ¶ 129.

384.     Finally, before enacting PR-22, in March 2014 OSINERGMIN published a Response Report addressing questions and comments from generators on the Second Draft PR-22. The Parties have focused on OSINERGMIN's response to a question from COES on the compensation of "*forced units* […] *called to operate (outside the ranking) to provide Secondary Regulation*". OSINERGMIN explained that those units would be compensated making "*sure* [*that* they] *would not have any losses due to* [their] *operations*".[437] Regardless of what COES and OSINERGMIN had in mind when referring to "*forced units*",[438] this exchange shows at least that they did not consider inconceivable the dispatch of SFR units outside the Merit Order.

385.     From the above, the Tribunal concludes that the drafting history of PR-22 provides two useful elements for the interpretation of the Bid Terms. The first is that, at the time it was designing the new SFR system, and based on the advice of experts, OSINERGMIN did not consider the Peruvian market ready for Joint Optimization, which is the most cost-efficient mechanism for allocating the SFR services. The second element is that, because the Peruvian market was not ripe for that mechanism, Peru consciously accepted to design a new SFR system that would entail higher costs for the National Grid than one based on Joint Optimization.[439]

386.     The Tribunal now turns to the analysis of the Bid Terms (i.e. PR-22, Technical Note 1 and the Guidelines), which were then crystallized in the Commitment Act and constituted the legal basis governing the SFR Service, and of the impact of the Economic Dispatch Principle on their interpretation.

---

[437] Response Report, March 2014 (C-54), Section 2.1.11.

[438] Claimants argue that such term referred to those units (i.e. the Base Providers) that would be continuously dispatched regardless of cost to provide the SFR service (Memorial, ¶ 87; Reply, ¶¶ 82-83; Claimants' Post-Hearing Brief, ¶¶ 55-56), whereas Respondent contends that it referred to units dispatched in "*exceptional circumstances*" to "*ensure that the service would be provided by a generator*" (Rejoinder, ¶ 155. See also Counter-Memorial, ¶ 94).

[439] In particular, it accepted to allocate the SFR services mainly to Base Providers, which would be included in the Daily Program to provide those services even if their variable costs were higher than the marginal costs of the system. The only difference is that Firm Base Providers would be included in any case, whereas Variable Base Providers would be included only if necessary to supplement the SFR reserve provided by the Firm Base Providers (Indra Report, February 24, 2014 (C-94bis), pp. 10-11; Second Draft PR-22, January 16, 2014 (C-53), Section 9.4.3; Pre-publication Report, January 2014 (C-52), Section 3.2.2).

### b. *PR-22*

387.   PR-22, which is at the forefront of the present dispute, was issued by OSINERGMIN on March 29, 2014. Relying on Sections 9.3, 9.5.3(a), 9.5.10 and 11.8, Claimants contend that PR-22 guaranteed that the winner of the Tender would always be included in the Daily Program to provide the SFR service as well as to dispatch energy, regardless of its costs. Respondent rejects this interpretation and, relying on Sections 5.6 and 6.1.17(e), argues that, under PR-22, the winner of the Tender would be subject to Joint Optimization (i.e. would be included in the Daily Program only if it qualified in the Merit Order).

388.   As explained below, also in light of the drafting history of PR-22, the Tribunal accepts Claimants' argument that (at least implicitly) Sections 9.3, 9.5.3(a), 9.5.10 and 11.8 contain a guarantee of continuous dispatch for the Firm Base Provider, and that this is not refuted by Sections 5.6 and 6.1.17(e). These provisions are analyzed in turn below.

389.   The first provision relied upon by Claimants is Section 9.3 of PR-22, which provides that:

> [t]he required [SFR] reserve **will be covered first** with the [SFR units] that have firmly committed amounts through the Base Provision, while the Balancing Market and the amounts not firmly committed as part of the Base Provision, will cover the rest. [440]

390.   By stating that the necessary amount of SFR reserve should be covered "*first*" by the Firm Base Provider, this provision must be understood as requiring that the Provider is continuously dispatched. The reason is technical. As recognized by Respondent, [441] the Provider is only in a position to provide the SFR service if it is already dispatching energy to the system. Thus, it is only able to provide the SFR reserve "*first*", as required by Section 9.3, if it is continuously dispatched (i.e. if it is always included in the Daily Program). Put otherwise, without a continuous dispatch, the Firm Base Provider would be unable to provide the SFR reserve with priority over other generators as mandated by Section 9.3.

---

[440] The original Spanish version reads as follows: "*La Reserva requerida se cubre primero con las URS que tengan cantidades comprometidas en firme en la Provisión Base, mientras que, con el Mercado de Ajuste y las cantidades no comprometidas en firme de la Provisión Base, se cubre lo faltante*".

[441] Counter-Memorial, ¶¶ 9, 66; Rejoinder, ¶¶ 7, 71.

391.    Respondent attempts to escape this conclusion by interpreting Section 9.3 as
        requiring that the SFR reserve be covered "*first*" by the Firm Base Provider, provided
        that the latter qualifies in the Merit Order.[442] But this means reading into Section 9.3
        a condition that is not there. It is reasonable to assume that, had the drafters of PR-
        22 intended the priority requirement of Section 9.3 only to operate if the Firm Base
        Provider qualifies in the Merit Order, they would have stated that explicitly.

392.    That the Firm Base Provider's SFR reserve would be mandatorily included in the Daily
        Program (and thus that the Provider would be continuously dispatched to provide it)
        is further confirmed by Sections 9.5.3 and 9.5.10, which must be analyzed together,
        as they both set out relevant criteria for the allocation of the SFR reserve among the
        different eligible generators.

393.    Section 9.5.3 provides that:

> The quantities in the Base Provision may be divided into two blocks with
> prices that may be different, as agreed in the commitment act:
>
> > (a) A firm committed block of Reserve that will be assigned and economically
> > liquidated in any case. [The Firm Base Provision]
> >
> > (b) One or more variable blocks that may be assigned to complete the total
> > Reserve required in the SEIN [ie National Grid], as specified in subsection 8,
> > provided that the Balancing Market is unable to provide the same quantities
> > at a lower cost [The Variable Base Provision].[443]

394.    Then, Section 9.5.10 states that:

> In the scheduling of the Reserve, COES will inform the SRU [SFR unit]
> representative of the quantity of reserve actually assigned to each Generation
> Unit for the following day. This assigned reserve quantity will be at least equal
> to the committed reserve mentioned in item a) of 9.5.3, provided that there
> is no unavailability that has been communicated and proven.[444]

---

[442] Counter-Memorial, ¶ 97(v); Rejoinder, ¶¶ 160, 239-245.

[443] The original Spanish version reads as follows: "*Las cantidades en Provisión Base podrán estar divididas en dos bloques con precios que podrán ser distintos, según se acuerde en el acta de compromiso: a) Un bloque de Reserva comprometida en firme que se asignará y liquidará económicamente en cualquier caso. b) Uno o varios bloques variables que podrán ser asignados para completar la Reserva total requerida en el SEIN, según lo especificado en el numeral 8, siempre y cuando el Mercado de Ajuste no esté en condiciones de proveer estas mismas cantidades a menor costo*".

[444] The original Spanish version reads as follows: "*En la programación de la Reserva el COES pondrá en conocimiento del representante de la URS la cantidad de reserva efectivamente asignada por cada Unidad de Generación para el día siguiente. Esta cantidad de reserva asignada será como mínimo igual a la reserva comprometida mencionada en el ítem a) del numeral 9.5.3, siempre que no tenga una indisponibilidad comunicada y sustentada*".

395.   The requirement of Section 9.5.3(a) that the Firm Base Provider's "*block of Reserve* […] *be assigned and economically liquidated in any case*" has two implications. <u>First</u>, by stating that the Firm Base Provider's reserve must be "*assigned* […] *in any case*", that provision requires COES always to include the Firm Base Provider among the generation units that will provide the SFR reserve for the next day. In other words, when preparing the Daily Program for the following day, COES must always "*assign*" to the Firm Base Provider its committed block of SFR reserve. <u>Second</u>, by providing that the Firm Base Provider's reserve will be "*economically liquidated in any case*", Section 9.5.3(a) requires COES to compensate that unit on a take-or-pay basis for the entire reserve committed for the SFR service, regardless of the amount of committed reserve provided for that service, and therefore even if only a portion of that reserve is used.

396.   Section 9.5.10 confirms that the Firm Base Provider must be mandatorily included among the units providing the SFR reserve because it specifies that "*the assigned reserve quantity*" scheduled by COES for the next day must always be "*at least equal to the committed reserve mentioned in item a) of 9.5.3*". This can only mean that COES must always schedule and "*assign*" in the Daily Program an amount of reserve equal to the one committed by the Firm Base Provider.[445]

397.   For reasons similar to the ones set out above with respect to Section 9.3,[446] by providing for a mandatory "*assignment*" of the Firm Base Provider's SFR reserve in the Daily Program, also Sections 9.5.3(a) and 9.5.10 impliedly provide for a mandatory permanent dispatch of that unit to provide energy to the system. Indeed, since – as explained – the Firm Base Provider is only able to provide the "*assigned*" amount of SFR reserve if it is dispatching energy, there cannot be a mandatory "*assignment*" of its reserve in the Daily Program unless it is mandatorily dispatched to provide energy.

398.   Respondent replies to this with a different interpretation of Sections 9.5.3 and 9.5.10. It submits that the phrase "[the Firm Base Provider's] *block of Reserve* [will be]

---

[445] This was confirmed by Respondent's witness Mr. Mendoza (Tr. Day 4, 674-675:15–1: "*Q. Here we are talking about next day programming; correct? A. Yes, that is talking about programming. Q. And COES must indicate the quantity of Reserve actually assigned to each Generation Unit in the program; correct? A. Yes, it must consider that amount of Reserve in order to program the dispatch at a minimum cost, yes, yes*".)

[446] See ¶¶ 390-391 *supra*.

*assigned and economically liquidated in any case*" in Section 9.5.3(a) cannot be interpreted as requiring a mandatory "*assignment*" of that reserve. Rather, according to it, that phrase merely requires that the Firm Base Provider be compensated on a take-or-pay basis (regardless of whether such reserve is "*assigned*"). According to Respondent, the *chapeau* of Section 9.5.3, which indicates that the Firm Base Providers and the Variable Base Providers would receive different "*prices*", confirms that Section 9.5.3 only deals with the compensation of Base Providers, and not with how their committed reserve would be included in the Daily Program.[447]

399. Respondent's interpretation conflicts with the *effet utile* principle requiring legal provisions to be construed in a way that gives effect to all their terms. This is because that interpretation only focuses on the words "*economically liquidated in any case*" in the last portion of Section 9.5.3(a) and overlooks the preceding portion which states that the Firm Base Provider's reserve will be "*assigned […] in any case*". In other words, Respondent's interpretation reads out (or ascribes no meaning to) the term "*assigned*" in Section 9.5.3(a). The reference to "*prices*" in the *chapeau* of Section 9.5.3 (which is per se inconclusive) cannot justify ignoring other terms of that provision.[448]

400. The Tribunal is not persuaded by Respondent's argument that, under Sections 9.5.3(a) and 9.5.10, the "*assignment*" of the Firm Base Provider's SFR reserve is conditional on that Provider qualifying in the Merit Order. In fact, such a condition is not mentioned in those provisions. Under Section 9.5.10, the only requirement for the assignment of the Firm Base Provider's SFR reserve is that its units are technically "*available*" to provide it (e.g. they are not out of service for maintenance or other technical reasons).[449]

---

[447] Rejoinder, ¶ 247.

[448] The Tribunal likewise cannot share Respondent's argument (Respondent's Post-Hearing Brief, ¶¶ 48-49) that its position that Section 9.5.3(a) only refers to the compensation of SFR units is supported by Article 2.2 of Annex IV of PR-22, as this provision uses the term "*assigned*" in the same sense as Section 9.5.3(a).

[449] This was confirmed by Respondent's witness Mr. Mendoza (Tr. Day 4, 675:14–21, quoted in Claimants' Post-Hearing Brief, ¶ 39 (footnote 59): "*Q. So, the Firm Base Provider must be included in the Daily Program unless it is unavailable. 'Unavailable' means not available to dispatch because it's in maintenance; correct? A. If it's not available, then it's not going to enter into the formula, of course. It's not going to enter into the question of whether it's going to dispatch or not*").

401. A further demonstration that PR-22 contemplates a continuous dispatch of the Firm Base Provider comes from Section 11.8, which reads:

> For the Generation Units, as applicable, their fuel costs shall be recognized for startup–shutdown, for low efficiency in the loading-unloading ramps and for operation without establishing the marginal cost, incurred for compliance of the Reserve, defined in the Technical Procedure "Recognition of efficient operating costs of the thermoelectric plants of COES" or any entity that may replace it.[450]

402. That provision sets out a compensation mechanism for units dispatched "*without establishing the marginal costs*" (i.e. without qualifying in the Merit Order) to provide the SFR service, which would be redundant if PR-22 envisaged an "*assignment*" of the SFR reserve exclusively based on Joint Optimization. Its inclusion confirms that the PR-22 scheme contemplated a continuous dispatch of (at least certain) SFR units regardless of costs.[451]

403. The Tribunal also rejects Respondent's argument that Section 11.8 of PR-22 sets out the compensation mechanism for the "*exceptional circumstance when an SFR service provider is a thermal plant and experiences costs*" for operational inflexibility, as would be demonstrated by the cross-reference to the "*Technical Procedure 'Recognition of efficient operating costs of the thermoelectric plants of COES'*" (i.e. PR-33), which only deals with thermal plants.[452] In fact, Section 11.8 only describes the mechanism for compensating the fuel costs incurred "*for operation without establishing the marginal cost, incurred for compliance of the reserve*", i.e. the costs incurred by a unit to provide the SFR ("*for compliance of the reserve*") when it is dispatched outside the Merit Order ("*without establishing the marginal cost*"). It does not say that it only applies in the exceptional circumstances of a thermal plant experiencing operating inflexibility. The cross-reference to PR-33 is only meant to define the compensation criteria for the Firm Base Provider when it does not qualify

---

[450] The original Spanish version reads as follows: "*Para las Unidades de Generación, en caso corresponda, se reconocerán sus costos por consumo de combustibles de arranque – parada, de baja eficiencia en las rampas de carga-descarga y por operación sin establecer el costo marginal, producidos por cumplimiento de la Reserva, definidos en el Procedimiento Técnico 'Reconocimiento de costos eficientes de operación de las centrales termoeléctricas del COES' o el que lo sustituya'*".

[451] Since the provision of the SFR service by Variable Base Providers and the Balancing Market units was expressly subject to Joint Optimization (sections 9.5.3(b), 9.6.8, and 9.6.9 of PR-22), the unit that would be dispatched regardless of costs could only be the Firm Base Provider.

[452] See Respondent's Post-Hearing Brief, ¶ 30.

in the Merit Order, and thus has higher variable costs than the marginal costs of the system, by reference to those set out in PR-33.

404.   The Tribunal is equally unconvinced by Respondent's further argument that Sections 9 and 11.8 of PR-22 cannot be interpreted as guaranteeing a continuous dispatch of the Firm Base Provider, because the dispatch of units outside the Merit Order would only be permitted for safety and voltage operations (so called Forced Dispatch). [453] While the provision of the SFR reserve seems to fall within the category of safety operations, there is no basis for Respondent's suggestion that the dispatch of units outside the Merit Order would only be allowed for safety and voltage operations. Indeed, Respondent has not pointed to any provision that would limit OSINERGMIN's authority to authorize the continuous dispatch of certain units outside the Merit Order whenever deemed necessary (for instance to incentivize generators to submit offers for the Firm Base Provision of SFR services).

405.   Finally, the Tribunal is not swayed by Respondent's argument that, pursuant to Sections 5.6 and 6.1.17(e), Firm Base Providers would be subject to Joint Optimization (and thus would have to qualify in the Merit Order in order to provide the SFR Service). [454]

406.   Section 5.6 of PR-22 provides that:

> Assignment of the necessary Reserve for the RS to each SRU will be based on a joint [Daily Dispatch Schedule] assignment procedure with the Reserve for RS (energy-power assignment) making use of price quote information presented by each group. The principal criteria for this assignment are described in section 9. [455]

407.   Section 6.1.17(e) provides that:

> Before the execution of the first Base Provision, COES will prepare a Technical Note for Secondary Regulation establishing the necessary technical specifications for the operation of the Secondary Regulation, which will include the following at a minimum: […] (e) Specification of methodology for

---

[453] Counter-Memorial, ¶¶ 7, 8, 62, 101; Rejoinder, ¶¶ 82-84; Respondent's Post-Hearing Brief, ¶ 21.

[454] Counter-Memorial, ¶ 87.

[455] The original Spanish version reads as follows: "*La asignación de la Reserva necesaria para la RS a cada URS se basará en un procedimiento de asignación conjunta PDO [Programa Diario de Operación] con la Reserva para RS (asignación energía-potencia) haciendo uso de información de oferta de precio presentada para cada grupo. Los criterios principales para esta asignación están descritos en el numeral 9*".

joint assignment of the PDO [Daily Operation Program] with the Reserve for Secondary Regulation.[456]

408.   Starting with Section 6.1.17(e), there is no contradiction between this provision and the interpretation of Sections 9.3, 9.5.3(a), 9.5.10 and 11.8 as envisaging a permanent dispatch of the Firm Base Provider regardless of cost.[457] Section 6.1.17(e) tasks COES with elaborating a Joint Optimization procedure, but does not specify which units would be subject to it. In particular, it does not indicate whether the procedure would apply to all units providing SFR services (as contended by Respondent) or rather only to Balancing Market units (as suggested by Claimants). Thus, this provision seems of little help for the Tribunal's decision.

409.   Section 5.6 is more relevant, as it says – without qualification – that the "*Assignment of the necessary Reserve for the RS*" is subject to Joint Optimization. This could mean that COES may only assign the SFR reserve to units qualified in the Daily Program based on the Merit Order. However, this directly contradicts Section 9, and particularly Sections 9.5.3(a) and 9.5.10, that require the "*assignment*" of the SFR reserve of the Firm Base Provider (and thus the inclusion of the Firm Base Provider in the Daily Program) "*in any case*", that is regardless of its position in the Merit Order.[458]

410.   In accordance with the *lex specialis* principle, this contradiction must be resolved in favor of Section 9, which – as expressly provided in Section 5.6 – is the one that sets out the specific criteria for the "*assignment*" of the SFR reserve. It follows that Section 5.6 does not contradict the conclusion that PR-22 provides for the mandatory "*assignment*" of the Firm Base Provider's SFR reserve and, by reflection, for the mandatory inclusion of such Provider in the Daily Program regardless of cost.

411.   In light of the foregoing, the Tribunal finds that – read together – Sections 9.3, 9.5.3(a), 9.5.10 and 11.8 implicitly (but unequivocally) provide for a continuous dispatch of the Firm Base Provider to provide the SFR Service, and that the opposite

---

[456] The original Spanish version reads as follows: "*Antes del desarrollo de la primera Provisión Base, el COES elaborará una Nota Técnica para Regulación Secundaria donde se establezcan las especificaciones técnicas necesarias para el funcionamiento de la Regulación Secundaria, y que incluirá al menos lo siguiente: […] e) La especificación de la metodología para la asignación conjunta del PDO con la Reserva para Regulación Secundaria*".

[457] See ¶¶ 389-404 *supra*.

[458] See ¶¶ 393-400 *supra*.

cannot be inferred from Sections 5.6 and 6.1.17(e). This is consistent with the drafting history of PR-22, showing that Peru accepted to design an SFR system that, in the short term, would not be based on Joint Optimization, but rather on permanent dispatch of Base Providers.

### c. Technical Note 1

412. Technical Note 1, issued by COES on October 1, 2015, sets out the technical requirements for the provision of the SFR service and in the Tribunal's opinion confirms Claimants' argument that the Bid Terms guarantee a continuous dispatch of the Firm Base Provider.

413. The most relevant provision of Technical Note 1 is Section 5.7.2, which reads as follows:

> The formula that is outlined considers that the assignment process of the reserve for SFR is conducted jointly with the dispatch of the rest of the system's generation units […] As a premise, it is considered that the reserve for SFR to be determined by the [Joint Optimization] model based on the described methodology will only be the one corresponding to the Balancing Market, if required, given that the Reserve for SFR allocated in the Base Provision is mandatorily included (its dispatch is not a decision variable) (emphasis added).[459]

414. As recognized by Respondent's expert Mr. Leyva at the Hearing,[460] Section 5.7.2 provides that "*only*" the Balancing Market was subject to Joint Optimization. It follows *a contrario* that the Firm Base Provider was not subject to that mechanism and that, as a result, its reserve would be permanently assigned in the Daily Program and its units would be permanently dispatched.

415. Respondent does not contest that Section 5.7.2 of Technical Note 1 contemplates a mandatory inclusion of the Firm Base Provider's SFR reserve in the Daily Program,[461]

---

[459] The original Spanish version reads as follows: "*Como premisa se considera que la reserva para RSF a ser determinada por el modelo con la metodología que se describe solo será la correspondiente al Mercado de Ajuste en caso se necesite dado que la Reserva para RSF adjudicada en la Provisión Base ingresa de manera obligada (su despacho no es una variable de decisión)*".

[460] Tr. Day 6, 1110:21-1111:5: "*Q.* […] *I'm asking you about Technical Note 1 and this text, and this text provides that the dispatch of the Base Provision was mandatory; correct? A. Yes, yes. This Technical Note says that*".

[461] Indeed, in its Post-Hearing Brief, Respondent states that by issuing Technical Note 1 COES "*failed to implement the joint assignment procedure from Section 6.1.17 of PR-22 to allocate the reserve for SFR*

but adduces two arguments to undermine its relevance. The <u>first</u> one is that, as a technical document prepared by COES, which is a private entity, Technical Note 1 could not validly derogate from PR-22's alleged requirement that the Firm Base Provider be subject to Joint Optimization.[462] The <u>second</u> argument is that, by providing that the Firm Base Provider would be mandatorily dispatched, COES disregarded OSINERGMIN's recommendation based on the EE Study that Section 5.7.2 be modified to include the Firm Base Provider's SFR reserve among the "*restrictions of the optimization model*".[463] According to Respondent, the term "*restriction*" means a "*limitation*" that "*the economic dispatch model must consider when determining the means to provide the main and ancillary electricity services at the lowest possible cost*".[464]

416.   Neither of these arguments is convincing. As to the first one, the Tribunal having concluded that PR-22 contemplated a continuous dispatch of the Firm Base Provider regardless of costs,[465] Technical Note 1 cannot be said to derogate from it.

417.   As to the second argument, COES does not appear to have disregarded OSINERGMIN's recommendations. There is no difference between saying that the Firm Base Provider's reserve is a "*boundary condition*" of the Joint Optimization model (as stated in Section 5.7.2 of Technical Note 1) and saying that it is a "*restriction*" of such model (as recommended in the EE Study).[466] In light of the PR-22's drafting history (and particularly of the Indra Report), both terms convey the idea that the such reserve would be mandatorily included in the model and not be subject to Joint Optimization (in that sense, it was a "*restriction*" in the operation of that model).[467] It is significant that OSINERGMIN did not challenge Technical Note 1

---

services within the economic dispatch model, as OSINERGMIN had requested" (Respondent's Post-Hearing Brief, ¶ 51).

[462] Counter-Memorial, ¶¶ 106-108; Rejoinder, ¶¶ 183-186; Respondent's Post-Hearing Brief, ¶ 55.

[463] Respondent's Post-Hearing Brief, ¶¶ 52-54; Counter-Memorial, ¶ 109; Rejoinder, ¶¶ 188-189.

[464] Respondent's Post-Hearing Brief, ¶ 52. See also Rejoinder, ¶ 189.

[465] See ¶ 411 *supra*.

[466] See ¶ 352 *supra*.

[467] For this reason, the Tribunal also finds unpersuasive Respondent's argument that a permanent dispatch of the Firm Base Provider would be incompatible with the mathematical model used by COES to create the Daily Program (the "*Economic Dispatch Model*"), which according to Technical Procedure No. 1 ("**PR-1**") must always seek to "*minimize the costs for the operation of the grid*", including those relating to the SFR service (Rejoinder, ¶¶ 58-63). Respondent seems to ignore that the Economic Dispatch Model

or sanction COES, as it should reasonably have done had it believed that COES had disregarded its instructions. Rather, OSINERGMIN approved the Guidelines for the Tender which incorporated by reference PR-22 and Technical Note 1, thereby indicating it had no objections regarding the latter.

418.   In light of the above, the Tribunal agrees with Claimants that Technical Note 1 confirms that the Firm Base Provider would be continuously dispatched regardless of costs.

### d.   The Guidelines

419.   The Guidelines, approved by OSINERGMIN on February 11, 2016,[468] set out the rules governing the Tender.

420.   The Tribunal does not view the Guidelines as particularly helpful for the present decision. Contrary to Claimants' suggestions,[469] their failure to attach relevance to the bidders' technology – and therefore to their variable costs – for the purpose of the Tender does not impact on whether the new SFR system guaranteed a continuous dispatch of the Firm Base Provider. At best, it may be an indication that, in the interest of opening the Tender to as many generators as possible and, possibly of increasing competition in the provision of the SFR service, Peru was prepared to accept that the Tender could be won by a generator with higher variable costs than the most-efficient units.

421.   The exchange between Engie (then Enersur) and OSINERGMIN regarding the draft Guidelines circulated by OSINERGMIN prior to the approval of the final document deserves greater attention. To recall, by Comment 2.1.3 on the draft Guidelines, Engie noted that:

> Subsection 6.5 of the proposal [i.e. the Guidelines] establishes the methodology for the award of the Base Provision within the scope of the auction, which indicates that it will be awarded, starting from the lowest to highest rate offered, until the required reserve margin has been covered. However, this fails to take into account the operational costs of each

expressly provides that its "*objective function*" is to minimize operating costs, "*subject to restrictions of the thermal, hydraulic units, system reserve, transmission network and other operative restrictions*" (COES, Yupana Model, November 2019 (R-109), Section 9.1). Thus, those restrictions, including the "*system reserve*", may justify a departure from the said "*objective function*" of minimizing costs.

[468] Guidelines, February 11, 2016 (C-60).

[469] Reply, ¶¶ 124-125; Claimants' Post-Hearing Brief, ¶ 72.

generation technology offering the Secondary Frequency Regulation service. This would create an unnecessary excess cost for the system.

As a matter of fact, if SFR is awarded to only one or two URS [SFR units], based on their bid prices, these generation units will operate in a firm manner during the tendered periods, that is, for three years. The operation of these units is going to be forced in the daily economic dispatch, thus possibly generating cost overruns.

For example, if a diesel generation unit offered all the required SFR reserve at a low bid price becoming the only winner of the tender. This unit would provide the SFR in a firm manner for the 3 years and would operate in a forced way in the dispatch, even during periods when the marginal cost of the system is much lower than its variable fuel costs. Currently, when said cost difference occurs, it is compensated by COES arbitrarily through a new rate that has been created and called 'SFR operation', which is imposed on the agents, generating higher costs.

Therefore, in addition to the bid prices, the technologies of the units providing SFR should also be considered so that the provision of such service is optimized, minimizing the operating cost of the SEIN.[470]

422.   OSINERGMIN replied to Engie's comment as follows:

PR-22 does not establish any relationship between the rates offered and the technologies of the generation units which provide Secondary Frequency Regulation to the SEIN. In this respect, the GUIDELINES considered that participation by the Agents is free, as established in subsection 3.2.1: "3.2.1. The Agents participate in the Award Process under their own and exclusive responsibility and base their decision on their own research, studies, reviews, inspections, economic calculations, financial calculations and other calculations as a part of their own Due Diligence."

As a result, it is not necessary to make any modifications to the draft of the GUIDELINES based on this comment.[471]

423.   This exchange is relevant in two respects. <u>First</u>, it shows that Engie shared Claimants' interpretation of the Bid Terms as guaranteeing a continuous and mandatory dispatch of the winner of the Tender for the entire period of time. This is implicit in its observation, by way of premise, that the winner of the Tender "*would provide the SFR in a firm manner for the 3 years and would operate in a forced way in the dispatch, even during periods when the marginal cost of the system is much lower than its variable fuel costs*".

---

[470] OSINERGMIN Report No. 110, February 2016 (C-103), Section 2.1.3.

[471] *Ibid*.

424.  <u>Second</u>, and perhaps more importantly, it is a strong indication that even OSINERGMIN subscribed to that interpretation of the Bid Terms, since it did not rebut it in its answer. Respondent denies that any inference can be drawn from OSINERGMIN's silence, because it had no obligation to correct the premises of the generators' comments, but only had to address their specific questions (in this case, whether the bidders' technology would be considered in the Tender).[472] The Tribunal is not convinced. Had OSINERGMIN believed that the premise of Engie's comment was incorrect, as a responsible regulator it would likely have corrected it, were it only to avoid the risk that other operators would share Engie's understanding of the Bid Terms. Such a course of action would have been especially appropriate in light of Peru's position that an interpretation of the Bid Terms guaranteeing the permanent dispatch of the winner of the Tender would have cost "*the electricity system (including, ultimately, Peruvian consumers) tens or hundreds of millions of dollars in unnecessary costs*".[473] The most reasonable inference from the Engie-OSINERGMIN exchange is therefore that OSINERGMIN shared the former's interpretation of the Bid Terms.

425.  Against this background, the Tribunal's conclusion is that the Engie-OSINERGMIN exchange provides additional confirmation that the Bid Terms, as a whole, guaranteed the permanent dispatch of the Firm Base Provider regardless of costs.

   *e.  Whether the guarantee of a permanent dispatch of the Firm Base Provider is compatible with the Economic Dispatch Principle*

426.  In light of the foregoing, the Tribunal accepts Claimants' interpretation of the Bid Terms as implicitly guaranteeing a permanent dispatch of the Firm Base Provider. It remains to be seen whether, as argued by Respondent, that interpretation contradicts the Economic Dispatch Principle enshrined in Article 12.1 of Law 28832 which requires COES to operate the National Grid at the lowest cost.[474]

427.  To recall, Article 12.1 of Law 28832 provides that:

   The purpose of COES is to coordinate the short, medium and long-term operation of the SEIN at the lowest cost, preserving the safety of the system,

---

[472] Counter-Memorial, ¶ 112; Rejoinder, ¶¶ 199 – 204; Respondent's Post-Hearing Brief, ¶¶ 58, 167-172.

[473] Respondent's Post-Hearing Brief, ¶ 63.

[474] Counter-Memorial, ¶¶ 13, 139; Rejoinder, ¶ 253. See also Respondent's Post-Hearing Brief, ¶ 17.

the best use of energy resources, as well as planning the development of the SEIN's transmission and administering the Short Term Market.[475]

428.   As recognized by both Parties' witnesses and experts,[476] Article 12.1 of Law 28832 requires COES to pursue cost minimization, but also to preserve the safety of the system. These goals are potentially conflicting. Indeed, as admitted by Respondent's expert Dr. Tabors at the Hearing, operating the system at the lowest cost is not always compatible with preserving its safety, and safety considerations may well require the operator to adopt a more costly solution.[477] Therefore, a trade-off between safety and cost-minimization is often necessary. Claimants are correct in saying that the decision on the goal to be prioritized at any given moment rests with the regulator (i.e. OSINERGMIN).

429.   As discussed above,[478] PR-22's drafting history shows that, in designing the new SFR system, Peru (through OSINERGMIN) consciously (and reasonably) accepted a trade-off between safety and cost-minimization in favor of the former. It is common ground that the SFR service is necessary to guarantee the safety of the National Grid.[479] It is equally undisputed that Joint Optimization of energy and SFR reserve is the cheapest

---

[475] Law 28832, Art. 12.1. The original Spanish version reads as follows: "*El COES tiene por finalidad coordinar la operación de corto, mediano y largo plazo del SEIN al mínimo costo, preservando la seguridad del sistema, el mejor aprovechamiento de los recursos energéticos, así como planificar el desarrollo de la transmisión del SEIN y administrar el Mercado de Corto Plazo*".

[476] See Tr. Day 2, 447:21-448:4 (Guerra): "*Q. And you would agree, would you not, that this Article provides exactly what you were describing in your Witness Statement, which is that COES must operate at the minimum cost while preserving safety--the safety of the system; correct? A. Correct*"; Tr. Day 3, 616:11-16 (Mendoza): "*Q. So, do I understand your testimony to be, Mr. Mendoza that, in order to fulfill the Economic Dispatch Principle, you need to mention low cost, preservation of safety, and best use of resources? A. Yes. And throughout that the principle of Economic Dispatch is present, correct*"; Tr. Day 5, 931:2-7 (Tabors): "*Q. No, no, I agree with that entirely. That you have to take into account those all three variables for the cardinal rule. A. Yeah. Q. And safety is one of them; correct? A. Yes*".

[477] In particular, in cross-examination, Dr. Tabors was put the hypothetical example of a system with three plants with different costs, where the lowest cost one would be able to generate enough power to satisfy demand during certain moments of the day. Dr. Tabors recognized that while dispatching only that plant during those moments would be the lowest cost solution, that would not adequately safeguard the safety of the system, because in the event of failure of plant the system would fail (which is per se a costly consequence). Thus, in those circumstances, safety considerations would require the operator to disregard the lowest-cost solution and operate an additional plant that would be ready to step in should the more cost-efficient one fail. (Tr. Day 5, 924:17-927:12).

[478] See ¶ 385 *supra*.

[479] Tr. Day 3, 604:8-12 (Mendoza): "*Q. [...] SFR is essential to ensure the safety of the electricity supply; correct? A. It is part, yes, of the complimentary services that one has in order to ensure the safety of the system. It is correct*".

solution for allocating that service among generators.[480] However, at the time OSINERGMIN was preparing to regulate the SFR Service and to issue PR-22, the Peruvian market was considered immature for Joint Optimization. Hence, also on the strength of the Indra Report, OSINERGMIN deliberately chose to design a different system, in which, in the short term, SFR services would be awarded to Firm Base Providers continuously dispatched regardless of the Merit Order (which was a more costly solution than Joint Optimization).[481] Together with the take-or-pay nature of the remuneration of the SFR Service, the guarantee of a continuous dispatch was intended to incentivize operators to make the necessary investments and submit offers to become Base Providers in a market where the alternative (Joint Optimization) was deemed impracticable.[482]

430. Against this background, according to the Tribunal interpreting the Bid Terms as guaranteeing a continuous dispatch of the Firm Base Provider would not be incompatible with the principles enshrined in Article 12.1 of Law 28832 merely because it would have resulted in significantly higher costs for the system. Peru was aware that the SFR system it was designing would be significantly more expensive than Joint Optimization, but accepted that as part of a trade-off between cost-minimization and safety that would make the National Grid more reliable in the medium and long term.[483]

431. The Tribunal is also not convinced by Respondents' observation that, after the conclusion of the Commitment Act and just before Kallpa GSA's filing of its Declared Costs, Claimants' competitors took the position that interpretating the Bid Terms as guaranteeing a permanent dispatch of Kallpa GSA's units would constitute a breach

---

[480] See ¶¶ 372, 385 *supra*.

[481] See ¶ 385 *supra*.

[482] The need to incentivize generators to provide SFR was highlighted by Respondent itself. See Counter-Memorial, ¶ 76: "*OSINERGMIN was concerned that COES's proposal was not suitable for the Peruvian market, in light of the fact that it was the first time in Perú that SFR services would be provided on a voluntary basis using the AGC system. Implementing this new system would require capital investments by generators, and OSINERGMIN did not know how many generators would be interested in making the necessary investments to provide the service using the AGC system on a voluntary basis*".

[483] Since the permanent dispatch of the winner of the Tender resulted from Peru's deliberate decision, the various calculations of the additional costs that would be borne by the National Grid in case of permanent dispatch of Kallpa GSA's units compared to their dispatch based on Joint Optimization system are irrelevant (Respondent's Post-Hearing Brief, ¶¶ 71-76, 155-158. See also Rejoinder, ¶ 263).

of the Economic Dispatch Principle.[484] The competitors' position cannot be considered genuine and disinterested, given that they would directly bear the higher costs deriving from a permanent dispatch of Kallpa GSA's units. This is confirmed by the fact that one of those companies, Engie, had instead previously interpreted the Bid Terms as guaranteeing a permanent dispatch of the winner of the Tender.[485]

432. Respondent also asserts that a guarantee of continuous dispatch was unnecessary to improve the safety of the system, because – after Resolution No. 141 – the system operated safely under a Joint Optimization procedure.[486] This fails to consider that, as recalled, at the time OSINERGMIN was drafting PR-22, the Peruvian market was considered unprepared for Joint Optimization, and awarding the SFR service to Base Providers that would be continuously dispatched was seen as a more reliable option. The fact that the system eventually may have operated well even under a Joint Optimization procedure does not render Peru's initial decision to opt for a different system irrational, let alone incompatible with the principles established in Article 12.1 of Law 28832.

433. Finally, the Tribunal does not believe that particular weight can be attached to Respondent's contention that "*even assuming that SFR Firm Base Provider were to be permanently forced dispatch[ed] as Claimants imagine – Claimants would not have been the most economical choice to act as SFR Firm Base Provider*", because other bidders (in particular, hydroelectric ones) could have provided the SFR Service with significantly lower costs for the system.[487] Even if true, this has no bearing on the compatibility of the guarantee of continuous dispatch inherent in the Bid Terms with the principles set out in Article 12.1 of Law 28832. Actually, Respondent's argument confirms that compatibility, since it shows that the cause of the increased costs for the system was OSINERGMIN's decision not to attach relevance to the technology of the bidders for the purpose of awarding the SFR services, which resulted in more costly units like Kallpa GSA's ones winning the Tender, and not the permanent dispatch itself.

---

484 Counter-Memorial, ¶¶ 124-125; Rejoinder, ¶ 231; Respondent's Post-Hearing Brief, ¶ 42.

485 See ¶ 385 *supra*.

486 Rejoinder, ¶ 95; Respondent's Post-Hearing Brief, ¶ 63.

487 Respondent's Post-Hearing Brief, ¶ 74.

434.   In any case, OSINERGMIN's decision on how to balance the criteria of Article 12.1 of Law 28832 was an exercise of its administrative discretion as regulator. It is not for this Tribunal to pass judgment on the consistency with those criteria of the decision not to filter bidders by technology and to permanently dispatch the winning bidder.[488]

435.   For all these reasons, the Tribunal resolves that Claimants' interpretation of the Bid Terms is reconcilable with the Economic Dispatch Principle.

*** 

436.   In light of the foregoing analysis, the Tribunal decides that the Bid Terms guaranteed to the winner of the Tender the continuous dispatch of energy to provide the SFR service, irrespective of its inclusion in the Merit Order.

### ii.   Whether Resolution No. 141 was seriously arbitrary

437.   The conclusion of the foregoing analysis is that the Bid Terms – which were the basis of the Commitment Act which recorded that Kallpa GSA won Tender by presenting the lowest offer and would accordingly be the First Base Provider for a three-year term – guaranteed the continuous dispatch of the winner of the Tender. On this basis, the Tribunal must now determine whether the repeal of that guarantee by Resolution No. 141 breached Article 10.5 of the Treaty, starting from Claimants' contention that the Resolution was seriously arbitrary.

438.   Resolution No. 141, issued by OSINERGMIN on June 13, 2016, purported to clarify that Sections 9.3 and 9.5.3 of PR-22 did not contemplate a continuous dispatch of the Firm Base Provider, but rather a dispatch based on Joint Optimization. Article 1 of Resolution No. 141 states that:

   a.   In the case of units that provide the Secondary Frequency Regulation reserve, **as long as they are programmed in the dispatch according to the economic dispatch**, the reserve will first be covered with the firmly committed amounts through Firm Base Provision, while the Balancing Market and the amounts not firmly committed as part of the Base Provision, will cover the rest, and;

---

[488] It is not unlikely that OSINERGMIN's decision was driven by its desire not to restrict the pool of potential bidders in a situation where the SFR service market was considered underdeveloped, and there was no clue about how many operators would eventually submit a bid for the Tender, at what prices and with which technology.

b. The Reserve block firmly committed through the Base Provision will be **assigned in the calculation of the payment** of the Secondary Regulation service and will be economically compensated in any case, **even if not programed to operate** (emphasis added). [489]

439. Claimants submit that although disguised as an "*interpretation*" of PR-22, Resolution No. 141 in fact eliminated the Bid Terms' and the Commitment Act's guarantee of permanent dispatch of Kallpa GSA's plants, while still holding these to the obligation to provide SFR services without compensation. According to them, this decision was motivated by Peru's after-the-fact realization that it was too expensive to dispatch Kallpa GSA's units to provide the SFR service and breached both the non-retroactivity principle and the legal requirements for the amendment of regulations under Peruvian law. [490] It therefore amounts to an arbitrary conduct in breach of Article 10.5 of the Treaty. Respondent replies that Resolution No. 141 did not alter any guarantee set out in PR-22, did not apply retroactively but rather prospectively to compensation for future services and was issued for the reasons stated therein, i.e. to clarify the meaning of PR-22, and in compliance with the requirements of Peruvian law. [491]

440. To determine whether Resolution No. 141 constitutes an arbitrary measure in breach of Article 10.5 of the Treaty, the Tribunal first needs to define arbitrariness. [492]

441. As noted by Claimants, the most common definition of arbitrariness is found in the *EDF v. Romania* award, which considered arbitrary measures (*i*) "*that inflict[] damage on the investor without serving any apparent legitimate purpose*"; (*ii*) "*that* [are] *not based on legal standards but on discretion, prejudice or personal preference*"; (*iii*)

---

[489] *Ibid*. The original Spanish version reads as follows: "a. *En el caso de las unidades que proveen la Reserva para la Regulación Secundaria de Frecuencia, siempre que se encuentren programadas en la operación por despacho económico, dicha Reserva será cubierta primero con las URS que tengan cantidades comprometidas en firme en la Provisión Base, mientras que, con el Mercado de Ajuste y las cantidades no comprometidas en firme de la Provisión Base, se cubre lo faltante; b. El bloque de la Reserva comprometida en firme en la Provisión Base se asignará en el cálculo del pago del servicio de Regulación Secundaria y se liquidará económicamente en cualquier caso, así no se encuentre programada en la operación*".

[490] See ¶ 347 *supra*.

[491] See ¶¶ 360-362 *supra*.

[492] Only Claimants advance arguments and quote authorities on this point. Respondent merely asserts that the MST enshrined in the Treaty does not protect from arbitrary conduct, but rather prohibits only outrageous, grossly unfair or egregious and shocking treatment. As discussed above, the Tribunal rejects this argument (see ¶ 303 *supra*).

"*taken for reasons that are different from those put forward by the decision maker*"; (iv) "*taken in willful disregard of due process and proper procedure*".[493]

442. This definition of arbitrariness was later endorsed in other investment tribunal decisions, such as *Joseph Charles Lemire v. Ukraine II* and *Owens-Illinois v. Venezuela*.[494] For instance, the *Joseph Charles Lemire v. Ukraine II* tribunal held that arbitrary conduct:

> has been described as "founded on prejudice or preference rather than on reason or fact"; "contrary to the law because…[it] shocks, or at least surprises, a sense of juridical propriety"; or "wilful disregard of due process of law, an act which shocks, or at least surprises a sense of judicial propriety"; or conduct which "manifestly violate[s] the requirements of consistency, transparency, even-handedness and non-discrimination". Summing up, the underlying notion of arbitrariness is that prejudice, preference or bias is substituted for the rule of law.[495]

443. Another authoritative definition of arbitrariness was given by the ICJ in the ELSI case, which held that "[a]rbitrariness is not so much something opposed to a rule of law […] It is a wilful disregard of due process of law, an act which shocks, or at least surprises, a sense of juridical propriety".[496]

444. Respondent does not quarrel with any of these definitions of arbitrariness.

445. The question is whether Resolution No. 141 can be considered arbitrary if measured against the MST/FET standard of Article 10.5 of the Treaty. As discussed in Section VI.A.3i, in accordance with the case-law that has applied MST/FET clauses, only conduct that is a sufficiently seriously arbitrary may give rise to a breach of the MST/FET standard. For instance, the *Murphy v. Canada* tribunal held that:

> a breach of Article 1105 [of the NAFTA] occurs only when it is shown that an investor has been treated in such an unjust or arbitrary manner that the

---

[493] *EDF v. Romania*, ¶ 303.

[494] *OI v. Venezuela*, ¶ 494.

[495] *Lemire v. Ukraine*, ¶¶ 262-263, referring to *Ronald S. Lauder v. The Czech Republic,* UNCITRAL, Award, September 3, 2001 (CL-14), ¶ 221; *Tecmed v. Mexico*, ¶ 154; *Loewen v. USA*, ¶ 131; *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL, Partial Award, March 17, 2006 (CL-30), ¶ 307.

[496] *Elettronica Sicula S.p.A, United States v. Italy*, 1989, I.C.J. Reporter 15, July 20, 1989, ¶ 128. By contrast, I do not consider *Saluka v. The Czech Republic* relevant to define arbitrariness under the MST/FET, as it does not deal directly with that concept (see *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL, Partial Award, March 17, 2006 (CL-30), ¶¶ 417-419, quoted in Memorial, ¶ 218 and Reply, ¶ 376).

treatment rises to the level that is unacceptable from the international perspective.[497]

446. Likewise, in *Cargill*, the tribunal noted that:

> arbitrariness may lead to a violation of a State's duties under Article 1105 [of the NAFTA], but only when the State's actions move beyond a merely inconsistent or questionable application of administrative or legal policy or procedure to the point where the action constitutes an unexpected and shocking repudiation of a policy's very purpose and goals, or otherwise grossly subverts a domestic law or policy for an ulterior motive.[498]

447. Similarly, the tribunals in *International Thunderbird*[499] and *Glamis Gold*[500] held that "*manifest arbitrariness falling below acceptable international standards*" was a conduct that can justify a finding of liability under the MST/FET standard.

448. It follows that Resolution No. 141 would only breach the MST/FET clause of Article 10.5 of the Treaty if it were shown to be seriously arbitrary, i.e. if it is "*shockingly*" or "*manifestly*" arbitrary or, otherwise, rises to a level "*unacceptable from the international perspective*". The Tribunal is satisfied that Resolution No. 141 rises to that standard for three reasons.

449. The first reason rests on the premise that, as discussed in Section VI.B.3i above, the Bid Terms and the Commitment Act provided for the permanent dispatch of the winner of the Tender, in furtherance of Peru's policy decision to opt for an SFR system contemplating a permanent dispatch of the Base Providers (in a situation where the Peruvian market was considered immature for a different and more cost-efficient mechanism like Joint Optimization).[501]

450. That being so, the Tribunal finds that Resolution No. 141 is seriously arbitrary because, to borrow the words of *Cargill*, it constituted an "*unexpected and shocking repudiation*" of the "*purpose and goals*" of the Bid Terms and the Commitment Act (and of the policy underlying those instruments). By providing in Resolution No. 141 that the winner of the Tender would be subject to Joint Optimization, Peru abruptly and shockingly repudiated the legal framework it had itself devised for the provision

---

[497] *Mobil v. Canada*, ¶¶ 152-153

[498] *Cargill v. Mexico*, ¶ 293.

[499] See *Thunderbird v. Mexico*, ¶ 194.

[500] *Glamis v. USA*, ¶ 627.

[501] See ¶ 385 *supra*.

of SFR services (and its underlying policy), in reliance on which Kallpa GSA had submitted its Bid. What is more, despite repealing Kallpa GSA's right to be permanently dispatched, Peru nonetheless held Kallpa GSA to the obligation to provide the SFR service without compensation (i.e. at the price zero Soles/kW-month), which it had accepted to assume only because it was guaranteed a right of permanent dispatch. This constitutes a typical example of seriously arbitrary conduct by a State in the treatment of a foreign investment.

451. The Tribunal cannot accept Respondent's defense that Resolution No. 141 "*saved consumers unnecessary costs*",[502] potentially amounting to a hundred million dollars, based on the consideration that – contrary to its own expectations – it eventually turned out that the system worked just as well under Joint Optimization.[503] It would offend judicial propriety, and more generally basic tenets of the rule of law, if a State were permitted suddenly to alter the express terms of a public tender after its award (and after entering into a public contract like the Commitment Act, particularly after a long and articulated assessment of the implications) simply because it realizes that there may have been more convenient alternatives to the winner.[504]

452. The second ground for the Tribunal's assessment that Resolution No. 141 was manifestly arbitrary is that the measure can be held to have been "*taken for reasons that are different from those put forward by the decision maker*", which is one of the facets of arbitrariness according to *EDF v. Romania*'s definition. The reason given by OSINERGMIN for issuing Resolution No. 141 was to clarify Kallpa GSA's alleged

---

[502] Respondent's Post-Hearing Brief, ¶ 65.

[503] Respondent's Post-Hearing Brief, ¶ 63.

[504] In its Post-Hearing Brief, Respondent contends that, even if Claimants' interpretation of PR-22 were correct, Resolution No. 141 would not engage its international liability under the Treaty because it constituted a legitimate exercise of its sovereign authority to regulate. The Tribunal does not need to address this defense, given that Respondent raised it only in the context of its reply to Claimants' argument that Resolution No. 141 frustrated their legitimate expectations. However, even if it had raised it as a reply to Claimants' contention that Resolution No. 141 was arbitrary, the Tribunal would have rejected it. This because, contrary to Respondent's allegation, Resolution No. 141 was not "*a bona fide regulation aimed at improving the public welfare*" or "*a normal and nondiscriminatory exercise of its regulatory powers*", but rather a complete, sudden and unexpected alteration of a framework that Peru had consciously devised and that was crystallized in a public contract like the Commitment Act. While States enjoy regulatory discretion to legislate and regulate in the public interest, they cannot use that discretion to entirely (and retroactively) subvert the terms of a public tender.

misunderstanding on "*how PR-22 was to be interpreted and implemented*".[505] However, the circumstances surrounding the adoption of Resolution No. 141, as well as Respondent's pleadings in this arbitration, reveal what appears to have been OSINERGMIN's true motive. That was to avoid the costs of permanently dispatching Kallpa GSA's units in accordance with the Bid Terms and the Commitment Act, which it suddenly (and probably also in light of the pressure exerted by Kallpa GSA's competitors through their June 2016 letters) considered excessive and wasteful, despite having carefully considered the implications of the system at the time of its adoption.[506] Resolution No. 141 must therefore be classified as a "*measure taken for reasons that are different from those put forward by the decision maker*".[507]

453.    The third reason for the Tribunal's finding that Resolution No. 141 was manifestly arbitrary is that it was issued in disregard of fundamental principles and procedures of Peruvian law:

   (i)    for a start, it breached the fundamental principle of non-retroactivity of laws and regulations recognized in Peruvian law (as well as by any other advanced legal system), since it reversed the Bid Terms' guarantee of permanent dispatch of the Firm Base Provider immediately after Kallpa GSA had won the Tender and signed the Commitment Act. It is impossible to follow Respondent's suggestion

---

[505] Counter-Memorial, ¶ 123. See Resolution No. 141 (C-66), p. 2, asserting that "*on 8 June 2016, through Letter No. ENG/535-2016, the company ENGIE Energía Perú S. A. ("ENGIE"), based on estimated scenarios, informed Osinergmin of possible effects contrary to the legal framework that could result from the implementation of the results of the Base Provision award process and dispatch programming, as a consequence of the projected Variable Cost value of the Kallpa Thermoelectric Plant and the Las Flores Thermoelectric plant of 3.25 USD/MMBTU, according to ENGIE. Consequently, the company requests the reaffirmation of the validity of the SEIN's operations coordination rule of minimum cost in accordance with Law No. 28832; On the other hand, on 10 June 2016, through Letter GG-MISC-348-2016, the company Termochilca S. A. requested the issuance of a correct interpretation of the application of PR-22 in the assignment of the Base Provision since, in the company's opinion, COES's current interpretation violates the provisions of Law No. 28832 and COES Technical Procedure PR-01 "Programing of Short Term Operation*".

[506] The Tribunal refers in particular to two circumstances. <u>First</u>, the letters sent by Kallpa GSA's competitors to OSINERGMIN shortly before the enactment of Resolution No. 141, complaining that a permanent dispatch of Kallpa GSA's units would have generated significant additional costs for the system. The fact that OSINERGMIN issued Resolution No. 141 shortly after receiving those letters indicates that it was influenced by them, and in particular by the observation that a permanent dispatch of Kallpa GSA's Plants would have been expensive for the system. <u>Second</u>, the fact that the Uribe & Leyva SFR Report commissioned by OSINERGMIN explicitly stated that it was not "*convenient*" to permanently dispatch Kallpa GSA's units. Although this Report was issued after Resolution No. 141 was issued, it illuminates the true reasons behind its enactment.

[507] *EDF v. Romania*, ¶ 303(c).

that Resolution No. 141 was not retroactive because Kallpa GSA had not yet started to provide SFR services pursuant to the Commitment Act. By the time Resolution No. 141 was issued, Kallpa GSA had already acquired the right to be permanently dispatched by winning the Tender and entering into the Commitment Act. This makes Resolution No. 141 a retroactive measure terminating a rightfully acquired right;

(ii) Additionally, Resolution No. 141 was inconsistent with the procedures of Peruvian law for the amendment by OSINERGMIN of existing regulations, like PR-22. It is undisputed that OSINERGMIN must obtain COES's opinion before modifying a technical procedure like PR-22.[508] This cannot be considered a purely formal requirement. As COES represents the generators, it could have brought to bear their opinion, including Kallpa GSA's, which could have led OSINERGMIN to change its mind on whether and how to amend the technical procedure. By presenting Resolution No. 141 as an interpretative instrument, while it was *de facto* a radical amendment of PR-22, OSINERGMIN deliberately circumvented the procedure for the modification of a regulation.

Furthermore, OSINERGMIN did not respect its obligation to publish the drafts of its resolutions in advance in order to obtain comments from the public. Respondent's defense that Peruvian law permitted OSINERGMIN to skip that step in an urgent situation like the one it was facing – i.e. the imminent submission of its Declared Costs by Kallpa GSA[509] is not convincing. OSINERGMIN had had more than two years to clarify the meaning of PR-22 (which had been published on March 29, 2014). Respondent provides no explanation as to why it waited until June 2016, just before Kallpa GSA was due to file its annual Declared Costs, to do so.

This renders Resolution No. 141 a "*measure taken in wilful disregard of due process and proper procedure*", which is another articulation of arbitrariness according to *EDF v. Romania*'s definition.

454.    In light of all these considerations, the Tribunal concludes that Respondent acted in a seriously arbitrary manner by issuing Resolution No. 141.

---

[508] See ¶¶ 347, 361 *supra*.

[509] Counter-Memorial, ¶ 145; Rejoinder, ¶ 259.

455.    This finding is sufficient to uphold the SFR Service Claim and, accordingly, pursuant to the principle of procedural economy recalled above, the Tribunal dispenses with analyzing whether the adoption of Resolution No. 141 also frustrated Claimants' legitimate expectations.

**C.   The New Methodology Claim**

456.    By the New Methodology Claim, Claimants seek compensation for losses allegedly incurred by them as a consequence of the adoption by OSINERGMIN of Resolution No. 164, which modified the cost-apportioning methodology for the Use Criterion Lines.

457.    According to Claimants, by issuing Resolution No. 164, Peru breached Article 10.5 of the Treaty because that measure was arbitrary and discriminatory, and in violation of the obligation to maintain a stable and predictable legal and regulatory environment. Respondent rejects this, saying that OSINERGMIN properly revised the cost-apportioning methodology to address the shortcomings of the prior regulation.

458.    The Tribunal has previously concluded that neither the MST/FET standard[510] nor the FPS standard[511] enshrined in the Treaty include an obligation for the host State to maintain a stable and predictable legal and regulatory environment. In light of this finding, Claimants' arguments predicated on Peru's alleged failure to comply with that obligation must be rejected outright.

459.    The Tribunal will accordingly consider exclusively Claimants' arguments that Resolution No. 164 was arbitrary and discriminatory in breach of the MST/FET standard of Article 10.5 of the Treaty, setting out, first, the Parties' positions (**Sections 1** and **2**) and, then its assessment of Claimants' New Methodology Claim (**Section 3**).

*1.    Claimants' position*

*i.    The arbitrariness of Resolution No. 164*

460.    Claimants contend that Resolution No. 164 was arbitrary for several reasons.[512]

---

[510] See ¶¶ 312 ff. *supra*.

[511] See ¶¶ 324 ff. *supra*.

[512] As for the standard of arbitrariness, see ¶ 345 *supra*.

461.  <u>First</u>, Resolution No. 164 was "*not based on legal standards, but on discretion and preference*",[513] because it introduced a cost-apportionment methodology (the New Methodology) inconsistent with the Use Criterion "*stabilized*" by Law 28832.[514] In particular, by removing the Second Methodology's Relevant Generators concept,[515] while maintaining its Energy/Distance Method,[516] the New Methodology made all generators liable for the costs of all Use Criterion Lines regardless of effective use (except for those Lines exclusively used by one generator or where the generator would be liable for a *de minimis* payment lower than 1% of the costs of the relevant Line).[517] This is because the Energy/Distance Method "*calculates the distance to all elements through which a generator's electricity could* theoretically *travel*", as if electricity could travel in all directions, while in reality it flows in one direction only.[518] That Method is in line with a Benefit Criterion (rather than a Use Criterion),[519] and thus in breach of Law 28832.

462.  Claimants allege that, by virtue of the New Methodology, Kallpa GSA became liable to pay for Use Criterion Lines it did not use, such as all the elements of the Mantaro-

---

[513] Claimants' Post-Hearing Brief, ¶ 247(b), quoting *EDF v. Romania*, ¶ 303.

[514] Claimants' Post-Hearing Brief, ¶ 247(b); Reply, ¶ 214. Claimants say that while OSINERGMIN has the power to regulate the apportionment of costs of Use Criterion Lines, its discretion is limited by the Use Criterion *"stabilized"* under Law 28832 (Reply, ¶¶ 207, 218-219, 392; Claimants' Post-Hearing Brief, ¶ 196(g)).

[515] To recall, the term Relevant Generators refers to generators having at least one of their electrical pathways to any demand "*busbar*" passing through a given Use Criterion Line. The Second Methodology first identified the Relevant Generators for any given Line through the TDF Method (i.e. a method identifying the generator using a line based on the net flows of electricity). It then apportioned the costs of such Line only among the Relevant Generators based on the Energy/Distance Method. By applying the Relevant Generators concept, Claimants say, the Second Methodology was consistent with the Use Criterion.

[516] For Claimants, the Energy/Distance Method ignores the real electricity flows, and thus the actual use of transmission lines or elements, as it focuses only on "*each generator's energy injected into the grid as a whole in a given period, and the generator's distance to each element*" (Reply, ¶ 242). In other words, according to Claimants that Method "*involves a simple arithmetic exercise: the amount of energy generated by the generator is divided by the electrical distance (known as impedance) from the generator to each element. The result of that division (the quotient) is then multiplied by the cost of that element. The closer a generator is to an element and the more electricity it produces, the more it pays for that element*" regardless of actual use (Claimants' Post-Hearing Brief, ¶¶ 207-208).

[517] Memorial, ¶¶ 151, 153; Reply, ¶¶ 229, 241, 242, 271, 413; Claimants' Post-Hearing Brief, ¶¶ 212-222.

[518] Claimants' Post-Hearing Brief, ¶ 208.

[519] Reply, ¶ 392; Claimants' Post-Hearing Brief, ¶ 247(b).

Lima system (while under the Second Methodology it only paid for 8 out of the 38 elements of that system).[520]

463.    Claimants say that at the Hearing, Respondent's witness Mr. Mendoza – the Manager of OSINERGMIN's Electricity Generation and Transmission division who approved Resolution No. 164 – admitted that the goal of the New Methodology was to make all generators pay the same unitary transmission cost, as in a postage stamp-like system.[521] This was confirmed by the Uribe & Leyva Transmission Report[522] and recognized also by Respondent's witness Mr. Buenalaya.[523]

464.    Claimants contest Respondent's suggestion that the Relevant Generator Concept was adequately replaced by the Impedance Filter of the New Methodology, arguing that such Filter "*eliminate*[s] [from the cost apportionment procedure] *exclusive use elements*" (i.e. Lines used by one generator only), but still makes generators pay for non-exclusive elements they do not use.[524]

465.    Second, Claimants contend that Resolution No. 164 was also arbitrary because it was "*taken in wilful disregard of due process and proper procedure*",[525] as it did not comply with the Peruvian law requirement that a regulatory change be (*i*) duly motivated, (*ii*) based on a cost-benefit analysis, (*iii*) implemented transparently, and (*iv*) non-discriminatory.[526]

---

[520] Reply, ¶ 233; Claimants' Post-Hearing Brief, ¶ 233. Moreover, due to the significant amount of energy produced by Kallpa and Las Flores and the location of the plants in proximity of the Mantaro-Lima system, they became responsible for the payment of a disproportional amount of the lines' costs (approximately 20%) compared to their actual use of the lines (Memorial, ¶ 159; Reply, ¶ 234; Claimants' Post-Hearing Brief, ¶ 234).

[521] Tr. Day 4, 704:11-706:10; Claimants' Post-Hearing Brief, ¶¶ 218-221.

[522] Uribe & Leyva Transmission Report (R-52), p. 98, quoted in Claimants' Post-Hearing Brief, ¶ 220.

[523] Tr. Day 4, 793:20-794:8: "*Q. So, here what the report [R-40] is making explicit is a sort of intention that the costs are shared among all the generators. It says that the costs should be shared amongst all the generators. It is a type of cost socialization. Correct? A. What we explained here is that we're looking for uniform and stable costs. That's what we're aiming for. That's the purpose of the methodology*".

[524] Claimants' Post-Hearing Brief, ¶ 214. See also Reply, ¶ 243.

[525] *EDF v. Romania*, ¶ 303. According to Claimants, Peruvian law requires that "*any change in regulation must be duly motivated, its rationale must be made known to the public in advance, and it must be issued only following a cost-benefit analysis*" (Reply, ¶ 393). See also Claimants' Post-Hearing Brief, ¶ 247(c).

[526] Claimants' Post-Hearing Brief, ¶ 223.

466.  To Respondent's argument that OSINERGMIN duly explained the reasons underlying Resolution No. 164 by its legal and technical reports,[527] Claimants reply that such reports were short and lacked any analysis on whether and how the New Methodology would be consistent with the Use Criterion.[528]

467.  According to Claimants, it is not credible that OSINERGMIN relied on the Uribe & Leyva Transmission Report and the Quantum Report to issue Resolution No. 164 because: (*i*) that Report was issued after the publication of the draft of Resolution No. 164 (i.e. Resolution No. 24), was never mentioned in any contemporaneous documents and was only disclosed in this arbitration;[529] (*ii*) the Quantum Report had been commissioned in support of Resolution No. 383 nine years before Resolution No. 164, and did not discuss the Relevant Generators concept, the elimination of which was one of the New Methodology's core innovations.[530]

468.  Claimants contest that OSINERGMIN analyzed the impact of the New Methodology in its response to the generators' comments. OSINERGMIN simply failed to address the generators' criticisms before finalizing the new procedure.[531]

469.  Third, Claimants submit that Resolution No. 164 was arbitrary because it was "*taken for reasons that are different from those put forward by the decision maker*".[532] While the Resolution was formally meant to resolve problems of the Second Methodology, its true purpose was "*to cross-subsidize Electroperú and other state-owned companies at the expense of private generators like Kallpa GSA*".[533] In particular, it

---

[527] Respondent's Post-Hearing Brief, ¶¶ 92-93.

[528] Claimants' Post-Hearing Brief, ¶¶ 225-226. According to Claimants, this would have been confirmed at the Hearing by Respondent's witness Jaime Mendoza (Tr. Day 4, 694:2-15: "*Q. So, you agree with me that this legal report [C-133] made no statement as to whether this methodological change was in accordance with the criteria stabilized under Law 28832? A. […] generally when it's a technical issue they make no statement. That's all that they say. They don't state that they oppose it, they don't say anything about the rest, but they do mention the antecedents, generally, the laws that are in force. Q. Okay. So, there is no analysis on the merits as stated there, it does not issue an opinion on its content because it was a technical issue*").

[529] Reply, ¶ 395.

[530] Reply, ¶¶ 249-250, 394; Claimants' Post-Hearing Brief, ¶ 231.

[531] Memorial, ¶ 248; Reply, ¶ 389(b); Claimants' Post-Hearing Brief, ¶¶ 227-228.

[532] *EDF v. Romania*, ¶ 303.

[533] Memorial, ¶ 246; Reply, ¶ 389(a); Claimants' Post-Hearing Brief, ¶ 247(a).

was passed to provide balance sheet relief for Electroperu[534] by socializing the costs of the Use Criterion Lines, a significant share of which at the time was borne by Electroperu. Hence, for Claimants, Resolution No. 164 also "*inflicted damage* [on private generators] *without serving a legitimate purpose*".[535]

### ii. The discriminatory nature of Resolution No. 164

470. Claimants also allege that Resolution No. 164 is discriminatory.

471. Preliminarily, they contend that discriminatory conduct under the MST/FET standard consists in treating like situations differently without a justified and reasonable policy ground,[536] and that discriminatory measures "*necessarily imply that the state benefited or harmed someone more in comparison with the generality*".[537] Claimants also maintain that discriminatory effect is sufficient for a finding of discrimination, and that intent is not essential.[538]

---

[534] Claimants emphasize that Resolution No. 164 was adopted at the same time as Electroperu's Power Purchase Agreements (PPAs) with certain new hydroelectric plants (which Electroperu signed upon request by Peru's Agency for the Promotion of Private investment ("**Proinversión**")) entered into force. Under the PPAs, Electroperú was to purchase all the power and 70% of the energy of the new hydroelectric projects on a take-or-pay basis for 15 years, to then sell the energy to distributors. However, due to demand for electricity slowing down, Electroperu realized that it would have to sell the energy it purchased at a loss. Thus, it requested financial relief from government authorities, a relief that came in the form of Resolution No. 164 (see Memorial, ¶¶ 167-172; Reply, ¶¶ 261-263; Claimants' Post-Hearing Brief, ¶¶ 244-245).

[535] Claimants' Post-Hearing Brief, ¶ 247(a), quoting *EDF v. Romania*, ¶ 303.

[536] Memorial, ¶ 219; Reply, ¶ 399, relying on *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL, Partial Award, March 17, 2006 (CL-30), ¶ 307: "*any differential treatment* […] *must be justified by showing that it bears a reasonable relationship to rational policies not motivated by a preference*"; *Marion and Reinhard Unglaube v. Republic of Costa Rica*, ICSID Case Nos. ARB/08/1 and ARB/09/20, Award, May 16, 2012 (CL-76), ¶ 262: "*In order to prevail regarding an allegation of discriminatory treatment, a Claimant must demonstrate that it has been subjected to unequal treatment in circumstances where there appears to be no reasonable basis for such differentiation*"; *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, August 27, 2008 (CL-48), ¶ 184: "*discrimination* […] *corresponds to the negative formulation of the principle of equality of treatment. It entails like persons being treated in a different manner in similar circumstances without reasonable or justifiable grounds*".

[537] Memorial, ¶ 220; Reply, ¶ 399, quoting *AES v. Hungary*, ¶ 10.3.53.

[538] Memorial, ¶ 221; Reply, ¶ 399, relying on *Siemens v. Argentina*, ¶ 321: "*The Tribunal concurs that intent is not decisive or essential for a finding of discrimination, and that the impact of the measure on the investment would be the determining factor to ascertain whether it had resulted in non-discriminatory treatment*".

472.  Claimants argue that Resolution No. 164 had a discriminatory effect because it resulted in a significant and unjustified shifting of costs from state-owned to private generators.[539] The reform favored Electroperu to the detriment of companies like Kallpa GSA.[540] Indeed, while Electroperu's share of costs for the Secondary System as a whole decreased by 56% (with its share for the Mantaro-Lima system, which had been designed to serve its plants, dropping by 70%), Kallpa GSA's share of such costs increased by 125%.[541] According to Claimants, after the enactment of Resolution No. 164, "*OSINERGMIN corrected certain distortions*" created by the Resolution, but "*did not address those that favorably affected Electroperú to the detriment of the private sector*".[542]

473.  Claimants contend that data relied upon by Respondent's expert[543] to assert that Resolution No. 164 indiscriminately affected or benefitted both private and public generators is "*disingenuously constructed*".[544] Indeed, Respondent's expert merely listed the number of individual companies that benefitted or were prejudiced, disregarding each company's contribution towards the system's overall electricity generation output. For instance, the 31 private companies that were not affected represent, in the aggregate, only 4.6% of the total electricity generation and therefore fall below the 1% threshold for the apportionment of costs. By contrast, the 12 private generators reporting cost increases represent 64.5% of the system's electricity output.[545]

474.  Claimants submit that in any event Resolution No. 164 was also tainted by a discriminatory intent, since the only plausible explanation for its adoption was to grant Electroperu's requests for financial relief.[546] In other words, the true motive

---

[539] Reply, ¶ 403; Claimants' Post-Hearing Brief, ¶ 242. For instance, Claimants allege that while under Resolution No. 383 State-owned generators bore nearly 78% of the costs of the Mantaro-Lima system and private generators close to 22%, after the adoption of Resolution No. 164 private generators came to bear approximately 76% of the costs of Mantaro-Lima system.

[540] Claimants' Post-Hearing Brief, ¶ 250.

[541] Claimants' Post-Hearing Brief, ¶¶ 234-235.

[542] Reply, ¶ 404.

[543] Direct Presentation of Boaz Moselle, Compass Lexecon, slide 24.

[544] Claimants' Post-Hearing Brief, ¶ 237.

[545] Claimants' Post-Hearing Brief, ¶¶ 237-240.

[546] See fn. 534 *supra.* According to Claimants, "*the context and timing in which Resolution No. 164 was passed [...] does not permit any other conclusion*" (Reply, ¶ 402).

behind that Resolution was "*to benefit Electroperu and other state-owned generators to the detriment of Claimants and other private generators*".[547] In their view, this is demonstrated by the timing of Resolution No. 164, the entry into force of which coincided with that of certain unfavorable power purchase agreements ("**PPAs**") signed by Electroperú (which were expected to generate losses).[548]

### 2. Respondent's position

#### i. The arbitrariness of Resolution No. 164

475. Respondent denies that Resolution No. 164 was arbitrary.

476. <u>First</u>, it rejects Claimants' suggestion that the New Methodology is inconsistent with the Use Criterion.[549] In fact, both of the New Methodology's core components, i.e. the Impedance Filter[550] and the Energy/Distance Method,[551] are consistent with that Criterion, as they measured the use of lines by generators based on "*impedance*".[552] By so doing, they ensured that costs would be allocated only to effective users.

477. Respondent further submits that Resolution No. 164 was reasonable, because it was meant to resolve the problems caused by the Second Methodology (for example due to the incompatibility between the TDF Method and the Energy/Distance Method,

---

[547] Reply, ¶ 400; Claimants' Post-Hearing Brief, ¶ 244.

[548] See fn. 534 *supra*.

[549] Rejoinder, ¶ 519.

[550] Respondent's Post-Hearing Brief, ¶¶ 81-82.

[551] Rejoinder, ¶¶ 321-322; Respondent's Post-Hearing Brief, ¶ 83. Respondent argues that the Energy/Distance Method is consistent with the Use Criterion because, through its "*distance*" component, it allocates costs based on the "*electrical distance*" between a generator and a line, which is measured using the "*electrical impedance between the generator and the transmission line under analysis, [i.e.] the opposition 'offered by a section of the system against the flow of [electric] current and is directly proportional to the length of the line'*" (Rejoinder, ¶¶ 309-311). Inherent in Respondent's argument is that energy flows through all elements of a line, following the path of least resistance (or impedance).

[552] In particular, Respondent argues that the Energy/Distance Method is consistent with the Use Criterion because it allocates costs based on the "*electrical distance*" between a generator and a line, which is measured using the "*electrical impedance between the generator and the transmission line under analysis, [i.e.] the opposition 'offered by a section of the system against the flow of [electric] current and is directly proportional to the length of the line'*" (Rejoinder, ¶¶ 309-311). Inherent in Respondent's argument is that a generator's energy does not flow through only one path, but it rather can flow in all directions, following the path of least resistance (or impedance).

which measure use differently), by implementing a more predictable, appropriate and fair methodology.[553]

478.    Respondent contests that under the New Methodology all generators would pay for all the Use Criterion Lines. Actually, "at most 28 out of 130 generators pay for any given transmission element [...] and a given generator contributes to approximately 11 out of a possible 29 lines in any given month".[554]

479.    Respondent contends that Claimants cannot complain that Kallpa GSA paid for the Mantaro-Lima system under the New Methodology, given that, as confirmed by their own witnesses and experts,[555] Kallpa GSA did use the Mantaro-Lima system. This is also demonstrated by the existence of power purchase agreements between Kallpa GSA's Cerro del Águila plant located South of Lima and companies based in Lima, which Kallpa GSA very likely performs by transmitting electricity through the Mantaro-Lima system.[556] Respondent also notes that, contrary to Claimants' submission, under the New Methodology Kallpa GSA in any event bore only between 6-11% of the costs of that system.[557]

480.    Second, Respondent disputes that OSINERGMIN failed to comply with the procedural requirements of Peruvian law when it adopted Resolution No. 164. Indeed, OSINERGMIN: (*i*) in its reports duly explained its reasons for adopting the New Methodology;[558] (*ii*) issued Resolution No. 164 based on a cost-benefit analysis (including the one contained in the Uribe & Leyva Transmission Report);[559] (*iii*) acted transparently all along, as – before issuing the Resolution – it published a draft, solicited comments from generators and responded to those comments (some of

---

[553] Counter-Memorial, ¶¶ 172-177; Rejoinder, ¶ 317.

[554] Rejoinder, ¶ 323. See also Respondent's Post-Hearing Brief, ¶ 84.

[555] Tr. Day 2, 390:13 – 395:19; Tr. Day 5, 888:17 – 889:22. See also RER-CLEX I, ¶ 7.43, Table 24; RER-CLEX II, ¶ 4.16, Table 17; Direct Expert Presentation of Compass Lexecon, December 19, 2021, slide 20.

[556] Respondent's Post-Hearing Brief, ¶ 88.

[557] Respondent's Post-Hearing Brief, ¶ 89.

[558] Respondent's Post-Hearing Brief, ¶¶ 92-93. Respondent underlines that at the Hearing Claimants' witness Mr. García admitted that Claimants were aware of those reports, and that Kallpa GSA's commercial team discussed all their relevant points in internal meetings (Tr. Day 2, 397:14- 406:12).

[559] Counter-Memorial, ¶¶ 181, 279; Rejoinder, ¶¶ 342-344.

which submitted by Kallpa GSA);[560] and (*iv*) did not act discriminatorily against Claimants or in favor of Electroperú.[561]

481.    Respondent rejects the suggestion that OSINERGMIN did not rely on the Uribe & Leyva Transmission Report and the Quantum Report to devise the New Methodology. As to the Uribe & Leyva Transmission Report, although formally issued after the adoption of Resolution No. 164, OSINERGMIN reviewed a draft before issuing the Resolution and relied on the recommendations contained therein to develop the New Methodology.[562] OSINERGMIN also relied on the Quantum Report despite its having been issued several years before, because it discussed the Energy/Distance Method, which was the Second Methodology's component that OSINERGMIN opted to retain in the New Methodology.[563]

482.    <u>Third</u>, Respondent argues that Claimants have failed to substantiate their allegation that Resolution No. 164 was issued for the undisclosed and illegitimate purpose of favoring Electroperú (rather than to resolve issues with the Second Methodology).[564]

### ii.    The discriminatory nature of Resolution No. 164

483.    Respondent also firmly denies that Resolution No. 164 was discriminatory.[565]

484.    For a start, Respondent asserts that such Resolution was reasonable, as it was meant "to remedy the inconsistencies and unpredictability that resulted from the incompatibility of the two apportionment methods used in the previous Resolution".[566] Moreover, it "allocate[d] costs reasonably on the basis of use, and, thus, there [was] no cross-subsidy", and entailed a more equal sharing of costs based

---

[560] Counter-Memorial, ¶¶ 182-187, 284; Rejoinder, ¶¶ 345-346, 520; Respondent's Post-Hearing Brief, ¶ 94.

[561] Counter-Memorial, ¶ 188; Rejoinder, ¶¶ 524-525. See also Section V.C.2ii.

[562] Rejoinder, ¶ 522. That no contemporary document made reference to the report is uninfluential. On one hand, OSINERGMIN had no obligation to refer to the report in those documents. On the other hand, in issuing the New Methodology, OSINERGMIN explained the shortcomings in the Second Methodology in a manner reflecting comments from the Uribe & Leyva Transmission Report. Hence, OSINERGMIN clearly relied on the report in issuing Resolution No. 164 (Rejoinder, ¶ 523). See also Respondent's Post-Hearing Brief, ¶ 94.

[563] Rejoinder, ¶ 521.

[564] See ¶ 485 *supra*.

[565] Rejoinder, ¶¶ 470, 526-527.

[566] Respondent's Post-Hearing Brief, ¶ 96.

on generator size.[567] For Respondent, Claimants cannot impugn Resolution No. 164, because"[r]ectifying problems of inconsistency and unpredictability in a regulatory mechanism, and developing a better-functioning, more consistent, and more appropriate cost allocation methodology to replace it, is entirely appropriate".[568]

485.     Respondent submits that there is no basis for Claimants' theory that Resolution No. 164 was issued with the intent of benefiting Electroperú to the detriment of private generators, which is only based on the fact that it came into force at the same time as certain PPAs agreements unfavorable to Electroperú. The true reason why Resolution No. 164 entered into force when it did is that was when the previous Tariff Period that applied the Second Methodology ended.[569] Claimants also ignore that Electroperú continued to request financial relief from governmental authorities, which denied it, even after the adoption of Resolution No. 164.[570]

486.     Respondent further disputes that Resolution No. 164 had a discriminatory effect. Its position is that the different cost allocation between generators that it entails "*does not constitute discrimination against anyone whose costs increased or in favor of anyone whose costs fell*".[571] In fact, as demonstrated by data shown at the Hearing,[572] under Resolution No. 164 "*certain private and public generators pay less for the STS-CTS transmission lines* [...] *than they would have if Resolution No. 383 had*

---

[567] Respondent's Post-Hearing Brief, ¶¶ 197-198.

[568] Rejoinder, ¶ 528.

[569] Rejoinder, ¶ 524. Respondent underscores that OSINERGMIN started reviewing the Second Methodology in 2013, at the end of the first Tariff Period implementing said methodology. For that purpose, OSINERGMIN engaged Uribe & Leyva to analyze the Second Methodology (see Counter-Memorial, ¶ 171).

[570] Rejoinder, ¶ 328, mentioning Letter from OSINERGMIN to Proinversión, Letter N° 0470-2018-GRT, May 29, 2018 (R-115); Letter from Electroperú to Proinversión, Letter N° 00193-2018-G, April 5, 2018 (R-111); Letter from Proinversión to OSINERGMIN containing Responses to Electroperú, Oficio N° 16-2018/PROINVERSIÓN/DPP/EL, June 1, 2018 (R-119), pp. 1-6; RWS-Buenalaya II, ¶ 202; Letter from Electroperú to FONAFE, July 24, 2015 (R-120); Letter from Proinversión to OSINERGMIN containing Responses to Electroperú, Oficio N° 16-2018/PROINVERSIÓN/DPP/EL, June 1, 2018 (R-119); Letter from Electroperu to OSINERGMIN, Letter N° 00195-2018-G, April 5, 2018 (R-121); Electroperú, Report N° 00001-2021-C, January 25, 2020 (R-122); Letter from Electroperú to OSINERGMIN, Letter N° 00035-2021-G, January 28, 2021 (R-123).

[571] Rejoinder, ¶¶ 528-529. Respondent adds that "*the State is under no obligation to fix every regulatory shortcoming at the same time, and it is free to prioritize some regulatory concerns over other concerns. That is an inevitable, even necessary, feature of the regulatory State*".

[572] See Respondent's Post-Hearing Brief, ¶¶ 187-201, drawing from Compass Lexecon's Hearing presentation.

*stayed in place, and certain private and public generators pay more*".[573] In particular, the Resolution had a positive impact on 7 private companies (entirely relieving 2 of them from paying for the Use Criterion Lines),[574] and no impact at all for several other private companies.[575] By contrast, it had a negative impact on at least one public company, which became liable for Lines for which it had never paid before.[576]

487.     According to Respondent, if the effects on single generators are considered, it becomes even clearer that Resolution No. 164 is not discriminatory. Indeed, the number of private generators that benefited from Resolution No. 164 because it decreased their costs (18) is three times that of public generators (6).[577]

488.     According to Respondent, it is unremarkable that the private generators' overall share of costs became higher than that of State-owned generators, given that "*there are simply more private generators than there are public generators*", and there is no reason that "*the impact of the Resolution needs to be proportionate between private and public generators*".[578] Respondent says that "*a change in the incidence of costs and benefits does not prove that the new methodology was in any way discriminatory in favor of Electroperú or against Claimants*".[579] Laws will always have differential impacts, and this is not enough to establish discrimination.[580]

### 3.     The Tribunal's decision

489.     The issue before the Tribunal is whether Resolution No. 164 was seriously arbitrary or discriminatory in breach of the MST/FET standard of Article 10.5 of the Treaty. The

---

[573] Respondent's Post-Hearing Brief, ¶ 96.

[574] The fact that those companies are smaller and located farther from Lima than Kallpa GSA does not diminish the significance of Resolution No. 164's beneficial impact on them (Respondent's Post-Hearing Brief, ¶ 189).

[575] Respondent's Post-Hearing Brief, ¶ 189.

[576] Respondent's Post-Hearing Brief, ¶¶ 189-192.

[577] Respondent's Post-Hearing Brief, ¶ 193. Respondent notes that "[t]*he preponderance of private generators responsible for costs compared to public generators responsible for costs under Resolution No. 164 is unremarkable. There are simply more private generators than there are public generators, and there is no reason that the impact of the Resolution needs to be proportionate between private and public generators*" (Respondent's Post-Hearing Brief, ¶ 196).

[578] Respondent's Post-Hearing Brief, ¶ 196.

[579] Rejoinder, ¶ 330.

[580] Rejoinder, ¶ 529.

Tribunal will first deal with the Resolution's alleged arbitrariness (*i*) and then with its supposed discriminatory nature (*ii*).

### i.    Whether Resolution No. 164 was seriously arbitrary

490.    Also with regard to the New Methodology Claim, Claimants rely on the definition of arbitrariness in *EDF v. Romania*, and contend that Resolution No. 164 was arbitrary for at least three reasons: (*i*) it was "*not based on legal standards, but on discretion and preference*",[581] as it introduced a cost-apportioning methodology (the New Methodology) inconsistent with the Use Criterion "stabilized" by Law 28832; (*ii*) it was "*taken in wilful disregard of due process and proper procedure*",[582] because it did not comply with the Peruvian law requirements for regulatory change; (*iii*) it was "*taken for reasons that are different from those put forward by the decision maker*",[583] and namely to cross-subsidize Electroperú at the expense of private generators, thereby also inflicting damage upon private generators for no "*legitimate purpose*".

491.    As with the SFR Service Claim, Respondent does not take issue with Claimants' definition of arbitrariness but denies that Resolution No. 164 was arbitrary.

492.    For the reasons illustrated above,[584] the Tribunal concurs with Claimants' articulation of the concept of arbitrariness but holds that to establish a breach of the MST/FET standard they must show that Resolution No. 164 was seriously arbitrary.

### a.    Resolution No. 164's alleged inconsistency with the Use Criterion

493.    Claimants submit that Resolution No. 164 was "*not based on legal standards, but on discretion and preference*",[585] because the New Methodology it introduced did not

---

[581] Claimants' Post-Hearing Brief, ¶ 247(b), quoting *EDF v. Romania*, ¶ 303.

[582] *EDF v. Romania*, ¶ 303. According to Claimants, Peruvian law requires that "*any change in regulation must be duly motivated, its rationale must be made known to the public in advance, and it must be issued only following a cost-benefit analysis*" (Reply, ¶ 393). See also Claimants' Post-Hearing Brief, ¶ 247(c).

[583] *EDF v. Romania*, ¶ 303.

[584] See Section VI.B.ii.

[585] Claimants' Post-Hearing Brief, ¶ 247(b), quoting *EDF v. Romania*, ¶ 303.

comply with the Use Criterion stabilized by Law 28832.[586] In particular, they contend that, by removing the Second Methodology's Relevant Generators concept,[587] while keeping the Energy/Distance Method that fails to measure use,[588] Resolution No. 164 rendered all generators liable for the costs of all Use Criterion Lines regardless of effective use.[589]

494.    Respondent contests this, saying that the New Methodology was not only consistent with the Use Criterion,[590] but also a more predictable, appropriate and fair cost-apportioning mechanism than the Second Methodology.[591]

495.    The Tribunal finds it impossible to characterize Resolution No. 164 as a seriously arbitrary measure in breach of the MST/FET standard of Article 10.5 of the Treaty, even accepting Claimants' position that the New Methodology was inconsistent with the Use Criterion of Law 28832. This is particularly so in the absence of further elements, such as a disregard of the procedural requirements governing the adoption of a regulation, or the existence of an ulterior and undisclosed motive behind its adoption (of which – as explained in the next sections[592] – the Tribunal sees no trace). In fact, absent other indicia of serious arbitrariness, the mere incompatibility of a

---

[586] Claimants' Post-Hearing Brief, ¶ 247(b); Reply, ¶ 214. Claimants say that while OSINERGMIN may regulate the apportionment of costs of Use Criterion Lines, its discretion is limited by the Use Criterion stabilized under Law 28832 (Reply, ¶¶ 207, 218-219, 392; Claimants' Post-Hearing Brief, ¶ 196(g)).

[587] To recall, the Relevant Generators concept refers to generators having at least one of their electrical pathways to any demand busbar passing through a given Use Criterion Line. The Second Methodology first identified the Relevant Generators for any given Line through the TDF Method (i.e. a method identifying the generator using a line based on the net flows of electricity). It then apportioned the costs of such Line only among the Relevant Generators based on the Energy/Distance Method. By applying the Relevant Generators concept, Claimants say, the Second Methodology was s consistent with the Use Criterion.

[588] For Claimants, the Energy/Distance Method ignores the electricity flows, and thus the actual use of transmission lines or elements, as it focuses only on "*each generator's energy injected into the grid as a whole in a given period, and the generator's distance to each element*" (Reply, ¶ 242). In other words, Claimants argue, such Method "*involves a simple arithmetic exercise: the amount of energy generated by the generator is divided by the electrical distance (known as impedance) from the generator to each element. The result of that division (the quotient) is then multiplied by the cost of that element. The closer a generator is to an element and the more electricity it produces, the more it pays for that element*" regardless of actual use (Claimants' Post-Hearing Brief, ¶¶ 207-208).

[589] Memorial, ¶¶ 151, 153; Reply, ¶¶ 229, 241, 242, 271, 413; Claimants' Post-Hearing Brief, ¶¶ 212-222.

[590] Rejoinder, ¶¶ 309-311, 321-322, 519; Respondent's Post-Hearing Brief, ¶¶ 81-82

[591] Counter-Memorial, ¶¶ 172-177; Rejoinder, ¶ 317.

[592] See ¶¶ 501-504 *infra*.

regulation with a law is insufficient to breach the high threshold of the standard of Article 10.5 of the Treaty. In any case, Resolution No. 164 appears to be a *bona fide* attempt at addressing pre-existing issues of the regulatory framework (in this case, the discrepancies and unpredictable outcomes deriving from combining two methods, the FTD Method and the Energy/Distance Method, which – as even Claimants admit – lead to inconsistent results).

496.     Nor is the Tribunal persuaded that Claimants have established that Resolution No. 164 breaches the Use Criterion by socializing the costs of the Use Criterion Lines among all generators.[593] While the New Methodology may be less accurate than the Second Methodology in measuring use of lines by generators, it did not render all generators liable for all non-exclusive Use Criterion Lines, which is the mainstay of Claimants' claim.[594] Indeed, as noted by Respondent – and uncontested by Claimants – under the New Methodology only 28 out of 130 generators paid for all those Lines.[595] Moreover, as confirmed by data submitted by Claimants themselves, three companies previously liable for those Lines under the Second Methodology were relieved from that obligation under the New Methodology.[596]

497.     In light of the foregoing, the Tribunal concludes that there is little or no evidence that Resolution No. 164 spread the costs of the Use Criterion Lines among all generators in breach of the Use Criterion.

### b.   The allegedly defective procedure for the adoption of Resolution No. 164

498.     Claimants maintain that Resolution No. 164 was "*taken in wilful disregard of due process and proper procedure*" because it allegedly disregarded the Peruvian law requirement that regulatory changes be (*i*) duly motivated, (*ii*) issued following a cost-benefit analysis, (*iii*) issued in a transparent manner, and (*iv*) non-discriminatory. Respondent contests this.

---

[593] Memorial, ¶¶ 151, 153; Reply, ¶¶ 229, 242, 271, 413; Claimants' Post-Hearing Brief, ¶¶ 212-222.

[594] Memorial, ¶¶ 151, 153; Reply, ¶¶ 229, 242, 271, 413; Claimants' Post-Hearing Brief, ¶¶ 212-222.

[595] Rejoinder, ¶ 323. I think it is irrelevant that this, as Claimants note, was the result of the application of the *de minimis* 1% filter.

[596] Annex 1 to Claimants' Post-Hearing Brief, which highlights a – 100% difference in costs between the actual scenario (with Resolution No. 164) and the but-for scenario (continued application of the Second Methodology) with regard to Egesur, Empresa de Generación Huanza and Empresa Eléctrica Río Doble.

499.   In light of the evidence on the record and of the Parties' pleadings, the Tribunal does not agree that OSINERGMIN failed to comply with those requirements. Indeed:

(i)   OSINERGMIN provided sufficient reasons for the need to adopt Resolution No. 164 in its Reports No. 111, 455 and 457. In particular, it explained that, by removing the TDF Method, the New Methodology would fix the Second Methodology's shortcomings (especially the discrepancies deriving from combining that method and the Energy/Distance Method).[597] Moreover, before issuing Resolution No. 164, OSINERGMIN addressed the generators' comments in detail.[598] According to the Tribunal, it is not relevant that OSINERGMIN's Reports did not deal with whether and how the New Methodology would be consistent with the Use Criterion, given the lack of evidence that any generator raised that specific issue at the time.[599] While OSINERGMIN's explanation of the reasons for the enactment of the New Methodology could arguably have been more comprehensive, it was sufficient to comply with the requirement that regulatory change be duly motivated.

(ii)   OSINERGMIN appears to have issued Resolution No. 164 based on the cost-benefit analysis of the Uribe & Leiva Transmission Report. The fact that OSINERGMIN relied on the draft of such Report, which was issued well before the adoption of Resolution No. 164 disproves Claimants' allegation that OSINERGMIN could not have relied on that Report because it was only published in April 2016.[600] The fact that OSINERGMIN did not disclose that Report or mention it in its official documents is not conclusive, since Claimants have failed to demonstrate that OSINERGMIN had a duty to do so.

(iii)   OSINERGMIN also acted transparently, as it published a draft of Resolution No. 164 in February 2016 (Resolution No. 24),[601] solicited comments from all

---

[597] As Claimants admitted at the Hearing, Kallpa GSA's commercial team was aware of those reports and discussed all their relevant points internally.

[598] Report No. 455, June 2016 (R-40); Report No. 457 (R-30), ¶ 2. While Report No. 455 considered the technical comments to the New Methodology, Report No. 457 dealt with the analysis of the legal aspects of the comments made by the generators.

[599] No such complaint is recorded in Report No. 455 (R-40). In particular, Kallpa rather complained that the New Methodology (*i*) would disproportionately benefit Electroperú, (*ii*) amounted to a tax on generators, and (*iii*) was not based on careful study (id., pp. 90-92).

[600] Uribe & Leyva Transmission Report, April 21, 2016 (R-52).

[601] Resolution No. 24, February 11, 2016 (C-61).

interested parties,[602] and then addressed those comments in detail.[603] In parallel, it published Report No. 111 (explaining the reasons for the change of methodology)[604] and Report No. 457 (which provided a legal justification for that change and answered the generators' comments on certain legal aspects of Resolution No. 164).[605] As mentioned, OSINERGMIN had no specific duty to disclose the Uribe & Leiva Transmission Report,[606] the substance of which was in any event reflected in OSINERGMIN's Reports.[607]

(iv) As explained below, Resolution No. 164 was not discriminatory either.[608]

500.    In light of the foregoing, the Tribunal rules that Resolution No. 164 was properly adopted.

### c.  Resolution No. 164's allegedly illegitimate purpose

501.    Claimants assert that Resolution No. 164 was "*taken for reasons that are different from those put forward by the decision maker*", and namely to subsidize State-owned companies, and Electroperú in particular.[609] This also had the effect of inflicting damage on private generators while serving no "*legitimate purpose*" (which according to Claimants is also a ground for concluding that Resolution No. 164 was arbitrary).[610]

502.    In the Tribunal's assessment, Claimants have not provided the concrete and compelling evidence needed to support such serious accusations. Their case on this

---

[602] Report No. 455, June 2016, ii (R-40): "*Resolution No. 024-2016-OS/CD granted a term of fifteen (15) calendar days in which to submit opinions and suggestions from interested parties. Subsequently, Resolution No. 038-2016-OS/CD modified the term for submission of opinions and suggestions from interested parties, extending it from fifteen (15) to thirty (30) calendar days*".

[603] Report No. 455, June 2016 (R-40). That OSINERGMIN did not implement the generators' comments does not lead to a breach of the relevant procedure.

[604] Report No. 111, February 2016 (R-29).

[605] Report No. 457 (R-30).

[606] Claimants' Post-Hearing Brief, ¶ 232.

[607] For this reason, the Tribunal needn't consider whether the Quantum Report is a legitimate basis for the New Methodology.

[608] See Section VI.C.3ii.

[609] Memorial, ¶¶ 167-171, 246; Reply, ¶ 389(a); Claimants' Post-Hearing Brief, ¶ 247(a).

[610] See ¶ 345 *supra*.

point rests mainly on the timing of Resolution No. 164, and specifically on the fact that it entered into force in May 2017, around the same time as certain PPAs signed by Electroperú which were expected to cause it to incur losses and for which it sought financial relief.[146] This does not seem very significant, especially if one considers that the previous Tariff Period was to end in May 2017, so that this was an appropriate moment for Resolution No. 164 to enter into force.

503. The absence of a correlation between Resolution No. 164 and Electroperú's requests for financial relief is also demonstrated by the fact that Electroperú continued to ask for such relief even after the adoption of the Resolution[611] and at least until 2021, *i.e.* four years after the New Methodology entered into force.[612]

504. Absent clear and conclusive evidence pointing to Resolution No. 164 having been issued with the aim of granting financial relief to Electroperú and considering the several contemporaneous documents (such as OSINERGMIN's Reports and the Leyva & Uribe Transmission Reports) showing that its purpose was to correct issues with the Second Methodology, the Tribunal finds that there is no ground to conclude that Resolution No. 164 was adopted for an illegitimate purpose.

\*\*\*

505. In conclusion, the Tribunal finds that Claimants have not evidenced that Resolution No. 164 was arbitrary, let alone seriously so, as required by Article 10.5 of the Treaty.

---

[611] See Letter from Proinversión to OSINERGMIN containing Responses to Electroperú, Oficio N° 16-2018/PROINVERSIÓN/DPP/EL, June 1, 2018 (R-119).

[612] See Electroperú, Report N° 00001-2021-C, January 25, 2020 (R-122): "[e]*l Encargo de Comercializador de los Contratos-G y Contratos-O le ha representado a ELECTROPERU un perjuicio económico en el período ejecutado de julio de 2016 a diciembre de 2020 de Si 647,7 millones [...]. ELECTROPERU ha venido solicitando a las instancias competentes como: Ministerio de Energía y Minas PROINVERSIÓN, FONAFE, OSINERGMIN, ONP y Ministerio de Economía y Finanzas, se adopten las medidas necesarias para eliminar o reducir el riesgo del perjuicio económico descrito para nuestra empresa, para lo cual se han enviado a las citadas entidades sendas comunicaciones. Es necesario recurrir nuevamente a dichas instancias con el objeto de requerir su apoyo para solucionar el problema ocasionado a ELECTROPERU por una decisión tomada por el Estado peruano para viabilizar proyectos hidroeléctricos que incrementen la oferta en el mercado eléctrico*"; Letter from Electroperú to OSINERGMIN, Letter N° 00035-2021-G, January 28, 2021 (R-123): *"el citado Encargo le ha representado a ELECTROPERU S.A. un perjuicio económico en el período ejecutado de julio de 2016 a diciembre de 2020 de S/ 647,7 millones, el cual, hasta setiembre de 2031 en que culmina el encargo, se incrementaría al monto estimado de S/ 1 064,3 millones. En tal sentido, con la presente tengo a bien solicitar a su despacho interponer sus buenos oficios a efecto de que se atienda* **nuestra reiterada petición de que se busquen los mecanismos viables para compensar a nuestra Empresa de la citada pérdida económica**, *la cual consideramos no corresponde asumir a ELECTROPERU S.A. por ser sólo el Comercializador designado por parte del Estado peruano*" (empahsis added).

*ii.    Whether Resolution No. 164 was seriously discriminatory*

506.    Claimants allege that Resolution No. 164 was discriminatory because it benefitted State-owned companies, and particularly Electroperú, to the detriment of private companies like Kallpa GSA, which Respondent denies.

507.    For present purposes, the Tribunal accepts Claimants' definition of discrimination under the MST/FET standard, which has not been contested by Respondent. As observed by Claimants, investment tribunals have consistently held that a measure is discriminatory if it subjects persons in like circumstances to unequal treatment, without a justified and reasonable policy ground.[613] Thus, differential treatment is only proscribed where it lacks a justified and reasonable basis. As also noted by Claimants, an overwhelming majority of tribunals have considered discriminatory effect (as opposed to intent) sufficient for a finding of discrimination.[614]

508.    In the Tribunal's view, Claimants have failed to demonstrate that Resolution No. 164 was discriminatory, let alone seriously so, in breach of the MST/FET standard of Article 10.5 of the Treaty.

509.    <u>First</u>, regardless of whether it treated public and private generators differently (of which the Tribunal does not see sufficient evidence), the record shows that Resolution No. 164 was based on a justified and reasonable policy, which is *per se* dispositive of Claimants' argument. Indeed, as discussed, and contrary to Claimants' speculations,[615] the Resolution aimed at correcting the inconsistencies of the previous regulation, with a view to implementing a more predictable, appropriate, and fair cost-apportioning mechanism.[616] As Claimants admit, a measure is not discriminatory if "*it bears a reasonable relationship to rational policies not motivated by a preference*".[617]

---

[613] See *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL, Partial Award, March 17, 2006 (CL-30), ¶ 307; *Marion and Reinhard Unglaube v. Republic of Costa Rica*, ICSID Case Nos. ARB/08/1 and ARB/09/20, Award, May 16, 2012 (CL-76), ¶ 262; *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, August 27, 2008 (CL-48), ¶ 184.

[614] *Siemens v. Argentina*, ¶ 321.

[615] As mentioned, there is no evidence that Resolution No. 164's unstated purpose was to favor Electroperú.

[616] See ¶ 495 *supra*.

[617] See *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL, Partial Award, March 17, 2006 (CL-30), ¶ 307, relied upon in Memorial, ¶ 219; Reply, ¶ 399.

510.  <u>Second</u>, and perhaps more importantly, Claimants failed to make a conclusive showing that Resolution No. 164 had a discriminatory effect. The record indicates that the New Methodology negatively and positively affected both private and public companies.[618] Of the 5 public companies in the Peruvian electricity generation market, 4 saw their costs decrease, while 1 saw its costs increase. Similarly, of the 50 private companies in that market, 7 saw their costs decrease, 12 saw their costs increase, whereas 31 were not impacted at all. It is noteworthy that the percentage of public and private companies negatively impacted by Resolution No. 164 was similar (20% compared to 24%). This alone is sufficient to show that Resolution No. 164 was not discriminatory.

511.  The Tribunal is likewise unable to follow Claimants' argument that Resolution No. 164 was discriminatory because it entailed a considerable shift of costs from public to private generators, or because the 12 negatively impacted private companies provided in the aggregate the majority of Peru's total electricity output. Those effects appear to have been accidental consequences of the significant reshuffling of factors caused by the New Methodology. The Tribunal has found no evidence that such Methodology, which applied the same cost-apportioning criteria to all companies regardless of whether they were public or private, was inherently more detrimental for the latter or was designed to subject them to a more unfavorable treatment because of their status.

512.  In light of the above, the Tribunal determines that Claimants have not shown that Resolution No. 164 was discriminatory under the MST/FET standard enshrined in Article 10.5 of the Treaty.

*** 

513.  In conclusion, based on the analysis of Sections *i* and *ii* above, the Tribunal establishes that the adoption by Peru of Resolution No. 164 and of the New Methodology did not breach Article 10.5 of the Treaty and accordingly rejects the New Methodology Claim.

---

[618] Annex 1 to Claimants' Post-Hearing Brief; Respondent's Post-Hearing Brief, ¶¶ 189-201.

## VII. QUANTUM

514.    The Tribunal now turns to Claimants' request for damages. Claimants claim indemnification in the amount of US$ 110.7 million for the SFR Service Claim and US$ 84.6 million plus interest for the New Methodology Claim. Since only the SFR Service Claim has been upheld, the quantum analysis of this Section will be limited to Claimants' claim for damages under that head of claim.

### A.   Claimants' position

515.    Claimants allege that they are entitled to full reparation for the damages arising from Peru's Treaty breach, including damages arising from Kallpa GSA's lost cash flows due to Peru's reversal of its commitments through Resolution No. 141. Claimants and their experts (Mr. Santiago Dellepiane and Ms. Daniela M. Bambaci of BRG) assess these lost cash flows for the duration of the Commitment Act (August 2016 to July 2019).

516.    According to Claimants, the appropriate date for the valuation of their damages is November 24, 2017 ("**Valuation Date**"), which is the date at which they sold their investments in Peru and the two components of losses incurred by them crystallized.[619] Those components are:

(i)    the historic losses, consisting of the cash flows ("**Historic Losses**") that would have accrued to Kallpa GSA from the effective date of the Commitment Act (August 2016) until the Valuation Date that were lost as a consequence of Resolution No. 141; and

(ii)   the loss in the equity value of Claimants' interest in Kallpa GSA ("**Loss in Value**") as of the Valuation Date due to the depression of Kallpa GSA's projected lost cash flows as a consequence of Resolution No. 141 (December 2017 to July 2019).[620]

---

[619] These losses were allegedly not recovered through the sale price. Memorial, ¶¶ 264-265; Reply, ¶ 417.

[620] Memorial, ¶ 267; Reply, ¶ 418.

517.    BRG assesses the damages resulting from those losses by means of a simplified version of the Discounted Cash Flows ("**DCF**") model in which it only computes the difference in the cash flow components impacted by Resolution No. 141.[621]

518.    To compute Historic Losses, Claimants and their expert apply interest to bring the cash flows lost prior to the Valuation Date to their value as of such date. Similarly, to compute Loss in Value, they apply a discount rate to bring the projected lost cash flows to their value as of the Valuation Date. Then, they apply interest to the Historic Losses and Loss in Value from the Valuation Date to the date of the Award.[622]

519.    Claimants contest Respondent's three objections to their damages claim, i.e. the one based on the price of the sale of the Subsidiaries and on the actions of the purchaser of the Subsidiaries, and the one relating to the alleged flaws of BRG's damages calculations and the one concerning the application of the discount and interest rates. Claimants' arguments on each of these three objections are analyzed respectively in the following **Sections 1, 2** and **3**.

   **1.    The irrelevance to Claimants' damages of the sales price of the Subsidiaries and of Nautilus Inkia's actions**

520.    Claimants submit that Respondent's criticism of their damages claim based on the sales price of the Subsidiaries under the SPA and on Nautilus Inkia's post-acquisition actions is meritless.

521.    As to the sales price of the Subsidiaries, Claimants contest its relevance for the purposes of computing damages, as confirmed by the fact that it is not relied on by Respondent's expert.[623] They also deny having hidden such price, which is available on the SEC's website, averring that there was no specific price allocation for the sale of the Subsidiaries under the SPA because the price was a lump sum for the sale of all of Claimants' interests in Latin America and the Caribbean.[624] In any event,

---

[621] BRG used "*actual historical information until the November 2017 Valuation Date and forecasts based on available information and reasonable market expectations for the period from the Valuation Date onwards*". See Memorial, ¶¶ 269-272; Reply, ¶ 419.

[622] Reply, ¶ 507.

[623] Reply, ¶¶ 427-428.

[624] Reply, ¶ 429.

Claimants submit that it is clear from the SPA that they were not compensated for losses claimed in the arbitration.[625]

522.   In response to the assertion that Nautilus Inkia's post-acquisition actions suggest that the value of the Subsidiaries was unaffected by Resolution No. 141, Claimants note that conduct postdating the Valuation Date is irrelevant for computing damages, and that – in any event – Respondent's contentions are baseless. In particular,

(i)   Nautilus Inkia acknowledged the negative effect of Resolution No. 141 on the Subsidiaries because in Exhibit E of the SPA it agreed to make subsequent payments if Resolution No. 141 were reversed in such a way as to increase the post-closing cash flows;

(ii)   Nautilus Inkia's acquisition of the remaining minority interest in the Subsidiaries does not exclude that Claimants suffered a loss;

(iii)   Nautilus Inkia's bidding strategy in Peru's 2019 SFR tender is irrelevant as "Peru offered in connection with the 2019 tender different terms, conditions and economic incentives as compared to those offered in the 2016 tender".[626]

### 2.   The accuracy of BRG's damages calculations

523.   BRG assesses the impact of Resolution No. 141 on Kallpa GSA's cash flows, and thus calculates Historic Losses and Loss in Value, by comparing Kallpa GSA's cash flows in the following two scenarios:

- the first scenario ("**With Measures Scenario**") is the factual scenario affected by Resolution No. 141. In this scenario BRG observes the historic cash flow until the sale of the Subsidiaries to Nautilus Inkia, and projects the cash flows from December 2017 through July 2019, based on a simulation of the dispatch and spot prices in the projected period by *SIDEC – Sociedad Integrada de Consultoría* ("**SIDEC's Dispatch Model**").[627]

---

[625] Reply, ¶¶ 430-431, referring to Article 2.6 and Exhibit E of the SPA. See also Claimants' Post-Hearing Brief, ¶ 167.

[626] Reply, ¶¶ 432-434. See also Tr. Day 2, 380:9-407:6; Claimants' Post-Hearing Brief, ¶ 167.

[627] Memorial, ¶ 276; Reply, ¶ 441. In the projected period, BRG assumes that Kallpa and Las Flores would not be dispatched outside the Merit Order to provide the Firm Base Provision and that they would not declare their total fuel costs, but rather the supply portion of their gas costs.

- the second scenario ("**Without Measures Scenario**")[628] is the counterfactual scenario in the absence of Resolution No. 141. To calculate Kallpa GSA's cash flows in that scenario, BRG relies on SIDEC's Dispatch Model.[629]

524. BRG's damages calculations rest, *inter alia*, on the assumption that in the Without Measure Scenario: (*i*) Kallpa and Las Flores would have been dispatched on a continuous basis, even outside the Merit Order, in order to provide the SFR Firm Base Provision on a priority basis;[630] (*ii*) when dispatched outside the Merit Order, they would have received operating costs compensation ("**Operating Costs Compensation**", i.e. compensation for dispatch outside the Merit Order in an amount equal to the difference between the Declared Costs and the Spot Price);[631] (*iii*) throughout the period of the awarded SFR service, they would have declared annual costs equal to their total gas costs, as they would not have had to compete to enter the Merit Order to be dispatched.[632]

525. Based on a comparison between the cash flows in the With Measures Scenario and those in the Without Measures Scenario, BRG calculates the total amount of damages suffered by Claimants as a consequence of Resolution No. 141 at **US$ 110.7 million** as follows:

(i) foregone additional revenues from selling energy at the spot price, valued at **US$ 11.7 million**;

plus

(ii) foregone additional revenues due the lower SFR Operating Costs Compensation received by Kallpa and Las Flores because of less frequent dispatch outside the Merit Order under Resolution No. 141, valued at **US$ 306.6 million**;

less

---

[628] Memorial, ¶¶ 273-274; Reply, ¶¶ 438-439.

[629] Memorial, ¶ 275; Reply, ¶ 440.

[630] Memorial, ¶ 274(a); Reply, ¶ 439(a).

[631] *Ibid*. By contrast, Kallpa and Las Flores would have received compensation based on the Spot Price when dispatched within the Merit Order.

[632] Memorial, ¶ 274(b); Reply, ¶ 439(b).

(iii) additional SFR costs that would have been incurred by Kallpa, Las Flores and Cerro del Águila as generators in the spot market,[633] valued at **US$ 54.8 million**;

less

(iv) foregone additional SFR opportunity costs compensation (i.e. compensation for the electricity held back based on the difference between the Spot Price and Declared Costs) received by Kallpa and Las Flores in the amount of **US$ 1.99 million** for Kallpa and **US$ 0.01 million** for Las Flores;

less

(v) additional fuel costs that would have been incurred by Kallpa and Las Flores due to continuous dispatch, valued at **US$ 134.8 million**;

plus

(vi) Kallpa GSA's lower PPA provision costs, which would have led to savings in the Without Measure Scenario for **US$ 82.8 million**;

less

(vii) regulatory contributions and taxes[634] on the additional cash flows in the absence of Resolution No. 141 amounting to **US$ 61.7 million**.[635]

526. Claimants criticize Respondent's alternative reconstruction of damages alleging that Compass Lexecon' assumptions are erroneous for the following reasons.

527. First, Compass Lexecon ignores that, under PR-22, Kallpa GSA was entitled to be continuously dispatched.[636]

---

[633] In the Without Measure Scenario, Kallpa GSA would have earned additional operational costs compensation, which is borne by all generators in the market. The portion of these costs allocated to Kallpa GSA shall therefore be subtracted from damages.

[634] BRG considers a corporate tax rate of 28% for 2016 and 29.5% thereafter and contributions amounting to at most 1% of revenues.

[635] Memorial, ¶¶ 277-278; Reply, ¶ 442; CER-BRG II, Table 15. In the Memorial, Claimants quantify damages at US$ 113.8 million, that is Historical Losses for US$ 38.1 million and Loss of Value for US$ 75.8 million (Memorial, ¶¶ 279-280). Damages are then decreased by US$ 1.8 million in the Reply due to the computation of additional Without Measures gas distribution costs for Las Flores for US$3.6 million (see Reply, ¶¶ 469-470, 481) – which amount to US$ 3.6 million, and not US$ 0.5 million as calculated by Compass Lexecon –, and then by 1.3% due to an adjustment to Kallpa's Without Measure power generation and the consequent fuel costs adjustment (see Reply, ¶¶ 475, 481).

[636] Reply, ¶¶ 448-454.

528.   <u>Second</u>, it is not true that PR-22 does not provide for Operating Costs Compensation in case of dispatch of the SFR Firm Base Provider outside the Merit Order. Section 11.8 of PR-22 expressly provides that in such case generation units must be compensated for fuel costs "*beyond the marginal costs of the system*" pursuant to PR-33.[637] In turn, Section 7.1 of PR-33 refers to instances where units are dispatched "*for Operational Inflexibility […] or by order of the Coordinator, without establishing the SEIN Short-term Marginal Cost*". This is a reference to dispatch outside the Merit Order, as confirmed at the Hearing by Peru's expert Mr. Gutierrez.[638] According to the formula in Section 7.1.4 of PR-33, the compensation of those units is equal to "*the sum of energy delivered by the unit ('E') multiplied by the unit's variable cost ('CV'), minus the marginal cost ('Cmg')*", i.e. Operating Costs Compensation.[639] Further, according to Claimants, the applicability of the Operating Costs Compensation in case of dispatch of the SFR Firm Base Provider outside the Merit Order was confirmed by OSINERGMIN during the approval process of PR-22, as well as by Peru's legal expert, Ricardo Leyva, in the Uribe & Leyva SFR Report.[640] By contrast, Compass Lexecon's theory that Claimants would only be entitled to recoup "*incremental costs*" has no legal basis.[641] It is "*mistaken*", "*wholly inconsistent with Peruvian regulations*" and an "*outcome-determinative analysis*", as Compass Lexecon "*was determined to reach an outcome that yielded, in its terminology, 'direct losses' of zero and then worked backwards from there*".[642]

529.   Claimants also contest Respondent's allegation that, by declaring total fuel costs, Kallpa GSA was trying to game the system to receive windfall profit. Recouping the fuel costs associated with the energy injected in the system (including costs for transportation, supply, and distribution) cannot be characterized as a profit.[643]

---

[637] Reply, ¶¶ 455-456. Claimants' Post-Hearing Brief, ¶¶ 169-170, 175(b). The "operation without establishing the marginal cost" mentioned in Section 1.8 of PR-22 refers to circumstances where a generation unit is dispatched even if its variable costs are higher than the Spot Price.

[638] Claimants' Post-Hearing Brief, ¶ 177, referring to Tr. Day 5, 1008:8-12, 1014:11-21.

[639] Claimants' Post-Hearing Brief, ¶ 175(d).

[640] Reply, ¶ 457 and Claimants' Post-Hearing Brief, ¶ 176, referring to Response Report, March 2014, C-54, Section 2.1.11, comment 11, p. 5 (internal pagination 29), and Uribe & Leyva SFR Report, December 12, 2016, C-142, p. 7.

[641] Reply, ¶¶ 459-463; Claimants' Post-Hearing Brief, ¶ 171.

[642] Claimants' Post-Hearing Brief, ¶ 172.

[643] Reply, ¶¶ 464-465; Claimants' Post-Hearing Brief, ¶ 169.

530. Since Compass Lexecon conceded that "*if the formula in PR-33 applies, then BRG have applied it correctly*",[644] Claimants assert that "*if PR-33 applies (and it does), then the Tribunal can largely end its analysis there and adopt Claimants' position on damages*".[645]

531. Third, Claimants object to Compass Lexecon's argument that, in the Without Measures Scenario, Kallpa GSA would have been able to provide the Firm Base reserve at a lower cost by operating through Kallpa with two rather than three gas turbines. Indeed, Compass Lexecon ignores three factors that reduced Kallpa's available bandwidth and thus its ability to operate with two gas turbines over that period, namely that: (*i*) generators with an output higher than 10 MW must keep certain capacity in reserve to provide PFR; (*ii*) maximum capacity of a plant varies depending on the season (decreasing in summer periods); and (*iii*) although during the pre-qualification tests[646] Kallpa was authorized to use two gas turbines from September 2016 onward,[647] the SFR reserve committed by it during the relevant period exceeded the amount of energy that the plant could generate in that configuration.[648]

532. In the Reply, Claimants conceded that Kallpa GSA would have been able to provide the committed SFR reserve through Kallpa with two gas turbines from September 2016 to November 2016 and adjusted their damages calculations downwards accordingly.[649] BRG disagrees that this would have required SIDEC to modify its

---

[644] Tr. Day 7, 1330:16-1331:6. Further, Claimants note that Compass Lexecon has stated that "*it was taking a legal instruction from counsel on the issue of the non-application of PR-33 to Forced Dispatch under PR-22*" (see Claimants' Post-Hearing Brief, ¶ 185, referring to Tr. Day 7, 1341:2-1343:15; RER-CLEX II, ¶ 3.52).

[645] Claimants' Post-Hearing Brief, ¶ 173.

[646] According to Claimants' witness, Mr. Frisancho, these tests were mandatory for units providing SFR and were aimed at determining the regulation bandwidth and response characteristics of the units. The qualification tests carried out between June 22 and July 1, 2016 were only performed in a configuration with three gas turbines, so this was the only allowed configuration. In September 2016, Kallpa was qualified to provide SFR with two gas turbines and showed adequate response between a minimum capacity of 330 MW and a maximum capacity of 550 MW. Kallpa GSA stated that the minimum capacity should be 350 MW because otherwise Kallpa could fail to comply with the quality of service. COES accepted that and approved a regulation band for that configuration between a minimum capacity of 350 MW and a maximum capacity of 550 MW, for a total regulation band of 200 MW (CWS-Frisancho II, ¶¶ 27-31).

[647] Reply, ¶¶ 471-473. CWS-Frisancho II, Section II.

[648] Claimants' Post-Hearing Brief, fn. 275.

[649] Reply, ¶¶ 474-475. See also fn. 635 *supra*.

Dispatch Model in the but-for scenario. BRG contests Compass Lexecon's argument that the reduction of Kallpa's generation capacity due to the use of two rather than three gas turbines necessarily impacted the Spot Price projected in the Model as a result of the entrance into the Merit Order of an additional generator to replace Kallpa's but-for dispatch reduction. In particular, BRG notes that, while the change in Kallpa's configuration over a three-month period may have impacted the Spot Price, the resulting change to Claimants' damages estimate would only have been "*inconsequential*",[650] given that: (*i*) it would only relate to a three months period out of the three years of validity of the Commitment Act, and (*ii*) it "*would only mean that either the marginal plant would expand its generation or a new thermal plant would come into the Economic Dispatch and the difference in costs would be small*".[651]

533.  Fourth, Claimants assert that Compass Lexecon's conclusion that there is no causal link between Respondent's alleged breach and Claimants' "*indirect losses*" (calculated by Compass Lexecon at US$ 36.7 million)[652] "*is premised on a blatant misapplication of the standard of compensation*".[653] That is because causation must be determined not with regard to the circumstances that would have persisted "but for" Claimants' participation in the Tender (as Compass Lexecon does), but rather to the circumstances that would have persisted but for the adoption of Resolution No. 141.[654] In fact, Claimants emphasize that at the Hearing Compass Lexecon could not recall having asked for any instruction on the applicable legal standard for

---

[650] CER-BRG II, ¶ 54.

[651] Tr. Day 6, pp. 1223:10 – 1229:21. This was confirmed by Mr. Torres (Electricity Market Specialist of SIDEC) (see Tr. Day 6, p. 1139:2-1140:4: "*Possibly there will be an impact that no – but in reality it shouldn't be significant.  If we were to simulate in a 2x1, we are talking about 100 megawatts and taking into account that the Peruvian market is mostly comprised of thermal gas plants, then the marginal should not differ that much.* [...] *It's intuitive because the Peruvian electricity market is basically gas thermal plants with different performances, with very similar variable costs, and the next plant-- If a gas plant does not enter, the next plant that would set the marginal cost and that would fix the price is a diesel, which is currently not supplying because there is oversupply.  Then, it will jump from a marginal cost and a thermal plant X to a thermal plant Y with a very similar variable cost.  So it's intuitive, but logically a simulation would probably back up what I've just explained*".

[652] The category of "indirect losses" identified by Compass Lexecon includes the following heads of damages identified by BRG: the additional revenues for Cerro del Águila from the spot market, savings in PPA provision costs and increase in SFR costs (Reply, ¶ 443(b)).

[653] Claimants' Post-Hearing Brief, ¶¶ 187-188.

[654] Claimants' Post-Hearing Brief, ¶ 190.

compensation[655] and admitted that if it were given a proper instruction it would have to reconsider its analysis.[656] Therefore, according to Claimants, Compass Lexecon's "*overall approach in the present case is inconsistent with the applicable standard of compensation and its analysis must be dismissed by the Tribunal*".[657]

### 3. The applicable interest and discount rates

534. Claimants submit that the applicable interest rate to update Historic Losses to the Valuation Date and to compute pre-award interest is the weighted average cost of capital applicable to Claimants' investments in the electricity sector in Peru (the "**WACC**") estimated at 5.56% in accordance with the International Capital Asset Pricing Model.[658]

535. Claimants explain that the reason they rely on the WACC is that it "*represents the minimum required return of an investor who, funded by both debt and equity, invests in the Peruvian power sector*"[659] and is thus the only rate that would fully compensate them for "*the opportunity cost of having been deprived of the funds in question*" in accordance with the principle of full reparation. Claimants note that the focus on the investor's opportunity cost has been endorsed in investment cases such as *Vivendi v. Argentina*,[660] *France Telecom v. Lebanon*[661] and *SAUR v Argentina*,[662] as well as in the *ConocoPhillips v. PDVSA* contractual dispute.[663]

---

[655] Claimants' Post-Hearing Brief, ¶ 191, referring to Tr. Day 7, 1321:10-11

[656] Claimants' Post-Hearing Brief, ¶ 191, referring to Tr. Day 7, 1326:17-1327:12.

[657] Claimants' Post-Hearing Brief, ¶ 193.

[658] Memorial, ¶ 297; Reply, ¶ 520.

[659] Reply, ¶ 520, quoting CER-BRG II, ¶ 113. Claimants criticize Compass Lexecon's approach to computing the interest rate by reference to Peru's cost of debt, as it does not compensate Claimants' opportunity costs (Reply, ¶¶ 521-522).

[660] *Vivendi v. Argentina*, ¶ 9.2.3, quoted in Memorial, ¶ 297; Reply, ¶¶ 516-517.

[661] *France Telecom Mobile International, S.A. FTML, S.A.L. v. Lebanese Republic*, UNCITRAL, Award, January 31, 2005 (CL-113), ¶ 209, quoted in Reply, ¶ 517.

[662] *SAUR International v. Argentine Republic*, ICSID Case No. ARB/04/4, Decision on Jurisdiction and Liability, June 6, 2012 (CL-77), ¶¶ 296-298, 430, quoted in Reply, ¶ 519.

[663] *Phillips Petroleum Company Venezuela Limited and Conocophillips Petrozuata B.V. v. Petróleos de Venezuela, S.A., Corpoguanipa, S.A. and PDVSA Petróleo, S.A. (PDVSA)*, ICC Case No. 16848/JRF/CA (C-16849/JRF), Award, September 17, 2012 (CL-131), ¶¶ 294–307, quoted in Reply, ¶ 518.

536.    BRG's WACC of 5.56% is based on:

(i)   a risk-free rate accounting for the time value of money of 2.24%, based on the 12-month average return on a 10-year US Treasury bond;

(ii)  a market risk premium (i.e. the difference between the expected rate of return on the "market portfolio" and the risk-free rate) of 4.77%;

(iii) a beta coefficient, which measures a security's exposure to general market risk and weights the market risk premium, of 0.64;

(iv)  a country risk premium (i.e. the incremental return demanded by investors for an investment in a country or location where the investment is exposed to greater risk than would be the case in a more stable economy) of 173 basis points (1.73%), calculated on the basis of the average monthly spread over the five years prior to the Valuation Date.[664]

537.    According to Claimants, Compass Lexecon's approach on interest should be rejected because it runs afoul of the principle "*that full compensation requires an award of interest that compensates the Claimants for their opportunity cost*".[665] As Claimants invested in power generating projects in Peru and the WACC is the return they would have demanded on such investment, the WACC is "*the best reflection of the Claimants' lost opportunity cost for having been deprived of the damages that are owing to them*".[666]

538.    Claimants submit that a WACC of 5.56% is also the appropriate discount rate to bring future expected cash flows to the Valuation Date in order to calculate the Loss in Value.[667] According to them, that is the most suitable rate for the risk profile of Kallpa GSA's cash flows because it factors in the cost of equity, the cost of debt and the country risk premium in Peru to which Kallpa GSA is exposed.[668]

---

[664] Memorial, ¶ 291; CER-BRG, Appendix D, ¶¶ 234-248.

[665] Reply, ¶ 522, relying on CER-BRG II, ¶ 128.

[666] *Ibid*.

[667] Memorial, ¶¶ 289-290; Reply, ¶¶ 510-511.

[668] Reply, ¶¶ 510-511.

539.    Claimants suggest that Compass Lexecon's calculation of the discount rate only by reference to the cost of equity is "*methodologically unsound*", as it does not consider the risks inherent to Kallpa GSA's operations in Peru.[669]

**B.    Respondent's position**

540.    As noted above, Respondent's primary position is that Claimants suffered no damages as a consequence of the issuance of Resolution No. 141.

541.    In its submissions, Respondent provides a different breakdown of Claimants' asserted damages from the one put forward by Claimants and their expert. Indeed, Compass Lexecon classifies Claimants' alleged damages into three components:

   (i)    losses purportedly incurred as a direct result of the alleged breach ("**Direct Losses**", comprised by "*losses when force dispatched in the But-For scenario*" and "*losses when economically dispatched in the But-For scenario*");

   (ii)    losses arising from the effects of the alleged breach on the Peruvian electricity market and on Claimants' economic activities ("**Indirect Losses**", comprised of "*additional revenues of Cerro del Águila from the spot market*", "*savings in PPA provision costs*" and "*increase in SFR costs*");

   (iii)    taxes and regulatory contributions.[670]

542.    Respondent advances the following three main arguments to contest Claimants' damages claim: first, Claimants failed to demonstrate that they suffered any damages, because they did not disclose the price at which they sold the Subsidiaries to Nautilus Inkia, whose post-acquisition actions confirm that no damages were incurred (**Section VII.B.1**); second,  the assumptions and results of BRG's damages calculations are inaccurate (**Section VII.B.2**); third, BRG's discount and interest rates are wrong (**Section VII.B.3**).

---

[669] Reply, ¶¶ 512-513. Further, Compass Lexecon makes a number of errors in computing the cost of equity (Reply, ¶ 514).

[670] Rejoinder, ¶ 575.

## 1. The relevance to Claimants' damages of the sales price of the Subsidiaries and of Nautilus Inkia's actions

543. Respondent asserts that Claimants failed to demonstrate that they suffered any damages[671] first of all because they refused to submit the sale price of the Subsidiaries, which is critical to assess whether they actually suffered damages and are seeking double recovery.[672] Respondent argues that "*the SPA almost certainly breaks down the price the buyers paid for each individual company, presumably including for Kallpa GSA and Samay*",[673] but, as recognized by Claimants, the copy of the SPA on the SEC website does not contain such information.[674] Thus, Respondent requests the Tribunal to draw adverse inferences regarding the sales price of the Subsidiaries and find that Claimants did not suffer any damages and/or are seeking double recovery for their allegedly harmed investments.[675]

544. Respondent then highlights that Nautilus Inkia: (*i*) bought out the remaining minority shareholders' 21.5% stake in the Subsidiaries; (*ii*) bid zero Soles as remuneration for reserve capacity payments related to the Firm Base Provision of the SFR service in 2019; and (*iii*) won the tender and has been providing SFR services since 2019.[676] According to Respondent, this means that the legal environment in Peru was not adverse to Claimants' investments and that Nautilus Inkia "*held the same*

---

[671] Rejoinder, ¶ 550.

[672] Rejoinder, ¶¶ 551, 556, 563-566. According to Respondent, Article 2.6 and Exhibit E of the SPA do "*not prove that the seller was not compensated for the damages that it seeks in this arbitration, nor [...] that the seller took a price reduction in order to retain those claims. It simply means that, inter alia, the new purchaser has no claim on whatever damages Claimants might receive*" (Rejoinder, ¶ 557).

[673] Rejoinder, ¶ 554, relying on Article 2.7 of the SPA, according to which "*The Parties agree that the values set across from the Acquired Companies and Subsidiaries listed on Schedule 2.7 represent the fair values attributable to such companies in connection with the transactions contemplated by this Agreement.*"

[674] Instead, it contains "*a composite, lump sum figure for all of the Claimants' interests that were sold under the Share Purchase Agreement, across Latin America and the Caribbean (not just Perú)*" (see Reply, ¶ 429).

[675] Rejoinder, ¶ 555.

[676] Contrary to what is asserted by Claimants, the differences between the 2016 and 2019 tenders are insufficient to explain the identical bidding strategies. In fact, (i) while lower maximum capacity amount in 2019 indicates lower revenues for the SFR Firm Base Provider, this does not justify a bidder offering to provide SFR Firm Base services for free —in fact, just the opposite would be expected—; and (ii) although spot market prices were lower on average in 2019 than in 2016, this would not impact a tenderer's behaviour, as spot market prices are not taken into consideration when compensating Firm Base Providers for the SFR services (Rejoinder, ¶ 569).

*expectations as Claimants held prior to Resolution No 141—and that those expectations were not based on a guarantee of forced dispatch".[677]*

545. On this point, Respondent contests that the negative effects of the measures at issue were acknowledged by the purchaser in Exhibit E of the SPA since, according to it, that exhibit does not take a position on whether Claimants suffered damages and is not specific to Claimants' Claims. Rather, Exhibit E evidences that Nautilus Inkia "*agreed to compensate Claimants if Perú's regulations were to change in the near future to the financial advantage of the power plants in Perú".[678]*

546. Further, Respondent alleges that Exhibit E, and in particular the purchaser's willingness to give Claimants 70%-100% of any increase in profits resulting from a change in the measures of any kind, suggests that the purchaser must have considered that the assets were sufficiently profitable even without this increase.[679] This is confirmed by Nautilus Inkia's subsequent investments in the Subsidiaries.[680] The considerable overlap between Claimants' and Nautilus Inkia' financial and management teams further shows "*that Claimants do not truly believe that the measures were debilitating to their business".[681]*

### 2. The accuracy of BRG's damages calculations

547. Respondent contends in any event that BRG's damages calculations are inaccurate for the following reasons.

548. <u>First</u>, those calculations rest on the flawed assumption that PR-22 guaranteed the dispatch of the Kallpa and Las Flores generation units even when they were not in the Merit Order.

---

[677] Rejoinder, ¶ 560. As for Claimants' argument that the purchaser's post-acquisition actions are not relevant for computing damages, Respondent asserts that such actions are relevant for determining whether Claimants suffered any damages in the first place (Rejoinder, ¶ 561).

[678] Rejoinder, ¶¶ 563-564. Respondent argues that "*if Exhibit E were related to Claimants' investment arbitration claims as Claimants suggest, then Claimants would indeed be attempting to obtain double recovery*" (Rejoinder, ¶ 565).

[679] Rejoinder, ¶ 566.

[680] Rejoinder, ¶ 567.

[681] Rejoinder, ¶ 568.

549.  <u>Second</u>, even assuming that PR-22 guaranteed the continuous dispatch of the SFR Firm Base Provider, Claimants' plants would not have been entitled to receive Operating Costs Compensation in case of dispatch outside the Merit Order.[682] Indeed, Annex IV of PR-22, which deals with the compensation of SFR providers, does not mention Operating Costs Compensation.[683] Hence, this component of Direct Losses amounts to nil.[684]

550.  Contrary to Claimants' (and BRG's) assumption, PR-33 does not contemplate a compensation mechanism for SFR providers dispatched outside the Merit Order.[685] Section 7.1 of PR-33 has nothing to do with the compensation of plants that are continuously dispatched. Rather it deals with "[c]*ompensation for Operational Inflexibility*", i.e. for costs incurred by a plant for the period of time that it is "*obliged to operate because of technological limitations*",[686] whether it is dispatched per the economic dispatch or "*by order of the Coordinator, without establishing the SEIN Short-Term Marginal Cost.*"[687] This is confirmed by the fact that Section 7.1.4 of PR-33 only provides one formula to calculate compensation for operational inflexibility, regardless of whether it is caused by economic or continuous dispatch.[688]

551.  Claimants' argument on the applicability of the Operating Costs Compensation under PR-33 is also undermined by the fact that – contrary to PR-22 – PR-33 is limited to a particular technology (i.e. that of thermal plants). As many hydro plants participated in the Tender, it "*would not make sense for PR-22 to set out the compensation*

---

[682] Rejoinder, ¶ 576.

[683] Respondent's Post-Hearing Brief, ¶ 105.

[684] Rejoinder, ¶ 579. BRG's corrections in its second report related to (*i*) failure to account for losses of revenue that included compensation for certain costs relating to gas transport and distribution incurred by the Las Flores plant, and (*ii*) the configuration at which Kallpa could have operated, are incomplete and do not detract from the fact that losses when force dispatched in the But-For scenario amount to 0 (Rejoinder, ¶ 580).

[685] Rejoinder, ¶ 577. Respondent observes that even "*if Perú had created a mechanism to provide compensation in the event of forced dispatch under PR-22, then, in accordance with the principles of economic regulation in Perú, Perú would have limited any such compensation to the exact incremental costs that a generator incurred as a result of such forced dispatch*" (Rejoinder, ¶ 578).

[686] Respondent's Post-Hearing Brief, ¶ 26.

[687] Respondent's Post-Hearing Brief, ¶ 27. Further, this compensation necessarily refers to voltage and safety operations, as they are the only operations that occur outside the economic dispatch (Respondent's Post-Hearing Brief, ¶ 29).

[688] Respondent's Post-Hearing Brief, ¶ 30.

*mechanisms for the SFR Firm Provider that could include hydro plants in a separate Technical Procedure (PR-33) that on its face is limited to thermal plants*".[689]

552.    Respondent also denies that in the but-for scenario Claimants would have received Operating Costs Compensation for costs not caused by providing the SFR service, such as fuel transportation and distribution costs "*that they would have incurred in any event under their fixed transportation and distribution contracts, regardless of whether or not they were the SFR Firm Base Provider*". That is because Operating Costs Compensation under Peruvian regulations is aimed at compensating for costs incurred by a generator to provide the relevant service and such costs would therefore not have been actual "*operating costs*" related to Claimants' provision of SFR service.[690]

553.    The exclusion of Operating Costs Compensation not only affects the quantification of Direct Losses, but also requires adjustments to certain alleged Indirect Losses and to the taxes and regulatory contributions included in BRG's damages calculation.[691] Compass Lexecon estimates that this correction reduces Claimants' alleged losses consequent to Resolution No. 141 to at most US$ 16.5 million.[692]

554.    <u>Third</u>, Respondent contends that, even if PR-22 could be interpreted as Claimants do, BRG grossly overstates the amount of damages.[693] For instance, notwithstanding BRG's concession that Kallpa GSA could have provided the committed SFR reserve through Kallpa with two gas turbines from September to November 2016, SIDEC did not update its Dispatch Model, which assumed that Kallpa GSA could only meet the committed SFR reserve with three gas turbines.[694] According to Respondent, "*Mr. Torres also conceded that any other changes to the underlying assumptions of SIDEC's*

---

[689] Respondent's Post-Hearing Brief, ¶ 30.

[690] Respondent's Post-Hearing Brief, ¶ 106. See also Counter-Memorial, ¶¶ 323-325.

[691] For instance, Respondent notes that "*if Kallpa GSA would not have received Operating Costs Compensation in case of forced dispatch under PR-22, then it would not have had to pay taxes on such compensation.*"

[692] Rejoinder, ¶ 586. Direct Losses for − US$5.3 million, Indirect Losses for US$36.7 million, taxes and regulatory contributions for − US$9.3 million, leading to losses to Kallpa GSA for US$22 million and to Claimants for US$16.5 million.

[693] Rejoinder, ¶ 574.

[694] Respondent's Post-Hearing Brief, ¶ 103.

*dispatch models would affect the outputs of those models*",[695] from which it would follow that after BRG's concession such model and BRG's damages calculations are no longer reliable.[696] Additionally, according to Respondent, Kallpa could have operated with two gas turbines for 12 additional months beyond November 2016, thus further reducing the damages.[697] Indeed, while Claimants argue that the authorized regulation band in a two gas turbines configuration was set at 200 MW (therefore insufficient for Kallpa GSA to provide the committed SFR reserve), Compass Lexecon explains that "*the technical tests run on Kallpa showed that it was technically feasible for the unit to provide up to 220 MW of reserve with a 2x1 configuration and that the limit of 200 MW was set at Kallpa GSA's reque*st".[698]

555.   Fourth, Respondent argues that there is no causal connection between its alleged breach and Claimants' Indirect Losses for the knock-on effects on the market of Resolution No. 141 (such as lower revenues due to the decrease of spot market prices). According to it, even assuming that Resolution No. 141 retroactively modified PR-22, Claimants would have suffered the said losses even if Kallpa GSA had not participated in the Tender. Thus, "*those damages cannot be said to arise out of Claimants' claimed 'investments' in participating in, or winning, the tender or the resulting Commitment Act*".[699]

### 3.    The applicable interest and discount rates

556.   As to the applicable interest rate to carry forward historical cash flows to the Valuation Date and calculate Historical Losses, Respondent and Compass Lexecon contend that it is the host State's cost of debt ("**CoD**"), because Claimants' alleged losses correspond to a loan they were forced to grant Peru.[700]

557.   Respondent asserts that using the WACC as the interest rate would overcompensate Claimants, by accounting for "*risks inherent in Claimants' activities that determine*

---

[695] *Ibid*.

[696] *Ibid*.

[697] Rejoinder, ¶ 580.

[698] RER-CLEX II, ¶ 3.61.

[699] Respondent's Post-Hearing Brief, ¶ 104. See also Counter-Memorial, ¶ 315.

[700] Counter-Memorial, ¶ 337; Rejoinder, ¶ 596.

*Claimants' cost of financing, but that Claimants did not actually bear*".[701] In fact, since historical losses in an investor-State arbitration are akin to a forced loan from Claimants to Respondent, Claimants are only entitled to be compensated for Peru's risk of default, which is captured by the CoD.[702] Respondent asserts that this economic theory is supported by investment decisions, such as *PSEG v. Turkey*[703] and *Total S.A. v. Argentina*,[704] and by decisions of U.S. courts.[705]

558.    Applying Peru's CoD (calculated on a monthly basis during the period of Claimants' historical losses) to carry forward historical losses to the Valuation Date, the damages amount to US$ 16.5 million.[706]

559.    As to the discount rate to bring future lost cash flows back to the Valuation Date and calculate the Loss in Value, according to Respondent and Compass Lexecon the applicable rate is not the WACC, but rather one of its components, Claimants' cost of equity ("**CoE**"). That is because the assumption underlying BRG's damages assessment is that all future cash flow would have gone to Kallpa GSA's equity holders, and none to its debtholders. Therefore, those cash flows must be discounted at the CoE rate, which reflects the risks associated therewith.[707] By contrast, the WACC "*reflects the lower risk of the entire company (rather than the risk perceived by its equity holders)*", and thus inflates Claimants' damage claim.[708]

560.    Compass Lexecon adds that Claimants' CoE is not 7.02%, as calculated by BRG, but 7.53%.[709] Applying this CoE, the damages relating to the SFR Service Claim are reduced to US$ 16.3 million.[710]

---

[701] Counter-Memorial, ¶ 338. See also Rejoinder, ¶ 597.

[702] Rejoinder, ¶ 597.

[703] *PSEG v. Turkey*, ¶¶ 341-345.

[704] *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Award, November 27, 2013 (RL-59), ¶ 245.

[705] *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431 (7th Cir. 1989) (RL-57), p. 4; *Matter of Oil Spill by the Amoco Cadiz*, 954 F.2d 1279 (7th Cir. 1992) (RL-58), p. 46.

[706] RER-CLEX II, ¶ 7.6.

[707] Counter-Memorial, ¶¶ 340-341; Rejoinder, ¶ 605.

[708] Rejoinder, ¶ 605.

[709] Counter-Memorial, ¶ 342. Compass Lexecon objects to the criticisms raised by BRG in relation to this calculation (see Rejoinder, ¶¶ 606-609).

[710] RER-CLEX II, ¶ 7.6.

561.    Finally, and for the reasons identified above, according to Respondent and Compass Lexecon, the WACC is not appropriate to calculate pre-award interest. Instead, under the "forced loan theory", according to them, pre-award interest should be calculated based on Peru's CoD for the period between the Valuation Date and the assumed date of the Award (i.e. 3.43%).[711]

562.    Applying the interest and discount rates used by Compass Lexecon, Respondent concludes that damages suffered by Claimants in respect of the SFR Service Claim would amount at most to US$ 16.3 million.[712]

## C.   The Tribunal's decision

563.    In respect of the SFR Service Claim, with the support of BRG's expert testimony Claimants submit that, as a consequence of Resolution No. 141, they suffered damages for a total amount of US$ 110.7 million, plus pre-award and post-award interest at a rate of 5.56% per annum, equal to Kallpa GSA's WACC.

564.    The Tribunal will consider Claimants' damages claim addressing Respondent's three main defenses, i.e. the preliminary one based on the SPA and on the post-acquisition actions of Nautilus Inkia (**Section VII.C.1**), the one based on the defects of BRG's damages calculations (**Section VII.C.2**), and the one regarding the applicable pre-award interest rate (**Section VII.C.3**).

565.    The Tribunal's analysis and decision on the quantum of the SFR Service Claim is premised on the Tribunal's following two findings on the merits of that Claim:

(i)    the Bid Terms guaranteed to the winner of the Tender (i.e. Kallpa GSA) the continuous dispatch of energy to provide the SFR service, irrespective of its units' inclusion in the Merit Order (see Section VI.B.3i); and

(ii)   Resolution No. 141 altered this framework in a manifestly arbitrary manner in breach of Article 10.5 of the Treaty (see Section VI.B.3ii).

---

[711] RER-CLEX II, ¶ 8.1.

[712] Counter-Memorial, ¶¶ 344-345; Rejoinder, ¶ 611.

### 1. *The relevance for the assessment of Claimants' damages of the sales price of the Subsidiaries and of Nautilus Inkia's actions*

566. Respondent's preliminary defense on quantum is that Claimants suffered no damages, as would be demonstrated by the price they received from Nautilus Inkia for the transfer of their interests in the Subsidiaries and by Nautilus Inkia's actions after the acquisition.

567. Respondent asks the Tribunal to draw negative inferences from Claimants' failure to disclose the sale price of the Subsidiaries which, according to it, is necessary to assess whether Claimants have already been compensated for the loss they allege having suffered and are therefore seeking double recovery.

568. In the Tribunal's view, there is no basis for such a request.

569. First, contrary to Respondent's assertion, there is no indication that the sales price set out in the SPA identified the portion attributable to "*each individual company, presumably including for Kallpa GSA and Samay*".[713] Indeed, while Article 2.7 of the SPA provides that the parties ascribed specific values to "*the Acquired Companies and Subsidiaries*", the relevant purchase price allocation information in the version of the SPA submitted by Claimants on December 18, 2021[714] shows that there was no agreed purchase price for the Subsidiaries.[715]

570. In any case, it can be inferred from the SPA that Claimants were not compensated for the damages they seek in this arbitration and did not accept a price reduction in order to retain their claims thereto. That emerges clearly from the following provisions:

- Section 2.6, which provides that:

  The Parties agree that IC Power Ltd. retains all rights it currently has in relation to the Investment Treaty Claims and there shall be no effect on such rights by virtue of this Agreement. For the avoidance of doubt, the Parties expressly acknowledge that this Agreement is being made without prejudice to IC

---

[713] Rejoinder, ¶ 554.

[714] Exhibit C-218 attached to the letter from Freshfields (Mr. Rovinescu) to ICSID (Mr. Montañés-Rumayor), December 18, 2021.

[715] C-218, p. 129. Indeed, the SPA only records the purchase price allocated to a minimal part of the assets sold by the Claimants (not related to the Subsidiaries), so that the price allocated to the Subsidiaries cannot be identified.

Power Ltd. receiving whatever redress is possible from an arbitration tribunal for its Investment Treaty Claims.

- Section 2.4(a) of Exhibit E which provides that:

  If the Secondary Frequency Regulation is amended, supplemented, modified, annulled, rescinded or revoked prior to September 30, 2019, and this results in a cash award or payment being paid to Kallpa or Samay, Buyer 1 shall pay, or cause to be paid, in cash, as promptly as practicable but in no event later than five (5) Business Days after receipt of such payment by Kallpa or Samay, as applicable, to Seller 1 an amount equal to such cash award or payment received by Kallpa or Samay, as applicable. […].

571. The Tribunal concurs with Claimants that these provisions would make no sense if Claimants had already been compensated for the damages arising from Resolution No. 141. Indeed, the SPA provides that Nautilus Inkia would make an additional payment to Claimants if Nautilus Inkia or the Subsidiaries were to receive any amount as a result of events listed in Section 2.4(a) of Exhibit E.[716] If the buyer had already compensated Claimants for the loss, it would not have undertaken to make such payment.

572. Therefore, the Tribunal concludes that the sale price of the Subsidiaries (even if it were quantified) is not relevant for assessing the existence of damages and excluding the risk of double recovery and that no negative inferences are to be drawn from its alleged non-disclosure.

573. Likewise, the Tribunal disagrees that Nautilus Inkia's post-acquisition actions have any bearing on whether Claimants actually suffered damages.

574. The Tribunal understands that Respondent considers Nautilus Inkia's decisions relevant not for the calculation of the amount of damages, but rather for the purpose of determining whether Claimants actually suffered damages.[717] If this is so, the case-law cited to by the Parties on the relevance of circumstances postdating the valuation date for the precise computation of damages[718] is of little relevance for the Tribunal's decision.

---

[716] The Tribunal does not see the risk of double recovery that according to Respondent would follow from such an interpretation of Section 2.4 of Exhibit E (Rejoinder, ¶ 565). In fact, according to that provision, additional payment to the seller is only due when a sum is paid post-acquisition to Kallpa or Samay or Nautilus Inkia itself and thus would not be triggered by an award of damages to Claimants by this Tribunal.

[717] Rejoinder, ¶ 561.

[718] Reply, ¶ 433; Rejoinder, ¶ 562.

575. In the present case, in the Tribunal's opinion it is irrelevant that Nautilus Inkia made further investments in Peru, pursued the same strategy as Kallpa GSA in a bid to provide the Firm Base of SFR in 2019 and won the tender. Even leaving aside that the conditions of the new tender – which was conducted in a different market situation – were different from those of the Tender, it remains a fact that Kallpa GSA was guaranteed continuous dispatch of its units under the Bid Terms and that this framework was altered in a manifestly arbitrary manner by Resolution No. 141, which resulted in lost cash flows and a diminution in the value of equity for Claimants. Even assuming that, as Respondent suggests,[719] the Subsidiaries remained a profitable venture after Resolution No. 141, yet they were not as profitable as they would have been without such Resolution (put otherwise, the profitability of the Subsidiaries is not incompatible with Claimants having suffered a loss). This is dispositive of Respondent's defense.

576. Moreover, Respondent itself seems to suggest that Nautilus Inkia's decisions would merely demonstrate that Kallpa GSA could not entertain legitimate expectations of guaranteed dispatch[720] and that Peru's legal environment was not unfavorable for Claimants.[721] However, these elements are irrelevant for a claim for damages for breach of Respondent's obligation to abstain from manifestly arbitrary conduct.

577. Therefore, Respondent's preliminary defenses to Claimants' claim for damages are rejected.

### 2. The accuracy of BRG's damages calculations

578. As noted above, Claimants' expert submits that the loss suffered by Claimants as a result of Resolution No. 141 consists of two components of the damages: (*i*) Historic Losses, consisting of actual lost cash flows to Kallpa GSA and (*ii*) Loss in Value of Claimants' interest in Kallpa GSA due to the depression of the company's lost projected cash flows as a consequence of Resolution No. 141 for the duration of the three-year term of the Commitment Act.[722] To calculate the Historic Losses and the

---

[719] Rejoinder, ¶¶ 552, 561, 566, 567.

[720] Rejoinder, ¶¶ 560, 571.

[721] Rejoinder, ¶ 560.

[722] See *supra*, ¶ 516. By contrast, Compass Lexecon (Respondent's damages expert) breaks down Claimants' asserted damages in Direct and Indirect Losses. The divergence in damages qualification,

Loss of Value BRG applies respectively (*i*) interest equal to a WACC of 5.56% to bring the cash flows lost prior to the Valuation Date to their value as of such date and (*ii*) a discount rate equal to a WACC of 5.56% to bring the projected cash flows to their value as of the Valuation Date. BRG comes to the conclusion that Claimants' damages amount to US$ 110.7 million, to which pre- and post-award interest must be added. Respondent disagrees with this calculation, submitting that Claimants did not suffer any damages or, alternatively, that their alleged losses amount at most to US$ 16.5 million.[723]

579.    In this section, the Tribunal will analyze Respondent's and Compass Lexecon's four main criticisms of BRG's damages calculation, which are based respectively on:

(i)   the non-applicability of Operating Costs Compensation of PR-33 to the dispatch of the Firm Base Provider outside the Merit Order;

(ii)  Kallpa GSA's alleged ability to meet the committed SFR reserve through Kallpa with two, instead of three, gas turbines and its impact on SIDEC's Dispatch Model;

(iii) the asserted lack of causal link between Respondent's breach and Claimants' so-called "indirect damages" (i.e. Resolution No. 141's knock-on effects on spot prices); and

(iv)  BRG's use of an incorrect interest rate and an incorrect discount rate to calculate the Historic Losses and Loss in Value.

### i.    The applicability of the Operating Costs Compensation

580.    The first issue that the Tribunal must determine in order to establish the quantum of Claimants' losses is whether the Operating Costs Compensation foreseen by PR-33 – in an amount equal to the difference between Declared Costs and the Spot Price, which is "*the predominant driver*" of Claimants' asserted damages[724] – would have been due to Kallpa GSA, had its units been dispatched outside the Merit Order to provide the SFR service. Indeed, Claimants' damages calculation is premised on the

---

however, is simply "*a different way of looking at* [the computation of damages]", as confirmed by Respondent's expert at the Hearing (Tr. Day 7, 1314:13-17).

[723] See *supra*, ¶ 553.

[724] Claimants' Post-Hearing Brief, ¶ 166.

applicability of PR-33 to Kallpa GSA by virtue of the cross-reference to PR-33 in Section 11.8 of PR-22. Respondent's criticism of BRG's damages calculations is in large part based on the non-applicability of Operating Costs Compensation, as demonstrated by Compass Lexecon's statement at the Hearing that

> if the Tribunal finds that PR 33 applies, then the remaining issues on the direct damages are the issues […] of three versus two turbines and the issue of the SIDEC Simulations, but there's no argument. If the formula in PR-33 applies, then BRG have applied it correctly.[725]

581. The Tribunal concurs with Claimants that the Operating Costs Compensation under PR-33 was applicable to Kallpa GSA in case of dispatch outside the Merit Order.

582. As held in ¶ 403 above, Section 11.8 of PR-22 provides that PR-33 applies to compensate Firm Base Providers dispatched outside the Merit Order ("*without establishing the marginal cost*") to provide the SFR reserve ("*for compliance of the reserve*"). Of the various compensation mechanisms set out in PR-33,[726] the only one that may apply by virtue of the cross-reference in Section 11.8 of PR-22 is that of Section 7.1.4,[727] which provides for Operating Costs Compensation[728] of thermal plants experiencing operational inflexibility. Indeed, Section 7.1.4 is the only provision of PR-33 dealing with the compensation of units operating "*without establishing the marginal cost*", i.e. outside the Merit Order, like the SFR Firm Base Provider. Therefore, in light of the said cross-reference, the Tribunal concurs with Claimants that PR-33's Operating Costs Compensation mechanism would have been applicable to the Firm Base Provider when dispatched outside the Merit Order.

---

[725] Tr. Day 7, 1330:16-1331:6.

[726] As established by Section 7.1 of PR-33 (C-57), different formula are provided to compensate (*i*) "*the costs of startup – shutdown and Low Upwards and Downwards Ramping Efficiency in Generation*"; (*ii*) "*startup – shutdown maintenance costs*"; (*iii*) "*the Cost of Additional Fuel Consumption in the Upwards and Downwards Generation Ramp*"; and (*iv*) "*for Operational Inflexibility originating from compliance with the Daily Operational Program (PDO) or by order of the Coordinator, without establishing the SEIN Short-Term Marginal Cost*".

[727] This is the "*Compensation for Operational Inflexibility originating from compliance with the Daily Operational Program (PDO) or by order of the Coordinator, without establishing the SEIN Short-Term Marginal Cost*".

[728] Pursuant to Section 7.1.4, that is "*Energy delivered by the Thermal Generation Unit in each q of operation with Operational Inflexibility*" multiplied by the "*Average Variable Cost of the Thermal Generation Unit during the operation period with Operational Inflexibility*" minus the "*Marginal Cost at generation terminals of the Thermal Generation Unit in interval q during the operation period with Operational Inflexibility*".

583. The Tribunal finds it irrelevant that, on its terms, Section 7.1.4 is meant to compensate thermal plants for operational inflexibility, which has nothing to do with permanent dispatch for the provision of the SFR service.[729] As noted, Section 7.1.4 applies to the compensation of Firm Base Providers dispatched outside the Merit Order by virtue not of its own terms, but rather of the cross-reference to PR-33 contained in Section 11.8 of PR-22, which does not mention that the compensation established therein shall only apply in the exceptional circumstance in which a thermal plant experiences operating inflexibility.[730] In other words, the cross-reference to PR-33 in Section 11.8 of PR-22 has the effect of extending the scope of application of Section 7.1.4 of PR-33, which was originally limited to the operational inflexibility of thermal plants, to the compensation of the Firm Base Provider when it does not qualify in the Merit Order.

584. The applicability of PR-33's Operating Costs Compensation mechanism to the winner of the Tender was acknowledged by OSINERGMIN in its Response Report, addressing questions and comments from generators on the Second Draft PR-22, which stated that:

> to make sure the [forced] unit would not have any losses due to its operations, it is going to be specified that generators providing reserve will be compensated for the fuel costs they may incur in relation to the start/stop of their units, drop in efficiency during charge/discharge ramps, and operation without setting the marginal cost. These are all defined in Technical Procedure "Recognition of Efficient Operating Costs of the Thermoelectric Power Units of COES" [i.e. PR-33].[731]

585. Similarly, the Uribe & Leyva SFR Report stated that:

> It should be noted that the costs for start-stop fuel consumption, efficiency drop in loading and unloading ramps and for operation without establishing the marginal cost, incurred when providing the Reserve are not part of any of these terms. These costs, in accordance with paragraph 11.8 of PR-22, will be

---

[729] See *supra*, ¶¶ 550-551.

[730] For the same reasons, the Tribunal rejects Respondent's argument that it "*would not make sense for PR-22 to set out the compensation mechanisms for the SFR Firm Provider that could include hydro plants in a separate Technical Procedure (PR-33) that on its face is limited to thermal plants*" (Respondent's Post-Hearing Brief, ¶ 30).

[731] Response Report, March 2014 (C-54), Section 2.1.11.

recognized through COES Technical Procedure No. 33 "Compensation of additional operating costs of the Thermal Generation Units".[732]

586.    On this basis, the Tribunal accepts Claimants' position that the Operating Costs Compensation of PR-33 would have applied to Kallpa GSA – as the winner of the Tender – when its units were dispatched outside the Merit Order.

587.    In the second part of its defense on this point, Respondent asserts that, were Operating Costs Compensation also to apply to fixed transportation and distribution contracts (as Claimants posit), this would entail a windfall compensation for costs that Kallpa GSA would have incurred regardless of whether or not it won the Tender.[733]

588.    The Tribunal cannot follow this argument. As noted, Section 11.8 of PR-22 establishes that "*For the Generation Units, as applicable, their fuel costs shall be recognized for* […] *operation without establishing the marginal cost, incurred for compliance with the Reserve, defined in* [PR-33]". The relevant formula in Section 7.1.4 of PR-33 provides for compensation equal to the sum of energy delivered by the unit multiplied by the unit's variable cost (corresponding to Declared Costs for gas fueled plants), minus the marginal cost. Transportation and distributions costs – whether fixed or incremental – constitute variable costs for the unit[734] and therefore fall within the Operating Costs Compensation mechanism of PR-33. Were they not subject to compensation, as Respondent advocates, the effect would be that Kallpa GSA would have had to operate at a loss, which conflicts with the policy of incentivizing the provision of the SFR service underlying the reform.

---

[732] Uribe & Leyva SFR Report, December 12, 2016, (C-142), p. 7. Although this Report was issued after Resolution No. 141 was issued, it is still relevant to shed light on the rationale behind its enactment.

[733] See *supra*, ¶ 552.

[734] See, *inter alia*, PR-31 (C-58), Annex 3, Section 2: "*The information which must be submitted by the Member Generators who use or will use natural gas is the following: 2.1. Single Price of the gas, expressed in United States dollars, per Gigajoule (USD/GJ) corresponding to the lower calorific value. The following components must be itemized: supply, transportation and distribution, as applicable*"; Supreme Decree Nº 016-2000-EM (C-77), Article 5, p. 3: "*In the case of thermal plants that use natural gas as fuel* […] *neither the single price declared by each generator, nor that which results from the application of the readjustment formulas, may be higher than the price that is obtained from the sum of the cost of supply, transportation and distribution of natural gas actually paid in transactions between the generator and its suppliers.*"

589.  It follows that Compass Lexecon's calculation of damages is incorrect, insofar as it is premised on the non-applicability of PR-33 to dispatch outside the Merit Order of the Firm Base Provider.[735]

   *ii.   Kallpa's alleged ability to operate with two gas turbines*

590.  The Tribunal now turns to Respondent's second criticism of BRG's damages calculations, which focuses on Kallpa GSA's alleged ability to meet the committed SFR reserve through Kallpa with two, instead of three, gas turbines and its impact on SIDEC's Dispatch Model from September 2016 to November 2017 (and, at the very least, from September to November 2016, as acknowledged by BRG). This, in Respondent's view, would make SIDEC's Dispatch Model, and thus BRG's damages calculations, unreliable, because the Model assumes that Kallpa could only operate with three gas turbines over that period of time.[736]

591.  Leaving aside for a moment Claimants' admission that Kallpa GSA could have provided the SFR reserve by operating Kallpa with two gas turbines from September to November 2016, the Tribunal finds that Respondent has failed to present sufficient evidence that Kallpa GSA could have done the same after November 2016. That is because Compass Lexecon's calculations are premised on the flawed assumption that Kallpa was able to provide up 220 MW of committed reserve with two gas turbines, whereas – as admitted by Respondent itself – it was authorized by COES to provide only 200 MW of reserve in that configuration. Respondent's argument that COES set that limit at Kallpa GSA's request is patently irrelevant,[737] given that Kallpa GSA was in any event bound to comply with that limit,[738] and that in any case its request was driven by technical considerations (i.e. that the unit "*takes time to reduce its generation due to the accumulation of steam in the boilers*").[739] Compass Lexecon's calculations also overlook two additional limitations affecting Kallpa's ability to provide 220 MW of SFR with two gas turbines identified by Mr. Frisancho[740] (the applicability of which was not contested by Respondent or by its expert): the

---

[735] RER-CLEX II, ¶ 3.52; Tr. Day 7, 1341:2-1343:15.

[736] See *supra*, ¶ 554.

[737] See *supra*, ¶ 554.

[738] COES Report 003-2016, September 2, 2016 (C-140), Section 4.

[739] *Id.*, Section 3.2.

[740] See *supra*, ¶ 531.

regulation band allocated to providing PFR and the effect of ambient temperature. In light of the above, the Tribunal concludes that there is no evidence that Kallpa GSA could have provided the committed SFR reserve through Kallpa with two gas turbines after November 2016.

592.  The Tribunal is unpersuaded that Claimants' admission that Kallpa GSA would have been able to provide the committed SFR reserve through Kallpa with two gas turbines from September to November 2016 would render unreliable SIDEC's Dispatch Model (in terms of spot prices) and, by reflection, Claimants' damages calculations. Indeed, BRG explained, even if it had assumed that Kallpa could have operated with a two-gas turbine configuration over the said three-month period, SIDEC would have projected very similar spot prices in its Model. That is because a reduction in Kallpa's projected energy generation (due to its operating with two gas turbines rather than three) would have led SIDEC to project either a higher energy generation by the unit with the highest variable costs in the Merit Order (with no impact at all on the spot prices) or the entrance in the Merit Order of an additional generator. As BRG notes, that generator would likely have been a thermal plant with very similar variable costs to the last generator in the Merit Order.[741] Neither Respondent nor its expert rebutted this argument,[742] which the Tribunal finds reasonable. As for Respondent's contention that Mr. Torres (SIDEC's Electricity Market Specialist) conceded at the Hearing[743] that a change in BRG'S assumption on Kallpa's configuration would have affected the output of SIDEC's Dispatch Model,[744] the Tribunal notes that Mr. Torres recognized that any potential impact "*shouldn't be significant*"[745] and endorsed BRG's position on this point.[746]

---

[741] See *supra*, ¶ 532.

[742] At the Hearing, Respondent's expert merely said that: "*I think that it would be necessary to do that correction today, whether or not it's material -- to know how material it is*" (Tr. Day 7, 1289:2-7).

[743] Tr. Day 6, p. 1137:12 - 1138:9.

[744] Respondent's Post-Hearing Brief, ¶ 103.

[745] Tr. Day 6, p. 1139:2-3.

[746] Mr. Torres explained that "*It's intuitive because the Peruvian electricity market is basically gas thermal plants with different performances, with very similar variable costs, and the next plant-- If a gas plant does not enter, the next plant that would set the marginal cost and that would fix the price is a diesel, which is currently not supplying because there is oversupply.  Then, it will jump from a marginal cost and a thermal plant X to a thermal plant Y with a very similar variable cost.  So it's intuitive, but logically a simulation would probably back up what I've just explained*" (Tr. Day 6, p. 1139:15-1140:4).

> ### iii. The causal link between Respondent's breach and Claimants' indirect damages

593. Respondent further criticizes BRG's damages calculations on the basis of the asserted lack of causal link between its breach and Claimants' so-called "indirect" damages (i.e. Resolution No. 141's knock-on effects on spot prices), because Claimants would have incurred them regardless of Kallpa GSA's participation in the Tender.

594. The Tribunal fails to see the pertinence of Respondent's argument.[747] As Claimants correctly point out,[748] what is relevant for the purposes of awarding damages is causation between injury and the wrongful conduct.[749] With respect to the present case, that standard of compensation requires the Tribunal to ascertain the existence of a causal link between damages asserted by Claimants and the reversal of the Bid Terms by Resolution No. 141. By contrast, whether or not the damages derive from Kallpa GSA's participation in the Tender is irrelevant for the purposes of awarding damages. It is obvious that, but for Respondent's issuance of Resolution No. 141, the spot prices would have been higher and that, therefore, Claimants would not have suffered the so-called "*indirect*" damages they claim in this arbitration.

> ### iv. The applicable interest and discount rates for the calculation of Historic Losses and Loss in Value

595. As noted above, Claimants' and BRG's calculation of the damages of US\$ 110.7 million for the SFR Service Claim is the result of the application of: (*i*) an interest rate equal to a WACC of 5.56% to bring the cash flows lost prior to the Valuation Date to their value as of such date; and (*ii*) a discount rate also equal to a WACC of 5.56% to bring projected cash flows lost after the Valuation Date back to their value at that date.[750]

---

[747] See *supra*, ¶ 555.

[748] See *supra*, ¶ 533.

[749] See, *inter alia*, Article 31 of International Law Commission, Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries (2001) (CL-13); *Case Concerning the Factory at Chorzów (Germany/Poland)*, PCIJ, Merits, September 13, 1928 (CL-1), p 47: "*The essential principle contained in the actual notion of an illegal act—a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals—is that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed*"; *Biwater v. Tanzania*, ¶ 785; *Joseph C. Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Award, March 28, 2011 (CL-69), ¶ 163.

[750] Reply, ¶ 507.

596.    Respondent agrees that the cash flows allegedly lost by Claimants' business prior and after the Valuation Date must be updated and discounted based on, respectively, an interest and a discount rate. Respondent, however, contests that the applicable rates are equal to a WACC of 5.56%, as contended by Claimants,[751] and maintains that Peru's CoD should be used to carry forward historical lost cash flows to the Valuation Date and that Kallpa GSA' CoE should be used to discount future lost cash flows to the Valuation Date.[752] Respondent further submits that BRG's calculation of the WACC at 5.56% is wrong because it underestimates one of its components, i.e. the CoE.[753]

597.    According to the Tribunal, the rate that reflects the risks associated with the cash flows to be brought forward (i.e. Historic Losses) and back (i.e. Loss in Value), and therefore the risks borne by the company generating them (i.e. Kallpa GSA) and its operations, can reasonably be used both as the interest rate to bring forward Claimants' historic lost cash flows and as the discount rate to bring back future lost cash flows to the Valuation Date. That rate is Kallpa GSA's WACC, which reflects the risk associated with Kallpa GSA's operations in the Peruvian electricity sector and thus with the cash flows in question.[754]

598.    Instead, the interest rate that according to Compass Lexecon should be applied as to Claimants' business' historic cash flows, i.e. Peru's CoD is inappropriate, because it does not capture the risk inherent in those cash flows, as it merely reflects Respondent's risk of default. The same holds true for the CoE, which Compass Lexecon contends should be applied to discount the future cash flows, since it reflects the risks associated with the cash flows of the equity holders, and not those of the underlying business, which are those to be discounted in this case.

599.    As for Respondent's assertion that BRG improperly calculated the CoE, and by consequence the WACC, of which CoE is a component,[755] the Tribunal finds that:

---

[751] See *supra*, Section VII.A.3.

[752] See *supra*, Section VII.B.3.

[753] See *supra*, ¶ 560.

[754] The Tribunal cannot share Compass Lexecon's argument that the opportunity cost to be considered would not be Kallpa GSA's one, since Kallpa GSA is not claimant, but rather one of the equity holders in the company is, i.e. the Claimants  (RER-CLEX II, fn. 246). That is because the cash flows to be brought forward are earned by Kallpa GSA and thus subject to risks inherent to it.

[755] Reply, ¶ 511.

- Compass Lexecon's approach, according to which different risk-free rates must be applied to different cash flows based on the duration of the cash flows at issue, is not persuasive, since BRG's damages calculations are aimed at determining the loss in value of Claimants' Peruvian business (i.e. Kallpa GSA), rather than at evaluating specific streams of revenues or costs for which specific risks should be taken into account.

- BRG's approach that calculates the beta coefficient (which measures a security's exposure to general market risk) based on estimated data for the U.S. Power sector for 2017 adjusted to take into account (*i*) the optimal capital structure in the U.S. power sector, and (*ii*) the applicable tax rate in Peru[756] is preferable to Compass Lexecon's approach that uses a beta and a debt-to-equity ratio that correspond to the power sector in emerging markets.[757] That is because, as acknowledged by Compass Lexecon,[758] data for emerging markets have limitations and the sample of emerging markets used to estimate the beta may be based on countries very different from Peru.

- BRG's use of a historical 5-year average of the Emerging Market Bond Index spread to compute the country risk premium[759] is more appropriate than Compass Lexecon's use of Professor Damodaran's estimate of Peru's country risk premium in 2017.[760] That is because the data used by Compass Lexecon is not specific to Peru. The Tribunal also concurs with BRG that using a five-year average of the Emerging Market Bond Index spread provides a better measure of the overall risk of investing in Peru than a more limited data sample, given that, as acknowledged by both BRG and Compass Lexecon,[761] Peru's country risk premium is volatile.[762]

---

[756] CER-BRG I, Appendix D, Section D.1.3; CER-BRG II, ¶ 163.

[757] RER-CLEX I, ¶ 9.19; RER-CLEX II, ¶ 6.43.

[758] RER-CLEX II, ¶ 6.45.b.i; Table 23.

[759] CER-BRG I, Appendix D, Section D.1.2; CER-BRG II, Appendix B, Section B.3.

[760] RER-CLEX I, ¶ 9.19; RER-CLEX II, ¶ 6.41.

[761] CER-BRG II, ¶ 171; RER-CLEX II, ¶ 6.42.

[762] CER-BRG II, ¶ 178.

600.   It follows from the above that the Tribunal is satisfied that a WACC of 5.56% must be used to bring forward Claimants' historic lost cash flows to the Valuation Date and to bring future lost cash flow back to such date.

                                          ***

601.   In conclusion, the Tribunal is satisfied that BRG's damages calculations are accurate and rejects Respondent's arguments to the contrary. It therefore decides, on the basis of BRG's expert testimony, that the damages suffered by Claimants as a consequence of the issuance of Resolution No. 141 amount to US$ 110.7 million.

### 3.     The applicable pre- and post-award interest rate

602.   Claimants submit[763] – and Respondent does not dispute[764] – that Claimants would be entitled to pre-award interest on their damages if the SFR Service Claim is upheld. However, while BRG applies an interest rate equal to Kallpa GSA's WACC of 5.56%, Compass Lexecon computes pre-award interest according to Peru's CoD.

603.   The Tribunal finds Compass Lexecon's recourse to Peru's CoD to calculate pre-award interest more reasonable than BRG's use of Kallpa's WACC. Indeed, even if there is no consensus in international investment law on the pre-award interest rate applicable to damages, the Tribunal is of the view that the most appropriate rate to calculate pre-award interest is Peru's CoD, because it reflects the risks that Claimants – as investors and creditors of Respondent – bore during the time they have been deprived of the US$ 110.7 million of damages owed to them by Respondent for its Treaty breach. In other words, during that period, between the Valuation Date (when damages crystallized) and the date of the Award, Claimants were exposed only to the risk of not obtaining the damages they are entitled to pursuant to the SFR Service Claim due to Peru's default, a risk reflected in Peru's CoD. By contrast, the use of Kallpa GSA's WACC advocated by Claimants is unconvincing, because it does not reflect the risks faced by Claimants for having to wait to obtain the cash flows of which they were deprived. Notably, the use of the host State's cost of debt as the

---

[763] Memorial, ¶ 294.

[764] Counter-Memorial, ¶¶ 344-345; Rejoinder, ¶ 611.

interest rate applicable to damages is endorsed by international investment case law.[765]

604.    Claimant submits that it is also entitled to post-award, at the same rate as for pre-award interest, without providing any further reasoning.[766] Respondent likewise does not take any position on this point.

605.    The Tribunal notes that the practice of tribunals on this point varies, but considers that in the present case the application of the same interest rate as for pre-award interest is justified for the same reasons discussed above.

606.    In conclusion, the Tribunal finds that Claimants are entitled to pre and post award interest on their damages at a rate equal to Peru's CoD at the date of this Award.

## VIII.   COSTS

### A.  Claimants' cost submission

607.    In their Statement of Costs, Claimants request that the Tribunal order Peru to bear their entire arbitration costs totaling US$ 12,980,045.86,[767] broken down as follows:

(i)    advances paid for fees and expenses of the Tribunal and ICSID's administrative fees for US$ 625,000;[768]

(ii)   fees and expenses of external legal counsel for US$ 9,415,026.50;[769]

(iii)  the compensation and expenses of one of Claimants' fact witnesses who had no affiliation to Claimants, Mr. Jaime Guerra, for US$ 22,974;[770]

---

[765] *PSEG Global Inc and others v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, January 19, 2007 (CL-36), ¶ 345; *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Award, November 27, 2013 (RL-59), ¶ 256.

[766] Reply, ¶ 523.

[767] Claimants' Statement of Costs, ¶¶ 2, 14.

[768] Claimants' Statement of Costs, ¶ 6.

[769] Claimants' Statement of Costs, ¶ 7. Of this amount, US$ 8,892,416.76 relate to fees and expenses of Freshfields Bruckhaus Deringer US LLP, US$ 227,764.59 to fees and expenses of De Trazegnies Thorne Abogados S.A.C. and US$ 294,845.15 to fees and expenses of Philippi, Prietocarrizosa, Ferrero DU & Uria S Civil De R.L.

[770] Claimants' Statement of Costs, ¶ 8.

ICSID Case No. ARB/19/19
Award

(iv) fees and expenses of Claimants' independent experts for US$ 1,031,649.81;[771]

(v) fees and expenses of consultants that provided services to Claimants or otherwise advised them in connection with the dispute for US$ 1,110,413.49;[772]

(vi) costs that the Claimants incurred in securing financing for the arbitration for US$ 703,048.39;[773] and

(vii) travel costs and expenses of Claimants' witnesses and representatives for US$ 71,933.67.[774]

---

[771] Claimants' Statement of Costs, ¶ 9. Of this amount, US$ 991,883.81 relate to fees and expenses of Berkeley Research Group and US$ 39,766.00 to fees and expenses of Mr. Luis Espinoza.

[772] Claimants' Statement of Costs, ¶ 10. Of this amount,

- US$ 503,403.31 relate to fees and expenses of Compass Lexecon, which Claimants initially engaged as their damages expert;

- US$ 91,946.07 relate to fees and expenses of SIDEC, which provided consultancy services and had representatives appear at the Hearing;

- US$41,929.01 relate to fees and expenses of Evoke Legal LLC, which provided consulting services in connection with the presentations and graphics used by Claimants at the Hearing;

- US$30,593.65 relate to fees and expenses of FTI Consulting, Inc., which provided Claimants with technology support at the Hearing;

- US$ 417,201.12 relate to fees and expenses of Chaffetz Lindsey LLP, which provided pre-arbitration legal advice;

- US$ 25,340.33 relate to fees and expenses of Miranda Amado Abogados, which provided pre-arbitration legal advice.

[773] Claimants' Statement of Costs, ¶¶ 11-12. Of this amount,

- US$ 61,099.04 relate to fees and expenses of Allen & Gledhill LLP, which provided legal services in connection with the financing of the arbitration;

- US$ 18,164.25 relate to fees and expenses of Gornitzky & Co., which provided legal services in connection with the financing of the arbitration;

- US$ 2,040 relate to fees and expenses of CT Corporation System, which provided contract agency services in connection with the financing of the arbitration; and

- US$ 621,745.10 for the transaction and advisory costs of Lomo Investments, i.e. Claimants' capital provider.

[774] Claimants' Statement of Costs, ¶ 13.

**B. Respondent's cost submission**

608.    Respondent requests that the Tribunal award it the costs and fees it has incurred in the arbitration,[775] which are quantified in its Statement of Costs at US$ 6,612,390.11,[776] broken down as follows:

(i)    counsel fees and expenses for US$ 5,075,265.11;[777]

(ii)    fees and expenses of experts and supporting services for US$ 937,125;[778]

(iii)    costs paid to ICSID for US$ 600,000.[779]

**C. The Tribunal's decision**

609.    Claimants and Respondent both seek an award of the entirety of their costs in the present arbitration.

610.    Claimants' overall costs amount to US$ 12,980,045.86 while Respondent's overall costs amount to US$ 6,612,390.11.

611.    The costs of the arbitration, including the fees and expenses of the Tribunal and the President's Assistant, ICSID's administrative fees and direct expenses, amount to the following sum (in US dollars):

---

[775] Counter-Memorial, ¶ 347; Rejoinder, ¶ 614; Respondent's Post-Hearing Brief, ¶ 213.

[776] Respondent's Statement of Costs, pp. 1-2.

[777] Respondent's Statement of Costs, pp. 2-4. Of this amount:

-    US$ 4,564,394.70 relate to fees and expenses (including travel and translations) of Sidley Austin LLP, Washington, D.C.;

-    US$ 360,563.75 relate to fees and expenses (including travel) of Stanimir A. Alexandrov PLLC;

-    US$ $150,306.66 relate to fees and expenses (including travel) of Estudio Navarro & Pazos.

[778] Respondent's Statement of Costs, pp. 5-6. Of this amount:

-    US$ 38,350.00 relate to Empresas y Negocios LF Consulting (Dr. Ricardo Leyva);

-    US$ 76,675.00 relate to Tabors Caramanis Rudkevich (Dr. Richard D. Tabors);

-    US$ 46,500.00 relate to Gesin Energia S.A.C. (Mr. César Gutiérrez);

-    US$ 95,600.00 relate to PSR Soluções e Consultoria em Energía Ltda.;

-    US$ 680,000.00 relate to Compass Lexecon / FTI (Dr. Boaz Moselle).

[779] Respondent's Statement of Costs, p. 6.

ICSID Case No. ARB/19/19
Award

| Arbitrators' fees and expenses | |
|---|---|
| Luca G. Radicati Di Brozolo, President | US$ 277,500.00 |
| Mr. David R. Haigh KC, Arbitrator | US$ 79,166.75 |
| Mr. Eduardo Siqueiros T., Arbitrator | US$ 115,275.00 |
| Assistant's fees and expenses | US$ 119,747.56 |
| ICSID's administrative fees | US$ 210,000.00 |
| Direct expenses (estimated) [780] | US$ 113,573.88 |
| **Total** | **US$ 915,263.19** |

612. Article 10.17.7 of the Treaty provides:

> The responsibility among the Parties for the assumption of expenses derived from their participation in the arbitration or conciliation shall be established:
>
> (a) by the arbitration or conciliation institution which the dispute has been submitted to, according to its rules of procedure for arbitration or conciliation proceedings; or
>
> (b) according to the rules of procedure for arbitration or conciliation proceedings agreed by the disputing investor and the disputing Party, where applicable.

613. Rule 28(2) provides:

> Promptly after the closure of the proceeding, each party shall submit to the Tribunal a statement of costs reasonably incurred or borne by it in the proceeding and the Secretary-General shall submit to the Tribunal an account of all amounts paid by each party to the Centre and of all costs incurred by the Centre for the proceeding. The Tribunal may, before the award has been rendered, request the parties and the Secretary-General to provide additional information concerning the cost of the proceeding.

614. According to Rule 47, the award shall contain "*any decision of the Tribunal regarding the cost of the proceeding*".

---

[780] This amount includes expenses related to meetings, stenographic and translation services. It excludes expenses related with courier services of this Award (courier, printing, among others).

615.    Article 61(2) of the ICSID Convention provides:

> In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

616.    This provision gives arbitral tribunals discretion to allocate all costs of the arbitration, including attorney's fees and other expenses, between the Parties as it deems appropriate. In exercising this discretion, ICSID tribunals tend to take into account the outcome of the arbitration,[781] the length and complexity of the proceedings and the parties' procedural conduct.[782]

617.    The Tribunal has considered all the circumstances of the case and observes in particular that: (*i*) both Parties behaved irreproachably throughout the proceedings, including during the Hearing, which was conducted with great efficiency, so that there is no reason to take their conduct into consideration for purposes of apportioning the costs; (*ii*) Claimants prevailed on the SFR Service Claim; and (*iii*) Respondent prevailed on the merits of the New Methodology Claim, but raised two unsuccessful jurisdictional objections.

618.    The Tribunal notes that the amount claimed by Claimants includes "*fees and disbursements [for] pre-arbitration legal advice in connection with matters that were at issue in the arbitration*" for US$ 442,541.45[783] and costs incurred in obtaining financial backing for the advancing of the Claims for US$ 703,048.39,[784] for a total of US$ 1,147,229.84, which in the opinion of the Tribunal cannot be claimed as arbitration costs. If this amount is deducted from the total claimed Claimants, their arbitration costs amount to US$ 11,832,816.02 (i.e. US$ 12,980,045.86 minus US$ 1,147,229.84).

---

[781] See *ADC Affiliate Ltd. and ADC & ADMC Management Ltd. v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, October 2, 2006 (CL-33), ¶ 533.

[782] *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, September 5, 2008 (CL-49), ¶ 318; *Georg Gavrilovic and Gavrilovic d.o.o. v. Republic of Croatia*, ICSID Case No. ARB/12/39, Award, July 26, 2018 (RL-15), ¶ 1317.

[783] Claimants' Statement of Costs, ¶ 10(e)(f).

[784] Claimants' Statement of Costs, ¶ 12.

619.  Accordingly, pursuant to the costs-follow-the-event principle, Claimants are entitled to recover their costs related to jurisdiction and to the SFR Service Claim. Claimants have not quantified the amounts attributable to jurisdiction and their Claims.

620.  The Tribunal is of the view that the portion of Claimants' costs attributable to jurisdiction should amount to **US$ 700,000**. As to the remaining amount (i.e. US$ 11,132,816.02, equal to US$ 11,832,816.02 minus US$ 700,000), the Tribunal considers that the portion attributable to the SFR Service Claim should be equal to the percentage of the value of the SFR Service Claim (US$ 110.7 million) with respect to the total value of the Claims (US$ 195.3 million), i.e. 57%, which is equal to **US$ 6,345,705.12** (i.e. 11,132,816.02 times 57%). Accordingly, Claimants' costs in respect to jurisdiction and the SFR Service Claim amount to **US$ 7,045,705.12** (i.e. US$ 700,000 plus US$ 6,345,705.12).

621.  The Tribunal is conscious of the considerable disparity between the overall costs claimed by Claimants (US$ 11,832,816.02) and the amount claimed by Respondent (US$ 6,612,390.11). While it does not consider Claimants' costs unreasonable in light of the amounts at stake and the complexity of the issues debated in the arbitration, it is of the opinion that the case was far from straightforward and that Peru's defenses were serious. In light of this, the Tribunal finds that Claimants should only be entitled to recover 70% of the amount of their costs attributable to jurisdiction and the SFR Service Claim, i.e. **US$ 4,931,993.58**.

622.  In light of the foregoing, in the exercise of the discretion granted to it by Article 61(2) of the ICSID Convention, the Tribunal orders that Respondent bear its own costs and pay **US$ 4,931,993.58** to Claimants in respect of their costs and expenses.

623.  As for the costs of the Tribunal and of ICSID set forth in ¶ 611 above, i.e. **US$ 915,263.19**, the Tribunal orders that Respondent shall bear 70% thereof, i.e. US$ 640,684.23 and accordingly shall pay to Claimants **US$ 640,684.23.**

## IX. DECISIONS

624. For the reasons set out above, the Tribunal:

(i) **Declares** that the Tribunal has jurisdiction over the SFR Service Claim and the New Methodology Claim;

(ii) **Declares** that Respondent breached Article 10.5 of the Treaty by issuing Resolution No. 141;

(iii) **Declares** that Respondent has not breached Article 10.5 of the Treaty by issuing Resolution No. 164;

(iv) **Orders** that Respondent pay Claimants **US$ 110.7 million** as compensation for the damages caused by the issuance of Resolution No. 141 in breach of the Treaty, plus pre-award interest at a rate equal to Peru's CoD from the Valuation Date to the date of this Award;

(v) **Orders** that Respondent pay Claimants post-award interest at a rate equal to Peru's CoD at the date of this Award from the date of the Award to the date of payment;

(vi) **Decides** that Peru shall bear its own arbitration costs and pay to Claimants **US$ 4,931,993.58** in respect of Claimants' arbitration costs and **US$ 640,684.23** in respect of the costs of the Tribunal and of ICSID;

(vii) **Rejects** all the Parties' other claims and defenses.

ICSID CASE No. ARB/19/19
Award

Mr. David R. Haigh
Arbitrator

Mr. Eduardo Siqueiros T.
Arbitrator

Date:   October 2, 2023

Date:   October 2, 2023

Professor Luca G. Radicati di Brozolo
President of the Tribunal

Date:   October 2, 2023

187